UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

ARCH ALUMINUM
& GLASS CO, INC., et al.[1].

Case No. 09-36232-BKC-JKO

Chapter 11
(Jointly Administered)

_____

**AFFIDAVIT OF VICTOR G. CARUSO IN SUPPORT OF DEBTORS'
EMERGENCY APPLICATION (I) PURSUANT TO 11 U.S.C. §§ 327
AND 328 AND FED.R.BANKR.P. 2014 AND 2016 FOR AN ORDER AUTHORIZING
THE RETENTION AND EMPLOYMENT OF PIPER JAFFRAY & CO. AS
INVESTMENT BANKERS FOR THE DEBTORS *NUNC PRO TUNC*
TO THE PETITION DATE, (II) APPROVING PROPOSED FEE STRUCTURE
AND (III) REQUEST FOR INTERIM RELIEF**

STATE OF NEW YORK           )
                            ) ss:
COUNTY OF NEW YORK          )

Pursuant to Fed.R.Bankr.P. 2014(a), Victor G. Caruso, being duly sworn, deposes and says:

1. I am a Managing Director of Piper Jaffray & Co. ("PJC"), a financial advisory and investment banking firm, and I make this affidavit on behalf of PJC (the "Affidavit"). I submit this Affidavit in support of the emergency application (the "Application") of the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (the "Chapter 11 Cases") for an order authorizing the employment and retention of PJC as investment banker to the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

---

[1]  The proposed jointly administered debtors are: Arch Aluminum & Glass Co., Inc; AAG Holdings, Inc.; Arch Aluminum, L.C.; Arch Aluminum and Glass International, Inc.; and AWP, LLC.

**PJC's Qualifications**

2.PJC and its professionals are recognized for their expertise in providing financial advisory services in financially distressed situations, including advising debtors, creditors and other constituents in chapter 11 proceedings and serving as investment bankers in numerous cases. I have previously worked on Chapter 11 restructurings, advising both debtors and creditors in various cases and have experience working on companies in distressed situations.

3.Since August 2009, PJC has rendered investment banking services to the Debtors in connection with their restructuring efforts. PJC has become thoroughly familiar with the Debtors' operations and is well qualified to represent the Debtors as financial advisors in connection with such matters in a cost-effective and efficient manner.

**Disinterestedness Of Professionals**

4.Based on the results of the conflict search conducted to date and described more fully below, to the best of my knowledge, neither I, PJC, nor any member or employee thereof, insofar as I have been able to ascertain, has any connection with the Debtors, their creditors, other parties-in-interest (as reasonably known to us), their respective attorneys, or the U.S. Trustee or any person employed in the Office of the U.S. Trustee, except as disclosed or otherwise described herein.

5.To the best of my knowledge, PJC is a "disinterested person" as that term is defined in Section 101(14) of title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>"), as modified by Section 1107(b) of the Bankruptcy Code, in that, its members and employees:

>(a)are not creditors, equity security holders or insiders of the Debtors;
>
>(b)are not and have not been, within two years before the date of the filing of the Debtors' Chapter 11 petitions, a director, officer, or employee of the Debtors; and

(c)    do not have an interest materially adverse to the interest of the Debtors' estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

6.    In order to formulate a strategy to effectively deal with its financial situation, the Debtors sought the assistance of a financial advisory firm.  On or about August 18, 2009, the Debtors retained PJC to assist them in connection with a potential financing or restructuring transaction.  In connection with their engagement, the Debtors and PJC executed a letter agreement dated August 18, 2009 (the "August PJC Agreement").  The services provided by PJC pursuant to the August PJC Agreement are substantially the same as the services that are to be provided by PJC under the PJC Agreement (as defined below) including, but not limited to, (i) assistance in planning and implementing a transaction, (ii) assistance in the preparation of offering materials needed to consummate a transaction, (iii) conducting a marketing process, and (iv) assistance with the structuring, negotiation and documentation of a transaction.

7.    The Debtors have paid PJC a total of $200,000 for services provided pursuant to the August PJC Agreement, which fees represented $50,000 per month for each of August, September, October and November of 2009.  In addition the Debtors paid PJC an amount equal to $24,312.14 in expenses.  All such payments were made during the year preceding the Petition Date for investment banking services substantially similar to those types of services proposed in the Application and by the PJC Agreement.  The Debtors have fully paid PJC for all services provided pre-petition to the Debtors and therefore PJC was not a creditor of the Debtors as of the filing of these Chapter 11 cases.

8.    As part of its diverse practice, PJC appears in numerous cases, proceedings and transactions involving many different professionals, including attorneys, accountants, investment bankers and financial consultants, some of which may represent claimants and parties-in-interest in these Chapter 11 cases.  Further, PJC has in the past, and may in the future, be represented by several attorneys and law firms in the legal community, some of whom may be involved in these

proceedings. In addition, PJC has in the past and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to these cases. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors herein in matters upon which PJC is to be employed, and none are in connection with these cases.

9. PJC has a large and diverse financial advisory practice. Accordingly, PJC and certain of its members and employees may have in the past represented, may currently represent, and likely in the future will represent, in matters wholly unrelated to the Debtors' cases, entities that are creditors or parties-in-interest in these proceedings. PJC has not represented, does not represent and will not represent any such entity's separate interest in the Chapter 11 Cases nor have any relationship with any such entity adverse to the Debtors as to the matter as on which PJC is to be employed. PJC does not represent any entity in connection with the Chapter 11 Cases nor does it believe that any relationship it may have with any of party-in-interest will interfere with or impair PJC's representation of the Debtors in the Chapter 11 Cases.

10. In a matter wholly unrelated to the Debtors and these cases, PJC has a contractual relationship with Grey Mountain Partners. Grey Mountain Partners is a potential bidder for the assets of the Debtors. In June 2008, PJC was engaged by a company owned by Grey Mountain Partners to act as its financial advisor in connection with a potential sale of its stock and/or assets. The sale process was curtailed in December 2008 and did not result in a transaction. PJC did not receive any fees in connection with this engagement.

11. In 2007, in a matter wholly unrelated to the Debtors and these cases, PJC acted as exclusive financial advisor to Sanitors, Inc., a portfolio company of Cravey, Green & Wahlen. Cravey, Green & Wahlen (CGW Southeast Partners), or its affiliates, is the current majority equity holder of one or more of the Debtors. This transaction included the sale of Sanitors, Inc. to Denmark-based ISS A/S. PJC is confident that this previous advisory assignment will not

interfere with or impair its representation of the Debtors in these proceedings. In connection with these services, PJC received fees totaling approximately $1.85 million and was reimbursed for its expenses.

12. In addition, PJC acted as financial advisor in connection with the recapitalization of the Debtors which was completed in October 2004. This transaction included the sale of the then existing majority equity owner's (Long Point Capital) approximate 60% stake in the Debtors to one of the Debtor's current equity holders, CGW Southeast Partners. PJC is confident that this previous representation will not affect its representation of the Debtors in these proceedings. In connection with these services, PJC received fees totaling approximately $1.15 million and was reimbursed for its expenses.

13. The entities disclosed herein have been located by PJC using its reasonable efforts. It is PJC's intent to update and expand its ongoing conflict search for additional parties in interest in an expeditious manner and update this information as necessary. PJC believes that the disclosed representation of such parties-in-interest in unrelated matters will not interfere with or impair its representation of the Debtors in these proceedings.

14. To the best of my knowledge, PJC has not been retained to assist any entity or person other than the Debtors on matters relating to, or in connection with, the Chapter 11 Cases. If this Court approves the proposed employment of PJC by the Debtors, PJC will not accept any engagement or perform any services for any entity or person other than the Debtors in this situation. PJC will, however, continue to provide professional services to entities or persons that may be creditors of the Debtors or parties-in-interest in the Chapter 11 Cases; *provided*, *however*, that such services do not relate to, or have any direct connection with, the Chapter 11 Cases.

15. PJC will periodically review its files during the pendency of the Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new

relevant facts or relationships are discovered or arise, PJC will use reasonable efforts to identify such further developments and will promptly file a Supplemental Affidavit as Bankruptcy Rule 2014(a) requires.

### Professional Services Compensation

16.     The Debtors and PJC have executed an agreement dated November 25, 2009 (the "PJC Agreement"), a true and correct copy of which is attached to the Application. The PJC Agreement defines certain terms and therefore all capitalized terms used herein and not otherwise specifically defined shall have the meanings ascribed to them in the PJC Agreement.

17.     Each of the following are among the services that have been or are to be provided by PJC to the Debtors during the Chapter 11 Cases (the "Investment Banking Services"):

(i)     assist the Debtors in planning and implementing a Transaction[2];

(ii)    assist the Debtors in preparing any offering materials (the "Offering Materials") that are beneficial or necessary to the consummation of a Transaction;

(iii)   assist the Debtors with the development, structuring, negotiation and implementation of the Transaction, including, among other things, assisting the Company with due diligence investigations and participating as a representative for the Company in negotiations with creditors and potential financing sources and other parties involved in the Transaction;

(iv)    provide the Debtors' Board of Directors and senior management with regular updates regarding the marketing process and discussions with investors, purchasers and creditors;

(v)     provide testimony, as necessary, with respect to the matters on which PJC has been retained to advise the Company;

(vi)    assist the Debtors in structuring any Transaction; and

(vii)   assist the Debtors in negotiating definitive documentation.

18.     PJC is willing to act on behalf of the Debtors as set forth herein and in the PJC Agreement.

---

[2] The term "Transaction" is defined by the PJC Agreement as a (i) restructuring, modification, reduction, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code), refinancing and/or recapitalization of the Debtors with respect to any of its existing and potential debt obligations; or (ii) a sale of all or substantially all of the stock or assets of the Company (a "Sale") by any method, including pursuant to Section 363 of the Bankruptcy Code.

19. The Investment Banking Services set forth in the PJC Agreement and summarized above do not encompass other services or transactions that may be undertaken by PJC at the request of the Debtors. The terms and conditions of any such additional services, including compensation arrangements, would be set forth in a separate written agreement between the Debtors and PJC and would be subject to any necessary Court approval.

20. PJC will maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services, including receipts for any individual expenditure in excess of $25, and shall seek reimbursement for all reasonable and documented out-of-pocket expenses incurred in connection with this engagement.

21. The Investment Banking Services that PJC will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully. The Debtors believe that the Investment Banking Services will not duplicate the services that, subject to this Court entering or having entered appropriate orders, other financial advisors, if any, would provide to the Debtors in these cases. PJC will carry out unique functions and will use reasonable efforts to coordinate with the Debtors' other retained professionals to avoid the unnecessary duplication of services.

22. On November 17, 2009 and November 25, 2009, PJC received the sums of $225,000 and $75,000 respectively, which sums are to be used as a retainer for post-petition services (the "Retainer") in connection with the PJC Agreement. PJC will apply the Retainer to pay any fees, charges and disbursements which remain unpaid as of the Petition Date and will retain the remainder of the Retainer to be applied to any fees, charges and disbursements incurred during these reorganization cases, which post-petition fees and expenses will be subject to review by and approval of this Court.

23. PJC has agreed to represent the Debtors for compensation at the amounts agreed upon between the parties pursuant to the PJC Agreement. As more fully described in the PJC

Agreement, in consideration of the Financial Advisory Services provided by PJC, the Debtors have agreed to pay PJC as follows:

> (a) A monthly advisory fee (the "<u>Monthly Fee</u>") in the amount of $75,000 per month.
>
> (b) If, during the term of this engagement or during the one-year period following termination of this engagement, a Transaction is consummated, PJC shall be paid in cash a fee of $1.05 million (the "<u>Transaction Fee</u>"); provided that any Retainer received by PJC and not credited against other fees due hereunder will be credited towards the Transaction Fee due to PJC. In addition, 100% of the Monthly Fees paid to Piper Jaffray shall be credited against the Transaction Fee.

24. PJC will seek compensation and reimbursement of expenses, as specified in the PJC Agreement, with the payment of such fees and expenses to be approved in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any orders of this Court; provided, however, that the approval of PJC's fees and expenses in these Chapter 11 Cases will be subject to the standards contained in Section 328(a) of the Bankruptcy Code.

25. Based on its experience and independent analysis, PJC believes that the fees are fair and reasonable. PJC believes that the fees appropriately reflect (i) the nature and scope of the services to be provided by PJC, (ii) PJC's substantial experience with respect to Investment Banking Services, and (iii) the fee structures typically utilized by PJC and other leading financial advisors which do not bill their clients on an hourly basis.

      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November _, 2009         _____
                                                      Victor G. Caruso
                                                      Managing Director of Piper Jaffray & Co.

Subscribed and Sworn to before me
this _____ day of _____, 2009

_____
Notary Public

My commission expires: _____