UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

ARCH ALUMINUM
& GLASS CO., INC., et al.[1].

_____/

Case No. 09-36232-BKC-JKO

Chapter 11
(Jointly Administered)

**DECLARATION OF VINCENT J. COLISTRA, CHIEF RESTRUCTURING OFFICER,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

STATE OF FLORIDA            )
                            ) ss:
COUNTY OF BROWARD           )

I, Vincent J. Colistra, being duly sworn, deposes and says:

1.      I am the Chief Restructuring Officer of AAG Holdings, Inc. ("**AAG**"), Arch

Aluminum & Glass Co., Inc. ("**Arch**"), Arch Aluminum L.C. ("**Arch I**"), AWP, LLC ("**AWP**") and

Arch Aluminum and Glass International, Inc ("**Arch International**") (collectively, the "**Debtors**" or

the "**Company**").  AAG owns 100% of the stock in Arch which in turn is the sole member of Arch I

and AWP.  AAG is also the sole shareholder of Arch International.

2.      I was engaged as CRO pursuant to a letter agreement dated August 26, 2009, as

amended by a letter agreement dated November 9, 2009 (collectively, "Agreement"), between

PMCM, LLC, an affiliate of Phoenix Management Services, Inc. (collectively "PMCM") and the

Company for the engagement of PMCM to assist in its restructuring as described therein.  Generally,

the engagement of PMCM, including any PMCM employees who serve in Executive Officer

_____

1      The proposed jointly administered debtors are: Arch Aluminum & Glass Co., Inc; AAG Holdings, Inc.; Arch
Aluminum, L.C.; Arch Aluminum and Glass International, Inc.; and AWP, LLC.

positions, is subject to the direction of the Board of Directors of the Company (the "Board of Directors"). I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

3.      On November 25, 2009, the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors each continue in the possession of their properties and the management of the business as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. In order to enable the Debtors to operate effectively and avoid the adverse effects of the Chapter 11 filings, the Debtors have filed various types of relief in "first-day" applications and motions filed with the Court.

4.      I submit this affidavit in support of the Debtors' Chapter 11 petitions and first-day applications in the above-captioned Chapter 11 cases. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first-day application or motion. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this affidavit.

5.      Part I of this affidavit describes the Debtors' businesses and capital structure. Part II describes the circumstances surrounding the filing of the Chapter 11 petitions. Part III sets forth the relevant facts in support of the Debtors' various first-day applications and motions filed concurrently herewith.

## I. <u>BACKGROUND</u>

**A.      <u>Background and Current Business Operations</u>**

6.      The Company is widely regarded as one of the leading fabricators and distributors of architectural glass in North America.  The Company's worldwide headquarters are in Tamarac, Florida.

7.      The details of the Company's corporate organizational structure are disclosed on the corporate organizational chart attached hereto as **Exhibit "A"**.

8.      The Company was founded in 1978 by Robert Silverstein, as a small South Florida glass and metal distributor with a single truck.  During the 1980's the Company opened fabrication facilities and additional distribution facilities in Florida and the Northeast.  Through the 1990's, the Company underwent a period of rapid growth, expanding from two fabrication facilities and three distribution facilities to ten fabrication facilities and three distribution facilities generating over $121.0 million in revenue.

9.      The Company now provides a comprehensive line of products and services to more than 5,000 customers from 28 office, manufacturing and distribution facilities located in 19 states nationwide.  Working directly with its customers, the Company purchases annealed (or "float") glass from a number of leading float glass manufacturers and then insulates, tempers, mirrors or laminates the glass to the customized requirements of each end user.  Additionally, the Company supplies its customers with a focused line of aluminum products, such as storefront/entrance frames, that can be fabricated in house to the customer's exact specifications, providing a complement to the Company's glass offerings.  The Company's ability to offer a comprehensive line of high-quality architectural glass from numerous float glass manufacturers, coupled with its unique ability to custom fabricate architectural and aluminum products, has allowed the Company to serve as the "True Single Source" supplier to the non-residential construction, retail glass and residential construction industries.

10.     In 1999, Long Point Capital became a financial partner in the Company.  Thereafter, the Company made significant investments in acquisitions and start-ups, more than doubling the number of fabrication facilities and in the process creating a nationwide platform in the architectural glass fabrication and distribution industry.

11.     In 2004, the Company recapitalized its equity sponsorship by obtaining an investment from CGW Southeast Partners IV, L.P ("**CGW**") (the "**Recapitalization**").  The Recapitalization was accomplished through execution of (i) a Redemption Agreement, (ii) the Amended and Restated Articles of Incorporation of AAG, (iii) the Shareholders Agreement dated September 30, 2004, (iv) the Management Agreement, and (v) other agreements by or among the holders of any equity securities of AAG.  As a result of the Recapitalization, CGW became the owner of approximately 50% of the outstanding shares of AAG.[2]   Nearly all of the remaining equity interests in AAG are owned by members of the Silverstein family.

12.     Following the Recapitalization, the Company continued its expansion and development into new markets.  Ultimately, in 2008, the Company generated revenue of $361,245,000.00 with an EBITDA of over $21,017,000.00.

**B.     Capital Structure – The Senior Credit Facility**

13.     On April 2, 2007, AAG, as borrower, and (i) Arch Aluminum & Glass Co., Inc.; (ii) Arch Aluminum, L.C.; (iii) AWP, LLC; (iv) Trident Consolidated Industries, Inc.[3]; and (v) Arch Aluminum and Glass International Inc., as borrowing subsidiaries, entered into that Amended and Restated Loan and Security Agreement dated April 2, 2007, as amended by the First Amendment to Amended and Restated Loan and Security Agreement, dated December 31, 2007, and the Second

_____

2       As set forth in the attached Exhibit A, AAG is the direct or indirect parent of each of the other Debtors.
3       Trident Consolidated Industries, Inc. was merged into Arch Aluminum & Glass Co., Inc. on May 31, 2007.

Amendment to Amended and Restated Loan and Security Agreement, Waiver and Consent, dated July 21, 2008, as amended from time to time (collectively, the "**Senior Secured Credit Facility**") with PNC Bank, N.A. as agent and lender (the "**Administrative Agent**" or "**PNC**") and the following lenders (together with the Administrative Agent, the "**Senior Lenders**"): Comerica Bank, RBS Business Capital (a division of RBS Asset Finance, Inc.), Wachovia Bank, N.A., Bank of America, N.A., Fifth Third Bank, and Sovereign Bank.

14.     The Senior Secured Credit Facility provided the Company with a credit facility composed of (i) $75,000,000 Senior Secured Revolving Credit Facility (the "**Revolving Advances**"), (ii) $50,000,000 Senior Secured Term Loan (the "**Tranche A Term Loan**"), (iii) $10,000,000 Senior Secured Capex Facility (the "**Capex Loans**"), and (iv) $13,600,000 Senior Secured Term Loan (the "**Delayed Draw Term Loan**"), for a total credit availability of $148,600,000.

15.     The Senior Credit Facility provides that the indebtedness thereunder is secured by, among other things, substantially all of the Debtors' assets, including all receivables, equipment, general intangibles, inventory, investment property, real property, subsidiary stock, constituting substantially all of the Debtors' real and personal property.

16.     In connection with the Senior Secured Credit Facility, the Debtors issued Delayed Draw Term Notes and Capex Notes to each of the Senior Lenders.

17.     Also in connection with the Senior Secured Credit Facility, the Debtors entered into a Swap Transaction with Wachovia Bank, effective as of April 26, 2007, and a CAD Amortizing Interest Rate Swap with Citizens Bank of Massachusetts, effective June 29, 2007, as amended (collectively, the "**Interest Rate Swap Agreements**").  As of December 31, 2008, the Debtors' valued the Interest Rate Swap Agreements as a $5,300,000.00 liability on its balance sheet.

18.     As of November 20, 2009, the aggregate outstanding amount (exclusive of accrued interest) (i) of the Revolving Advances was not less than $28,850,545, (ii) of the Letters of Credit was not less than $11,075,095, (iii) of the Tranche A Term Loans was not less than $40,000,000, (iv) of the Capex Loans was not less than $7,200,704 and (v) of the Delayed Draw Term Loans was not less than $13,333,333, for a total outstanding principal indebtedness of approximately $100,459,677 (the "**Senior Debt**").

C.      **Capital Structure – The Subordinated Debt**

19.     In order to finance a portion of the redemption price in connection with the Recapitalization, on September 20, 3004, AAG and Arch entered into a Note Purchase Agreement with Churchill Capital Partners IV, L.P. ("**Churchill IV**"), whereby the Company sold certain Senior Subordinated Notes to Churchill IV in the principal amount of $13,000,000 (the "**Subordinated Debt**").  The Note Purchase Agreement was amended by the First Amendment to Note Purchase Agreement dated January 11, 2006; the Second Amendment to Note Purchase Agreement dated October 31, 2007; the Third Amendment to Note Purchase Agreement and Waiver dated April 2, 2007; the Fourth Amendment to Note Purchase Agreement dated December 31, 2007; and the Fifth Amendment to Note Purchase Agreement, Waiver and Consent dated July 31, 2008.

20.     As contemplated by the Note Purchase Agreement, AAG and Arch executed and delivered to Churchill IV the Senior Subordinated Note Due September 30, 2010 in the principal amount of $13,000,000 (the "**Senior Subordinated Note**").

21.     Concurrently, PNC and Churchill IV entered into that Intercreditor and Subordination Agreement dated September 30, 2004, whereby (i) the payment of the principal of and interest on, and any fees or other charges in respect of the Subordinated Debt and (ii) any other payment on account of the acquisition, prepayment or redemption of the Subordinated Debt by the Debtors was

subordinated to the prior payment in full of all the Senior Debt (the "**Intercreditor Agreement**").
Subsequently, in January 2006, the Intercreditor Agreement was amended by that First Amendment
to Intercreditor and Subordination Agreement, which was executed in connection with the Debtors'
entry into the Second Amendment to Loan and Security Agreement and the First Amendment to
Note Purchase Agreement of even date.

22.     On or about February 23, 2007, Churchill IV assigned and transferred unto Churchill
Financial Cayman Ltd. ("**Churchill Financial**") all of its right, title and interest in and to the Senior
Subordinated Note, plus all accrued but unpaid interest.  Churchill Financial also executed a Joinder
to Intercreditor and Subordination Agreement on or about February 23, 2007.

23.     On or about April 2, 2007, AAG and Arch executed and delivered to Churchill
Financial, in substitution and exchange for the Senior Subordinated Note, the First Amended and
Restated Senior Subordinated Note Due April 2, 2013, in the principal amount of $13,000,000 (the
"**First Amended and Restated Senior Subordinated Note**").  Subsequently, on or about July 31,
2008, AAG and Arch executed and delivered to Churchill Financial, in substitution and exchange for
the First Amended and Restated Senior Subordinated Note, the Second Amended and Restated
Senior Subordinated Note Due April 2, 2013, in the principal amount of $13,000,000 (the "**Second
Amended and Restated Senior Subordinated Note**", and together with the Senior Subordinated
Note and the Intercreditor Agreement, the "**Subordinated Loan Documents**").

E.     **Intercompany Loan Transactions**

24.     On or about April 2, 2007, 1310545 Alberta ULC ("**Arch Canada**") executed and
delivered to Arch International a Secured Term Promissory Note for the principal amount of
C$10,000,000.00.  Concurrently, Arch Canada executed a General Security Agreement to Arch
International.  Further, Arch International subsequently executed a Collateral Assignment of

Intercompany Note and Security Documents in favor of PNC (collectively, the "**Intercompany Loan**").

25.     As a result of the Intercompany Loan, Arch Canada became obligated to repay C$10,000,000 to Arch International, and granted Arch International a security interest in substantially all of Arch Canada's assets.  Arch International, in turn, pledged its security interest in Arch Canada's assets to PNC.

## II.     EVENTS LEADING TO CHAPTER 11 FILING

26.     As a result of the downturn in the commercial and residential construction sectors leading up to and following the collapse of the credit markets in fall 2008, the Debtors experienced significantly shortfalls in their cash-flow which compromised their ability to meet all payment and borrowing base obligations under the Senior Secured Credit Facility.

27.     In May 2009, the Debtors advised Churchill Financial that it would fail to make the scheduled payment of interest as required by the Subordinated Loan Documents in the amount of $190,305.56 due and payable on May 29, 2009 and the scheduled payment of interest on the Second Amended and Restated Senior Subordinated Note due and payable on June 30, 2009 in the amount of $184,166.67.  A further event of default occurred under the Subordinated Loan Documents as a result of the Debtors' failure to maintain the required leverage ratio for the fiscal quarter ending March 31, 2009 (the "**Subordinated Events of Default**").

28.     As a result of the Subordinated Events of Default, the Debtors and Churchill Financial entered into a Forbearance Agreement dated May 29, 2009 (the "Churchill Deferral Agreement"), pursuant to which Churchill Financial agreed to defer the April Deferred Interest Payment, the May Payment and the June Payment (as such terms are defined in the Churchill Deferral Agreement).

29.    Moreover, certain events of default under the Senior Secured Credit Facility have occurred and are continuing under (a) Section 10.1 of the Senior Secured Credit Facility arising from the Borrowers' failure to comply with the provisions of Sections 2.4(a), (b) and (c) of the Senior Secured Credit Facility regarding amortization of principal of the Term Loans, Capex Loans and Delayed Draw Term Loans, respectively on June 30, 2009, (b) Section 10.5(a) of the Senior Secured Credit Facility arising from the Borrowers' failure to comply with (i) the financial covenants set forth in Section 6.5(a) of the Senior Secured Credit Facility (Fixed Charge Coverage Ratio) and Section 6.5(b) of the Senior Secured Credit Facility (Leverage Ratio) for the fiscal quarters ending March 31, 2009 and June 30, 2009 and (ii) the covenant set forth in Section 9.7 of the Senior Secured Credit Facility regarding delivery of audited annual financial statements for the fiscal year ending December 31, 2008, (c) Section 10.9 of the Senior Secured Credit Facility arising from the occurrence of a default or event of default under the Intercompany Loan Documents and (d) Section 10.12 of the Credit Agreement arising from the occurrence of one or more events of default under the Subordinated Loan Documentation (collectively, the "**Senior Existing Events of Default**").

30.    Additionally, at the time, the Debtors anticipated that certain events of default would occur on September 30, 2009 under (i) Section 10.5(a) of the Senior Secured Credit Facility arising from the Borrowers' failure to comply with the financial covenants set forth in Section 6.5(a) of the Senior Secured Credit Facility (Fixed Charge Coverage Ratio) and Section 6.5(b) of the Senior Secured Credit Facility (Leverage Ratio) for the fiscal quarter ending September 30, 2009 and (ii) Section 10.1 of the Senior Secured Credit Facility arising from the Borrowers' failure to comply with the provisions of Sections 2.4(a), (b) and (c) of the Senior Secured Credit Facility regarding amortization payments of principal of the Term Loans, Capex Loans and Delayed Draw Term Loans due on September 30, 2009, respectively (collectively, the "**Senior Anticipated Events of Default**",

and together with the Senior Existing Events of Default and the Subordinated Events of Default, the "**Events of Default**").

31.     In an effort to deter the Senior Lenders from taking precipitous actions with respect to their collateral as a result of the Events of Default, the Debtors and the Senior Lenders entered into a Forbearance Agreement dated June 30, 2009 (the "**Senior Forbearance Agreement**").  The Senior Forbearance Agreement required, among other things, that the Debtors (i) deliver to the Secured Lenders a restructuring term sheet on or before July 31, 2009; (ii) cooperate with a consultant engaged by the Secured Lenders to review the cash flow projections and financial models to be delivered to the Secured Lenders by the Debtors and to provide other services as may be required by the Secured Lenders; and (iii) enter into a second forbearance agreement with Churchill Financial. The Senior Forbearance Agreement was to expire, by its own terms, on August 15, 2009.

32.     In compliance with the Senior Forbearance Agreement, the Debtors entered into a Forbearance Agreement with Churchill Financial dated June 30, 2009 (the "**Second Churchill Forbearance**").  The Debtors further complied with the Senior Forbearance Agreement by executing a Payment and Indemnification Agreement with Carl Marks Advisory Group LLC ("**CMAG**"), the Senior Lenders' chosen consultant. Finally, the Debtors complied with the Senior Forbearance Agreement by providing the Senior Lenders a restructuring term sheet on July 31, 2009.

33.     In addition to the above-specified forbearance agreements, the Debtors undertook significant cost-cutting initiatives in an effort to improve its cash-position and maximize its ability to satisfy the requirements of the forbearance agreements and cure the Events of Default.  These initiatives include, without limitation, (i) termination or wage reduction for a number of the Debtors' employees, (ii) renegotiation of certain real property and vehicle leases, and (iii) reductions in corporate SG&A expenses.

34.     Because the Senior Forbearance Agreement expired by its own terms on August 15, 2009, the Debtors entered into a further forbearance agreement with the Senior Lenders (the "**Second Senior Forbearance Agreement**") on August 17, 2009.  The Second Senior Forbearance Agreement required, among other things, that the Debtors retain the services of an independent Chief Restructuring Officer to direct the Company in improving the operations and financial performance of the Company.  The Second Senior Forbearance Agreement was to expire, by its own terms, on October 23, 2009.

35.     In compliance with the Second Senior Forbearance Agreement, the Debtors retained my services as CRO.  Over the next two months, I, with the assistance of my staff, engaged in an extensive review of the Company's business and finances.  Simultaneously, the Debtors engaged the services of Piper Jaffray & Co. ("**PJC**") as investment bankers to pursue a potential deleveraging transaction.  Ultimately, in early October 2009, I recommended to the Senior Lenders that a further forbearance agreement be entered into that would allow the Company to continue operating while PJC endeavored to locate an investor that could provide a permanent solution to the Company's financial distress.

36.     On October 23, 2009, the Debtors and the Senior Lenders entered into a further forbearance agreement (the "Third Senior Forbearance Agreement"), which made certain modifications to the available borrowing base under the Senior Loans, thereby allowing the Debtors to continue operations.  The Third Senior Forbearance Agreement was set to expire by its own terms on November 5, 2009.  Accordingly, the Debtors and the Senior Lenders continued negotiations throughout early November.  During this time, PJC received numerous non-binding expressions of interest from potential purchasers/investors.  As a result, the Debtors and the Senior Lenders entered into a Fourth Senior Forbearance Agreement on November 6, 2009 (the "Fourth Senior Forbearance

Agreement"), which was set to expire by its own terms on November 20, 2009.

37. The Fourth Senior Forbearance Agreement required, among other things, that the Company, on or before November 16, 2009, deliver to the Senior Lenders no less than three (3) firm offers to purchase substantially all of the Debtors' assets.

38. On November 16, 2009, the Company delivered three firm offers to the Senior Lenders and had discussions with the Senior Lenders regarding the need for additional time to clarify and quantify the submitted offers on an "apples-to-apples" basis.

39. Based on the need for this additional time to analyze the offers, on November 20, 2009, the Seniors Lenders agreed to enter into a Fifth Senior Forbearance Agreement with the Debtors for a two-week period expiring December 4, 2009. The additional time given to the Debtors under the Fifth Senior Forbearance Agreement enabled the Company to: (i) negotiate the best offer for the sale of the Debtors' assets; (ii) further negotiations of an asset purchase agreement; and (iii) negotiate bid procedures for the stalking horse bid to be subjected to an auction process under Section 363 of the Bankruptcy Code.

40. Subsequent to entry in the Fifth Senior Forbearance Agreement, the Company's revised projected cash flow indicated that the Company would no longer be able to operate until December 4, 2009 under the Senior Lenders' asset-based formula. Based on such cash flows, on November 19, 2009, I, in conjunction and after consultation with the Company's management, recommended to the Board of Directors, and the Board of Directors authorized, that each of the Debtors file petitions under Chapter 11 of the Bankruptcy Code in order to facilitate the sale of substantially all of the Debtors' assets to the stalking horse bidder, subject to higher and better offers under Section 363 of the Bankruptcy Code.

41. The Debtors first engaged PJC on August 18, 2009 in order to formulate a strategy to

effectively deal with their financial situation as well as to assist the Debtors in connection with a potential financing or restructuring transaction. In connection with the initial engagement, the Debtors and PJC executed a letter agreement dated August 18, 2009 (the "August PJC Agreement"). Pursuant to the August PJC Agreement, PJC, among other things, prepared a confidential investment memorandum (the "CIM") to assist in the marketing of the Debtors' assets for sale or in raising equity. Among other things, the CIM described the Company's business, growth opportunities and historical financial performance.

42.     In September 2009, PJC started contacting potential buyers and signing confidentiality agreements with those parties who had expressed interest in getting additional information on the Company. At the end of September 2009, PJC and the Company's management finalized the CIM, which was distributed to those parties who had executed the confidentiality agreements. In total, 149 potential buyers were contacted, with 78 receiving CIMs.

43.     In mid-October 2009, PJC and the Company's management completed a supplemental information package to the CIM, which provided the Company's financial projections. PJC distributed the supplemental CIM packages, as well as process letters requesting the initial indications of interest on October 26, 2009 to potential buyers who were still reviewing the CIM. Between October 26, 2009 and October 29, 2009, PJC had received 16 initial indications of interest.

44.     Subsequent to receiving the initial indications of interest, PJC was involved in various due diligence activities including setting up the data room, creating a management presentation and answering specific requests by potential buyers. On November 17, 2009, PJC received five final bids. On November 19, 2009, the Debtors, with the assistance of their professionals selected a "stalking horse" bidder, subject to completion of its due diligence and execution of a definitive asset purchase agreement, which Transaction the Debtors intend to present

to the Court for approval in short order.

45.     As of the filing of this Declaration, the Debtors believe that they have reached agreement on all material terms of a transaction with their stalking horse bidder for the sale of all or substantially all of their assets pursuant to Section 363 of the Bankruptcy Code.  The Debtors have worked tirelessly over the last several days, including the Thanksgiving weekend, to negotiate and finalize the asset purchase agreement for such sale, including several related documents and all of the disclosure schedules in connection therewith.  The Debtors intend to execute the asset purchase agreement within the next 24 hours and immediately thereafter file a motion seeking approval of such agreement and certain bidding procedures and bid protections in connection therewith.  As of the filing of this Declaration, the value anticipated to be generated from such sale to and in favor of the Debtors' estates is approximately $62,000,000.

### III.  FACTS IN SUPPORT OF FIRST DAY MOTIONS

46.     Concurrently with the filing of this affidavit, the Debtors are filing a number of applications and motions seeking entry of orders (the "First Day Orders") which the Debtors believe are necessary to enable them to operate in Chapter 11 with a minimum of disruption and loss of productivity.  The Debtors respectfully request that each of the First Day Orders be entered as a critical element in stabilizing and facilitating the Debtors' operations during these Chapter 11 cases.  A brief description of the relief requested and the facts supporting each of the First Day Orders is set forth below.

**DEBTORS' EMERGENCY MOTION FOR ORDER (A) AUTHORIZING THE DEBTORS (1) TO USE CASH COLLATERAL ON AN INTERIM BASIS PURSUANT TO 11 U.S.C. § 363, AND (2) TO PROVIDE ADEQUATE PROTECTION IN CONNECTION THEREWITH PURSUANT TO 11 U.S.C. § 361, AND (B) SETTING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

47.     Any cash or cash equivalents, funds or proceeds of or derived from certain of the

collateral securing the obligations of the Debtors to the Senior Lenders and Churchill Financial (collectively, the Senior Lenders and Churchill Financial are referred to herein as the "Lenders") under the Senior Secured Credit Facility and the Subordinated Credit Facility, respectively, may constitute cash collateral within the meaning of Section 363 of the Bankruptcy Code (the "Cash Collateral").

48.     By this Motion, the Debtors seek the entry of an interim order (the "Interim Order") authorizing, on an emergency and limited basis, the use of Cash Collateral in accordance with the Budget attached to the Motion as Exhibit "A."  The filing of this Motion does not constitute an admission by the Debtors' that any of the Lenders hold valid liens on the Debtors' cash or cash equivalents or any other assets.  The Debtors reserve the right to contest the validity, priority and extent of the alleged liens and alleged claims of the Lenders.

49.     An immediate and critical need exists for the Debtors to be permitted access to Cash Collateral in order to continue to operate their businesses, maintain approximately 1,725 jobs and preserve their ongoing, enterprise value.  Therefore, the Debtors seek an emergency interim hearing (the "Interim Hearing") in accordance with Rule 4001(b)(2) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").  At the Interim Hearing, the Debtors will seek entry of an Interim Order, a copy of which is attached to the Motion as Exhibit "B."

50.     In connection with the Debtors' proposed use of Cash Collateral and in order to provide the Lenders with adequate protection for the aggregate diminution of the Cash Collateral resulting from the Debtors' use thereof, the Debtors have agreed, subject to approval of this Court, that the Lenders, shall have, *nunc pro tunc* as of the commencement of these Chapter 11 cases, a replacement lien pursuant to 11 U.S.C. §361(2) on and in all property of the Debtors acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and

nature, as the property of the Debtors securing the prepetition obligations to the Lenders under the Senior Secured Credit Facility and the Subordinated Credit Facility, respectively.

51.     The Debtors propose to use the Cash Collateral strictly in accordance with the terms of that certain Budget prepared by the Debtors and attached Motion.  The Budget covers the three (3) week period from the Petition Date through December 18, 2009. The Debtors also request that they be authorized on a weekly basis to exceed the amounts set forth in the Budget by the sum of (x) 110% of the disbursements projected for such week in the Budget, plus (y) (except for the first week) any unused portion of the disbursements projected for any prior week in the Budget (but excluding, for avoidance of doubt, any amounts in excess of 100% of the projected disbursements for any week).

52.     The Debtors request that the replacement liens and administrative expense claims granted to the Lenders pursuant to the terms hereof be at all times subject and junior to: (i) the fees of the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; and (ii) any court costs (collectively, the "Carve Out").

53.     Supplemental to the replacement liens provided to the Lenders, the Debtors will furnish the Lenders with such financial and other information as required by the Senior Secured Credit Facility and the Subordinated Credit Facility or other reports as the Lenders reasonably request.

54.     The replacement liens granted to the Lenders in connection with the use of the Cash Collateral shall be valid and perfected without the need for the execution or filing of any further documents or instruments.

55.     I believe that use of Cash Collateral pursuant to the terms and conditions set forth above is fair and reasonable and adequately protects the Lenders by virtue of the combination of: (i)

the Debtors' ability to preserve the going concern value of the business with the use of Cash Collateral; (ii) the post-petition liens granted to the Lenders; (iii) the super-priority administrative expenses granted to the Senior Lenders in the Motion, and (iv) providing the Lenders with the other protections set forth in the Motion, including the availability of financial reporting.

56.     For all of the reasons stated above, this Court's approval of the Debtors' use of the Lenders' Cash Collateral is proper as set forth in the Motion.

**DEBTORS' EMERGENCY MOTION FOR THE ENTRY OF AN ORDER (I) AUTHORIZING THE PAYMENT OF PRE-PETITION WAGES, SALARIES, COMMISSIONS AND EMPLOYEE BENEFITS (II) AUTHORIZING THE DEBTORS TO CONTINUE THE MAINTENANCE OF EMPLOYEE PRACTICES AND BENEFIT PLANS AND PROGRAMS IN THE ORDINARY COURSE AND (III) DIRECTING ALL BANKS TO HONOR PRE-PETITION CHECKS FOR PAYMENT OF PRE-PETITION EMPLOYEE OBLIGATIONS**

57.     By this Motion, the Debtors seek an order: (i) authorizing, but not directing, the Debtors to pay pre-petition employee compensation, benefits, vacation, reimbursement and payroll expenses earned within 180 days before the Petition Date and to pay related withholding taxes; (ii) authorizing, but not directing, the Debtors to continue their practices, programs and policies with respect to such obligations as such were in effect as of the Petition Date; (iii) authorizing, but not directing, the Debtors to continue to pay all pre-petition amounts due and owing in respect of workers' compensation obligations and to remain and continue on an uninterrupted basis pre-petition practices with respect to such workers' compensation policies, including, among other things, allowing claimants to proceed directly against the applicable insurance carrier to the extent that such claims are valid workers' compensation claims; (iv) directing all banks to receive, process, honor and pay any and all checks drawn on the Debtors' general disbursement accounts related to Pre-petition Employee Obligations, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

58.     As of the Petition Date, the Debtors employed approximately 1725 full and part time Employees, including management, operations, customer service, sales, manufacturing and financial personnel.  Historically, the aggregate gross bi-weekly payroll for all Employees is approximately $3,000,000, including taxes and benefits. No Employees' pre-petition compensation exceeds the $10,950 priority wage limit set forth in Section 507(a)(4) of the Bankruptcy Code.

59.     In the ordinary course of its business, and as is customary in the Debtors' industry, the Debtors offer their employees various benefits, including medical, dental and life insurance, vacation pay, and other similar such benefits.   The Debtors request authorization to honor all employee reimbursement requests in respect of pre-petition business related expenses incurred, in the manner consistent with its pre-petition practices.  I believe it would be inequitable and cause an undue hardship if those employees were required to bear those expenses incurred on behalf of the Debtors.

60.     I believe that the payment to the Debtors' employees of pre-petition employee obligations in accordance with its pre-petition business practices is in the best interests of the estates, creditors, and interest holders and will enable the Debtors to continue to operate their businesses in an efficient manner without disruption.  These payments and the continuation of benefit programs will be crucial to the well being of the Debtors' employees, who are vital to the ongoing businesses and to maximizing recovery for the Debtors' creditors.

### DEBTORS' EMERGENCY MOTION OF THE FOR INTERIM AND FINAL ORDERS DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES

61.     Section 366(a) of the Bankruptcy Code prevents utility companies from discontinuing, altering or refusing service to a debtor during the first 20 days of a bankruptcy case. However, 30 days from the Petition Date, a utility company has the option of terminating its

services, pursuant to Section 366(c)(2) of the Bankruptcy Code, if a debtor has not furnished adequate assurance of payment.

62.     By this Motion, the Debtors seek entry of an Order: (i) determining that the Utility Providers (as defined below) have been provided with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code; (ii) approving the Debtors' proposed offer of adequate assurance and procedures whereby Utility Providers may request additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (iv) establishing procedures for the Utility Providers to seek to opt out of the Debtors' proposed adequate assurance procedures; (v) determining that the Debtors are not required to provide any additional adequate assurance beyond what it proposed by this Motion, pending entry of the Final Order; and (vi) setting a final hearing on the Debtors' proposed adequate assurance.

63.     Uninterrupted utility services are essential to ongoing operations and, therefore, to the success of these Chapter 11 cases.  Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  The impact on the Debtors' business operations, marketing efforts, revenue and profits would be extremely harmful and would jeopardize the Debtors' restructuring efforts.  It is therefore critical that utility services continue uninterrupted.

64.     I submit that granting the relief requested is both necessary and appropriate, and that, based on the facts of this case, no deposits should be required in addition to the Proposed Adequate Assurance.  Such relief will help the Debtors to successfully restructure and thus fulfill the purposes of Section 105 of the Bankruptcy Code and will not prejudice the rights of the Utility Providers

under Section 366 of the Bankruptcy Code.

**EMERGENCY MOTION FOR ORDER (1) AUTHORIZING CONTINUED USE OF
EXISTING BUSINESS FORMS AND RECORDS; (2) AUTHORIZING MAINTENANCE
OF EXISTING CORPORATE BANK ACCOUNTS AND CASH MANAGEMENT
SYSTEMS; AND (3) EXTENDING TIME TO COMPLY WITH 11 U.S.C. § 345
<u>INVESTMENT GUIDELINES</u>**

65.    I understand that the Office of the United States Trustee has established certain

operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11

cases. These guidelines require Chapter 11 debtors to, among other things, close all existing bank

accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for

all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP

account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-

in-possession," the bankruptcy case number, and the type of account. The Debtors seek a waiver of

these requirements.

66.    I am advised that section 345 of the Bankruptcy Code establishes certain

requirements with respect to all deposits and investments of money of the estate. The Debtors seek a

45 day extension of time to comply with the requirements of section 345 or to request a waiver of

such requirements.

67.    The Debtors seek a waiver of the requirement that they open a new set of books and

records as of the Petition Date because the Debtors respectfully submit that opening a new set of

books and records would create unnecessary administrative burdens and would cause unnecessary

expense, utilization of resources, and delay. With the use of computer technology, it will be easy to

differentiate between pre and post-petition transactions by date. In the ordinary course of their

business, the Debtors use many checks, invoices, stationery, and other business forms. By virtue of

the nature and scope of the business in which the Debtors are engaged, and the numerous other

parties with whom the Debtors deal, the Debtors need to be permitted to use their existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, the Debtors respectfully request that they be authorized to continue to use their existing business forms and to maintain their existing business records.

68.    The Debtors respectfully request authority to maintain their existing bank accounts (each a "Bank Account" or "Account" and collectively, the "Bank Accounts" or "Accounts") and cash management systems (each a "Cash Management System" and collectively, the "Cash Management Systems") in accordance with their usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations.

69.    The Debtors also request authority to close any of the Bank Accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.  Only if the Bank Accounts are continued with the same account numbers can the transition into chapter 11 be smooth and orderly, with minimal interference with continuing operations. In order to conduct their post-petition businesses, the Debtors need to be able to issue checks to vendors, service providers, employees, and others. To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' business.  Moreover, as discussed above, a change in the Accounts to which customers wire and route payments could delay the Debtors' receipt of funds needed for operations. By preserving business continuity and avoiding operational and administrative paralysis that would result from closing the existing Bank Accounts and opening new ones, all parties-in-interest, including employees, vendors, and customers, will be best served, and the benefit to the Debtors' estates will be considerable. The confusion that would

otherwise result could only work to the detriment of these chapter 11 cases. (Of course, no checks issued prior to the Petition Date are to be honored, except as otherwise provided by separate order of this Court.)

70.     The Debtors will continue to maintain records respecting all transfers between and among the Bank Accounts so that all transactions can be ascertained after they have occurred. In addition, the Debtors will instruct their banks to add the designation, "Debtor-in-Possession" or "DIP" to their current and any future domestic Accounts with each such bank, will treat the Accounts for all purposes as Accounts of the Debtors as DIPs, and will maintain records that recognize the distinction between pre-petition and post-petition transfers. The Debtors believe that their current cash and investments are relatively safe because the Debtors' financial institutions are, upon information and belief, financially stable.

71.     Due to the significant amounts of money that may be in the Bank Accounts from time to time, it would take some time for the Debtors to locate and determine, where necessary, appropriate alternative accounts that satisfy section 345(b). Therefore, Debtors seek a reasonable extension of time to meet the requirements of section 345(b).

**EMERGENCY MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(c) AND 503(b) OF THE BANKRUPTCY CODE GRANTING ADMINISTRATIVE EXPENSE STATUS TO DEBTORS' OBLIGATIONS TO VENDORS ARISING FROM POSTPETITION DELIVERY OF MERCHANDISE ORDERED PREPETITION AND AUTHORIZING THE DEBTORS TO PAY SUCH EXPENSES IN THE ORDINARY COURSE OF BUSINESS**

72.     In the ordinary operation of the businesses of the Debtors, numerous vendors provide the Debtors' manufacturing facilities with millions of dollars of inventory and raw materials on a monthly basis.  As of the Petition Date and in the ordinary course of its business, the Debtors had numerous pre-petition purchase orders outstanding (the "Outstanding Orders") with various vendors

(the "Vendors") for merchandise. However, many of the Vendors have voiced concern about the financial well being of the Debtors and may be concerned that shipments of goods made after the Petition Date pursuant to a pre-petition purchase order will render a vendor who makes such shipment a general unsecured creditor of the Debtors' estates. Based on past experience, the Debtors estimate that approximately several million dollars in inventory or raw materials are the subject of Outstanding Orders that will be delivered post-petition.

73.     Accordingly, there is a risk that Vendors may not ship goods to the Debtors until they issue substitute purchase orders post-petition or obtain an order of this Court deeming all obligations of the Debtors arising from post-petition shipments of merchandise to be granted administrative expense status to be paid by the debtors pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

74.     By this Motion, the Debtors seek entry of an order granting the Vendors administrative expense priority status under section 503(b) of the Bankruptcy Code for those undisputed obligations arising from shipments of merchandise received and accepted by the Debtors subsequent to the Petition Date in respect of the Outstanding Orders (the "Vendor Obligations"). In addition, in order to provide the Vendors with further comfort and out of an abundance of caution, the Debtors seek authorization to pay, in the ordinary course of its business pursuant to section 363(c) of the Bankruptcy Code, the undisputed obligations arising from the post-petition shipment of merchandise by the Vendors and acceptance thereof by the Debtors.

75.     I believe that the relief requested in the Motion will ensure the continuous supply of inventory, which is vital to the Debtors' continuing operations and integral to its successful reorganization. Absent such relief, the Debtors may be required to expend substantial time and resources to reissue the Outstanding Orders. The attendant disruption to the continuous flow of inventory to the Debtors' manufacturing facilities would likely result in disruption of order

completion. Such a result would lower customer confidence in the Debtors at a critical juncture and could jeopardize the Debtors' opportunity to achieve a successful reorganization.

### EMERGENCY MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR ADDRESSING RECLAMATION CLAIMS <u>PURSUANT TO 11 U.S.C. § 546(C)</u>

76.     The Debtors' bankruptcy proceedings will be severely disrupted without a uniform reclamation procedure that is fair to all parties. Further, the attention of the Debtors' management, operational personnel and advisors would be diverted from more important bankruptcy-related issues if the Reclamation Procedures (as defined in the Motion) are not approved and the Debtors are instead required to respond to and resolve each reclamation demand on an ad hoc basis, as numerous, individual adversary proceedings are filed or as other actions are taken by the sellers of goods. Instead, the Reclamation Procedures will effectively and efficiently streamline the process of resolving such demands for the Debtors and the sellers alike.

77.     The Debtors believe that its ability to resolve demands in this uniform manner will assist in the consensual resolution of such claims and, ultimately, the maximization of value for the Debtors, their estates, and their creditors. Moreover, section 546(h) of the Bankruptcy Code clearly provides authority for the Debtors to return goods that are subject to reclamation. Therefore, it is in the best interests of the Debtors and their estate and creditors to implement the Reclamation Procedures.

### EXPEDITED MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§105(a), 541, AND 507(a)(8) AUTHORIZING THE DEBTORS TO PAY PRE-PETITION SALES, USE, TRUST FUND AND OTHER TAXES AND RELATED OBLIGATIONS

78.     By this Motion, the Debtors request entry of an order pursuant to Sections 105(a), 541, and 507(a)(8) of the Bankruptcy Code authorizing them to pay pre-petition sales, use, and other similar "trust fund" taxes (the "Taxes") and similar obligations detailed in the Motion to various

state and local taxing authorities (collectively, the "Taxing Authorities") in the ordinary course of the Debtors' business. Such relief will be without prejudice to the Debtors' rights to contest the amounts of any Taxes on any grounds they deem appropriate.

79.     The Debtors, in the ordinary course of their business, incur various Taxes, including state and local sales and use tax. Sales and use taxes, at both the state and local level, accrue as the Debtors sell products and are calculated based upon statutorily mandated percentages of the price at which the Debtors' products are sold. The Debtors seek authority to pay those Taxes that have accrued but were not remitted to the Taxing Authorities prior to the Petition Date.

80.     The Taxing Authorities require the Debtors to remit estimated sales and use taxes and similar collections on a periodic basis during the subsequent month after sales are made. The Taxing Authorities then "true up" any deficiency or surplus on the date on which the taxes are actually due. Prior to the Petition Date, the Debtors were current on their obligations with respect to these Taxes.

81.     The Debtors estimate that their aggregate pre-petition tax liabilities to the various Taxing Authorities are approximately: (i) $300,000 for sales and use taxes; (ii) $1,200,000 for property taxes; and (iii) $760,000 for tangible and intangible personal property taxes. The Debtors therefore requests relief to pay such portion of the Taxes due to the Taxing Authorities that represents pre-petition taxes in the ordinary course of the Debtors' business.

**EMERGENCY APPLICATION OF DEBTORS-IN-POSSESSION FOR EMPLOYMENT OF PAUL J. BATTISTA AND THE LAW FIRM OF GENOVESE JOBLOVE & BATTISTA, P.A., AS COUNSEL FOR DEBTORS-IN-POSSESSION *NUNC PRO TUNC* TO THE PETITION DATE AND REQUEEST FOR INTERIM RELIEF**

82.     By this Application, the Debtors seek to employ and retain Paul J. Battista, Esq. and the law firm of GJB, on an emergency basis, as their general restructuring and bankruptcy counsel with regard to the filing of their Chapter 11 petitions and the prosecution of their Chapter 11 cases.

Accordingly, the Debtors respectfully request the entry of an interim and final order pursuant to Section 327(a) of the Bankruptcy Code authorizing them to employ and retain Paul J. Battista, Esq. and the law firm of GJB as their attorneys under a general retainer to perform the legal services that will be necessary during their Chapter 11 cases as more fully described below.

83.     Prior to the commencement of these Chapter 11 cases, the Debtors sought the services of GJB with respect to, among other things, advice regarding restructuring matters in general, and preparation for the potential commencement and prosecution of Chapter 11 cases for the Debtors. The Debtors believe that continued representation by their pre-petition restructuring counsel, GJB, is critical to the Debtors' efforts to restructure their business because GJB has extensive experience and expertise in complex commercial reorganization cases and has become familiar with the Debtors' business, legal and financial affairs. Accordingly, GJB is well-suited to guide the Debtors through the Chapter 11 process.

84.     Continued representation of the Debtors by their restructuring counsel, GJB, is critical to the success of the Debtors' reorganization because GJB is familiar with the Debtors' business, financial and legal affairs.

85.     The Debtors have selected the firm of GJB as attorneys because of the firm's experience with and knowledge of the Debtors and their business, as well as its extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

86.     The Debtors desire to employ the firm of GJB under a general retainer because of the extensive legal services that will be required in connection with their Chapter 11 cases and the firm=s familiarity with the business of the Debtors.

87.     Except as set forth in the Battista Affidavit, to the best of the Debtors' knowledge, the

shareholders, counsel and associates of the firm of GJB: (a) do not have any connection with any of the Debtors, their affiliates, their creditors, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any other party in interest, or their respective attorneys and accountants; (b) are "disinterested persons," as that term is defined in Section 101(14) of the Bankruptcy Code; and (c) do not hold or represent any interest adverse to the Debtors' estate.

**EMERGENCY MOTION OF THE DEBTORS FOR IMMEDIATE ENTRY OF AN INTERIM ORDER APPROVING THE ENGAGEMENT AGREEMENT BETWEEN THE DEBTORS, VINCENT J. COLISTRA AND PMCM, LLC, *NUNC PRO TUNC* TO THE PETITION DATE AND REQUEST FOR INTERIM RELIEF**

88.     By the Motion, the Debtors seek authority to retain Vincent J. Colistra as their Chief Restructuring Officer (the "CRO") pursuant to the terms of an engagement agreement (the "Engagement Agreement") among the Debtors and PMCM, LLC, an affiliate of Phoenix Management Services, Inc. (collectively "PMCM") dated as of August 26, 2009, as amended on or about November 9, 2009, a copy of which is attached to the Motion as Exhibit B. Pursuant to the Engagement Agreement, Vincent J. Colistra will serve as Chief Restructuring Officer ("CRO") to the Debtors and PMCM will provide additional professionals (the "Temporary Staff") to support the CRO in his responsibilities.

89.     The Debtors are familiar with the professional standing and reputation of PMCM, and my professional standing and reputation. The Debtors understand and recognize that PMCM and I have a wealth of experience in providing consulting services in restructurings and reorganizations and enjoy an excellent reputation for services they have rendered in large and complex Chapter 11 cases on behalf of debtors and creditors throughout the United States.

90.     PMCM and I also have obtained a detailed familiarity with the Debtors' business, capital structure, and financial affairs through their pre-petition services rendered to the Debtors.

91.      The Debtors engaged PMCM and me to help plan and implement the Debtors' restructuring and to serve as restructuring consultants in connection with the Chapter 11 Cases in light of our expertise in large Chapter 11 reorganizations.

92.      To the best of the Debtors' knowledge, information, and belief, based on and other than as set forth in the Engagement Agreement, the disclosures made by PMCM in the Engagement Agreement (regarding connections with the Debtors, their creditors, any other parties in interest in these cases, their respective attorneys and accountants, any United States District Judge or United States Bankruptcy Judge for the Southern District of Florida, the United States Trustee or any person employed in the office of the United States Trustee for Region 21) satisfies any disclosure requirements necessary to employ PMCM.

93.      The Debtors believe that PMCM and I are both well qualified and uniquely able to serve them effectively and efficiently in the Chapter 11 Cases as restructuring consultants. Our resources, capabilities and experience in advising the Debtors are crucial to the Debtors' successful restructuring. As such, the Debtors believe that the retention of PMCM and me is in the best interest of the Debtors, their estates, their creditors and other parties in interest.

94.      The Debtors submit that the progress made in the first 20 days of the Chapter 11 cases will be a determinative factor in the ultimate outcome of the cases. As the Debtors' Chief Restructuring Officer, I will play an integral role in all of the key work streams during this critical period. Among other things, the Debtors will need my assistance, along with the assistance of the Temporary Staff, in stabilizing business operations, consummating the proposed sale of all or substantially all of the Debtors' assets, and defining the Debtors' path after confirmation.

95.      Failure to have all of our resources readily available during the first 20 days of the cases will severely hamper the Debtors' initial restructuring efforts and could jeopardize the ultimate

outcome of the cases.

**EMERGENCY APPLICATION OF DEBTORS-IN-POSSESSION AUTHORIZING
EMPLOYMENT AND RETENTION OF JOSEPH J. DEVINE AND THE LAW FIRM OF
SCHNADER HARRISON SEGAL & LEWIS LLP AS SPECIAL CORPORATE
COUNSEL FOR DEBTORS-IN-POSSESSION *NUNC PRO TUNC*
AND REQUEST FOR INTERIM RELIEF**

96.     By this Application, the Debtors seek to employ and retain Joseph J. Devine and the

law firm of Schnader Harrison Segal & Lewis LLP as their special corporate counsel *nunc pro tunc*

to the Petition Date.  Accordingly, the Debtors respectfully request entry of an order pursuant to

section 327(e) of the Bankruptcy Code authorizing each of them to employ and retain the firm of

Schnader Harrison as special corporate counsel to perform legal services relating to corporate issues

that will arise during their Chapter 11 cases.

97.     The law firm of Schnader Harrison has represented the Debtors for many years as

general corporate counsel, rendering legal advice and related professional services in three general

areas: (i) general corporate work, including contract review, general advice to officers and directors,

preparation of Board of Director and Shareholder Minutes and Consent Actions without a meeting,

maintenance of all corporate and stock records, creating subsidiaries and qualifying entities to do

business in various jurisdictions and researching and advising on various business regulations; (ii)

trademark matters, including general intellectual property advice, filing of federal and foreign

trademark applications for numerous marks used by the Debtors, prosecution of those applications

and coordinating with foreign agents with respect to prosecution of foreign applications, monitoring

for users violating the marks, United States opposition and cancellation proceedings and monitoring

of litigation; and (iii) commercial litigation, including intellectual property litigation.  The

continuing services of Schnader Harrison are necessary to enable the Debtors to effectively and

efficiently deal with their corporate and trademark issues and to maximize value in connection

therewith.

98.    The Debtors believe that continued representation by their pre-petition general corporate counsel, Schnader Harrison, is critical to the Debtors' efforts to restructure their business because during this engagement, Schnader Harrison has developed a great deal of institutional knowledge regarding the Debtors' operations, finance and systems.  Such experience and knowledge will be valuable to the Debtors in their efforts to reorganize.

99.    Except as set forth in the Devine Affidavit, to the best of the Debtors' knowledge, the members, counsel and associates of the firm of Schnader Harrison (a) do not have any connection with any of the Debtors, their affiliates, their creditors, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any other party-in-interest, or their respective attorneys and accountants; (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code; and (c) do not hold or represent any interest adverse to the Debtors' estates on the matters upon which they are being employed.

**DEBTORS' EMERGENCY (I) APPLICATION PURSUANT TO 11 U.S.C. §§ 327 AND 328 AND FED.R.BANKR.P. 2014 AND 2016 FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF PIPER JAFFRAY & CO. AS INVESTMENT BANKERS FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE (II) APPROVING PROPOSED FEE STRUCTURE AND (III) REQUEST FOR INTERIM RELIEF**

100.    By this Application, the Debtors request that this Court enter an order: (i) authorizing the Debtors to retain and employ PJC as their investment banker, *nunc pro tunc* to the Petition Date, pursuant to the terms of the PJC Agreement; (ii) approving the terms of PJC's employment, including the proposed fee structure and indemnification provisions set forth in the PJC Agreement, subject to the standards set forth in Section 328 of the Bankruptcy Code, effective nunc pro tunc to the Petition Date; (iii) modifying the fee application and information requirements contained in

Local Rule 2016-1 incorporating the Guidelines for Fee Applications for Professionals in the Southern District of Florida in Bankruptcy Cases; and (iv) granting such other and further relief as the Court deems just and proper.

101.    PJC's professionals have extensive experience in providing investment banking services in reorganization proceedings and have an excellent reputation for the services they have rendered in Chapter 11 cases on behalf of debtors and creditors throughout the United States.  PJC also has substantial experience representing troubled companies or creditors to troubled companies and is highly qualified to assist the Debtors in these Chapter 11 Cases.

102.    The Debtors believe that PJC is well qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.  PJC is willing to act on behalf of the Debtors and agrees to subject itself to the jurisdiction and supervision of the Court.

103.    It is critical that the Debtors employ PJC to render the investment banking services described in the Application.  The Debtors believe that the services will not duplicate the services that other professionals will be providing to the Debtors in these Chapter 11 Cases.  Specifically, PJC will carry out unique functions and will use reasonable efforts to coordinate with the Debtors and other professionals retained in these Chapter 11 Cases to avoid unnecessary duplication of efforts.  The investment banking services that PJC will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.

104.    The Debtors seek approval of PJC's retention and employment as set forth in the PJC Agreement and pursuant to section 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and Local Rule 2016-1.

105.    In addition, given the numerous issues that PJC may be required to address in the performance of the services set forth in the Application, PJC's commitment to the variable level of

time and effort necessary to address all such issues as they arise, and the market prices for PJC's services for engagements of this nature, the Debtors believe that the Fee Structure set forth in the PJC Agreement is reasonable under the standards set forth in Section 328 of the Bankruptcy Code.

106.    The Debtors respectfully request that the requirements of the Guidelines be tailored to the nature of PJC's engagement and its compensation structure.  PJC has requested, pursuant to 328(a) of the Bankruptcy Code, payment of its fees on a fixed monthly fee basis, which, as set forth above, is customary in the investment banking services industry.  As such, the submission of detailed time entries pursuant to the Guidelines, is unnecessary, and as such the Debtors request a modification of such reporting requirements.

107.    The Debtors respectfully submit the terms of the PJC Agreement, including the Indemnification Provisions, are reasonable and customary and should be approved in these Chapter 11 cases.

**MOTION FOR AN ADMINISTRATIVE ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 331 ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS**

108.    The Debtors request the entry of an order authorizing and establishing procedures for the compensation and reimbursement of expenses to court approved professionals on a monthly basis. Such an order will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees and expenses incurred in these Chapter 11 cases more effectively.

109.    The procedures suggested in this Motion will enable the Debtors to closely monitor the costs of administration, maintain a level cash flow, and implement efficient cash management procedures.  Moreover, these procedures will also allow the Court and the key parties in interest to insure the reasonableness and necessity of the compensation and reimbursement sought pursuant to

such procedures.

## MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 1007(c) GRANTING AN EXTENSION OF TIME TO FILE STATEMENT OF FINANCIAL AFFAIRS AND <u>SCHEDULES OF ASSETS AND LIABILITIES</u>

110.    Under Bankruptcy Rule 1007(c), the Debtors are required to file their Statements and Schedules within fifteen days after the Petition Date. To prepare the Statements and Schedules, the Debtors must gather information from books, records, and documents relating to thousands of transactions.  The collection of the information necessary to complete the Statements and Schedules will require an expenditure of substantial time and effort on the part of the Debtors' employees.

111.    In the days and weeks leading up to the filing of these Chapter 11 Cases, the Debtors' key management has been entirely occupied in pursuing strategic alternatives, negotiating agreements to assist in the Debtors' reorganization and preparing information and documents necessary to prepare the Debtors' chapter 11 filings. In the early days of these cases, the Debtors anticipate that their key management and other employees will have many competing demands assisting in efforts to implement the Debtors' restructuring efforts while also addressing myriad employee, customer, and vendor issues.  Under these circumstances, it appears unlikely that the Debtors will be able to complete their Statements and Schedules properly and accurately by the ordinary fifteen-day deadline.

112.    Accordingly, the Debtors request that the Court extend the period under Bankruptcy Rule 1007(c) for an additional twenty (20) days, thereby setting the deadline to file the Statement and Schedules to thirty -five (35) days after the Petition Date, until December 30, 2009.

## EMERGENCY EX-PARTE MOTION FOR AUTHORITY TO <u>FILE CONSOLIDATED CASE MANAGEMENT SUMMARY</u>

113.    I am advised that in accordance with Administrative Order 05-1 dated May 20, 2005,

the debtor in possession in a Chapter 11 case is directed to file with the Court and serve all parties of record, within the earlier of three business days after relief is entered, or one business day prior to the date of the first scheduled hearing, a completed local form Chapter 11 Case Management Summary (the "Case Management Summary") providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors. These Chapter 11 cases were commenced by Arch Aluminum and four (4) of its related debtor affiliates.

114.    Contemporaneously herewith the Debtors have each filed in their respective Chapter 11 cases ex-parte motions seeking joint administration of these Chapter 11 cases. The Debtors request that the Court authorize them to file a consolidated Case Management Summary, reflecting the assets, liabilities and financial information of each of the Debtors. The Debtors request authority to file a consolidated Case Management Summary, as the filing of a separate Case Management Summary for each of the numerous Debtors would be burdensome. In addition, much of the information contained in the Case Management Summary is duplicative for many of the Debtors and the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

115.    Notwithstanding the relief requested, the U.S. Trustee retains the right to request that the Debtors each prepare and file separate Case Management Summaries should the U.S. Trustee believe that such separate Case Management Summaries are necessary. The Debtors believe that filing a consolidated Case Management Summary provided creditors and parties of interest with the financial disclosures contemplated by Administrative Order 05-1.

## EMERGENCY EX-PARTE MOTIONS FOR JOINT ADMINISTRATION

116.    The Debtors seek orders directing the joint administration of their chapter 11 cases for procedural purposes only, including the joint filing of any disclosure statements and plans of

reorganization and other contested matters.

117.    The Debtors are "affiliates" as I understand that term as defined in section 101(2)(A) of the Bankruptcy Code.

118.    The issues that will be addressed in these bankruptcy cases will be related and overlapping. Joint administration of these cases will obviate the need for duplicative notices, motions, applications, hearings and orders, and will therefore save considerable time and expense for the Debtors and their estates.

119.    Each creditor may still file its claim against a particular estate. I believe the rights of all creditors will actually be enhanced by the reduction in costs resulting from joint administration. The Court also will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders and maintaining redundant files. Finally, I believe supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee will be simplified.

120.    Accordingly, for the reasons stated herein and in each of the first day applications, the Debtors respectfully request that First Day Motions be approved.

[Signature on next page]

_____

Vincent J. Colistra, Chief Restructuring Officer

SWORN TO AND SUBSCRIBED before me, a Notary Public for the State of Florida, on this 24 day of _November_ , 2009.

_____

NOTARY PUBLIC, STATE OF FLORIDA
AT LARGE

Print Name: _GLORIA SEGARRA_

Commission No. _____

NOTARY PUBLIC-STATE OF FLORIDA
Gloria Segarra
Commission # DD841827
Expires:    JAN. 16, 2013
BONDED THRU ATLANTIC BONDING CO., INC.

OWNERSHIP STRUCTURE
12/31/2008

