UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

ARCH ALUMINUM
& GLASS CO, INC., et al.[1].

Case No. 09-36232-BKC-JKO

Chapter 11
(Jointly Administered)

_____/

**DEBTORS' MOTION FOR ENTRY OF ORDERS PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, AND 6006 (A) APPROVING ASSET PURCHASE AGREEMENT WITH ARCH GLASS ACQUISITION CORPORATION, AN AFFILIATE OF GREY MOUNTAIN PARTNERS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO ASSET PURCHASE AGREEMENT WITH ARCH GLASS ACQUISITION CORPORATION, (C) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (D) AUTHORIZING THE DEBTORS TO PROVIDE CERTAIN STALKING HORSE BID PROTECTIONS; (E) SCHEDULING A HEARING TO CONSIDER THE APPROVAL OF AND APPROVING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AT THE SALE HEARING, (G) APPROVING THE FORM AND MANNER OF NOTICE IN CONNECTION THEREWITH AND (H) GRANTING RELATED RELIEF**

**(Hearing Requested on or Prior to Thursday, December 17, 2009
on Approval of Bid Procedures and Stalking Horse Bid Protections)**

Arch Aluminum & Glass Co., Inc. ("Arch Aluminum") and four (4) of its subsidiaries and affiliates, as jointly administered debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or the "Company"), by and through undersigned counsel, file this motion (the "Motion") for entry of orders, pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, (a) approving that certain Asset Purchase Agreement,

---

[1]       The jointly administered debtors are: Arch Aluminum & Glass Co., Inc; AAG Holdings, Inc.; Arch Aluminum and Glass International, Inc.; Arch Aluminum, L.C.; and AWP, LLC.

dated December 2, 2009 (the "Purchase Agreement"), by and among the Debtors, as sellers, and Arch Glass Acquisition Corporation, as buyer (the "Stalking Horse Bidder"), for the purchase and sale of the Purchased Assets (as defined below), which Purchase Agreement is attached hereto as Exhibit A, (b) authorizing the Debtors to execute and deliver the Purchase Agreement, (c) establishing bidding procedures for the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and interests pursuant to Section 363(f) of the Bankruptcy Code, (d) authorizing the Debtors to provide certain "stalking horse" bid protections to the Stalking Horse Bidder, (e) scheduling a hearing (the "Sale Hearing") to consider approval of, and approving, the sale of the Purchased Assets pursuant to Sections 363 and 365 of the Bankruptcy Code free and clear of all liens, claims, encumbrances and interests pursuant to the Purchase Agreement to the Stalking Horse Bidder or the highest and best bidder, if applicable, at an Auction (as defined below), (f) authorizing the Debtors' assumption and assignment of certain executory contracts and unexpired leases in connection therewith at the Sale Hearing, (g) approving the form and manner of notice thereof, and (h) granting related relief.

In support of the Motion, the Debtors rely on the Declaration of Vincent J. Colistra, Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions (the "Colistra Declaration"). In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction to consider this Motion and to grant the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## PRELIMINARY STATEMENT

2.      By this Motion, the Debtors respectfully request court approval of a sales process through which the Debtors desire to pursue the sale of the Purchased Assets, which Purchased Assets represent substantially all of their assets, through a competitive bidding process pursuant to the terms of the Purchase Agreement with the Stalking Horse Bidder, subject in all events to higher and better bids pursuant to the Bidding Procedures set forth below.

3.      For the reasons discussed below, the Debtors have concluded, in the exercise of their best business judgment, that the sale of all or substantially all of their assets is in the best interests of the Debtors, their bankruptcy estates, their creditors and equity holders.  Prior to coming to such conclusion, the Debtors explored several strategic alternatives, including a diligent search for an equity investment to support their business operations, a restructuring of the secured debt, a sale of substantially all of their assets as a going concern and/or an orderly liquidation of their assets.  In connection with such efforts, and as more particularly described below, the Debtors engaged Piper Jaffray & Co. ("PJC") as their investment bankers in August 2009 to assist them in exploring the market for an equity investor and/or potential purchasers for the Debtors' assets as a going concern.  As explained below, PJC engaged in an exhaustive marketing process prior to the filing of these Chapter 11 cases to locate such investor(s) and/or potential purchasers for the Debtors' assets.  The Debtors believe that such process was successful in that it resulted in the Purchase Agreement with the Stalking Horse Bidder.

4.      The Debtors also engaged the services of PMCM, LLC, an affiliate of Phoenix Management Services, Inc., to provide financial and restructuring advice to the Debtors in connection with their dealings with PNC Bank, National Association, as agent for itself and a consortium of senior secured lenders (collectively, the "Senior Lenders"),[2] as well as the services

---

[2] The Debtors capital and debt structure with the Senior Lenders is more particularly described in the Colistra Declaration.

of Vincent Colistra as the Debtors' chief restructuring officer (the "CRO").  Immediately upon

his engagement in late August 2009, the CRO proceeded to analyze and evaluate the Debtors'

assets, cash flow and overall financial condition.   In connection therewith and among other

things, the CRO prepared cash flow projections for the Debtors for the balance of 2009 and for

2010, as well as a liquidation analysis for the Debtors' assets.  The Debtors, prior to the CRO's

engagement, identified and implemented a number of expense reductions and cost cutting

measures to streamline and reduce the Debtors' financial obligations.  Upon his engagement, the

CRO, with the cooperation of the Debtors' management, identified and implemented further

expense reductions.  Based on such analyses and notwithstanding the substantial reductions in

costs and expenses made by the Debtors and then the CRO, the CRO concluded that the Debtors

required a significant infusion of equity capital in the short term and over the next 18-24 months

in order for the Debtors to continue their operations.  As a result, and given the lack of any such

equity capital, the CRO agreed with the Debtors' business judgment to pursue a sale of all or

substantially all of their assets pursuant to the Purchase Agreement.

     5.      Specifically, the CRO has concluded that the Debtors will not be able to continue

their operations in the ordinary course of business beyond approximately December 18, 2009

without obtaining a debtor-in-possession loan.[3]   As a result, the Debtors, with the assistance of

the CRO, are presently in negotiations with the Senior Lenders and the Stalking Horse Bidder to

provide debtor-in-possession financing in the amount of approximately $5.0 million (the "DIP

Loan") in order to fund the anticipated shortfall in the Debtors' cash flow from and after

December 18, 2009 through the closing of the sale of the Purchased Assets pursuant to the

---

[3] As one of their "first day" motions, the Debtors have sought approval from this Court to use the cash collateral of the Senior Lenders through December 18, 2009.  See Debtors' Emergency Motion for an Order (A) Authorizing the Debtors (1) to use Cash Collateral on an Interim Basis Pursuant to 11 U.S.C. § 363 and (2) to Provide Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. §361, and (B) Setting a Final Hearing Pursuant to Bankruptcy Rule 4001 (C.P. #8).

Purchase Agreement, which is projected to be the end of January 2010 as more fully described below.   The amount and terms of such DIP Loan are tied directly to the timing of the closing on the sale of the Purchased Assets.   The sooner the Debtors can consummate such closing, then the lower the required amount of the proposed DIP Loan.   As a result, the Debtors have no choice but to propose the expedited sale process contained in this Motion.[4]

6.       Notwithstanding such discussions, however, the Senior Lenders have not at this time consented to the proposed sale of the Purchased Assets to the Stalking Horse Bidder pursuant to the Purchase Agreement.   While the Debtors believe the purchase price proposed to be paid by the Stalking Horse Bidder for the Purchased Assets represents fair market value for the Purchased Assets (including as a result of the extensive pre-petition marketing process employed by the Debtors through PJC, and the Debtors' view of the liquidation value of such Purchased Assets as more fully discussed below), such purchase price is nevertheless significantly less than the amount of senior debt owed to the Senior Lenders in respect of the Purchased Assets.   The Debtors, however, with the assistance of their professionals, continue to work closely with the Senior Lenders (i) to obtain their consent to such sale, as well as the carve outs from their collateral that will be necessary in order to consummate such sale, and (ii) to provide the necessary DIP Loan to bridge the Debtors from approximately December 18, 2009 through the closing of such sale.

---

[4] In the event that the Debtors are not able to secure the DIP Loan on a timely basis, then the Debtors reserve the right to seek to further expedite the sale of the Purchased Assets hereunder, to a date to be agreed upon with the Stalking Horse Bidder, so as to avoid the cessation of their business operations and the loss of significant value in the context of the Purchase Agreement.

7.      Pursuant to the terms of the Purchase Agreement with the Stalking Horse Bidder, the Debtors' estates expect to realize total consideration from such sale in an amount equal to approximately $62,000,000.  The other salient terms of the Purchase Agreement are as follows:[5]

- The Purchased Assets include substantially all of the Debtors' assets, including without limitation (i) Owned Real Property, Leased Real Property, Inventory, Receivables, tangible personal property, books and records, goodwill, Transferred Intellectual Property, Assigned Contracts and Permits and Licenses, (ii) 100% of the capital stock in Arch Canada, ULC, which is owned by Arch Aluminum and Glass International, Inc. and operates as the Debtors' Canadian subsidiary, (Arch Canada, ULC is not seeking separate creditor protection under the laws of Canada), and (ii) certain avoidance actions under Chapter 5 of the Bankruptcy Code that may exist against certain vendors and customers;

- The Excluded Assets include, among other things, the Debtors' right, title and interest in any Tax Refunds expected to be generated by the Debtors from the carry back of net operating losses to prior tax years;

- The Stalking Horse Bidder is assuming certain liabilities of the Debtors as set forth in Section 2.02(a) of the Purchase Agreement, including certain obligations to Transferred Employees in an amount up to $2,800,000;

- The Purchase Price consists of cash in the amount of $52,000,000, plus the assumption of the liabilities set forth in Section 2.02(a) of the Purchase Agreement, plus certain adjustments to the Purchase Price as set forth in Section 2.04 of the Purchase Agreement;

- In addition, the Stalking Horse Bidder has agreed to replace certain letters of credit outstanding as collateral supporting certain obligations of the Debtors in the amount of $7,000,000;

- A deposit in the amount of five (5%) percent of the Purchase Price;

- All Cure Costs associated with the assumption and assignment of Assigned Contracts shall be paid from the Purchase Price;

- A Break Up Fee in the amount of 3% of the Purchase Price plus an Expense Reimbursement for reasonable fees and expenses, as may be determined by the Court and capped at $1,000,000, which Break Up Fee and Expense

---

[5] Notwithstanding the summary of the salient terms discussed herein, all parties are urged to read the Purchase Agreement in its entirety as this summary is qualified by the Purchase Agreement.  In the event of any inconsistencies between this summary and the Purchase Agreement, the terms of the Purchase Agreement control. All capitalized terms used in this summary shall have the meanings ascribed to them as set forth in the Purchase Agreement.

Reimbursement be payable in accordance with the Purchase Agreement through a "carve out" from the collateral securing the obligations to the Senior Lenders;

- A requirement that ninety (90%) percent of the Business Employees accept employment with the Stalking Horse Bidder;

## BACKGROUND

### A.    Introduction

8.    On November 25, 2009 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

9.    No creditors' committee has yet been appointed in these cases. In addition, no trustee or examiner has been appointed.

10.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

11.    The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

### B.    Background and Current Business Operations

12.    The Company was founded in 1978 by Robert Silverstein, as a small South Florida glass and metal distributor with a single truck. During the 1980's the Company opened fabrication facilities and additional distribution facilities in Florida and the Northeast. Through the 1990's, the Company underwent a period of rapid growth, expanding from two fabrication facilities and three distribution facilities to ten fabrication facilities and three distribution facilities generating over $121.0 million in revenue.

13.    The Company now provides a comprehensive line of products and services to more than 5,000 customers from 28 office, manufacturing and distribution facilities located in 19 states nationwide.  Working directly with its customers, the Company purchases annealed (or "float") glass from a number of leading float glass manufacturers and then insulates, tempers, mirrors or laminates the glass to the customized requirements of each end user.  Additionally, the Company supplies its customers with a focused line of aluminum products, such as storefront/entrance frames, that can be fabricated in house to the customer's exact specifications, providing a complement to the Company's glass offerings.  The Company's ability to offer a comprehensive line of high-quality architectural glass from numerous float glass manufacturers, coupled with its unique ability to custom fabricate architectural and aluminum products, has allowed the Company to serve as the "True Single Source" supplier to the non-residential construction, retail glass and residential construction industries.

14.    For further information on the Debtors' capital structure, business and operations, the Debtors refer to the Colistra Declaration filed contemporaneously herewith.

**C.    Prepetition, the Debtors, With the Assistance of Their Professionals, Have Aggressively Marketed the Debtors' Businesses and Assets as a Going Concern.**

15.    The Debtors first engaged PJC on August 18, 2009 in order to formulate a strategy to effectively deal with their financial situation as well as to assist the Debtors in connection with a restructuring transaction and/or sale of the Debtors' assets.  Upon their engagement, PJC, among other things, immediately worked with the Debtors to prepare a comprehensive confidential investment memorandum (the "CIM") in order to assist in the marketing of the Debtors' assets for sale or in raising equity capital.   Among other things, the CIM described the Company's business, growth opportunities and historical financial performance.

16.    In September 2009, PJC started contacting potential buyers and signing confidentiality agreements with those parties who had expressed an interest in getting additional information on the Company.  At the end of September 2009, PJC and the Company's management finalized the CIM, which was distributed to those parties who had executed the confidentiality agreements.  In total, 149 potential buyers were contacted, with 78 receiving CIMs after they signed confidentiality agreements.

17.    In mid-October 2009, PJC and the Company's management completed a supplemental information package to the CIM, which provided the Company's financial projections going forward, which projections were prepared by the CRO in cooperation with the Company's management.  PJC distributed the supplemental CIM packages, as well as process letters requesting that interested buyers submit initial indications of interest on October 26, 2009.  Between October 26, 2009 and October 29, 2009, PJC received initial indications of interest from 16 separate potential and interested buyers.

18.    Subsequent to receiving the initial indications of interest, PJC was involved in various due diligence activities including setting up the data room, creating a management presentation and answering specific requests by potential buyers.  On November 17, 2009, PJC received five (5) final bids.  On November 19, 2009, the Debtors, with the assistance of their professionals selected the Stalking Horse Bidder, who is an affiliate of Grey Mountain Partners, as their "stalking horse" bidder.  Grey Mountain Partners is a private equity firm focused on acquiring interests in smaller, middle market companies, typically in mature, basic industries.  In addition to traditional transaction structures, the firm has significant expertise in acquiring companies in distress or emerging from bankruptcy.

19.     After selecting the Stalking Horse Bidder, the Debtors and the Stalking Horse Bidder extensively and in good faith negotiated the terms of, and entered into, the Purchase Agreement.

20.     The Debtors intend to continue to utilize the services of PJC in these Chapter 11 cases in order to coordinate the continued marketing and due diligence process for those proposed buyers who previously expressed an interest in acquiring the Debtors' assets and/or for any other proposed buyers who desire to make a competing bid for the Purchased Assets.  The Debtors are both hopeful and optimistic that entering into the Purchase Agreement and obtaining approval of the Bidding Procedures contained herein marks the beginning of a competitive sale process that will drive substantial incremental value to the Debtors' estates and their creditors over and above the purchase price offered by the Stalking Horse Bidder.

21.     In order to maximize the value of the Purchased Assets through a robust bidding process while meeting the strict timetable necessitated by the Debtors' cash needs and the need for the DIP Loan, it is essential that Bidding Procedures contained herein be established and approved on an expedited basis.

## PROPOSED BIDDING PROCEDURES

**A.     Bidding Procedures**

22.     The Debtors submit that their extensive pre-petition marketing efforts, including through and with the substantial assistance of PJC as described above, have generated a number of potential purchasers interested in acquiring the Debtors' assets.  Throughout the pre-petition marketing process, these potential purchasers have had access to a substantial amount of due diligence and information on the Debtors and their assets, and have had the opportunity to fully and completely evaluate the Debtors' business. The Bidding Procedures proposed herein by the

Debtors, while recognizing the limited time available in light of the Debtors' financial situation, seek to ensure that any other prospective purchasers for the Debtors' assets are likewise identified, encouraged to participate in the sale process and are provided with the requisite information to enable such prospects to so participate. Moreover, these bidding procedures are designed to provide sufficient notice to potential purchasers and otherwise to ensure a transparent sale process.

      23.     The Debtors respectfully request that the Court approve the expedited bidding procedures set forth below (the "Bidding Procedures"). The Bidding Procedures are designed to afford potential competing bidders until January 8, 2010 (the "Bid Deadline") to complete due diligence and submit a bid to purchase the Debtors' assets.  If one or more qualified competitive bids (as described in the Bidding Procedures) is presented to the Debtors in accordance with the Bidding Procedures by the Bid Deadline, then the Debtors propose to conduct an auction on January 13, 2010 (the "Auction").  On January 14, 2010 or as soon thereafter as the Court can schedule a hearing (the "Sale Hearing"),[6] the Debtors propose to seek approval of the highest and best bid at the Auction, which bid will be determined by the Debtors in the exercise of their best business judgment in accordance with the Bidding Procedures.[7]  At the Sale Hearing, the Debtors propose to seek approval of the sale of the Purchased Assets to the successful bidder pursuant to Sections 363 and 365 of the Bankruptcy Code free and clear of all liens, claims, encumbrances and interests pursuant to the Purchase Agreement.   Based on such timetable, the Debtors

---

[6] Pursuant to the Purchase Agreement with the Stalking Horse Bidder, the order approving the sale of the Purchased Assets must be entered on or before January 22, 2010 or the Stalking Horse Bidder will have the right to terminate the Purchase Agreement.

[7] The Office of the United States Trustee anticipates conducting the Debtors' section 341 meeting of creditors during the first week of January 2010 so as to enable creditors and parties in interest sufficient time in advance of the proposed Sale Hearing to review the Debtors' bankruptcy schedules and ask questions at the 341 meeting.

anticipate that the closing of the sale of the Purchased Assets can occur prior to January 19, 2010.[8]

24.    The Bidding Procedures proposed by the Debtors are as follows:

- **Purchased Assets**. The "Purchased Assets" shall include those assets set forth in Section 2.01(a) of the Purchase Agreement.  The Purchased Assets shall not include the Excluded Assets set forth in Section 2.01(b) of the Purchase Agreement.

- **Qualification**. The Debtors shall: (a) coordinate the efforts of Potential Bidders (as defined below) in conducting their respective due diligence investigations regarding the Purchased Assets; (b) determine whether any person or entity is a Qualified Bidder (as defined below); (c) receive and evaluate bids from Qualified Bidders; and (d) administer the Auction (as defined below). Any person or entity who wishes to participate in the bidding process and the Auction must meet the participation requirements for Potential Bidders below and must thereafter submit a Qualified Bid to become a Qualified Bidder. Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any person or entity who does not comply with the participation requirements below.

- **Participation Requirements**. To participate in the bidding process and the Auction, each interested person or entity (a "Potential Bidder") must deliver the following documents (the "Participation Materials") on or before five (5) business days prior to the Bid Deadline to (i) Genovese Joblove & Battista, P.A., counsel to the Debtors, 100 S.E. Second Street, 44th Floor, Miami, FL 33131, Attn: Paul J. Battista, Esq., pbattista@gjb-law.com, (ii) Piper Jaffray & Co., 800 Nicollet Mall, Minneapolis,   MN   55402,   Attn:   Michael   R.   Dillahunt, michael.r.dillahunt@pjc.com, (iii) Moore & Van Allen, counsel to the Senior Lenders, 100 North Tryon Street, Suite 4700, Charlotte, NC 28292, Attn: James R. Langdon, Esq., jimlangdon@mvalaw.com, and (iv) Berger Singerman, counsel to Leon Silverstein, 200 South Biscayne Boulevard, Suite 1000, Miami, FL 33131 Attn: Daniel Lampert, Esq.,   DLampert@bergersingerman.com (the "Notice Parties"):

    i.    an executed confidentiality agreement in form and substance satisfactory to the Debtors;

    ii.   a statement demonstrating, to the Debtors' satisfaction, the Potential Bidder's bona fide interest in purchasing substantially all of the Purchased Assets from the Debtors;

---

[8] As set forth in footnote 4 above, the Debtors reserve the right to seek to further expedite the timeline for the sale process, using dates to be agreed upon with the Stalking Horse Purchaser, in the event that they are not able to secure the requisite DIP Loan.  At present, the Purchase Agreement requires the closing to occur no later than January 29, 2010.

iii. written evidence acceptable to the Debtors that the Potential Bidder has received debt and/or equity funding commitments or has on deposit in its bank account(s) sufficient unrestricted cash to consummate the purchase contemplated hereby, provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such Bid;

iv. A letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder, and full disclosure of all parties participating with the Potential Bidder, as well as full disclosure of any prepetition and post-petition affiliation that the Potential Bidder may have with (i) the Debtors, (ii) the Debtors' affiliates, (iii) major creditors of the Debtors, (iv) equity security holders of the Debtors, and/or (v) any of the Debtors' former officers or directors or other insiders; and

v. An executed letter acknowledging receipt of a copy of the Bidding Procedures and agreeing to accept and be bound by the provisions contained therein.

vi. If, based on such Participation Materials, the Debtors determine that a Potential Bidder has a bona fide interest in purchasing the Purchased Assets, then no later than three (3) business days after the Debtors make that determination and have received from the Potential Bidder all of the Participation Materials required above, the Debtors will deliver to the Potential Bidder: (a) an electronic copy of the Purchase Agreement; and (b) access information for confidential data concerning the Purchased Assets, which shall include any and all documents furnished by the Debtors to the Stalking Horse Bidder in connection with its due diligence related to the Purchase Agreement (the "Data Room").

- **Due Diligence Period**. Until the Bid Deadline (as defined below), the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their judgment, determine to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to the Debtors. The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders. If the Debtors determine that due diligence material requested by a Potential Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Potential Bidder, the Debtors shall post such materials in the Data Room and provide email notice of such posting to all Potential Bidders, as well as to the Notice Parties, and shall provide such materials to the Stalking Horse Bidder. Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease on the Bid Deadline. Except as provided above with respect to the copy of

the Purchase Agreement provided by the Debtors to the Potential Bidders, and information in the Data Room, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any party.

- **Bid Deadline**. A Potential Bidder that desires to make a bid on all or substantially all of the Purchased Assets (a "Bid") shall deliver written and electronic copies of its Bid and the Bid Requirements set forth below to (i) the Notice Parties, and (ii) counsel to the Official Committee of Unsecured Creditors (the "Committee") so that it is received not later than 5:00 p.m., Eastern Time, on January 8, 2010 (the "Bid Deadline"), provided however, that the Deposit shall be made to the trust account of Debtors' counsel pursuant to instructions to be provided by Debtors' counsel.

- **Bid Requirements**. To participate in the Auction, if any, a Qualified Bidder must deliver to the Debtors a written offer, which must provide, at a minimum, the items noted below to be deemed a "Qualified Bid":

  i.  An executed purchase agreement (a "Marked Agreement") in substantially the same form as the Purchase Agreement, pursuant to which the Potential Bidder offers to purchase substantially all of the Purchased Assets from the Debtors. Such Marked Agreement shall not contain any conditions to closing based upon the ability of the Potential Bidder to obtain financing, the outcome of unperformed due diligence by the Potential Bidder, or any other conditions other than those set forth in the Purchase Agreement. The Potential Bidder shall also provide a marked copy of the Marked Agreement showing any changes to the Purchase Agreement, including changes to reflect the name of the Potential Bidder and the amount of such Potential Bidder's Bid;

  ii. The purchase price in such Bid is a higher or better offer for the Purchased Assets as compared to the offer of the Stalking Horse Bidder. An offer shall not be considered a higher or better offer unless such Bid provides for the assumption of the same amount of liabilities that the Stalking Horse Bidder is assuming under the Purchase Agreement and provides for net consideration (on a risk-adjusted basis) to the Debtors' estates of at least $250,000.00 more than the sum of (i) the cash portion of the purchase price provided by the Stalking Horse Bidder in the Purchase Agreement, plus (ii) the amount of the Break Up Fee, plus (iii) plus the amount of the Expense Reimbursement (such amount, the "Minimum Overbid Amount").

  iii. A deposit of cash or cash equivalents in the amount equal to at least five (5%) percent of the Minimum Overbid Amount (the "Deposit"). The Deposit shall be tendered by cashier's check and/or wire transfer into a segregated bank account established by Debtors' counsel. A Potential Bidder shall forfeit its Deposit if it is the Successful Bidder or Back-Up Bidder (as defined below) and (i) modifies or withdraws its Bid without the Debtors' consent before the consummation of the sale with such

Potential Bidder or (ii) breaches the terms of the agreement pursuant to which the Bidder has agreed to purchase the Purchased Assets or a portion thereof. A Potential Bidder's Deposit shall be returned (i) if such Potential Bidder is determined by the Debtors not to be a Qualified Bidder, promptly upon the making of such determination, (ii) if such Potential Bidder is not the Successful Bidder or the Back-Up Bidder, promptly after the conclusion of the Auction, or (iii) if such Potential Bidder is the Back-Up Bidder and the sale transaction is consummated with the Successful Bidder, promptly upon the consummation of the sale with the Successful Bidder;

iv. The Bid is received by the Debtors by the Bid Deadline, together with the Potential Bidder's Deposit;

v. The Bid does not entitle the Potential Bidder to any break-up fee, termination fee or similar type of payment or reimbursement;

vi. A statement that the Bid is irrevocable and binding until the closing of the sale of the Purchased Assets if the applicable bidder is the Successful Bidder or the Back-Up Bidder;

vii. Evidence satisfactory to the Debtors of the Potential Bidder's (i) financial ability to close the sale described in its Marked Agreement, which may include the most recent audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring some or all of the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidder, and such other financial disclosure acceptable to, and requested by, the Debtors, and (ii) ability to consummate such sale on or prior to the date contemplated by and on the date and on terms and conditions no less favorable to the Debtors those set forth in the Purchase Agreement; and

viii. The Bid is accompanied by a list of any executory contracts and unexpired leases that are to be assumed and/or assigned under such Bid and a demonstration of the Potential Bidder's commitment to pay all Cure Costs in accordance with the Marked Agreement and provide adequate assurance of future performance under any such executory contracts or unexpired leases to be assumed and/or assigned pursuant to such Bid.

ix. A Potential Bidder shall accompany its Bid with: (a) written evidence acceptable to the Debtors that the Potential Bidder has received debt and/or equity funding commitments or has on deposit in its bank account(s) sufficient unrestricted cash to consummate the purchase contemplated hereby, provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such Bid; (b) a copy of a board resolution or similar document demonstrating

the authority of the Potential Bidder to make a binding and irrevocable Bid on the terms proposed; and (c) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws or other aspects of the Bid.

- A Bid received from a Potential Bidder will be considered a "Qualified Bid" only if it meets the above requirements. Each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." For purposes hereof and notwithstanding anything to the contrary provided herein, the Stalking Horse Bidder is a "Qualified Bidder" and the Purchase Agreement executed by the Stalking Horse Bidder and the Bid contained therein is a Qualified Bid.

- A Qualified Bid will be valued based upon the following factors: (a) the purported amount of the Qualified Bid, including any benefit to the Debtors' bankruptcy estates from any assumption of liabilities of the Debtors; (b) the ability to close the proposed sale transaction without delay and within the time frames contemplated by the Purchase Agreement; (c) the ability and delay associated with obtaining all necessary antitrust or other regulatory approvals, including under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, for the proposed transaction; and (d) any other factors the Debtors may deem relevant.

- As soon as reasonably practicable following the Bid Deadline but it no event later than noon Eastern Time on Monday, January 11, 2010, the Debtors shall distribute a copy of each Bid received by the Bidding Deadline, together with notice of which Bids the Debtors have determined are Qualified Bids, to the Notice Parties, to counsel for the Stalking Horse Bidder and to counsel to the Committee.  Any disputes as to whether a Potential Bidder is a Qualified Bidder shall be resolved by the Bankruptcy Court prior to the Auction. The Debtors reserve the right to reject any Bid if such Bid: (i) is on terms that are materially more burdensome or conditional than the terms of the Purchase Agreement; (ii) requires any indemnification of the Potential Bidder on terms that are materially more burdensome than the terms of the Purchase Agreement; or (iii) includes a noncash instrument or similar consideration that is not freely marketable. Any Bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid.

- **Auction.** In the event that the Debtors receive one or more Qualified Bids (other than the Bid of the Stalking Horse Bidder), then the Debtors will hold an auction (the "Auction") on January 13, 2010, commencing at 10:00 a.m. Eastern Time at the offices of Genovese Joblove & Battista, P.A. at 100 S.E. 2nd Street, Suite 4400, Miami, Florida 33131,[9] for consideration of the Qualified Bids, each as may be increased at such Auction.  Bidding will start at the highest Qualified Bid and will continue with minimum Bid increments of $250,000. The Auction may be adjourned as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given

---

[9] The Debtors would be pleased and honored to have the Court conduct the Auction in the courtroom if the Court is willing to do so.

to all entities that submitted a Qualified Bid. The Auction shall be conducted in accordance with the following procedures:

   i. Only the Debtors, representatives of the Senior Lenders and their counsel, members of the Committee and its counsel, the Stalking Horse Bidder and any other Qualified Bidder, in each case, along with their representatives, shall attend the Auction in person, and only the Stalking Horse Bidder and such other Qualified Bidders will be entitled to make any Bids at the Auction.

   ii. Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale by the Debtors of the Purchased Assets;

   iii. By 12:00 p.m. Eastern Time on January 12, 2010, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that, in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.

   iv. By 5:00 p.m. Eastern Time on January 12, 2010, the Debtors will notify the Stalking Horse Bidder and all Qualified Bidders that have informed the Debtors of their intent to participate in the Auction of which Qualified Bid(s) the Debtors believes, in their reasonable judgment, is the highest or best offer (the "Starting Bid").

   v. Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

   vi. At the Auction, the Debtors may employ and announce additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

   vii. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent Bid or combination of Bids is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's immediately

prior Qualified Bid (such bid or combination of Bids, a "Subsequent Bid") and (ii) the Debtors determine that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental Bid or combination of Bids at the Auction shall provide net value to the Debtors' estates of at least U.S. $250,000 over the Starting Bid or the Leading Bid, as the case may be. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid or combination of Bids that they believe to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Promptly at the conclusion of the Auction, the Debtors shall (a) determine, consistent with the Bidding Procedures, which Bid constitutes the highest or best Bid (such Bid, the "Successful Bid") and (b) communicate to the Stalking Horse Bidder, the Notice Parties, and the other Qualified Bidders the identity of the Successful Bidder(s) and the details of the Successful Bid(s). If no Qualified Bids are received other than the Purchase Agreement, the Purchase Agreement shall be designated as the Successful Bid, and there shall be no Auction. The Bidder making the Successful Bid is referred to as the "Successful Bidder." The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final subject to approval by the Bankruptcy Court.

- **The Back-Up Bid**. After determining which Qualified Bid is the Successful Bid, the Debtors shall (a) determine which of the Qualified Bid constitutes the next highest or best Qualified Bid(s) for the Purchased Assets and (b) communicate to the Stalking Horse Bidder, the other Qualified Bidders, and the other Notice Parties the identity of such Qualified Bidder(s) (a "Potential Back-Up Bidder(s)") and the details of such Qualified Bid(s) (a "Potential Back-Up Bid(s)"). In the event that the Potential Back-Up Bidder(s) agrees that (a) its/their Back-Up Bid(s) will remain irrevocable and (b) the Debtors may retain its/their Deposit, until the closing and effectiveness of the sale transactions, then such Potential Back-Up Bidder(s) shall be considered the "Back-Up Bidder(s)" and its/their Potential Back-Up Bid(s) shall be considered the "Back-Up Bid(s)". In the event of the failure by the Successful Bidder(s) to timely consummate the sale transaction, the Back-up Bidder(s) shall be deemed the Successful Bidder(s) without further order of the Court, and shall proceed to close the transactions contemplated by its/their Bid(s) no later than three (3) business days following the Debtors' tender of a notice to the Back-up Bidder(s), unless otherwise ordered by the Bankruptcy Court. The Debtors shall be entitled to the Deposit of any Successful Bidder in circumstances described above, and in such circumstances, such Deposit shall be deemed forfeited by such defaulting Successful Bidder, and shall not be credited against the purchase price for the benefit of any Back-up Bidder. Similarly, in the event that any Back-up Bidder fails to consummate the sale transaction, then the Debtors shall be entitled to the Deposit of said party, and such Deposit shall be

deemed forfeited. The Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder and/or Back-up Bidder as the case may be, provided however, that any recourse against the Stalking Horse Bidder shall be strictly governed by the terms of the Purchase Agreement. If the Qualified Bidder(s) initially identified as the Potential Back-Up Bidder(s) do/es not agree to become the Back-Up Bidder(s), then such Potential Back-Up Bidder(s) shall be entitled to its/their Deposit(s) and the Debtors (and the Bankruptcy Court, to the extent there is a dispute), may identify the next highest or otherwise best Bid(s) as the Potential Back-Up Bid(s), and may continue to do so until Potential Back-Up Bidder(s) agree to become the Back-Up Bidder(s).

- **The Successful Bid**. At the Auction, the Debtors shall have the right to select the highest and best Bid from the Auction, which will be determined by considering, among other things: (A) the number, type and nature of any changes to the Purchase Agreement requested by each Qualifying Bidder; (B) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and the cost to the Debtors of such modifications or delay; (C) the total consideration to be received by the Debtors; (D) the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof; and (E) the net benefit to the estate, taking into account the Stalking Horse Bidder's rights to the Breakup Fee and Expense Reimbursement (for avoidance of doubt, the Debtors hereby agree that the value attributed by the Debtors to any Bid made by the Stalking Horse Bidder at the Auction shall include the requirement to pay the Break Up Fee and the Expense Reimbursement).

- **The Sale Hearing**. The Successful Bid will be presented to the Bankruptcy Court for approval at the Sale Hearing. If no other Qualified Bid is received by the Debtors, and the Stalking Horse Bid is the Successful Bid, then the Debtors will seek entry of an order at the Sale Hearing authorizing and approving the sale transaction, including the sale of the Purchased Assets to the Stalking Horse Bidder, pursuant to the terms and conditions set forth in the Purchase Agreement. If a different Qualified Bid is the Successful Bid, then the Debtors anticipate that they will seek the entry of an order, modified as necessary to reflect the terms of the Successful Bid, authorizing and approving the sale of the applicable Purchased Assets to the Successful Bidder. The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of such adjournment at the Sale Hearing. Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale, and parties shall be prepared to present their evidence in support of or in opposition to the proposed sale at the Sale Hearing.

- **"As Is, Where Is"**. The sale transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates, except to the extent expressly set forth in the Purchase Agreement or the Marked Agreement corresponding to the Successful Bid, as the case may be. Except as otherwise provided in the Successful Bid, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims (as such term is defined by section 101(5) of the

Bankruptcy Code), encumbrances, rights, remedies, restrictions, interests, liabilities, leasehold interests and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Purchased Assets to the Successful Bidder, and the proposed order approving the sale transaction (as so defined therein, "Claims") as set forth in the Purchase Agreement and the Sale Order, with such Claims to attach to the net proceeds of the sale with the same validity and priority as such Claims applied against the Purchased Assets.

- **<u>Bankruptcy Court Jurisdiction</u>**. Any and all disputes related or pertaining to or resulting or arising from the Bid Procedures, the Auction, the sale transaction and/or the conduct of the Debtors shall be adjudicated solely by the Bankruptcy Court. The submission of a Bid shall constitute an express consent by the Bidder to the exclusive jurisdiction of the Bankruptcy Court for all such matters.

- **<u>Break Up Fee</u>**. In consideration of the Stalking Horse Bidder's undertaking of the substantial legal, accounting and other expenses attendant to the Purchase Agreement, proceeding toward the consummation of the sale transaction, and acting as the Stalking Horse Bidder, the Debtors have agreed to pay the Stalking Horse Bidder (i) a fee of 3.0% of the Purchase Price (the "Break Up Fee") plus (b) reimbursement for reasonable fees and expenses, as may be determined by the Court and capped at $1,000,000, incurred by Stalking Horse Bidder in connection with the Stalking Horse Bidder's due diligence (the "Expense Reimbursement"), which Break Up Fee and Expense Reimbursement shall be payable in accordance with the terms of the Purchase Agreement, including specifically through a "carve out" from the collateral securing the obligations owed to the Senior Lenders under the Prepetition Credit Agreement, as defined in the Purchase Agreement.[10]

25.     The Bidding Procedures provide a flexible process where the Debtors will be soliciting bids in a manner that will allow the Debtors to maximize the value of their assets given the severe liquidity constraints and accompanying time pressure they currently face.

**B.     <u>Authority to Offer Breakup Fee and Expense Reimbursement.</u>**

26.     As set forth above in detail, the Debtors have determined, in the exercise of their best business judgment, that a sale of the Purchased Assets at this time to the Stalking Horse Bidder, subject to higher or better offers, is warranted and necessary. As set forth above, the Debtors request authority to enter into the Purchase Agreement with the Stalking Horse Bidder

---

[10] Nothing in this Motion or the Purchase Agreement shall constitute a waiver of the Stalking Horse Bidder's right to seek payment of the Break Up Fee and Expense Reimbursement as a surcharge pursuant to Section 506(c) of the Bankruptcy Code, if necessary.

and approval of the Bidding Procedures, including (i) the amount and payment terms for the Break Up Fee and Expense Reimbursement, and (ii) certain other overbid protections set forth above.

27.     The ability of the Debtors to offer the Stalking Horse Bidder the proposed bidding protections is beneficial to the Debtors' estates and creditors because it affords the Debtors the means necessary to induce the Stalking Horse Bidder to submit or increase its bid prior to the Auction and allows the Debtors to establish a floor and appropriate parameters for the submission of Bids prior to the Auction. Thus, even if the Stalking Horse Bidder is paid a Break-Up Fee and Expense Reimbursement from the Senior Lenders' collateral because the Stalking Horse Bidder is not the Successful Bidder, the Debtors and their estates will have benefited from the higher floor established by the Stalking Horse Bid and the certainty that such Bid brings to the sale process. Approval of breakup fees, expense reimbursements and other forms of bidding protection in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become an established practice in large chapter 11 cases.

28.     Three different approaches have been used by the bankruptcy courts in assessing the validity and enforceability of bidding incentives. The first approach – the business judgment test – is based on the corporate control cases and applies the business judgment rule to make certain that bidding is promoted, not deterred, and that the fees are reasonable in relationship to the size of the transaction and the bidder's efforts. *See In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Col. 1992), adopting *In re Integrated Resources, Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *In re Metaldyne Corp.,* 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) (applying business judgment test to Debtor's selection of stalking horse bidder); *see also Cottle v. Stores*

*Communications, Inc.*, 849 F. 2d 570 (11th Cir. 1988) (using business judgment test in corporate control context). This approach also has been endorsed by a leading bankruptcy treatise. See 3 *Collier on Bankruptcy* § 363.02[6] at 363-21 (15th ed. 2005) (courts "should approve [bidding incentives] unless they are unreasonable or appear more likely to chill the bidding process than to enhance it.").

29.     The second approach – the best interests of the estate test – focuses on whether the bidding incentive at issue is in the best interests of the estate to ensure that the debtor's estate is not unduly burdened and that the relative rights of the parties are protected. See *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ("this Court declines to follow other Bankruptcy Court's opinions where break-up fees are treated as another topic of corporate negotiation without reference to what in fact is in the best interests of the estate."); see also *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) (adopting *America West*); *In re Tiara Motorcoach Corp.*, 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (same).

30.     The third approach – the administrative claim test – considers whether the bidding incentive at issue is "actually necessary to preserve the value of the estate." See *In re O'Brien Environmental Energy, Inc.*, 181 F. 3d 527, 535 (3d Cir. 1999) (concluding that none of the cases which support the first two approaches "offers a compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for administrative expenses under the same provision"); see also *AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C.* (*In re Tama Beef Packing, Inc.*), 290 B.R. 90, 97-98 (B.A.P. 8th Cir. 2003) (adopting reasoning of *O'Brien* and holding that administrative expense jurisprudence is applicable); *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) (citing *Tama Beef* as applicable circuit precedent); *In re Dorado Marine, Inc.*, 332 B.R.

637 (M.D. Fla. 2005) (using administrative expense test, citing *O'Brien*); *In re Beth Israel Hospital Ass'n of Passaic*, 2007 WL 2049881 at *15 (Bankr. D.N.J. July 12, 2007) (break-up fees must be determined by the same standard applied to the allowance of any administrative expense); (*In re Reliant Energy Channelview, LP*, 403 B.R. 308, 311 (D. Del. 2009) (parties agreed that *O'Brien* set forth correct standard).

31.    The Debtors submit that under each of the above tests the proposed Break Up Fee and Expense Reimbursement will not chill bidding, but rather enhance it and that the proposed Break Up Fee and Expense Reimbursement will preserve and enhance the value of the estates' assets. Moreover, the amount of the proposed Break Up Fee, 3% of the Purchase Price <u>plus</u> the Expense Reimbursement capped at $1.0 million payable in accordance with the terms of the Purchase Agreement, namely a "carve out" from the collateral securing the obligations owed to the Senior Lenders, is reasonable under the circumstances and in light of the substantial time and effort that the Stalking Horse Bidder has invested in negotiating the Purchase Agreement and related documents, as well as the risk taken by the Stalking Horse Bidder in connection therewith. In addition, the Debtors agreed to the Break Up Fee and the Expense Reimbursement in the context of the other offers that were made to the Debtors at the time that they were considering which potential purchaser to select as the stalking horse.  Specifically, the purchase price proposed by the Stalking Horse Bidder under the Purchase Agreement was materially higher than the other proposals received by the Debtors, even after taking into account the amount of the Break Up Fee and Expense Reimbursement.  Moreover, the Debtors submit that the amount of the Break-Up Fee and Expense Reimbursement are consistent with both market rates and recent break up fees that have been approved in other large Chapter 11 cases.  See *In re Continuum Care Services, Inc.*, No. 07-10749-JKO (Bankr. S.D. Fla. December 12, 2007)

(approving breakup fee in the amount of $360,000 [3.0%]); *In re Gemini Cargo Logistics, Inc.*, No. 06-10870 (Bankr. S.D. Fla. April 17, 2006) (approving break-up fee payable in connection with exit financing and expense reimbursement of reasonable out-of-pocket expenses); *In re Picadilly Cafeterias, Inc.*, No. 03-27976 (Bankr. S.D. Fla. September 14, 2004) (approving payment of expense reimbursement as bidder protection); see also *In re Tribune Company*, No. 08-13141(KJC) (Bankr. D. Del. August 31, 2009) (approving "Investor Protections" related to sale of Chicago Cubs that included a potential $20,000,000 maximum breakup fee [2.49%]); *In re Solutia Inc.*, Case No. 03-17949 (PCB) (Bankr. S.D.N.Y. October 19, 2005) (approving termination fee of $7.5 million [2.94%] and reimbursement of expenses up to $2 million); *In re Magellan Health Servs., Inc.*, Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. September 8, 2003) (approving termination fee of $4 million [2.6%] and reimbursement of expenses up to $1 million); *In re Genuity Inc.*, Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. December 16, 2002) (approving breakup fee of $10 million [4.1%] and expense reimbursement up to $3 million).

## C.    <u>Proposed Notice of the Sale Hearing</u>

32.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 20 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested.

33.    The Debtors have served, or will serve, this Motion on: (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) all parties known to be asserting a lien in the Debtors' assets (including each of the Debtors' Senior Lenders and all known claimants asserting mechanics and/or materialmens' liens); (d) all counterparties to executory contracts and unexpired leases potentially to be assumed and assigned; (e) all state attorney generals in states

where the Debtors conduct business; and (f) various federal and state tax authorities, including the Internal Revenue Service.

34.    In compliance with Bankruptcy Rule 2002(c), the Debtors also will serve, by regular mail, a notice of the Bidding Procedures, Auction and Sale Hearing (the "Sale Notice"), substantially in the form annexed hereto as Exhibit B, which includes, among other things, the date, time and place of the Auction and of the Sale Hearing. The Sale Notice shall be served upon (i) the Office of the United States Trustee for the Southern District of Florida; (ii) counsel to the Stalking Horse Bidder; (iii) the holders of the 20 largest unsecured claims against the Debtor, Arch Aluminum & Glass Co., Inc., and the holders of the 20 largest unsecured claims against the Debtor, AWP, LLC, as identified in the Debtors' Chapter 11 petitions; (iv) counsel to the Senior Lenders; (v) the Notice Parties; (vi) any party that, in the past year, expressed in writing to the Debtors an interest in acquiring the Purchased Assets, directly or through a merger or alliance; (vii) all parties who are known to assert Claims upon the Purchased Assets; (viii) the U.S. Treasury; (ix) the Securities and Exchange Commission; (x) the Internal Revenue Service; (xi) all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities; (xii) all applicable state and local taxing authorities; (xiii) the Federal Trade Commission; (xiv) United States Attorney General/Antitrust Division of Department of Justice; (xv) the U.S. Environmental Protection Agency; (xvi) United States Attorney's Office; (xvii) the entities set forth in the Master Service List established in these cases; (xviii) all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002; and (xix) any other party identified on the creditor matrices in these cases.

35.    The Debtors submit that the methods of notice described in this Motion comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the Bidding

Procedures and of the sale of the Purchased Assets. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

**D.    Sale of Substantially all Assets Pursuant to Section 363(b) of the Bankruptcy Code**

36.    The Debtors request authority to sell, assign and transfer the Purchased Assets to Stalking Horse Bidder, or the highest and best bidder, pursuant to Section 363(b) of the Bankruptcy Code, which Section provides that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."

37.    The sale of the Purchased Assets to Stalking Horse Bidder pursuant to the Purchase Agreement constitutes substantially all of the Debtors' assets.  Courts interpreting Section 363(b) have approved non-ordinary course sales even where substantially all of a debtor's assets were being sold prior to proposal of a plan of reorganization.  *In re Parkstone Med. Info. Sys.*, 2001 WL 36189822 at *1 (Bankr. S.D. Fla. Oct. 16, 2001) (Hyman, J.); *In re Lionel Corporation*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983); *In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984); *In re Tower Automotive, Inc.*, 342 B.R. 158, 163-64 (Bankr. S.D.N.Y. 2006 (discussing legal standards governing asset sales outside the plan process). Following the guidelines established by the seminal decision of the Second Circuit in the *Lionel* case and its progeny, a debtor may sell all of the assets of the estate under Bankruptcy Code section 363 outside of a plan.  As the *Lionel* court observed:

> Resolving the apparent conflict between Chapter 11 and section 363(b) does not require an all or nothing approach.  Every sale under 363(b) does not automatically short-circuit or side step Chapter 11; nor are these two statutory provisions to be read as mutually exclusive.  Instead, if a bankruptcy judge is to administer a business reorganization successfully under the Code, then ... some plan for the operation of both 363(b) must be allowed for. ... The rule we adopt requires that a judge determining a section 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.

*In re Lionel Corporation*, 722 F.2d at 1070-71; see also *In re General Motors Corp.*, 407 B.R. 463, 498 (Bankr. S.D.N.Y. 2009) (holding that proposed 363 transaction did not constitute an impermissible *sub rosa* plan); *In re Chrysler LLC*, 405 B.R. 84, 94 (Bankr. S.D.N.Y. 2009) (applying *Lionel* factors).

38.     Therefore, as a general rule, courts approve the sale of all or substantially all of a debtor's assets, prior to confirmation of a plan and pursuant to Section 363(b), provided the debtor establishes "sound business judgment" for such a transaction. *Parkstone Med. Info. Sys.*, 2001 WL 36189822; *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995) ("courts consistently have acknowledged that assets of an estate can be sold prior to the confirmation, or even filing, of a plan")*.; In re Lorraine Brooke Associates, Inc.*, 2007 WL 2257608 at *4 (Bankr. S.D. Fla. Aug. 2, 2007) (Cristol, J.) (applying business judgment test in assessing 363(b) motion in chapter 7 proceedings) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-176 (D. Del. 1991)); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).  The "sound business judgment" test requires a debtor to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested parties, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith.  *Id.*; see also *In re Equity Management Systems*, 149 B.R. 120, 124 (applying same factors); *In re Phoenix Steel Corporation*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (same); *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 136 (Bankr. W.D.N.Y. 2009) (same) (citing *In re Lionel Corp.*, 722 F.2d at 1071 and *Phoenix Steel*, 82 B.R. at 335).

### (i)     *Sound Business Reasons Exist to Sell the Assets at this Time*

39.     The Debtors respectfully submit that all of the factors demonstrating their sound business judgment are met, and that the sale should be approved.  There are sound business

reasons justifying the sale of the Purchased Assets to Stalking Horse Bidder, or the highest and best bidder, at this time. The Debtors are concerned about the ability to effectuate a true "internal" reorganization, nor do they have the luxury of time to negotiate, formulate and propose a plan of reorganization and disclosure statement. Rather, the Debtors have determined that the best way to maximize the value of their assets is to sell their business and property as a going concern, for fair market value, to the highest and best bidder pursuant to a section 363 sale.

40.    As set forth above, in August 2009, Vincent Colistra became the chief restructuring officer of the Debtors. As the Debtors did before he was engaged, Mr. Colistra immediately took steps to further reduce overhead and improve the net operations of the Debtors. However, even with these improved operations, the Debtors may not have the ability to restructure their financial affairs solely based on their business revenue.

41.    As set forth above in detail, PJC conducted an extensive pre-petition marketing process that generated several interested parties who undertook significant effort and incurred significant expense conducting due diligence on the Debtors' assets. The result of such process was the proposed sale of the Purchased Assets to the Stalking Horse Bidder pursuant to the Purchase Agreement. Due to the cash constraints facing the Debtors as described above, the Debtors must seek approval of the sale of the Purchased Assets to the Stalking Horse Bidder, or the highest and best bidder at the Auction, as quickly as possible, such that a closing can occur by mid to late January 2010. If the Debtors were required to effectuate these sales pursuant to the typical plan and disclosure statement process, the closings would not occur for several more months. Therefore, in order to avoid losing these valuable opportunities, and in order to preserve the maximum value of the Purchased Assets for the estates, the Debtors were required to seek approval of the sales by way of motion rather than pursuant to a plan of reorganization.

42.     Moreover, as set forth below, the Debtors may be required to close their operations and convert their cases to a Chapter 7 liquidation proceeding if this opportunity is lost.  Attached hereto as Exhibit "C" is a liquidation analysis prepared by the CRO for the Debtors' assets (the "Liquidation Analysis").  As set forth therein, in the event that the Purchased Assets were liquidated in a Chapter 7 or a "forced sale" scenario, then after accounting for the cost of liquidation, the Debtors project that they would receive between a low of $29.104 million to a high of $41.338 million, with a base case liquidation value net of costs equal to $35.873 million.  Such liquidation value is substantially less than the approximate $62,000,000 that will be realized by the Debtors' estates under the Purchase Agreement.  Moreover, a conversion to Chapter 7 would result in the loss of approximately 1,800 jobs, as well as a future customer for all of the Debtors' vendors.  As such, the Debtors submit that they have demonstrated sound business judgment for this Motion.

*(ii)*     ***Alternatives to Sale Motion.***

43.     Rather than seeking to sell substantially all of its assets, the Debtors could have sought to restructure their financial affairs through a plan of reorganization.  In such a scenario, the Debtors would have been required to demonstrate to the Court, and to creditors of the estates, that they had the ability to emerge from Chapter 11 as a "reorganized entity".  The Debtors would have to show, among other things, that they had the financial ability to meet the requirements of Section 1129 of the Bankruptcy Code, which requires a debtor to demonstrate, among other things (a) that creditors will receive or retain under such plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor was liquidated on such date under chapter 7 of the Bankruptcy Code, and (b) confirmation of the plan is not likely to be

followed by the liquidation, or the need for further financial reorganization of the debtor.  Based on the financial condition of the Debtors and the need for an immediate and significant capital infusion as described above, it is unclear at best whether the Debtors could satisfy these requirements.  Therefore, the Debtors have not sought to propose and seek confirmation of a plan of reorganization.

44.    Another alternative to the proposed sale would be the conversion of this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, which would require the immediate closure and cessation of the Debtors' business operations and the liquidation of all assets of the Debtors and the Debtors' estate by a Chapter 7 bankruptcy trustee.  Due to the nature of the Debtors' business, the Debtors' business assets have limited value unless they are used in connection with a going concern business.  Therefore, if the Debtors' operations cease, then the Debtors assert, as demonstrated by the Liquidation Analysis attached hereto as Exhibit C, that all creditors of the Debtors' estates will receive substantially less than the proposed value of the Purchase Agreement with the Stalking Horse Bidder.

45.    Yet another alternative to the proposed sale to the Stalking Horse Bidder is the dismissal of these Chapter 11 cases.  In that event, however, the Debtors readily anticipate that the Senior Lenders will commence proceedings to foreclose on their collateral.  In addition, the Debtors anticipate that certain other creditors would quickly file suit against the Debtors.  Moreover, given the immediate need for a capital infusion, the Debtors will more likely than not need to cease all of their operations and close their doors.  The court presiding over any particular court proceeding would not have jurisdiction over any other proceeding, and as a consequence each creditor would be free to undertake such collection activity, including lawsuits, as such creditor deemed appropriate, all in what would amount to a "race to the

courthouse." These consequences are exactly the types of activities that the bankruptcy process is designed to avoid. It is only through the bankruptcy process that the Debtors' creditors can be treated in accordance with each creditor's respective rights.

46.    Collectively, these factors clearly evidence that the Debtors' proposed sale of the Purchased Assets to Stalking Horse Bidder, or the highest and best bidder, is in the best interest of all creditors of the estate.

> ### (iii)    *The Debtors have Obtained a Fair and Reasonable Price*

47.    The Debtors believe that the sale proposed herein is the best way to preserve the going concern, enterprise value of the Purchased Assets and to maximize the value of the estates for the benefit of all creditors in these Chapter 11 cases. As set forth above, the Purchased Assets were extensively marketed by the Debtors with the substantial assistance of PJC and the CRO for several months prior to the filing of these Chapter 11 cases. After several potential purchasers conducted extensive due diligence, the Debtors received no less than five (5) firm offers for the Debtors' assets. After evaluating such offers with the Debtors' board of directors and with the assistance of their professionals, the Debtors selected the Stalking Horse Bidder as the best offer received for the Purchased Assets. Moreover, as set forth above, the value of the Purchase Agreement to the Debtors' estates (approximately $62,000,000) greatly exceeds the liquidation value of the Purchased Assets. Finally, pursuant to Bidding Procedures set forth above, the sale will be subject to higher and better offers.

> ### (iv)    *The Sale is in Good Faith*

48.    The Purchase Agreement is the product of good faith, arms' length negotiations between the Debtors and the Stalking Horse Bidder. The Stalking Horse Bidder is not an insider of the Debtors within the meaning of Section 101(31) of the Bankruptcy Code, and does not

control or act on behalf of any insider of the Debtors.  Therefore, the sale has been proposed in

good faith.  See *In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) ("deference to a

DIP's decision as to a successful bidder of its assets is appropriate, and that decision may be

honored unless it is proven that the DIP abused that discretion"); *In re Abbotts Dairies of

Pennsylvania, Inc.*, 788 F.2d 143, 149, n.5 (3d Cir. 1986) (purpose of good faith requirement is

to "prevent[] a debtor-in-possession or trustee from effectively abrogating the creditor

protections of Chapter 11."); see also *In re Lorraine Brooke Associates*, 2007 WL 2257608 at

\*4; *In re Grand Prix Associates, Inc.*, 2009 WL 1850966 at \*4 (Bankr. D.N.J. June 26, 2009)

("A court may not find good faith if fraud, collusion, or unfair advantages are determined.")

(citing *Abbotts Dairies*, 788 F.2d at 149-50).

E.    **Sale of Assets Free and Clear of Certain Liens, Claims and Encumbrances**

49.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property

under Bankruptcy Code section 363(b) free and clear of liens, claims and encumbrances if one of

the following conditions is satisfied: (a) applicable nonbankruptcy law permits the sale of the

property free and clear of such interest; (b) the entity holding the lien, claim or encumbrance

consents to the sale; (c) the interest is a lien and the price at which such property is to be sold is

greater than the aggregate value of all liens on the property; (d) the interest is in bona fide

dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a

money satisfaction of its interest. 11 U.S.C. § 363(f). *See In re Smart World Tech., LLC*, 423

F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims

and interests. It thus allows purchasers ... to acquire assets [from a debtor] without any

accompanying liabilities"); *In re Dundee Equity Corp.*, 1992 WL 53743, at \*3 (Bankr. S.D.N.Y.

Mar. 6, .1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

50.    The Purchase Agreement requires that the sale of the Purchased Assets be free and clear of all liens, claims, encumbrances and interests (collectively, the "Liens"). The sale of the Purchased Assets pursuant to the Bidding Procedures will satisfy section 363(f) of the Bankruptcy Code because the Debtors believe that the Senior Lenders will consent to such sale and/or the Debtors believe that they can compel such a sale over objection pursuant to one or more of the other subsections of section 363(f) of the Bankruptcy Code.  In all events, any Lien on the Purchased Assets sold pursuant to the Bidding Procedures shall attach to the net proceeds of the sale of the Purchased Assets.  The Debtors will address and more fully brief these issues in advance of the Sale Hearing if they are not able to garner the requisite consents from their Senior Lenders.

51.    In addition, the Debtors submit that the Purchased Assets may be sold free and clear of all successor liability claims. Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Chrysler LLC*, 576 F.3d 108, 126 (2nd Cir. 2009) (agreeing with *TWA* decision "that the term 'any interest in property' encompasses those claims that 'arise from the property being sold.'");  *Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), *affd*, 805

F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(1) barred successor liability for products defect claim).

**F.**     **The Successful Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser**

52.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal. Specifically, section 363(m) states that: "The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal 11 U.S.C. § 363(m)." *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Global Vision Products, Inc.*, 2009 WL 2170253 at *3 (Bankr. S.D.N.Y. Jul 14, 2009) (citing *Hughes*)*; In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal"); *In re MacNeal,* 308 Fed. Appx. 311, 315 (11th Cir. 2009) ("after a sale is approved by the bankruptcy court and consummated by the parties, the sale may not be invalidated unless it is stayed pending appeal") (citing *In re The Charter Co.*, 829 F.2d 1054, 1056 (11th Cir. 1987) ("In order to protect those who purchase property from a bankruptcy estate, the Bankruptcy Code provides that once a sale is approved by the bankruptcy court and consummated by the parties, the bankruptcy court's authorization of the sale cannot be effectively altered on appeal.")).

53.    Although the Bankruptcy Code does not define "good faith," one court has held that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *In re Gucci,* 126 F.3d 380, 390 (2nd Cir. 1997) (*quoting In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Andy Frain Services, Inc*., 798 F.2d 1113, 1125 (7th Cir. 1986).

54.    Here, the selection of the Stalking Horse Bidder was the result of an extensive marketing process and extended arm's-length, good-faith negotiations. The Debtors and the Stalking Horse Bidder were both advised by their legal and financial advisors throughout the process. In the event of a competitive Auction, the Debtors will only select the Stalking Horse Bid as the Successful Bid if, after a review of all Qualified Bids (and Subsequent Bids submitted by the Stalking Horse Bidder or other Qualified Bidders), the Debtors determines that the Bid of the Stalking Horse Bidder is the highest and best offer submitted for the Purchased Assets. Accordingly, the Debtors request that the Court make a finding that the Stalking Horse Bidder, or the Successful Bidder at the Auction of the Purchased Assets, is entitled to the protections of section 363(m) of the Bankruptcy Code.

## G.    The Court Should Waive or Reduce the Periods Required By Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure

55.    Pursuant to Rule 6004(h), all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order, unless the court orders otherwise. Fed. R. Bankr. P. 6004(h).

56.      Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately if there is a showing of a sufficient need to close the sale within the 10-day period. 10 Collier on Bankruptcy § 6004.10 (15th ed. 2007); *see In re Perry Hollow Management Co., Inc.*, 297 F.3d 34, 41 (1st Cir. 2002) (affirming bankruptcy court's decision to waive 10-day stay where trustee presented as evidence for the waiver that: (i) the sale price was reasonable; (ii) the buyer was ready to complete the sale the next day; and (iii) the debtor would incur costs for storing the sold property pending closing); *see also In re Second Grand Traverse School*, 100 Fed. Appx. 430 (6th Cir. 2004) (bankruptcy court's decision to waive automatic 10-day stay following sale of debtor's property was not abuse of discretion).

57.      In order to limit the costs of administering the Debtors' estates, it is critical that the Debtors close the sale of the Purchased Assets as soon as possible after the Sale Hearing, but in no event later than mid to late January 2010.  Accordingly, the Debtors hereby request that the Court waive the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d), to the extent applicable.

**H.      Assumption And Assignment of Executory Contracts and Unexpired Leases**

58.      The assumption and assignment of the Debtors' executory contracts and unexpired leases is an integral part of the proposed sale and should be approved by the Court. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). By enacting section 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject

those that are of no value or are burdensome to the estate. *See Cinicloa v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *In re Chira*, 367 B.R. 888, 898 (S.D. Fla. 2007); *In re Sandman Assocs., LLC*, 251 B.R. 473; 481 (W.D. Va. 2000) (noting that "[t]he authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable and rejecting those that are not.").

59.    It is well established that decisions to assume or reject executory contracts or unexpired leases are matters within the "business judgment" of the debtor. See *In re Chira*, 367 B.R. at 897 ("[A] bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract [pursuant to § 365] should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it.'" (quoting *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2nd Cir. 1993); see also *In re Prime Motor Inns*, 124 B.R. 378 (Bankr. S.D. Fla. 1991) (Cristol, J.) (applying the business judgment test in analyzing debtor's rejection of executory contract. Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "the product of bad faith, whim or caprice."  *In re Prime Motor Inns*, 124 B.R. at 381; *In re Surfside Resort and Suites, Inc.*, 325 B.R. 465, 469 (Bankr. M.D. Fla. 2005) (same) (citing *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985).

60.    Adequate business justification exists to merit judicial approval of the proposed assumption and assignment of the Debtors' executory contracts and unexpired leases. The Debtors' contracts and leases are valuable assets of the Debtors' estates and represent an integral

part of any proposed transaction for the sale of the Purchased Assets. To the extent that the Debtors can sell them as part of the sale, the sales will generate cash which the estates can use to satisfy claims and reduce potential claims against the estates.

61.    Section 365(b)(1) of the Bankruptcy Code authorizes a debtor-in-possession to assume and/or assign an executory contract if the debtor: "(A) cures, or provides adequate assurance that [it] will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;  (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease. . . ."  Further, Section 365(f)(2) provides that: "The trustee may assign an executory contract or unexpired lease of the debtor only if - (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. *See* 11 U.S.C. §§ 365(a), (b)(1), (f)(2). Accordingly, Section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments of executory contracts and unexpired leases, provided

that the defaults under such contracts are cured and adequate assurance of future performance is provided.

62.     It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but that a contract counterparty is not required to receive an absolute guarantee of future performance. *See, e.g., In re Glycogensys, Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee"); *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (for purposes of 365(b)(1)(C), adequate assurance of future performance "is to be given a practical, pragmatic construction based upon . . . the circumstances of [the] case." (quoting *In re Carlisle Homes*, 103 B.R. at 538).

### (i).     *Proposed Procedure for Assumption and Assignment of Executory Contracts and Unexpired Leases.*

63.     In the interest of time and in order to facilitate a process for the assumption and assignment of executory contracts and unexpired leases that is integrated with the Bidding Procedures set forth above, the Debtors propose and respectfully request approval of the following process for the Debtors to assume and assign to the Stalking Horse Bidder or the Successful Bidder certain executory contracts and unexpired leases.

64.     As set forth above, any Bid that is conditioned upon the assumption and assignment of executory contracts and unexpired leases must (a) be submitted with a list of executory contracts and unexpired leases (if any) that are to be assumed and/or assigned; and (b) evidence of such bidder's ability to provide adequate assurance of future performance in respect

of such agreements (the "Adequate Assurance Package"). Similarly, prior to the Bid Deadline, the Stalking Horse Bidder must identify the executory contracts and unexpired leases that it desires to assume if it is ultimately the buyer and provide the Debtors with information similar to the Adequate Assurance Packages required pursuant to the Bidding Procedures.

65.    On or before three (3) business days prior to the Sale Hearing, the Debtors shall file with the Bankruptcy Court and shall serve on each non-debtor counterparty to an executory contract or unexpired lease with any of the Debtors (each a "Non-Debtor Counterparty") that the Debtors may assume and assign to the Stalking Horse Bidder or another Successful Bidder (each such agreement, a "Designated Agreement"), by overnight delivery service, a notice of assumption and assignment of executory contracts and unexpired leases (the "Assignment Notice"). The Debtors shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to each Designate Agreement and the cure costs, if any, that would be due pursuant to section 365(b)(1) of the Bankruptcy Code ("Cure Costs") to each Non-Debtor Counterparty, provided that such Assignment Notice shall in no way limit such Non-Debtor Counterparty's entitlement to Cure Costs by filing an objection to such Cure Costs prior to the Sale Hearing.

66.    The Assignment Notice shall also provide notice to each Non-Debtor Counterparty of the date and time of the Sale Hearing and indicate that, upon written request to the Debtors' counsel by a Non- Debtor Counterparty to a Designated Agreement, the Debtors will provide to such party any Adequate Assurance Package provided by the Stalking Horse Bidder or Successful Bidder, as applicable.

67.    Objections, if any to the proposed assumption and assignment of the Designated Agreements, including the Cure Costs the provision of adequate assurance of future performance

or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of Section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with the Court and served on the Notice Parties so as to be received no later than 12:00 pm Eastern one (1) business day prior to the Sale Hearing.  Where a Non-Debtor Counterparty to an Designated Agreement files an objection to the assumption by the Debtors and assignment to the Successful Bidder of such Designated Agreement (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtors, the Successful Bidder and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.

68.    If any of the Debtors, the Non-Debtor Counterparty or the Successful Bidder determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under Section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Bankruptcy Court at the Sale Hearing.

69.    Any Non-Debtor Counterparty to a Designated Agreement who fails to file a timely objection to the proposed Cure Costs or the proposed assumption and assignment of an Designated Agreement is deemed to have consented to such Cure Costs and the assumption and assignment of such Designated Agreement, and such party shall be forever barred from objecting to the Cure Costs or such assumption and assignment and from asserting any additional cure or other amounts against the Debtors, their estates or the Stalking Horse Bidder.

70.    If the Non-Debtor Counterparty to a Designated Agreement fails to timely assert an objection as described above, or upon the resolution of any timely objection by agreement of

the parties or order of the Court approving an assumption and assignment, such Designated Agreement shall be deemed to be assumed by the Debtors and assigned to the Stalking Horse Bidder or other Successful Bidder and the proposed Cure Cost related to such Designated Agreement shall be established and approved in all respects, subject to the conditions set forth below.

71.     The Debtors' decision to assume and assign the Designated Agreements is subject to Court approval and consummation of the sale transaction with the Stalking Horse Bidder or a higher and better bidder pursuant to the Bidding Procedures. Accordingly, subject to the satisfaction of conditions to address any cure or assignment disputes, the Debtors shall be deemed to have assumed and assigned to the Successful Bidder each of the Designated Agreements as of the date of and effective only upon the Closing Date, and absent such closing, each of the Designated Agreements shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.  Assumption and assignment of the Designated Agreements also is subject to the Successful Bidder's rights set forth above. The Successful Bidder shall have no rights in and to a particular Designated Agreement until such time as the particular Designated Agreement has been assumed and assigned in accordance with the procedures set forth herein.

72.     Based on the foregoing, the Debtors respectfully request that the Bankruptcy Court approve the procedure set forth above for the assumption and assignment of the Designated Agreements.

## **NO PRIOR REQUEST**

73.     No previous motion for the relief sought herein has been made to this or to any other court.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) approve the Purchase Agreement and authorize the Debtors to enter into the Purchase Agreement, (b) approve the Bidding Procedures set forth herein; (c) authorize the Debtors to provide certain stalking horse bid protections; (d) approve the Break Up Fee and the Expense Reimbursement, as well as the payment terms related thereto as set forth in the Purchase Agreement; (e) schedule a final hearing to consider approval of, an approving, the sale of substantially all of the Debtors' assets; (f) authorizing the Debtors to assume and assign certain executory contracts and unexpired leases in connection with the Purchase Agreement, (g) approve the form and manner of notice of the sale and of the Sale Hearing; and (h) grant such other and further relief as is just and proper.

Respectfully submitted this 2nd day of December 2009,

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

GENOVESE JOBLOVE & BATTISTA, P.A.
Proposed Attorneys for Debtors-in-Possession
4400 Bank of America Tower
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:     /s/     Paul J. Battista
        Paul J. Battista, Esq.
        Florida Bar No. 884162
        pbattista@gjb-law.com
        Heather L. Harmon, Esq.
        Florida Bar No. 013192
        hharmon@gjb-law.com
        Michael L. Schuster, Esq.
        Florida Bar No. 57119
        mschuster@gjb-law.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via facsimile, CM/ECF, and/or First Class postage-paid U.S. Mail to all parties on the attached service list this 2nd day of December, 2009.

By: /s/ Paul J. Battista
Paul J. Battista, Esq.

**MASTER SERVICE LIST**
**ARCH ALUMINIM & GLASS CO.,  INC.,** *et al.*
**CASE NO. 09-36232-BKC-JKO**

## DEBTORS

**ARCH ALUMINIM & GLASS, CO., INC,** *et al*
Attn: Leon Silverstein
10200 N.W. 67th Street
Tamarac, FL 33321

## STAKEHOLDERS

**MSouth Equity Partners**
Attn: Garrison Kitchen
Two Buckhead Plaza
3050 Peachtree Road NW
Suite 550
Atlanta, GA 30305

## SENIOR LENDERS

**PNC Bank, N.A.**
*As Lender and Agent*
Attn: Jay Stein
5200 Town Center Circle, Suite 302
Boca Raton, FL 33486

**Moore & Van Allen**
*Counsel to Senior Lending Group*
Attn: James Langdon
100 North Tryon Street
Suite 4700
Charlotte, NC 28202-4003

**RBS**
P O Box 845991
Boston, Ma 02284

**Comerica Bank**
1717 Main Street
Dallas, TX 75201

**Fifth Third Bank**
38 Fountain Square Plaza
Cincinnati, OH 45263

**Sovereign Bank**
840 Penn Avenue
Wyomissing, PA 19610

**Bank of America**
101 S Tryon St
Charlotte, NC 28280

**Wachovia**
301 South College Street
Charlotte, NC 28288

## SUBORDINATED LENDER

**Churchill Capital Partners**
333 South Seventh Street, Suite 2400
Minneapolis, MN 55402

**Faegre & Benson LLP**
*Counsel to Subordinated Lenders*
Attn: Nicole J. Kroetsch
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

## TOP 20 UNSECURED CREDITORS – ARCH ALUMINUM & GLASS CO., INC.

**Pilkington North America Inc.**
811 Madison Avenue
Toledo, OH 46304-5684

**Guardian Industries**
4681 Collection Center Drive
Chicago, IL 60693

**PPG Industries, Inc.**
PO Box 360175
Pittsburgh, PA 15251

**MASTER SERVICE LIST**
**ARCH ALUMINIM & GLASS CO., INC.,** *et al.*
**CASE NO. 09-36232-BKC-JKO**

**William Bonnell Co., Inc.**
Cs Drawer 198638
Atlanta, GA 30384

**Zeledyne, LLC**
PO Box 841426
Dallas, TX 75284

**Solutia, Inc.**
PO Box 75098
Charlotte, NC 28275

**Hydro Aluminum North America MP**
PO Box 2599
Carol Stream, IL 60132

**Rockford Trading Co.**
124 N Walter Street
Rockford, IL 61107

**AGC Industries**
PO Box 533108
Charlotte, NC 28290

**C.R. Laurence**
PO Box 58923
Los Angeles, CA 90058

**Allmetal**
97412 Eagle Way
Chicago, IL 60678

**Spraylat Corp.**
24268 Network Place
Chicago, IL 60673

**Penske**
PO Box 827380
Philadelphia, PA 19182

**Walker Glass Co. Ltd.**
9551 Ray Lawson Blvd.
Montreal, Quebec H1J 1L5 Canada

**Ryder Truck Rental**
c/o Kevin P. Sauntry
6000 Windward Parkway
Alpharetta, GA 30005

**Fenzi USA, Inc.**
PO Box 2508
Buffalo, NY 14240

**Ir Security & Safety**
75 Remittance Dr
Chicago, IL 60675

**Global Door Control, Inc.**
PO Box 601296
Charlotte, NC 28260

**Lockton Companies, LLC**
PO Box 671291
Dallas, TX 75267

**Industrial Control Development**
13911 NW Third Court
Vancouver, WA 98685

**TOP 20 UNSECURED CREDITORS –**
**AWP, LLC**

**Benada Aluminum of Florida, Inc.**
PO Box 126100
Hialeah, FL 33012

**Vetro USA**
8050 NW 74th Ave
Medley, FL 33166-7542

**Yale Ogron Mfgr. Inc.**
15201 NW 34th Ave
Opalocka, FL 33054

**Ryder Transportation Services**
PO Box 96723
Chicago, IL 96723

MASTER SERVICE LIST
ARCH ALUMINIM & GLASS CO.,  INC., *et al.*
CASE NO. 09-36232-BKC-JKO

**MC Aluminum and Glass**
227 Landings Blvd.
Weston, FL 33327-1106

**Amesbury Group**
Box 65637
Charlotte, NC 28265

**Sullivan & Associates**
3360 SW 13th Ave
Ft. Lauderdale, FL 33315

**Sunlite Sales**
545 Burlington Street
Opalocka, FL 33054

**Fenestration Testing Laboratory, Inc.**
8148 NW 74th Ave
Medley, FL 33166

**The Southern Die Casting Corp.**
3500 NW 59th St
Miami, FL 33142-2022

**Timbar Packaging & Display**
148 North Penn Street
Hanover, PA 17331

**Bellsouth Security Systems**
7255 Corporate Center Drive, Building 2,
Bay F
Miami, FL 33126

**Saint-Gobain Technical Fabrics**
1795 Baseline Road
Grand Island, NY 14072

**Guardian Industries Corp.**
24396 Network Place
Chicago, IL 60673

**Nudo Products**
1500 Taylor Ave
Springfield, IL 62703

**Jamar Park**
4207 Murray Ave
Pittsburg, PA 15217-2903

**Alro Metal Services Center**
PO Box 860673
Orlando, FL 32886

**Eastern Metal Supply Inc.**
3600 23rd Avenue South
Lake Worth, FL 33461

**Ashley F. Ward, Inc.**
3525 Enterprise Way
Green Cove Springs, FL 32043

**United Die & Mfg. Corp.**
PO Box 38
100 S 17th St.
Sebring, OH 44672-0128

## GOVERNMENTAL ENTITIES

**U. S. Trustee's Office**
51 S.W. 1st Avenue, Room #1204
Miami, FL 33130

**Internal Revenue Service**
PO Box 21126
Philadelphia, PA 19114

**Internal Revenue Service**
**Special Procedures – Insolvency**
7850 SW 6th Court
Plantation, FL 33324

**Special Asst. U.S. Attorney**
P.O. Box 9, Stop 8000
51 SW 1st Avenue, #1114
Miami, FL 33130

**MASTER SERVICE LIST**
**ARCH ALUMINIM & GLASS CO., INC., *et al.***
**CASE NO. 09-36232-BKC-JKO**

**Special Asst. U.S. Attorney**
**IRS District Counsel**
1000 S. Pine Island Rd., Ste 340
Plantation, FL 33324-3906


**The Honorable Eric H. Holden, Jr.**
**Attorney General of the U.S.**
950 Pennsylvania Avenue, NW Room 4400
Washington, DC 20530-0001

**State of Florida**
**Department of Revenue**
c/o Frederick F. Rudzik
PO Box 6668
Tallahassee, FL 32314

**Securities and Exchange Commission**
**Branch of Reorganization**
3475 Lenox Road, N.E., #1000
Atlanta, GA 30326-1232

## <u>PARTIES IN INTEREST</u>

Paul J. Keenan, Esq.
Greenberg Traurig
1221 Brickell Avenue
Miami, FL 33131

Daniel Lampert
Berger Singerman
200 South Biscayne Boulevard
Suite 1000
Miami, FL 33131

Michael R. Dillahunt
Piper Jaffrey & Co.
800 Nicollet Mall
Minneapolis, MN 55402