<u>EXHIBIT 1.01(a)</u>

Form of Omnibus Assignment of Lease

**OMNIBUS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT**

**OMNIBUS ASSIGNMENT AND ASSUMPTION Of LEASE AGREEMENT**, dated as of _____, 2010, by and among AAG HOLDINGS, INC., a Florida corporation ("AAG"), ARCH ALUMINUM & GLASS CO., INC., a Florida corporation ("Arch"), ARCH ALUMINUM L.C., a Florida limited liability company ("Arch LC"), AWP, LLC, a Florida limited liability company ("AWP"), and ARCH ALUMINUM AND GLASS INTERNATIONAL, INC., a Florida corporation ("Arch International", and collectively with AAG, Arch, Arch LC and AWP, the "Assignor") and Arch Glass Acquisition Corporation, a Delaware corporation (the "Assignee").

**WHEREAS**, Assignor and Assignee have entered into that certain Asset Purchase Agreement dated as of December [*], 2009 (as may be amended from time to time, the "Asset Purchase Agreement") pursuant to which the Assignor has agreed to sell, transfer and assign to the Assignee the leases and subleases set forth in Schedule A hereto (collectively, the "Leases") and the Assignee has agreed to assume certain obligations under the Leases, arising and relating to the period from and after the date hereof; Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Asset Purchase Agreement;

**NOW, THEREFORE**, in consideration of the premises and covenants hereinafter contained, in consideration of the representations, warranties and covenants contained in the Asset Purchase Agreement, and for other good and valuable consideration the receipt and sufficiency of which arc hereby acknowledged, the parties hereto desire to enter into this Omnibus Assignment and Assumption of Lease Agreement on the terms set forth herein.

**KNOW ALL PERSONS BY THESE PRESENTS**, that Assignor does hereby sell, convey, assign, transfer and deliver to the Assignee, and the Assignee does hereby purchase, acquire and accept from the Assignor, all right, title and interest of the Assignor in, to and under the Leases (including, for greater certainty, all rights, privileges and options contained in the Leases and all security deposits and pre-paid paid thereunder), free and clear of all Liens (except Permitted Encumbrances other than Mechanics Liens),

**TO HAVE AND TO HOLD** the same, unto Assignee, its successors and assigns forever and absolutely.

Assignee hereby accepts the foregoing assignment, and assumes and agrees to pay, discharge and perform all Liabilities under the Leases, arising and relating solely to the period from and after the Closing Date and which are not discharged upon Closing pursuant to the Asset Purchase Agreement, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities or obligations are owed, on the terms and subject to the conditions set forth in the Asset Purchase Agreement.

The respective rights of Assignor, on the one hand, and Assignee, on the other, with respect to the rights under the Leases sold, transferred, assigned, set over and conveyed hereby and the Liabilities under the Leases shall be governed exclusively by the Asset Purchase Agreement, and nothing in this Omnibus Assignment and Assumption of Lease Agreement shall

alter any or result in any additional liability or obligations arising under the Asset Purchase Agreement, which shall (without limiting the generality of the foregoing) govern, and shall contain the representation, warranties, liabilities and obligations of the parties with respect to the rights, liabilities and obligations assigned and assumed hereunder.  If there is any conflict or inconsistency between the provisions of the Asset Purchase Agreement and this Omnibus Assignment and Assumption of Lease Agreement, the provisions of the Asset Purchase Agreement shall govern.

This Omnibus Assignment and Assumption of Lease Agreement shall be binding upon and shall inure to the benefit of, Assignee and Assignor and their respective successors and permitted assigns, and shall survive the execution and delivery hereof.  This Omnibus Assignment and Assumption of Lease Agreement is not intended and shall not be construed to confer upon any Person, other than Assignor and Assignee, any rights or remedies hereunder.

The Assignor hereby covenants and agrees that all of the entities that comprise the Assignor shall be jointly and severally liable for all obligations of the Assignor pursuant to this Omnibus Assignment and Assumption of Lease Agreement.

The Assignor shall, at the request and expense of the Assignee, use commercially reasonable efforts to timely execute and deliver any additional documents and perform such additional acts that may be necessary, proper, or advisable under applicable Law to sell, transfer and assign the Leases to the Assignee and assist the Assignee in the registration, recordation or perfection of this Omnibus Assignment and Assumption of Lease Agreement and any Leases and any specific assignment of any particular Lease.

This Omnibus Assignment and Assumption of Lease Agreement shall be governed by, and construed in accordance with, the laws of the State of Florida and, to the extent applicable, the Bankruptcy Code.

No waiver, modification or change of any of the provisions of this Omnibus Assignment and Assumption Agreement shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

This Omnibus Assignment and Assumption of Lease Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

PHDATA 3251534_2

IN WITNESS WHEREOF, to the extent each below entity is an Assignee or - Assignor with respect to the Leases, Assignee and Assignor have caused this Omnibus Assignment and Assumption of Lease Agreement to be executed by their duly authorized representatives as of the date first above written.

**ASSIGNOR:**

AAG HOLDINGS, INC.

By: _____

      Name:
      Title:


ARCH ALUMINUM & GLASS CO., INC.

By: _____

      Name:
      Title:


ARCH ALUMINUM L.C.

By: _____

      Name:
      Title:


AWP, LLC

By: _____

      Name:
      Title:


ARCH ALUMINUM & GLASS
INTERNATIONAL, INC.

By: _____

      Name:
      Title:

PHDATA 3251534_2

**ASSIGNEE:**

ARCH GLASS ACQUISITION CORPORATION

By: _____
       Name:
       Title:

<u>Schedule A</u>

The Leases
[To be attached]

EXHIBIT 1.01(b)

Form of Assignment of Transferred Intellectual Property

## ASSIGNMENT OF INTELLECTUAL PROPERTY

This ASSIGNMENT OF INTELLECTUAL PROPERTY (this "Assignment"), effective the [*] day of [*], 2010, is made and entered into by and among AAG HOLDINGS, INC., a Florida corporation ("AAG"), ARCH ALUMINUM & GLASS CO., INC., a Florida corporation ("Arch"), ARCH ALUMINUM L.C., a Florida limited liability company ("Arch LC"), AWP, LLC, a Florida limited liability company ("AWP"), and ARCH ALUMINUM AND GLASS INTERNATIONAL, INC., a Florida corporation ("Arch International") (each of AAG, Arch, Arch LC, AWP and Arch International is referred to herein as an "Assignor," and collectively, as the "Assignors"), and Arch Glass Acquisition Corporation, a Delaware corporation (the "Assignee") (each of the Assignors and Assignee, a "party," and collectively, the "parties"). Capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in the Asset Purchase Agreement (defined below).

WHEREAS, an Assignor is the (a) registrant of record and owner of each of the Internet domain names (including any and all goodwill associated exclusively therewith) set forth on Schedules A-1 (United States Domain Names) and A-2 (Foreign Domain Names) hereto and the domain name registrations therefor (the "Domain Names"), and (b) owner of each of the trademarks and service marks, and trademark and service mark registrations (including any and all goodwill associated exclusively with any of the foregoing) set forth on Schedules B-1 (United States Trademarks) and B-2 (Foreign Trademarks) hereto (the "Trademarks");

WHEREAS, the Assignors and Assignee are parties to that certain Asset Purchase Agreement, dated as of the [*] day of December, 2009 (as may be amended from time to time, the "Asset Purchase Agreement"), pursuant to which Assignee has agreed to purchase and Assignor wishes to irrevocably assign to Assignee all of Assignors' right, title and interest in and to the Transferred Intellectual Property from the Assignors, including the Domain Names and the Trademarks (collectively, the "Purchased Intellectual Property"); and

WHEREAS, the execution and delivery of this Assignment is a condition to the Closing.

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants set forth in the Asset Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignors and the Assignee hereby agree as follows:

1.    Assignment.    Effective upon the Closing, each Assignor hereby irrevocably sells, assigns, grants, transfers, and sets over unto Assignee and Assignee's successors and assigns, and Assignee hereby accepts the sale, assignment and transfer of, all of Assignors' worldwide right, title and interest in, to and under the Purchased Intellectual Property, together with the goodwill of the business associated therewith and which is symbolized thereby, all causes of action (whether in law or equity) and all rights to sue, counterclaim, and recover for the past, present and future infringement or misappropriation and the right to seek patents of any Purchased Intellectual Property, whether arising prior to or subsequent to the date of this Assignment, and any and all renewals and extensions thereof that may hereafter be secured under the laws now or hereafter in effect in the United States and in any other jurisdiction throughout

the world, the same to be held and enjoyed by the said Assignee, its successors and assigns from and after the date hereof as fully and entirely as the same would have been held and enjoyed by the said Assignors had this Assignment not been made.

Assignor hereby requests the Commissioner of Patents and Trademarks, the Register of Copyrights and the corresponding entity or agency in any applicable foreign country, to record, as applicable, Assignee as the Assignee and owner of the Purchased Intellectual Property.

Assignor hereby consents that a copy of this Assignment shall be deemed a full legal and formal equivalent of any assignment, consent to file or like document that may be required in any country for any purpose and more particularly in proof of the right of Assignee or nominee to claim the aforesaid benefit of the right of priority provided by any convention.

2.    Further Action.    Each Assignor shall, at the request and expense of Assignee, use commercially reasonable efforts to timely execute and deliver any additional documents and instruments and do all other things, deemed necessary, proper or advisable by Assignee in establishing and perfecting Assignee's proprietary right, title and interest in the Purchased Intellectual Property including, without limitation, the recordation or perfection of this Assignment.

3.    Attorney-in-Fact.    Where Assignee is unable because of an Assignor's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure such Assignor's signature to apply for or to pursue any application for any United States or foreign patents, mask work, copyright or trademark registrations covering the Purchased Intellectual Property then Assignor(s) hereby irrevocably designates and appoints assignee and its duly authorized officers and agents as such Assignor's agent and attorney-in-fact, to act for and in such Assignor's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further a prosecution and issuance of patents, copyright, trademark and mask work registrations thereon with the same legal force and effect as if executed by Assignor, such appointment is coupled with an interest.

4.    Successors and Assigns.    This Assignment shall be binding on and inure to the benefits of the parties hereto and their respective successors and assigns.

5.    Governing Law.    The Assignment shall be governed by, and construed in accordance with, the Laws of the State of Florida and, to the extent applicable, the Bankruptcy Code.

6.    Joint and Several.    The parties hereby covenant and agree that each of the Assignors shall be jointly and severally liable for all obligations of the Assignors pursuant to this Assignment.

7.    Notices.    All notices, demands, or other communications given under this Assignment shall be given in accordance with the Asset Purchase Agreement.

8.    Counterparts.    This Assignment may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in

2

separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

        9.    <u>Intent of Assignment.</u>  No provision of this Assignment shall modify, replace, amend, change, rescind, waive or in any way affect the express provisions (including the representations, warranties, covenants, agreements, conditions, or any of the obligations and indemnifications, and the limitations relating thereto, of any Assignor) set forth in the Asset Purchase Agreement.  This Assignment is intended solely to effect the transfer of certain property sold and purchased pursuant to the Asset Purchase Agreement in accordance with the Asset Purchase Agreement.  If any portion of this Assignment is found to be contrary to law or ineffective, the remainder of the Assignment shall survive and be interpreted, to the maximum extent possible, for the purpose of carrying out the intent of the parties which is the full and complete transfer and assignment of all Purchased Intellectual Property to Assignee.

[Remainder of page intentionally left blank]

PHDATA 3251538_3

IN WITNESS WHEREOF, each party has caused this Assignment of Intellectual Property to be executed by its duly authorized representative.

**ASSIGNORS:**

AAG HOLDINGS, INC.

By:  _____
　　　　Name:
　　　　Title:

ARCH ALUMINUM & GLASS CO., INC.

By:  _____
　　　　Name:
　　　　Title:

ARCH ALUMINUM L.C.

By:  _____
　　　　Name:
　　　　Title:

AWP, LLC

By:  _____
　　　　Name:
　　　　Title:

ARCH ALUMINUM & GLASS
INTERNATIONAL, INC.

By:  _____
　　　　Name:
　　　　Title:

**ASSIGNEE:**

ARCH GLASS ACQUISITION CORPORATION

By:  _____
　　　　Name:
　　　　Title:

4

# SCHEDULE A-1

## UNITED STATES DOMAIN NAMES

## SCHEDULE A-2

**FOREIGN DOMAIN NAMES**

## SCHEDULE B-1

### UNITED STATES TRADEMARKS

# SCHEDULE B-2

## FOREIGN TRADEMARKS

<u>Exhibit 1.01(c)</u>

Form of Bill of Sale and Instrument of
Assignment of Assets and Assumption of Liabilities

## BILL OF SALE AND INSTRUMENT OF ASSIGNMENT OF ASSETS AND ASSUMPTION OF LIABILITIES

BILL OF SALE AND INSTRUMENT OF ASSIGNMENT OF ASSETS AND ASSUMPTION OF LIABILITIES ("Bill of Sale and Instrument of Assignment and Assumption"), dated as of [*], 2010 by and among AAG HOLDINGS, INC., a Florida corporation ("AAG"), ARCH ALUMINUM & GLASS CO., INC., a Florida corporation ("Arch"), ARCH ALUMINUM L.C., a Florida limited liability company ("Arch LC"), AWP, LLC, a Florida limited liability company ("AWP"), and ARCH ALUMINUM AND GLASS INTERNATIONAL, INC., a Florida corporation ("Arch International", and together with AAG, Arch, Arch LC and AWP, collectively referred to herein as, the "Sellers" and individually a "Seller"), to Arch Glass Acquisition Corporation, a Delaware corporation (the "Purchaser").

WHEREAS, the Sellers and the Purchaser have entered into an Asset Purchase Agreement, dated as of December [*], 2009 (as may be amended from time to time, the "Asset Purchase Agreement"; unless otherwise defined herein, capitalized terms shall be used herein as defined in the Asset Purchase Agreement), pursuant to which the Sellers have agreed to sell, assign and transfer to the Purchaser, and the Purchaser has agreed to purchase and acquire from the Sellers, the Purchased Assets and the Purchaser has agreed to assume the Assumed Liabilities; and

WHEREAS, the execution and delivery of this Bill of Sale and Instrument of Assignment and Assumption by the Sellers and the Purchaser is required by Sections [2.11(b)] and [2.12(a)(ii)] of the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Asset Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Sellers and the Purchaser do hereby agree as follows:

1.     Sale and Assignment of Assets and Properties:  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, the Sellers hereby sell, assign, transfer, convey and deliver unto the Purchaser and its successors and assigns, forever, the entire right, title and interest of the Sellers free and clear of all Liens (except Permitted Encumbrances other than Mechanics Liens) in and to the Purchased Assets.

2.     Assumption of Assumed Liabilities:  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, the Purchaser hereby assumes, and agrees to pay, perform and discharge in accordance with their terms, the Assumed Liabilities, subject to any defenses or clamed offsets asserted in good faith against the obligee to whom such Liabilities are owed.

3.     Further Action:  The Sellers shall, at the request of the Purchaser, use commercially reasonable efforts to timely execute and deliver any additional documents and perform such additional acts that may be necessary, proper and advisable under applicable Law to grant, sell, convey, assign, transfer, set over to or vest in the Purchaser any of the Purchased Assets.

PHDATA 3251540_2

4.    <u>No Third Party Beneficiaries</u>:   This Bill of Sale and Instrument of Assignment and Assumption shall he binding upon and inure solely to the benefit of the parties to the Asset Purchase Agreement and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person, any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Bill of Sale and Instrument of Assignment and Assumption.

5.    <u>Interpretation</u>:   The respective rights of Sellers, on the one hand, and Purchaser, on the other, with respect to the Purchased Assets sold, transferred, assigned and conveyed hereby and the assumption of the Assumed Liabilities hereunder shall be governed exclusively by the Asset Purchase Agreement, and nothing in this Bill of Sale and Instrument of Assignment and Assumption shall alter any liability or obligations arising under the Asset Purchase Agreement, which shall (without limiting the generality of the foregoing) govern, and shall contain the sole and exclusive representations, warranties and obligations of the parties with respect to the rights and obligations sold, transferred, assigned, conveyed and assumed hereunder. If there is any conflict or inconsistency between the provisions of the Asset Purchase Agreement and this Bill of Sale and Instrument of Assignment and Assumption, the provisions of the Asset Purchase Agreement shall govern.

6.    <u>Governing Law</u>:   This Bill of Sale and Instrument of Assignment and Assumption shall be governed by the Laws of the State of Florida, and to the extent applicable, the Bankruptcy Code.

7.    <u>Joint and Several</u>:   The parties hereby covenant and agree that all of the entities that comprise the Sellers shall be jointly and severally liable for all obligations of the Sellers pursuant to this Bill of Sale and Instrument of Assignment and Assumption.

8.    <u>Notices</u>:   All notices, demands, or other communications given under this Bill of Sale and Instrument of Assignment and Assumption shall be given in accordance with the Asset Purchase Agreement.

9.    <u>Counterparts</u>:   This Bill of Sale and Instrument of Assignment and Assumption may be executed and delivered (including by facsimile transmission) in counterparts, and by the different parties hereto in separate counterparts, each of when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

PHDATA 3251540_2

**IN WITNESS WHEREOF,** this Bill of Sale and Instrument of Assignment and Assumption has been duly executed as of the date first above written.

**SELLERS:**

AAG HOLDINGS, INC.

By: _____
      Name:
      Title:

ARCH ALUMINUM & GLASS CO., INC.

By: _____
      Name:
      Title:

ARCH ALUMINUM L.C.

By: _____
      Name:
      Title:

AWP, LLC

By: _____
      Name:
      Title:

ARCH ALUMINUM & GLASS
INTERNATIONAL, INC.

By: _____
      Name:
      Title:

**PURCHASER:**

ARCH GLASS ACQUISITION CORPORATION

By: _____
      Name:
      Title:

3                                    PHDATA 3251540_2

<u>EXHIBIT 1.01(d)</u>

Sellers' Knowledge

Leon Silverstein, President and Chief Executive Officer;

Thomas Watson, Chief Financial Officer;

Richard Silverstein, Assistant Secretary.

<u>EXHIBIT 1.01(e)</u>

Principles and Procedures for Inventory Valuation

Inventories will be valued in accordance with the customary Inventory valuation policy of the Sellers (which fairly reflects the value of obsolete, spoiled or excess Inventory) for stating Inventory, in accordance with GAAP.

EXHIBIT 1.01(f)

Principles and Procedures for Receivables Valuation

Receivables will be valued at amounts receivable for merchandise actually delivered or services actually provided (or, in the case of non-trade accounts or notes, amounts receivable in respect of other bona fide business transactions), which have arisen in the ordinary course of the Business consistent with past practices, are not subject to any counterclaims or offsets and have been billed and are generally due within sixty (60) days after such billing.  In addition, Receivables will include amounts received from customers as deposits for orders that will be delivered in the future so long as such deposits are booked as Receivables and transferred to the Purchaser at Closing.  All such Receivables will reflect amounts which are fully collectable in the normal and ordinary course of Business, net of reserves for doubtful accounts which shall be fairly stated in accordance with GAAP.

EXHIBIT 1.01(g)

Form of Arch Assets Bid Procedures Motion

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

Case No. 09-36232-BKC-JKO

ARCH ALUMINUM
& GLASS CO., INC., et al.[1].

Chapter 11
(Jointly Administered)

_____/

**DEBTORS' MOTION FOR ENTRY OF ORDERS PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, AND 6006 (A) APPROVING ASSET PURCHASE AGREEMENT WITH ARCH GLASS ACQUISITION CORPORATION, AN AFFILIATE OF GREY MOUNTAIN PARTNERS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO ASSET PURCHASE AGREEMENT WITH ARCH GLASS ACQUISITION CORPORATION, (C) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (D) AUTHORIZING THE DEBTORS TO PROVIDE CERTAIN STALKING HORSE BID PROTECTIONS; (E) SCHEDULING A HEARING TO CONSIDER THE APPROVAL OF AND APPROVING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AT THE SALE HEARING, (G) APPROVING THE FORM AND MANNER OF NOTICE IN CONNECTION THEREWITH AND (H) GRANTING RELATED RELIEF**

**(Hearing Requested on or Prior to Thursday, December 17, 2009
on Approval of Bid Procedures and Stalking Horse Bid Protections)**

Arch Aluminum & Glass Co., Inc. ("Arch Aluminum") and four (4) of its subsidiaries and affiliates, as jointly administered debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or the "Company"), by and through undersigned counsel, file this motion (the "Motion") for entry of orders, pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, (a) approving that certain Asset Purchase Agreement,

---

[1]       The jointly administered debtors are: Arch Aluminum & Glass Co., Inc; AAG Holdings, Inc.; Arch Aluminum and Glass International, Inc.; Arch Aluminum, L.C.; and AWP, LLC.

dated December 2, 2009 (the "Purchase Agreement"), by and among the Debtors, as sellers, and Arch Glass Acquisition Corporation, as buyer (the "Stalking Horse Bidder"), for the purchase and sale of the Purchased Assets (as defined below), which Purchase Agreement is attached hereto as Exhibit A, (b) authorizing the Debtors to execute and deliver the Purchase Agreement, (c) establishing bidding procedures for the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and interests pursuant to Section 363(f) of the Bankruptcy Code, (d) authorizing the Debtors to provide certain "stalking horse" bid protections to the Stalking Horse Bidder, (e) scheduling a hearing (the "Sale Hearing") to consider approval of, and approving, the sale of the Purchased Assets pursuant to Sections 363 and 365 of the Bankruptcy Code free and clear of all liens, claims, encumbrances and interests pursuant to the Purchase Agreement to the Stalking Horse Bidder or the highest and best bidder, if applicable, at an Auction (as defined below), (f) authorizing the Debtors' assumption and assignment of certain executory contracts and unexpired leases in connection therewith at the Sale Hearing, (g) approving the form and manner of notice thereof, and (h) granting related relief.

In support of the Motion, the Debtors rely on the Declaration of Vincent J. Colistra, Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions (the "Colistra Declaration"). In further support of this Motion, the Debtors respectfully state as follows:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Motion and to grant the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### PRELIMINARY STATEMENT

2.      By this Motion, the Debtors respectfully request court approval of a sales process through which the Debtors desire to pursue the sale of the Purchased Assets, which Purchased Assets represent substantially all of their assets, through a competitive bidding process pursuant to the terms of the Purchase Agreement with the Stalking Horse Bidder, subject in all events to higher and better bids pursuant to the Bidding Procedures set forth below.

3.      For the reasons discussed below, the Debtors have concluded, in the exercise of their best business judgment, that the sale of all or substantially all of their assets is in the best interests of the Debtors, their bankruptcy estates, their creditors and equity holders.  Prior to coming to such conclusion, the Debtors explored several strategic alternatives, including a diligent search for an equity investment to support their business operations, a restructuring of the secured debt, a sale of substantially all of their assets as a going concern and/or an orderly liquidation of their assets.  In connection with such efforts, and as more particularly described below, the Debtors engaged Piper Jaffray & Co. ("PJC") as their investment bankers in August 2009 to assist them in exploring the market for an equity investor and/or potential purchasers for the Debtors' assets as a going concern.  As explained below, PJC engaged in an exhaustive marketing process prior to the filing of these Chapter 11 cases to locate such investor(s) and/or potential purchasers for the Debtors' assets.  The Debtors believe that such process was successful in that it resulted in the Purchase Agreement with the Stalking Horse Bidder.

4.      The Debtors also engaged the services of PMCM, LLC, an affiliate of Phoenix Management Services, Inc., to provide financial and restructuring advice to the Debtors in connection with their dealings with PNC Bank, National Association, as agent for itself and a consortium of senior secured lenders (collectively, the "Senior Lenders"),[2] as well as the services

---

[2] The Debtors capital and debt structure with the Senior Lenders is more particularly described in the Colistra Declaration.

of Vincent Colistra as the Debtors' chief restructuring officer (the "CRO").  Immediately upon

his engagement in late August 2009, the CRO proceeded to analyze and evaluate the Debtors'

assets, cash flow and overall financial condition.  In connection therewith and among other

things, the CRO prepared cash flow projections for the Debtors for the balance of 2009 and for

2010, as well as a liquidation analysis for the Debtors' assets.  The Debtors, prior to the CRO's

engagement, identified and implemented a number of expense reductions and cost cutting

measures to streamline and reduce the Debtors' financial obligations.  Upon his engagement, the

CRO, with the cooperation of the Debtors' management, identified and implemented further

expense reductions.  Based on such analyses and notwithstanding the substantial reductions in

costs and expenses made by the Debtors and then the CRO, the CRO concluded that the Debtors

required a significant infusion of equity capital in the short term and over the next 18-24 months

in order for the Debtors to continue their operations.  As a result, and given the lack of any such

equity capital, the CRO agreed with the Debtors' business judgment to pursue a sale of all or

substantially all of their assets pursuant to the Purchase Agreement.

     5.       Specifically, the CRO has concluded that the Debtors will not be able to continue

their operations in the ordinary course of business beyond approximately December 18, 2009

without obtaining a debtor-in-possession loan.[3]  As a result, the Debtors, with the assistance of

the CRO, are presently in negotiations with the Senior Lenders and the Stalking Horse Bidder to

provide debtor-in-possession financing in the amount of approximately $5.0 million (the "DIP

Loan") in order to fund the anticipated shortfall in the Debtors' cash flow from and after

December 18, 2009 through the closing of the sale of the Purchased Assets pursuant to the

---

[3] As one of their "first day" motions, the Debtors have sought approval from this Court to use the cash collateral of
the Senior Lenders through December 18, 2009.  See Debtors' Emergency Motion for an Order (A) Authorizing the
Debtors (1) to use Cash Collateral on an Interim Basis Pursuant to 11 U.S.C. § 363 and (2) to Provide Adequate
Protection in Connection Therewith Pursuant to 11 U.S.C. §361, and (B) Setting a Final Hearing Pursuant to
Bankruptcy Rule 4001 (C.P. #8).

Purchase Agreement, which is projected to be the end of January 2010 as more fully described below.  The amount and terms of such DIP Loan are tied directly to the timing of the closing on the sale of the Purchased Assets.  The sooner the Debtors can consummate such closing, then the lower the required amount of the proposed DIP Loan.  As a result, the Debtors have no choice but to propose the expedited sale process contained in this Motion.[4]

6.      Notwithstanding such discussions, however, the Senior Lenders have not at this time consented to the proposed sale of the Purchased Assets to the Stalking Horse Bidder pursuant to the Purchase Agreement.  While the Debtors believe the purchase price proposed to be paid by the Stalking Horse Bidder for the Purchased Assets represents fair market value for the Purchased Assets (including as a result of the extensive pre-petition marketing process employed by the Debtors through PJC, and the Debtors' view of the liquidation value of such Purchased Assets as more fully discussed below), such purchase price is nevertheless significantly less than the amount of senior debt owed to the Senior Lenders in respect of the Purchased Assets.  The Debtors, however, with the assistance of their professionals, continue to work closely with the Senior Lenders (i) to obtain their consent to such sale, as well as the carve outs from their collateral that will be necessary in order to consummate such sale, and (ii) to provide the necessary DIP Loan to bridge the Debtors from approximately December 18, 2009 through the closing of such sale.

---

[4] In the event that the Debtors are not able to secure the DIP Loan on a timely basis, then the Debtors reserve the right to seek to further expedite the sale of the Purchased Assets hereunder, to a date to be agreed upon with the Stalking Horse Bidder, so as to avoid the cessation of their business operations and the loss of significant value in the context of the Purchase Agreement.

7.     Pursuant to the terms of the Purchase Agreement with the Stalking Horse Bidder, the Debtors' estates expect to realize total consideration from such sale in an amount equal to approximately $62,000,000.  The other salient terms of the Purchase Agreement are as follows:[5]

- The Purchased Assets include substantially all of the Debtors' assets, including without limitation (i) Owned Real Property, Leased Real Property, Inventory, Receivables, tangible personal property, books and records, goodwill, Transferred Intellectual Property, Assigned Contracts and Permits and Licenses, (ii) 100% of the capital stock in Arch Canada, ULC, which is owned by Arch Aluminum and Glass International, Inc. and operates as the Debtors' Canadian subsidiary, (Arch Canada, ULC is not seeking separate creditor protection under the laws of Canada), and (ii) certain avoidance actions under Chapter 5 of the Bankruptcy Code that may exist against certain vendors and customers;

- The Excluded Assets include, among other things, the Debtors' right, title and interest in any Tax Refunds expected to be generated by the Debtors from the carry back of net operating losses to prior tax years;

- The Stalking Horse Bidder is assuming certain liabilities of the Debtors as set forth in Section 2.02(a) of the Purchase Agreement, including certain obligations to Transferred Employees in an amount up to $2,800,000;

- The Purchase Price consists of cash in the amount of $52,000,000, plus the assumption of the liabilities set forth in Section 2.02(a) of the Purchase Agreement, plus certain adjustments to the Purchase Price as set forth in Section 2.04 of the Purchase Agreement;

- In addition, the Stalking Horse Bidder has agreed to replace certain letters of credit outstanding as collateral supporting certain obligations of the Debtors in the amount of $7,000,000;

- A deposit in the amount of five (5%) percent of the Purchase Price;

- All Cure Costs associated with the assumption and assignment of Assigned Contracts shall be paid from the Purchase Price;

- A Break Up Fee in the amount of 3% of the Purchase Price plus an Expense Reimbursement for reasonable fees and expenses, as may be determined by the Court and capped at $1,000,000, which Break Up Fee and Expense

---

[5] Notwithstanding the summary of the salient terms discussed herein, all parties are urged to read the Purchase Agreement in its entirety as this summary is qualified by the Purchase Agreement.  In the event of any inconsistencies between this summary and the Purchase Agreement, the terms of the Purchase Agreement control. All capitalized terms used in this summary shall have the meanings ascribed to them as set forth in the Purchase Agreement.

Reimbursement be payable in accordance with the Purchase Agreement through a "carve out" from the collateral securing the obligations to the Senior Lenders;

- A requirement that ninety (90%) percent of the Business Employees accept employment with the Stalking Horse Bidder;

## BACKGROUND

### A.    Introduction

8.    On November 25, 2009 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

9.    No creditors' committee has yet been appointed in these cases.  In addition, no trustee or examiner has been appointed.

10.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

11.    The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

### B.    Background and Current Business Operations

12.    The Company was founded in 1978 by Robert Silverstein, as a small South Florida glass and metal distributor with a single truck.  During the 1980's the Company opened fabrication facilities and additional distribution facilities in Florida and the Northeast.  Through the 1990's, the Company underwent a period of rapid growth, expanding from two fabrication facilities and three distribution facilities to ten fabrication facilities and three distribution facilities generating over $121.0 million in revenue.

13.     The Company now provides a comprehensive line of products and services to more than 5,000 customers from 28 office, manufacturing and distribution facilities located in 19 states nationwide.  Working directly with its customers, the Company purchases annealed (or "float") glass from a number of leading float glass manufacturers and then insulates, tempers, mirrors or laminates the glass to the customized requirements of each end user.  Additionally, the Company supplies its customers with a focused line of aluminum products, such as storefront/entrance frames, that can be fabricated in house to the customer's exact specifications, providing a complement to the Company's glass offerings.  The Company's ability to offer a comprehensive line of high-quality architectural glass from numerous float glass manufacturers, coupled with its unique ability to custom fabricate architectural and aluminum products, has allowed the Company to serve as the "True Single Source" supplier to the non-residential construction, retail glass and residential construction industries.

14.     For further information on the Debtors' capital structure, business and operations, the Debtors refer to the Colistra Declaration filed contemporaneously herewith.

**C.     Prepetition, the Debtors, With the Assistance of Their Professionals, Have Aggressively Marketed the Debtors' Businesses and Assets as a Going Concern.**

15.     The Debtors first engaged PJC on August 18, 2009 in order to formulate a strategy to effectively deal with their financial situation as well as to assist the Debtors in connection with a restructuring transaction and/or sale of the Debtors' assets.  Upon their engagement, PJC, among other things, immediately worked with the Debtors to prepare a comprehensive confidential investment memorandum (the "CIM") in order to assist in the marketing of the Debtors' assets for sale or in raising equity capital.   Among other things, the CIM described the Company's business, growth opportunities and historical financial performance.

16.     In September 2009, PJC started contacting potential buyers and signing confidentiality agreements with those parties who had expressed an interest in getting additional information on the Company.   At the end of September 2009, PJC and the Company's management finalized the CIM, which was distributed to those parties who had executed the confidentiality agreements.   In total, 149 potential buyers were contacted, with 78 receiving CIMs after they signed confidentiality agreements.

17.     In mid-October 2009, PJC and the Company's management completed a supplemental information package to the CIM, which provided the Company's financial projections going forward, which projections were prepared by the CRO in cooperation with the Company's management.   PJC distributed the supplemental CIM packages, as well as process letters requesting that interested buyers submit initial indications of interest on October 26, 2009. Between October 26, 2009 and October 29, 2009, PJC received initial indications of interest from 16 separate potential and interested buyers.

18.     Subsequent to receiving the initial indications of interest, PJC was involved in various due diligence activities including setting up the data room, creating a management presentation and answering specific requests by potential buyers.   On November 17, 2009, PJC received five (5) final bids.   On November 19, 2009, the Debtors, with the assistance of their professionals selected the Stalking Horse Bidder, who is an affiliate of Grey Mountain Partners, as their "stalking horse" bidder.   Grey Mountain Partners is a private equity firm focused on acquiring interests in smaller, middle market companies, typically in mature, basic industries.   In addition to traditional transaction structures, the firm has significant expertise in acquiring companies in distress or emerging from bankruptcy.

19.     After selecting the Stalking Horse Bidder, the Debtors and the Stalking Horse Bidder extensively and in good faith negotiated the terms of, and entered into, the Purchase Agreement.

20.     The Debtors intend to continue to utilize the services of PJC in these Chapter 11 cases in order to coordinate the continued marketing and due diligence process for those proposed buyers who previously expressed an interest in acquiring the Debtors' assets and/or for any other proposed buyers who desire to make a competing bid for the Purchased Assets.  The Debtors are both hopeful and optimistic that entering into the Purchase Agreement and obtaining approval of the Bidding Procedures contained herein marks the beginning of a competitive sale process that will drive substantial incremental value to the Debtors' estates and their creditors over and above the purchase price offered by the Stalking Horse Bidder.

21.     In order to maximize the value of the Purchased Assets through a robust bidding process while meeting the strict timetable necessitated by the Debtors' cash needs and the need for the DIP Loan, it is essential that Bidding Procedures contained herein be established and approved on an expedited basis.

**PROPOSED BIDDING PROCEDURES**

A.     **Bidding Procedures**

22.     The Debtors submit that their extensive pre-petition marketing efforts, including through and with the substantial assistance of PJC as described above, have generated a number of potential purchasers interested in acquiring the Debtors' assets.  Throughout the pre-petition marketing process, these potential purchasers have had access to a substantial amount of due diligence and information on the Debtors and their assets, and have had the opportunity to fully and completely evaluate the Debtors' business. The Bidding Procedures proposed herein by the

Debtors, while recognizing the limited time available in light of the Debtors' financial situation, seek to ensure that any other prospective purchasers for the Debtors' assets are likewise identified, encouraged to participate in the sale process and are provided with the requisite information to enable such prospects to so participate. Moreover, these bidding procedures are designed to provide sufficient notice to potential purchasers and otherwise to ensure a transparent sale process.

      23.    The Debtors respectfully request that the Court approve the expedited bidding procedures set forth below (the "Bidding Procedures"). The Bidding Procedures are designed to afford potential competing bidders until January 8, 2010 (the "Bid Deadline") to complete due diligence and submit a bid to purchase the Debtors' assets.  If one or more qualified competitive bids (as described in the Bidding Procedures) is presented to the Debtors in accordance with the Bidding Procedures by the Bid Deadline, then the Debtors propose to conduct an auction on January 13, 2010 (the "Auction").  On January 14, 2010 or as soon thereafter as the Court can schedule a hearing (the "Sale Hearing"),[6] the Debtors propose to seek approval of the highest and best bid at the Auction, which bid will be determined by the Debtors in the exercise of their best business judgment in accordance with the Bidding Procedures.[7]  At the Sale Hearing, the Debtors propose to seek approval of the sale of the Purchased Assets to the successful bidder pursuant to Sections 363 and 365 of the Bankruptcy Code free and clear of all liens, claims, encumbrances and interests pursuant to the Purchase Agreement.  Based on such timetable, the Debtors

---

[6] Pursuant to the Purchase Agreement with the Stalking Horse Bidder, the order approving the sale of the Purchased Assets must be entered on or before January 22, 2010 or the Stalking Horse Bidder will have the right to terminate the Purchase Agreement.

[7] The Office of the United States Trustee anticipates conducting the Debtors' section 341 meeting of creditors during the first week of January 2010 so as to enable creditors and parties in interest sufficient time in advance of the proposed Sale Hearing to review the Debtors' bankruptcy schedules and ask questions at the 341 meeting.

anticipate that the closing of the sale of the Purchased Assets can occur prior to January 19, 2010.[8]

24.    The Bidding Procedures proposed by the Debtors are as follows:

- **Purchased Assets**. The "Purchased Assets" shall include those assets set forth in Section 2.01(a) of the Purchase Agreement. The Purchased Assets shall not include the Excluded Assets set forth in Section 2.01(b) of the Purchase Agreement.

- **Qualification**. The Debtors shall: (a) coordinate the efforts of Potential Bidders (as defined below) in conducting their respective due diligence investigations regarding the Purchased Assets; (b) determine whether any person or entity is a Qualified Bidder (as defined below); (c) receive and evaluate bids from Qualified Bidders; and (d) administer the Auction (as defined below). Any person or entity who wishes to participate in the bidding process and the Auction must meet the participation requirements for Potential Bidders below and must thereafter submit a Qualified Bid to become a Qualified Bidder. Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any person or entity who does not comply with the participation requirements below.

- **Participation Requirements**. To participate in the bidding process and the Auction, each interested person or entity (a "Potential Bidder") must deliver the following documents (the "Participation Materials") on or before five (5) business days prior to the Bid Deadline to (i) Genovese Joblove & Battista, P.A., counsel to the Debtors, 100 S.E. Second Street, 44th Floor, Miami, FL 33131, Attn: Paul J. Battista, Esq., pbattista@gjb-law.com, (ii) Piper Jaffray & Co., 800 Nicollet Mall, Minneapolis, MN 55402, Attn: Michael R. Dillahunt, michael.r.dillahunt@pjc.com, (iii) Moore & Van Allen, counsel to the Senior Lenders, 100 North Tryon Street, Suite 4700, Charlotte, NC 28292, Attn: James R. Langdon, Esq., jimlangdon@mvalaw.com, and (iv) Berger Singerman, counsel to Leon Silverstein, 200 South Biscayne Boulevard, Suite 1000, Miami, FL 33131 Attn: Daniel Lampert, Esq., DLampert@bergersingerman.com (the "Notice Parties"):

  i.    an executed confidentiality agreement in form and substance satisfactory to the Debtors;

  ii.   a statement demonstrating, to the Debtors' satisfaction, the Potential Bidder's bona fide interest in purchasing substantially all of the Purchased Assets from the Debtors;

---

[8] As set forth in footnote 4 above, the Debtors reserve the right to seek to further expedite the timeline for the sale process, using dates to be agreed upon with the Stalking Horse Purchaser, in the event that they are not able to secure the requisite DIP Loan. At present, the Purchase Agreement requires the closing to occur no later than January 29, 2010.

iii. written evidence acceptable to the Debtors that the Potential Bidder has received debt and/or equity funding commitments or has on deposit in its bank account(s) sufficient unrestricted cash to consummate the purchase contemplated hereby, provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such Bid;

iv. A letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder, and full disclosure of all parties participating with the Potential Bidder, as well as full disclosure of any prepetition and post-petition affiliation that the Potential Bidder may have with (i) the Debtors, (ii) the Debtors' affiliates, (iii) major creditors of the Debtors, (iv) equity security holders of the Debtors, and/or (v) any of the Debtors' former officers or directors or other insiders; and

v. An executed letter acknowledging receipt of a copy of the Bidding Procedures and agreeing to accept and be bound by the provisions contained therein.

vi. If, based on such Participation Materials, the Debtors determine that a Potential Bidder has a bona fide interest in purchasing the Purchased Assets, then no later than three (3) business days after the Debtors make that determination and have received from the Potential Bidder all of the Participation Materials required above, the Debtors will deliver to the Potential Bidder: (a) an electronic copy of the Purchase Agreement; and (b) access information for confidential data concerning the Purchased Assets, which shall include any and all documents furnished by the Debtors to the Stalking Horse Bidder in connection with its due diligence related to the Purchase Agreement (the "Data Room").

- **Due Diligence Period**. Until the Bid Deadline (as defined below), the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their judgment, determine to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to the Debtors. The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders. If the Debtors determine that due diligence material requested by a Potential Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Potential Bidder, the Debtors shall post such materials in the Data Room and provide email notice of such posting to all Potential Bidders, as well as to the Notice Parties, and shall provide such materials to the Stalking Horse Bidder. Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease on the Bid Deadline. Except as provided above with respect to the copy of

the Purchase Agreement provided by the Debtors to the Potential Bidders, and information in the Data Room, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any party.

- **Bid Deadline**. A Potential Bidder that desires to make a bid on all or substantially all of the Purchased Assets (a "Bid") shall deliver written and electronic copies of its Bid and the Bid Requirements set forth below to (i) the Notice Parties, and (ii) counsel to the Official Committee of Unsecured Creditors (the "Committee") so that it is received not later than 5:00 p.m., Eastern Time, on January 8, 2010 (the "Bid Deadline"), provided however, that the Deposit shall be made to the trust account of Debtors' counsel pursuant to instructions to be provided by Debtors' counsel.

- **Bid Requirements**. To participate in the Auction, if any, a Qualified Bidder must deliver to the Debtors a written offer, which must provide, at a minimum, the items noted below to be deemed a "Qualified Bid":

  i.  An executed purchase agreement (a "Marked Agreement") in substantially the same form as the Purchase Agreement, pursuant to which the Potential Bidder offers to purchase substantially all of the Purchased Assets from the Debtors. Such Marked Agreement shall not contain any conditions to closing based upon the ability of the Potential Bidder to obtain financing, the outcome of unperformed due diligence by the Potential Bidder, or any other conditions other than those set forth in the Purchase Agreement. The Potential Bidder shall also provide a marked copy of the Marked Agreement showing any changes to the Purchase Agreement, including changes to reflect the name of the Potential Bidder and the amount of such Potential Bidder's Bid;

  ii. The purchase price in such Bid is a higher or better offer for the Purchased Assets as compared to the offer of the Stalking Horse Bidder. An offer shall not be considered a higher or better offer unless such Bid provides for the assumption of the same amount of liabilities that the Stalking Horse Bidder is assuming under the Purchase Agreement and provides for net consideration (on a risk-adjusted basis) to the Debtors' estates of at least $250,000.00 more than the sum of (i) the cash portion of the purchase price provided by the Stalking Horse Bidder in the Purchase Agreement, plus (ii) the amount of the Break Up Fee, plus (iii) plus the amount of the Expense Reimbursement (such amount, the "Minimum Overbid Amount").

  iii. A deposit of cash or cash equivalents in the amount equal to at least five (5%) percent of the Minimum Overbid Amount (the "Deposit"). The Deposit shall be tendered by cashier's check and/or wire transfer into a segregated bank account established by Debtors' counsel. A Potential Bidder shall forfeit its Deposit if it is the Successful Bidder or Back-Up Bidder (as defined below) and (i) modifies or withdraws its Bid without the Debtors' consent before the consummation of the sale with such

Potential Bidder or (ii) breaches the terms of the agreement pursuant to which the Bidder has agreed to purchase the Purchased Assets or a portion thereof. A Potential Bidder's Deposit shall be returned (i) if such Potential Bidder is determined by the Debtors not to be a Qualified Bidder, promptly upon the making of such determination, (ii) if such Potential Bidder is not the Successful Bidder or the Back-Up Bidder, promptly after the conclusion of the Auction, or (iii) if such Potential Bidder is the Back-Up Bidder and the sale transaction is consummated with the Successful Bidder, promptly upon the consummation of the sale with the Successful Bidder;

iv. The Bid is received by the Debtors by the Bid Deadline, together with the Potential Bidder's Deposit;

v. The Bid does not entitle the Potential Bidder to any break-up fee, termination fee or similar type of payment or reimbursement;

vi. A statement that the Bid is irrevocable and binding until the closing of the sale of the Purchased Assets if the applicable bidder is the Successful Bidder or the Back-Up Bidder;

vii. Evidence satisfactory to the Debtors of the Potential Bidder's (i) financial ability to close the sale described in its Marked Agreement, which may include the most recent audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring some or all of the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidder, and such other financial disclosure acceptable to, and requested by, the Debtors, and (ii) ability to consummate such sale on or prior to the date contemplated by and on the date and on terms and conditions no less favorable to the Debtors those set forth in the Purchase Agreement; and

viii. The Bid is accompanied by a list of any executory contracts and unexpired leases that are to be assumed and/or assigned under such Bid and a demonstration of the Potential Bidder's commitment to pay all Cure Costs in accordance with the Marked Agreement and provide adequate assurance of future performance under any such executory contracts or unexpired leases to be assumed and/or assigned pursuant to such Bid.

ix. A Potential Bidder shall accompany its Bid with: (a) written evidence acceptable to the Debtors that the Potential Bidder has received debt and/or equity funding commitments or has on deposit in its bank account(s) sufficient unrestricted cash to consummate the purchase contemplated hereby, provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such Bid; (b) a copy of a board resolution or similar document demonstrating

the authority of the Potential Bidder to make a binding and irrevocable Bid on the terms proposed; and (c) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws or other aspects of the Bid.

- A Bid received from a Potential Bidder will be considered a "Qualified Bid" only if it meets the above requirements. Each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." For purposes hereof and notwithstanding anything to the contrary provided herein, the Stalking Horse Bidder is a "Qualified Bidder" and the Purchase Agreement executed by the Stalking Horse Bidder and the Bid contained therein is a Qualified Bid.

- A Qualified Bid will be valued based upon the following factors: (a) the purported amount of the Qualified Bid, including any benefit to the Debtors' bankruptcy estates from any assumption of liabilities of the Debtors; (b) the ability to close the proposed sale transaction without delay and within the time frames contemplated by the Purchase Agreement; (c) the ability and delay associated with obtaining all necessary antitrust or other regulatory approvals, including under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, for the proposed transaction; and (d) any other factors the Debtors may deem relevant.

- As soon as reasonably practicable following the Bid Deadline but it no event later than noon Eastern Time on Monday, January 11, 2010, the Debtors shall distribute a copy of each Bid received by the Bidding Deadline, together with notice of which Bids the Debtors have determined are Qualified Bids, to the Notice Parties, to counsel for the Stalking Horse Bidder and to counsel to the Committee.  Any disputes as to whether a Potential Bidder is a Qualified Bidder shall be resolved by the Bankruptcy Court prior to the Auction. The Debtors reserve the right to reject any Bid if such Bid: (i) is on terms that are materially more burdensome or conditional than the terms of the Purchase Agreement; (ii) requires any indemnification of the Potential Bidder on terms that are materially more burdensome than the terms of the Purchase Agreement; or (iii) includes a noncash instrument or similar consideration that is not freely marketable. Any Bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid.

- **Auction.** In the event that the Debtors receive one or more Qualified Bids (other than the Bid of the Stalking Horse Bidder), then the Debtors will hold an auction (the "Auction") on January 13, 2010, commencing at 10:00 a.m. Eastern Time at the offices of Genovese Joblove & Battista, P.A. at 100 S.E. 2nd Street, Suite 4400, Miami, Florida 33131,[9] for consideration of the Qualified Bids, each as may be increased at such Auction.  Bidding will start at the highest Qualified Bid and will continue with minimum Bid increments of $250,000. The Auction may be adjourned as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given

---

[9] The Debtors would be pleased and honored to have the Court conduct the Auction in the courtroom if the Court is willing to do so.

to all entities that submitted a Qualified Bid. The Auction shall be conducted in accordance with the following procedures:

    i. Only the Debtors, representatives of the Senior Lenders and their counsel, members of the Committee and its counsel, the Stalking Horse Bidder and any other Qualified Bidder, in each case, along with their representatives, shall attend the Auction in person, and only the Stalking Horse Bidder and such other Qualified Bidders will be entitled to make any Bids at the Auction.

    ii. Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale by the Debtors of the Purchased Assets;

    iii. By 12:00 p.m. Eastern Time on January 12, 2010, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that, in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.

    iv. By 5:00 p.m. Eastern Time on January 12, 2010, the Debtors will notify the Stalking Horse Bidder and all Qualified Bidders that have informed the Debtors of their intent to participate in the Auction of which Qualified Bid(s) the Debtors believes, in their reasonable judgment, is the highest or best offer (the "Starting Bid").

    v. Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

    vi. At the Auction, the Debtors may employ and announce additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

    vii. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent Bid or combination of Bids is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's immediately

prior Qualified Bid (such bid or combination of Bids, a "Subsequent Bid") and (ii) the Debtors determine that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental Bid or combination of Bids at the Auction shall provide net value to the Debtors' estates of at least U.S. $250,000 over the Starting Bid or the Leading Bid, as the case may be. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid or combination of Bids that they believe to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.  Promptly at the conclusion of the Auction, the Debtors shall (a) determine, consistent with the Bidding Procedures, which Bid constitutes the highest or best Bid (such Bid, the "Successful Bid") and (b) communicate to the Stalking Horse Bidder, the Notice Parties, and the other Qualified Bidders the identity of the Successful Bidder(s) and the details of the Successful Bid(s). If no Qualified Bids are received other than the Purchase Agreement, the Purchase Agreement shall be designated as the Successful Bid, and there shall be no Auction. The Bidder making the Successful Bid is referred to as the "Successful Bidder." The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final subject to approval by the Bankruptcy Court.

- **The Back-Up Bid**. After determining which Qualified Bid is the Successful Bid, the Debtors shall (a) determine which of the Qualified Bid constitutes the next highest or best Qualified Bid(s) for the Purchased Assets and (b) communicate to the Stalking Horse Bidder, the other Qualified Bidders, and the other Notice Parties the identity of such Qualified Bidder(s) (a "Potential Back-Up Bidder(s)") and the details of such Qualified Bid(s) (a "Potential Back-Up Bid(s)"). In the event that the Potential Back-Up Bidder(s) agrees that (a) its/their Back-Up Bid(s) will remain irrevocable and (b) the Debtors may retain its/their Deposit, until the closing and effectiveness of the sale transactions, then such Potential Back-Up Bidder(s) shall be considered the "Back-Up Bidder(s)" and its/their Potential Back-Up Bid(s) shall be considered the "Back-Up Bid(s)". In the event of the failure by the Successful Bidder(s) to timely consummate the sale transaction, the Back-up Bidder(s) shall be deemed the Successful Bidder(s) without further order of the Court, and shall proceed to close the transactions contemplated by its/their Bid(s) no later than three (3) business days following the Debtors' tender of a notice to the Back-up Bidder(s), unless otherwise ordered by the Bankruptcy Court.  The Debtors shall be entitled to the Deposit of any Successful Bidder in circumstances described above, and in such circumstances, such Deposit shall be deemed forfeited by such defaulting Successful Bidder, and shall not be credited against the purchase price for the benefit of any Back-up Bidder. Similarly, in the event that any Back-up Bidder fails to consummate the sale transaction, then the Debtors shall be entitled to the Deposit of said party, and such Deposit shall be

deemed forfeited. The Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder and/or Back-up Bidder as the case may be, provided however, that any recourse against the Stalking Horse Bidder shall be strictly governed by the terms of the Purchase Agreement.  If the Qualified Bidder(s) initially identified as the Potential Back-Up Bidder(s) do/es not agree to become the Back-Up Bidder(s), then such Potential Back-Up Bidder(s) shall be entitled to its/their Deposit(s) and the Debtors (and the Bankruptcy Court, to the extent there is a dispute), may identify the next highest or otherwise best Bid(s) as the Potential Back-Up Bid(s), and may continue to do so until Potential Back-Up Bidder(s) agree to become the Back-Up Bidder(s).

- **The Successful Bid**.  At the Auction, the Debtors shall have the right to select the highest and best Bid from the Auction, which will be determined by considering, among other things:  (A) the number, type and nature of any changes to the Purchase Agreement requested by each Qualifying Bidder; (B) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and the cost to the Debtors of such modifications or delay; (C) the total consideration to be received by the Debtors; (D) the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof; and (E) the net benefit to the estate, taking into account the Stalking Horse Bidder's rights to the Breakup Fee and Expense Reimbursement (for avoidance of doubt, the Debtors hereby agree that the value attributed by the Debtors to any Bid made by the Stalking Horse Bidder at the Auction shall include the requirement to pay the Break Up Fee and the Expense Reimbursement).

- **The Sale Hearing**. The Successful Bid will be presented to the Bankruptcy Court for approval at the Sale Hearing. If no other Qualified Bid is received by the Debtors, and the Stalking Horse Bid is the Successful Bid, then the Debtors will seek entry of an order at the Sale Hearing authorizing and approving the sale transaction, including the sale of the Purchased Assets to the Stalking Horse Bidder, pursuant to the terms and conditions set forth in the Purchase Agreement. If a different Qualified Bid is the Successful Bid, then the Debtors anticipate that they will seek the entry of an order, modified as necessary to reflect the terms of the Successful Bid, authorizing and approving the sale of the applicable Purchased Assets to the Successful Bidder. The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of such adjournment at the Sale Hearing. Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale, and parties shall be prepared to present their evidence in support of or in opposition to the proposed sale at the Sale Hearing.

- **"As Is, Where Is"**. The sale transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates, except to the extent expressly set forth in the Purchase Agreement or the Marked Agreement corresponding to the Successful Bid, as the case may be. Except as otherwise provided in the Successful Bid, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims (as such term is defined by section 101(5) of the

Bankruptcy Code), encumbrances, rights, remedies, restrictions, interests, liabilities, leasehold interests and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Purchased Assets to the Successful Bidder, and the proposed order approving the sale transaction (as so defined therein, "Claims") as set forth in the Purchase Agreement and the Sale Order, with such Claims to attach to the net proceeds of the sale with the same validity and priority as such Claims applied against the Purchased Assets.

- **Bankruptcy Court Jurisdiction**. Any and all disputes related or pertaining to or resulting or arising from the Bid Procedures, the Auction, the sale transaction and/or the conduct of the Debtors shall be adjudicated solely by the Bankruptcy Court. The submission of a Bid shall constitute an express consent by the Bidder to the exclusive jurisdiction of the Bankruptcy Court for all such matters.

- **Break Up Fee**. In consideration of the Stalking Horse Bidder's undertaking of the substantial legal, accounting and other expenses attendant to the Purchase Agreement, proceeding toward the consummation of the sale transaction, and acting as the Stalking Horse Bidder, the Debtors have agreed to pay the Stalking Horse Bidder (i) a fee of 3.0% of the Purchase Price (the "Break Up Fee") plus (b) reimbursement for reasonable fees and expenses, as may be determined by the Court and capped at $1,000,000, incurred by Stalking Horse Bidder in connection with the Stalking Horse Bidder's due diligence (the "Expense Reimbursement"), which Break Up Fee and Expense Reimbursement shall be payable in accordance with the terms of the Purchase Agreement, including specifically through a "carve out" from the collateral securing the obligations owed to the Senior Lenders under the Prepetition Credit Agreement, as defined in the Purchase Agreement.[10]

25.    The Bidding Procedures provide a flexible process where the Debtors will be soliciting bids in a manner that will allow the Debtors to maximize the value of their assets given the severe liquidity constraints and accompanying time pressure they currently face.

### B.    Authority to Offer Breakup Fee and Expense Reimbursement.

26.    As set forth above in detail, the Debtors have determined, in the exercise of their best business judgment, that a sale of the Purchased Assets at this time to the Stalking Horse Bidder, subject to higher or better offers, is warranted and necessary. As set forth above, the Debtors request authority to enter into the Purchase Agreement with the Stalking Horse Bidder

---

[10] Nothing in this Motion or the Purchase Agreement shall constitute a waiver of the Stalking Horse Bidder's right to seek payment of the Break Up Fee and Expense Reimbursement as a surcharge pursuant to Section 506(c) of the Bankruptcy Code, if necessary.

and approval of the Bidding Procedures, including (i) the amount and payment terms for the Break Up Fee and Expense Reimbursement, and (ii) certain other overbid protections set forth above.

27.    The ability of the Debtors to offer the Stalking Horse Bidder the proposed bidding protections is beneficial to the Debtors' estates and creditors because it affords the Debtors the means necessary to induce the Stalking Horse Bidder to submit or increase its bid prior to the Auction and allows the Debtors to establish a floor and appropriate parameters for the submission of Bids prior to the Auction. Thus, even if the Stalking Horse Bidder is paid a Break-Up Fee and Expense Reimbursement from the Senior Lenders' collateral because the Stalking Horse Bidder is not the Successful Bidder, the Debtors and their estates will have benefited from the higher floor established by the Stalking Horse Bid and the certainty that such Bid brings to the sale process. Approval of breakup fees, expense reimbursements and other forms of bidding protection in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become an established practice in large chapter 11 cases.

28.    Three different approaches have been used by the bankruptcy courts in assessing the validity and enforceability of bidding incentives. The first approach – the business judgment test – is based on the corporate control cases and applies the business judgment rule to make certain that bidding is promoted, not deterred, and that the fees are reasonable in relationship to the size of the transaction and the bidder's efforts. *See In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Col. 1992), adopting *In re Integrated Resources, Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *In re Metaldyne Corp.,* 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) (applying business judgment test to Debtor's selection of stalking horse bidder); *see also Cottle v. Stores*

*Communications, Inc.*, 849 F. 2d 570 (11th Cir. 1988) (using business judgment test in corporate control context). This approach also has been endorsed by a leading bankruptcy treatise. See 3 *Collier on Bankruptcy* § 363.02[6] at 363-21 (15th ed. 2005) (courts "should approve [bidding incentives] unless they are unreasonable or appear more likely to chill the bidding process than to enhance it.").

29.    The second approach – the best interests of the estate test – focuses on whether the bidding incentive at issue is in the best interests of the estate to ensure that the debtor's estate is not unduly burdened and that the relative rights of the parties are protected. See *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ("this Court declines to follow other Bankruptcy Court's opinions where break-up fees are treated as another topic of corporate negotiation without reference to what in fact is in the best interests of the estate."); see also *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) (adopting *America West*); *In re Tiara Motorcoach Corp.*, 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (same).

30.    The third approach – the administrative claim test – considers whether the bidding incentive at issue is "actually necessary to preserve the value of the estate." See *In re O'Brien Environmental Energy, Inc.*, 181 F. 3d 527, 535 (3d Cir. 1999) (concluding that none of the cases which support the first two approaches "offers a compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for administrative expenses under the same provision"); see also *AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C.* (*In re Tama Beef Packing, Inc.*), 290 B.R. 90, 97-98 (B.A.P. 8th Cir. 2003) (adopting reasoning of *O'Brien* and holding that administrative expense jurisprudence is applicable); *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) (citing *Tama Beef* as applicable circuit precedent); *In re Dorado Marine, Inc.*, 332 B.R.

637 (M.D. Fla. 2005) (using administrative expense test, citing *O'Brien*); *In re Beth Israel Hospital Ass'n of Passaic*, 2007 WL 2049881 at *15 (Bankr. D.N.J. July 12, 2007) (break-up fees must be determined by the same standard applied to the allowance of any administrative expense); (*In re Reliant Energy Channelview, LP*, 403 B.R. 308, 311 (D. Del. 2009) (parties agreed that *O'Brien* set forth correct standard).

31.    The Debtors submit that under each of the above tests the proposed Break Up Fee and Expense Reimbursement will not chill bidding, but rather enhance it and that the proposed Break Up Fee and Expense Reimbursement will preserve and enhance the value of the estates' assets. Moreover, the amount of the proposed Break Up Fee, 3% of the Purchase Price plus the Expense Reimbursement capped at $1.0 million payable in accordance with the terms of the Purchase Agreement, namely a "carve out" from the collateral securing the obligations owed to the Senior Lenders, is reasonable under the circumstances and in light of the substantial time and effort that the Stalking Horse Bidder has invested in negotiating the Purchase Agreement and related documents, as well as the risk taken by the Stalking Horse Bidder in connection therewith. In addition, the Debtors agreed to the Break Up Fee and the Expense Reimbursement in the context of the other offers that were made to the Debtors at the time that they were considering which potential purchaser to select as the stalking horse.  Specifically, the purchase price proposed by the Stalking Horse Bidder under the Purchase Agreement was materially higher than the other proposals received by the Debtors, even after taking into account the amount of the Break Up Fee and Expense Reimbursement.  Moreover, the Debtors submit that the amount of the Break-Up Fee and Expense Reimbursement are consistent with both market rates and recent break up fees that have been approved in other large Chapter 11 cases.  See *In re Continuum Care Services, Inc.*, No. 07-10749-JKO (Bankr. S.D. Fla. December 12, 2007)

(approving breakup fee in the amount of $360,000 [3.0%]); *In re Gemini Cargo Logistics, Inc.*, No. 06-10870 (Bankr. S.D. Fla. April 17, 2006) (approving break-up fee payable in connection with exit financing and expense reimbursement of reasonable out-of-pocket expenses); *In re Picadilly Cafeterias, Inc.*, No. 03-27976 (Bankr. S.D. Fla. September 14, 2004) (approving payment of expense reimbursement as bidder protection); see also *In re Tribune Company*, No. 08-13141(KJC) (Bankr. D. Del. August 31, 2009) (approving "Investor Protections" related to sale of Chicago Cubs that included a potential $20,000,000 maximum breakup fee [2.49%]); *In re Solutia Inc.*, Case No. 03-17949 (PCB) (Bankr. S.D.N.Y. October 19, 2005) (approving termination fee of $7.5 million [2.94%] and reimbursement of expenses up to $2 million); *In re Magellan Health Servs., Inc.*, Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. September 8, 2003) (approving termination fee of $4 million [2.6%] and reimbursement of expenses up to $1 million); *In re Genuity Inc.*, Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. December 16, 2002) (approving breakup fee of $10 million [4.1%] and expense reimbursement up to $3 million).

## C.    <u>Proposed Notice of the Sale Hearing</u>

32.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 20 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested.

33.    The Debtors have served, or will serve, this Motion on: (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) all parties known to be asserting a lien in the Debtors' assets (including each of the Debtors' Senior Lenders and all known claimants asserting mechanics and/or materialmens' liens); (d) all counterparties to executory contracts and unexpired leases potentially to be assumed and assigned; (e) all state attorney generals in states

where the Debtors conduct business; and (f) various federal and state tax authorities, including the Internal Revenue Service.

34.     In compliance with Bankruptcy Rule 2002(c), the Debtors also will serve, by regular mail, a notice of the Bidding Procedures, Auction and Sale Hearing (the "Sale Notice"), substantially in the form annexed hereto as Exhibit B, which includes, among other things, the date, time and place of the Auction and of the Sale Hearing. The Sale Notice shall be served upon (i) the Office of the United States Trustee for the Southern District of Florida; (ii) counsel to the Stalking Horse Bidder; (iii) the holders of the 20 largest unsecured claims against the Debtor, Arch Aluminum & Glass Co., Inc., and the holders of the 20 largest unsecured claims against the Debtor, AWP, LLC, as identified in the Debtors' Chapter 11 petitions; (iv) counsel to the Senior Lenders; (v) the Notice Parties; (vi) any party that, in the past year, expressed in writing to the Debtors an interest in acquiring the Purchased Assets, directly or through a merger or alliance; (vii) all parties who are known to assert Claims upon the Purchased Assets; (viii) the U.S. Treasury; (ix) the Securities and Exchange Commission; (x) the Internal Revenue Service; (xi) all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities; (xii) all applicable state and local taxing authorities; (xiii) the Federal Trade Commission; (xiv) United States Attorney General/Antitrust Division of Department of Justice; (xv) the U.S. Environmental Protection Agency; (xvi) United States Attorney's Office; (xvii) the entities set forth in the Master Service List established in these cases; (xviii) all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002; and (xix) any other party identified on the creditor matrices in these cases.

35.     The Debtors submit that the methods of notice described in this Motion comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the Bidding

Procedures and of the sale of the Purchased Assets. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

**D.    Sale of Substantially all Assets Pursuant to Section 363(b) of the Bankruptcy Code**

36.    The Debtors request authority to sell, assign and transfer the Purchased Assets to Stalking Horse Bidder, or the highest and best bidder, pursuant to Section 363(b) of the Bankruptcy Code, which Section provides that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."

37.    The sale of the Purchased Assets to Stalking Horse Bidder pursuant to the Purchase Agreement constitutes substantially all of the Debtors' assets.  Courts interpreting Section 363(b) have approved non-ordinary course sales even where substantially all of a debtor's assets were being sold prior to proposal of a plan of reorganization.  *In re Parkstone Med. Info. Sys.*,2001 WL 36189822 at *1 (Bankr. S.D. Fla. Oct. 16, 2001) (Hyman, J.); *In re Lionel Corporation*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983); *In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984); *In re Tower Automotive, Inc.*, 342 B.R. 158, 163-64 (Bankr. S.D.N.Y. 2006 (discussing legal standards governing asset sales outside the plan process). Following the guidelines established by the seminal decision of the Second Circuit in the *Lionel* case and its progeny, a debtor may sell all of the assets of the estate under Bankruptcy Code section 363 outside of a plan.  As the *Lionel* court observed:

> Resolving the apparent conflict between Chapter 11 and section 363(b) does not require an all or nothing approach.  Every sale under 363(b) does not automatically short-circuit or side step Chapter 11; nor are these two statutory provisions to be read as mutually exclusive.  Instead, if a bankruptcy judge is to administer a business reorganization successfully under the Code, then ... some plan for the operation of both 363(b) must be allowed for. ... The rule we adopt requires that a judge determining a section 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.

*In re Lionel Corporation*, 722 F.2d at 1070-71; see also *In re General Motors Corp.*, 407 B.R. 463, 498 (Bankr. S.D.N.Y. 2009) (holding that proposed 363 transaction did not constitute an impermissible *sub rosa* plan); *In re Chrysler LLC*, 405 B.R. 84, 94 (Bankr. S.D.N.Y. 2009) (applying *Lionel* factors).

38.     Therefore, as a general rule, courts approve the sale of all or substantially all of a debtor's assets, prior to confirmation of a plan and pursuant to Section 363(b), provided the debtor establishes "sound business judgment" for such a transaction. *Parkstone Med. Info. Sys.*, 2001 WL 36189822; *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995) ("courts consistently have acknowledged that assets of an estate can be sold prior to the confirmation, or even filing, of a plan")*.*; *In re Lorraine Brooke Associates, Inc.*, 2007 WL 2257608 at *4 (Bankr. S.D. Fla. Aug. 2, 2007) (Cristol, J.) (applying business judgment test in assessing 363(b) motion in chapter 7 proceedings) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-176 (D. Del. 1991)); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991). The "sound business judgment" test requires a debtor to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested parties, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith. *Id.*; see also *In re Equity Management Systems*, 149 B.R. 120, 124 (applying same factors); *In re Phoenix Steel Corporation*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (same); *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 136 (Bankr. W.D.N.Y. 2009) (same) (citing *In re Lionel Corp.*, 722 F.2d at 1071 and *Phoenix Steel*, 82 B.R. at 335).

### (i)     *Sound Business Reasons Exist to Sell the Assets at this Time*

39.     The Debtors respectfully submit that all of the factors demonstrating their sound business judgment are met, and that the sale should be approved. There are sound business

reasons justifying the sale of the Purchased Assets to Stalking Horse Bidder, or the highest and best bidder, at this time. The Debtors are concerned about the ability to effectuate a true "internal" reorganization, nor do they have the luxury of time to negotiate, formulate and propose a plan of reorganization and disclosure statement. Rather, the Debtors have determined that the best way to maximize the value of their assets is to sell their business and property as a going concern, for fair market value, to the highest and best bidder pursuant to a section 363 sale.

40. As set forth above, in August 2009, Vincent Colistra became the chief restructuring officer of the Debtors. As the Debtors did before he was engaged, Mr. Colistra immediately took steps to further reduce overhead and improve the net operations of the Debtors. However, even with these improved operations, the Debtors may not have the ability to restructure their financial affairs solely based on their business revenue.

41. As set forth above in detail, PJC conducted an extensive pre-petition marketing process that generated several interested parties who undertook significant effort and incurred significant expense conducting due diligence on the Debtors' assets. The result of such process was the proposed sale of the Purchased Assets to the Stalking Horse Bidder pursuant to the Purchase Agreement. Due to the cash constraints facing the Debtors as described above, the Debtors must seek approval of the sale of the Purchased Assets to the Stalking Horse Bidder, or the highest and best bidder at the Auction, as quickly as possible, such that a closing can occur by mid to late January 2010. If the Debtors were required to effectuate these sales pursuant to the typical plan and disclosure statement process, the closings would not occur for several more months. Therefore, in order to avoid losing these valuable opportunities, and in order to preserve the maximum value of the Purchased Assets for the estates, the Debtors were required to seek approval of the sales by way of motion rather than pursuant to a plan of reorganization.

42.     Moreover, as set forth below, the Debtors may be required to close their operations and convert their cases to a Chapter 7 liquidation proceeding if this opportunity is lost.  Attached hereto as Exhibit "C" is a liquidation analysis prepared by the CRO for the Debtors' assets (the "Liquidation Analysis").  As set forth therein, in the event that the Purchased Assets were liquidated in a Chapter 7 or a "forced sale" scenario, then after accounting for the cost of liquidation, the Debtors project that they would receive between a low of $29.104 million to a high of $41.338 million, with a base case liquidation value net of costs equal to $35.873 million.  Such liquidation value is substantially less than the approximate $62,000,000 that will be realized by the Debtors' estates under the Purchase Agreement.  Moreover, a conversion to Chapter 7 would result in the loss of approximately 1,800 jobs, as well as a future customer for all of the Debtors' vendors.  As such, the Debtors submit that they have demonstrated sound business judgment for this Motion.

*(ii)*     ***Alternatives to Sale Motion.***

43.     Rather than seeking to sell substantially all of its assets, the Debtors could have sought to restructure their financial affairs through a plan of reorganization.  In such a scenario, the Debtors would have been required to demonstrate to the Court, and to creditors of the estates, that they had the ability to emerge from Chapter 11 as a "reorganized entity".  The Debtors would have to show, among other things, that they had the financial ability to meet the requirements of Section 1129 of the Bankruptcy Code, which requires a debtor to demonstrate, among other things (a) that creditors will receive or retain under such plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor was liquidated on such date under chapter 7 of the Bankruptcy Code, and (b) confirmation of the plan is not likely to be

followed by the liquidation, or the need for further financial reorganization of the debtor.  Based on the financial condition of the Debtors and the need for an immediate and significant capital infusion as described above, it is unclear at best whether the Debtors could satisfy these requirements.  Therefore, the Debtors have not sought to propose and seek confirmation of a plan of reorganization.

44.     Another alternative to the proposed sale would be the conversion of this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, which would require the immediate closure and cessation of the Debtors' business operations and the liquidation of all assets of the Debtors and the Debtors' estate by a Chapter 7 bankruptcy trustee.  Due to the nature of the Debtors' business, the Debtors' business assets have limited value unless they are used in connection with a going concern business.  Therefore, if the Debtors' operations cease, then the Debtors assert, as demonstrated by the Liquidation Analysis attached hereto as Exhibit C, that all creditors of the Debtors' estates will receive substantially less than the proposed value of the Purchase Agreement with the Stalking Horse Bidder.

45.     Yet another alternative to the proposed sale to the Stalking Horse Bidder is the dismissal of these Chapter 11 cases.  In that event, however, the Debtors readily anticipate that the Senior Lenders will commence proceedings to foreclose on their collateral.  In addition, the Debtors anticipate that certain other creditors would quickly file suit against the Debtors. Moreover, given the immediate need for a capital infusion, the Debtors will more likely than not need to cease all of their operations and close their doors.  The court presiding over any particular court proceeding would not have jurisdiction over any other proceeding, and as a consequence each creditor would be free to undertake such collection activity, including lawsuits, as such creditor deemed appropriate, all in what would amount to a "race to the

courthouse." These consequences are exactly the types of activities that the bankruptcy process is designed to avoid. It is only through the bankruptcy process that the Debtors' creditors can be treated in accordance with each creditor's respective rights.

46.     Collectively, these factors clearly evidence that the Debtors' proposed sale of the Purchased Assets to Stalking Horse Bidder, or the highest and best bidder, is in the best interest of all creditors of the estate.

### (iii)     *The Debtors have Obtained a Fair and Reasonable Price*

47.     The Debtors believe that the sale proposed herein is the best way to preserve the going concern, enterprise value of the Purchased Assets and to maximize the value of the estates for the benefit of all creditors in these Chapter 11 cases. As set forth above, the Purchased Assets were extensively marketed by the Debtors with the substantial assistance of PJC and the CRO for several months prior to the filing of these Chapter 11 cases. After several potential purchasers conducted extensive due diligence, the Debtors received no less than five (5) firm offers for the Debtors' assets. After evaluating such offers with the Debtors' board of directors and with the assistance of their professionals, the Debtors selected the Stalking Horse Bidder as the best offer received for the Purchased Assets. Moreover, as set forth above, the value of the Purchase Agreement to the Debtors' estates (approximately $62,000,000) greatly exceeds the liquidation value of the Purchased Assets. Finally, pursuant to Bidding Procedures set forth above, the sale will be subject to higher and better offers.

### (iv)     *The Sale is in Good Faith*

48.     The Purchase Agreement is the product of good faith, arms' length negotiations between the Debtors and the Stalking Horse Bidder. The Stalking Horse Bidder is not an insider of the Debtors within the meaning of Section 101(31) of the Bankruptcy Code, and does not

control or act on behalf of any insider of the Debtors.  Therefore, the sale has been proposed in

good faith.  See *In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) ("deference to a

DIP's decision as to a successful bidder of its assets is appropriate, and that decision may be

honored unless it is proven that the DIP abused that discretion"); *In re Abbotts Dairies of

Pennsylvania, Inc.*, 788 F.2d 143, 149, n.5 (3d Cir. 1986) (purpose of good faith requirement is

to "prevent[] a debtor-in-possession or trustee from effectively abrogating the creditor

protections of Chapter 11."); see also *In re Lorraine Brooke Associates*, 2007 WL 2257608 at

*4; *In re Grand Prix Associates, Inc.*, 2009 WL 1850966 at *4 (Bankr. D.N.J. June 26, 2009)

("A court may not find good faith if fraud, collusion, or unfair advantages are determined.")

(citing *Abbotts Dairies*, 788 F.2d at 149-50).

### E.    Sale of Assets Free and Clear of Certain Liens, Claims and Encumbrances

49.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property

under Bankruptcy Code section 363(b) free and clear of liens, claims and encumbrances if one of

the following conditions is satisfied: (a) applicable nonbankruptcy law permits the sale of the

property free and clear of such interest; (b) the entity holding the lien, claim or encumbrance

consents to the sale; (c) the interest is a lien and the price at which such property is to be sold is

greater than the aggregate value of all liens on the property; (d) the interest is in bona fide

dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a

money satisfaction of its interest. 11 U.S.C. § 363(f). *See In re Smart World Tech., LLC*, 423

F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims

and interests. It thus allows purchasers ... to acquire assets [from a debtor] without any

accompanying liabilities"); *In re Dundee Equity Corp.*, 1992 WL 53743, at *3 (Bankr. S.D.N.Y.

Mar. 6, .1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

50.     The Purchase Agreement requires that the sale of the Purchased Assets be free and clear of all liens, claims, encumbrances and interests (collectively, the "Liens"). The sale of the Purchased Assets pursuant to the Bidding Procedures will satisfy section 363(f) of the Bankruptcy Code because the Debtors believe that the Senior Lenders will consent to such sale and/or the Debtors believe that they can compel such a sale over objection pursuant to one or more of the other subsections of section 363(f) of the Bankruptcy Code.  In all events, any Lien on the Purchased Assets sold pursuant to the Bidding Procedures shall attach to the net proceeds of the sale of the Purchased Assets.  The Debtors will address and more fully brief these issues in advance of the Sale Hearing if they are not able to garner the requisite consents from their Senior Lenders.

51.     In addition, the Debtors submit that the Purchased Assets may be sold free and clear of all successor liability claims. Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Chrysler LLC*, 576 F.3d 108, 126 (2nd Cir. 2009) (agreeing with *TWA* decision "that the term 'any interest in property' encompasses those claims that 'arise from the property being sold.'"); *Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), *affd*, 805

F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(1) barred successor liability for products defect claim).

**F.      The Successful Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser**

52.      Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal. Specifically, section 363(m) states that: "The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal 11 U.S.C. § 363(m)." *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Global Vision Products, Inc.*, 2009 WL 2170253 at *3 (Bankr. S.D.N.Y. Jul 14, 2009) (citing *Hughes*)*; In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal"); *In re MacNeal,* 308 Fed. Appx. 311, 315 (11th Cir. 2009) ("after a sale is approved by the bankruptcy court and consummated by the parties, the sale may not be invalidated unless it is stayed pending appeal") (citing *In re The Charter Co.*, 829 F.2d 1054, 1056 (11th Cir. 1987) ("In order to protect those who purchase property from a bankruptcy estate, the Bankruptcy Code provides that once a sale is approved by the bankruptcy court and consummated by the parties, the bankruptcy court's authorization of the sale cannot be effectively altered on appeal.")).

53.    Although the Bankruptcy Code does not define "good faith," one court has held that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *In re Gucci,* 126 F.3d 380, 390 (2nd Cir. 1997) (*quoting In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Andy Frain Services, Inc*., 798 F.2d 1113, 1125 (7th Cir. 1986).

54.    Here, the selection of the Stalking Horse Bidder was the result of an extensive marketing process and extended arm's-length, good-faith negotiations. The Debtors and the Stalking Horse Bidder were both advised by their legal and financial advisors throughout the process. In the event of a competitive Auction, the Debtors will only select the Stalking Horse Bid as the Successful Bid if, after a review of all Qualified Bids (and Subsequent Bids submitted by the Stalking Horse Bidder or other Qualified Bidders), the Debtors determines that the Bid of the Stalking Horse Bidder is the highest and best offer submitted for the Purchased Assets. Accordingly, the Debtors request that the Court make a finding that the Stalking Horse Bidder, or the Successful Bidder at the Auction of the Purchased Assets, is entitled to the protections of section 363(m) of the Bankruptcy Code.

## G.    **The Court Should Waive or Reduce the Periods Required By Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure**

55.    Pursuant to Rule 6004(h), all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order, unless the court orders otherwise. Fed. R. Bankr. P. 6004(h).

56.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately if there is a showing of a sufficient need to close the sale within the 10-day period. 10 Collier on Bankruptcy § 6004.10 (15th ed. 2007); *see In re Perry Hollow Management Co., Inc.*, 297 F.3d 34, 41 (1st Cir. 2002) (affirming bankruptcy court's decision to waive 10-day stay where trustee presented as evidence for the waiver that: (i) the sale price was reasonable; (ii) the buyer was ready to complete the sale the next day; and (iii) the debtor would incur costs for storing the sold property pending closing); *see also In re Second Grand Traverse School*, 100 Fed. Appx. 430 (6th Cir. 2004) (bankruptcy court's decision to waive automatic 10-day stay following sale of debtor's property was not abuse of discretion).

57.     In order to limit the costs of administering the Debtors' estates, it is critical that the Debtors close the sale of the Purchased Assets as soon as possible after the Sale Hearing, but in no event later than mid to late January 2010.  Accordingly, the Debtors hereby request that the Court waive the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d), to the extent applicable.

## H.     Assumption And Assignment of Executory Contracts and Unexpired Leases

58.     The assumption and assignment of the Debtors' executory contracts and unexpired leases is an integral part of the proposed sale and should be approved by the Court. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). By enacting section 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject

those that are of no value or are burdensome to the estate. *See Cinicloa v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *In re Chira*, 367 B.R. 888, 898 (S.D. Fla. 2007); *In re Sandman Assocs., LLC*, 251 B.R. 473; 481 (W.D. Va. 2000) (noting that "[t]he authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable and rejecting those that are not.").

59.     It is well established that decisions to assume or reject executory contracts or unexpired leases are matters within the "business judgment" of the debtor. See *In re Chira*, 367 B.R. at 897 ("[A] bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract [pursuant to § 365] should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it.'" (quoting *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2nd Cir. 1993); see also *In re Prime Motor Inns*, 124 B.R. 378 (Bankr. S.D. Fla. 1991) (Cristol, J.) (applying the business judgment test in analyzing debtor's rejection of executory contract. Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "the product of bad faith, whim or caprice." *In re Prime Motor Inns*, 124 B.R. at 381; *In re Surfside Resort and Suites, Inc.*, 325 B.R. 465, 469 (Bankr. M.D. Fla. 2005) (same) (citing *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985).

60.     Adequate business justification exists to merit judicial approval of the proposed assumption and assignment of the Debtors' executory contracts and unexpired leases. The Debtors' contracts and leases are valuable assets of the Debtors' estates and represent an integral

part of any proposed transaction for the sale of the Purchased Assets. To the extent that the Debtors can sell them as part of the sale, the sales will generate cash which the estates can use to satisfy claims and reduce potential claims against the estates.

61.    Section 365(b)(1) of the Bankruptcy Code authorizes a debtor-in-possession to assume and/or assign an executory contract if the debtor: "(A) cures, or provides adequate assurance that [it] will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;  (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease. . . ."  Further, Section 365(f)(2) provides that: "The trustee may assign an executory contract or unexpired lease of the debtor only if - (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. *See* 11 U.S.C. §§ 365(a), (b)(1), (f)(2). Accordingly, Section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments of executory contracts and unexpired leases, provided

that the defaults under such contracts are cured and adequate assurance of future performance is provided.

62.    It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but that a contract counterparty is not required to receive an absolute guarantee of future performance. *See, e.g., In re Glycogensys, Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee"); *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (for purposes of 365(b)(1)(C), adequate assurance of future performance "is to be given a practical, pragmatic construction based upon . . . the circumstances of [the] case." (quoting *In re Carlisle Homes*, 103 B.R. at 538).

*(i).    Proposed Procedure for Assumption and Assignment of Executory Contracts and Unexpired Leases.*

63.    In the interest of time and in order to facilitate a process for the assumption and assignment of executory contracts and unexpired leases that is integrated with the Bidding Procedures set forth above, the Debtors propose and respectfully request approval of the following process for the Debtors to assume and assign to the Stalking Horse Bidder or the Successful Bidder certain executory contracts and unexpired leases.

64.    As set forth above, any Bid that is conditioned upon the assumption and assignment of executory contracts and unexpired leases must (a) be submitted with a list of executory contracts and unexpired leases (if any) that are to be assumed and/or assigned; and (b) evidence of such bidder's ability to provide adequate assurance of future performance in respect

of such agreements (the "Adequate Assurance Package"). Similarly, prior to the Bid Deadline, the Stalking Horse Bidder must identify the executory contracts and unexpired leases that it desires to assume if it is ultimately the buyer and provide the Debtors with information similar to the Adequate Assurance Packages required pursuant to the Bidding Procedures.

65.    On or before three (3) business days prior to the Sale Hearing, the Debtors shall file with the Bankruptcy Court and shall serve on each non-debtor counterparty to an executory contract or unexpired lease with any of the Debtors (each a "Non-Debtor Counterparty") that the Debtors may assume and assign to the Stalking Horse Bidder or another Successful Bidder (each such agreement, a "Designated Agreement"), by overnight delivery service, a notice of assumption and assignment of executory contracts and unexpired leases (the "Assignment Notice"). The Debtors shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to each Designate Agreement and the cure costs, if any, that would be due pursuant to section 365(b)(1) of the Bankruptcy Code ("Cure Costs") to each Non-Debtor Counterparty, provided that such Assignment Notice shall in no way limit such Non-Debtor Counterparty's entitlement to Cure Costs by filing an objection to such Cure Costs prior to the Sale Hearing.

66.    The Assignment Notice shall also provide notice to each Non-Debtor Counterparty of the date and time of the Sale Hearing and indicate that, upon written request to the Debtors' counsel by a Non- Debtor Counterparty to a Designated Agreement, the Debtors will provide to such party any Adequate Assurance Package provided by the Stalking Horse Bidder or Successful Bidder, as applicable.

67.    Objections, if any to the proposed assumption and assignment of the Designated Agreements, including the Cure Costs the provision of adequate assurance of future performance

or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of Section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with the Court and served on the Notice Parties so as to be received no later than 12:00 pm Eastern one (1) business day prior to the Sale Hearing.  Where a Non-Debtor Counterparty to an Designated Agreement files an objection to the assumption by the Debtors and assignment to the Successful Bidder of such Designated Agreement (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtors, the Successful Bidder and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.

68.    If any of the Debtors, the Non-Debtor Counterparty or the Successful Bidder determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under Section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Bankruptcy Court at the Sale Hearing.

69.    Any Non-Debtor Counterparty to a Designated Agreement who fails to file a timely objection to the proposed Cure Costs or the proposed assumption and assignment of an Designated Agreement is deemed to have consented to such Cure Costs and the assumption and assignment of such Designated Agreement, and such party shall be forever barred from objecting to the Cure Costs or such assumption and assignment and from asserting any additional cure or other amounts against the Debtors, their estates or the Stalking Horse Bidder.

70.    If the Non-Debtor Counterparty to a Designated Agreement fails to timely assert an objection as described above, or upon the resolution of any timely objection by agreement of

the parties or order of the Court approving an assumption and assignment, such Designated Agreement shall be deemed to be assumed by the Debtors and assigned to the Stalking Horse Bidder or other Successful Bidder and the proposed Cure Cost related to such Designated Agreement shall be established and approved in all respects, subject to the conditions set forth below.

71.     The Debtors' decision to assume and assign the Designated Agreements is subject to Court approval and consummation of the sale transaction with the Stalking Horse Bidder or a higher and better bidder pursuant to the Bidding Procedures. Accordingly, subject to the satisfaction of conditions to address any cure or assignment disputes, the Debtors shall be deemed to have assumed and assigned to the Successful Bidder each of the Designated Agreements as of the date of and effective only upon the Closing Date, and absent such closing, each of the Designated Agreements shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.  Assumption and assignment of the Designated Agreements also is subject to the Successful Bidder's rights set forth above. The Successful Bidder shall have no rights in and to a particular Designated Agreement until such time as the particular Designated Agreement has been assumed and assigned in accordance with the procedures set forth herein.

72.     Based on the foregoing, the Debtors respectfully request that the Bankruptcy Court approve the procedure set forth above for the assumption and assignment of the Designated Agreements.

## NO PRIOR REQUEST

73.     No previous motion for the relief sought herein has been made to this or to any other court.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) approve the Purchase Agreement and authorize the Debtors to enter into the Purchase Agreement, (b) approve the Bidding Procedures set forth herein; (c) authorize the Debtors to provide certain stalking horse bid protections; (d) approve the Break Up Fee and the Expense Reimbursement, as well as the payment terms related thereto as set forth in the Purchase Agreement; (e) schedule a final hearing to consider approval of, an approving, the sale of substantially all of the Debtors' assets; (f) authorizing the Debtors to assume and assign certain executory contracts and unexpired leases in connection with the Purchase Agreement, (g) approve the form and manner of notice of the sale and of the Sale Hearing; and (h) grant such other and further relief as is just and proper.

Respectfully submitted this 2nd day of December 2009,

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

GENOVESE JOBLOVE & BATTISTA, P.A.
Proposed Attorneys for Debtors-in-Possession
4400 Bank of America Tower
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:     /s/     Paul J. Battista
        Paul J. Battista, Esq.
        Florida Bar No. 884162
        pbattista@gjb-law.com
        Heather L. Harmon, Esq.
        Florida Bar No. 013192
        hharmon@gjb-law.com
        Michael L. Schuster, Esq.
        Florida Bar No. 57119
        mschuster@gjb-law.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via facsimile, CM/ECF, and/or First Class postage-paid U.S. Mail to all parties on the attached service list this 2nd day of December, 2009.

By: _____ /s/ Paul J. Battista _____
Paul J. Battista, Esq.

**MASTER SERVICE LIST**
**ARCH ALUMINIM & GLASS CO., INC.,** *et al.*
**CASE NO. 09-36232-BKC-JKO**

## DEBTORS

**ARCH ALUMINIM & GLASS, CO., INC,** *et al*
Attn: Leon Silverstein
10200 N.W. 67th Street
Tamarac, FL 33321

## STAKEHOLDERS

**MSouth Equity Partners**
Attn: Garrison Kitchen
Two Buckhead Plaza
3050 Peachtree Road NW
Suite 550
Atlanta, GA 30305

## SENIOR LENDERS

**PNC Bank, N.A.**
*As Lender and Agent*
Attn: Jay Stein
5200 Town Center Circle, Suite 302
Boca Raton, FL 33486

**Moore & Van Allen**
*Counsel to Senior Lending Group*
Attn: James Langdon
100 North Tryon Street
Suite 4700
Charlotte, NC 28202-4003

**RBS**
P O Box 845991
Boston, Ma 02284

**Comerica Bank**
1717 Main Street
Dallas, TX 75201

**Fifth Third Bank**
38 Fountain Square Plaza
Cincinnati, OH 45263

**Sovereign Bank**
840 Penn Avenue
Wyomissing, PA 19610

**Bank of America**
101 S Tryon St
Charlotte, NC 28280

**Wachovia**
301 South College Street
Charlotte, NC 28288

## SUBORDINATED LENDER

**Churchill Capital Partners**
333 South Seventh Street, Suite 2400
Minneapolis, MN 55402

**Faegre & Benson LLP**
*Counsel to Subordinated Lenders*
Attn: Nicole J. Kroetsch
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

## TOP 20 UNSECURED CREDITORS – ARCH ALUMINUM & GLASS CO., INC.

**Pilkington North America Inc.**
811 Madison Avenue
Toledo, OH 46304-5684

**Guardian Industries**
4681 Collection Center Drive
Chicago, IL 60693

**PPG Industries, Inc.**
PO Box 360175
Pittsburgh, PA 15251

**MASTER SERVICE LIST**
**ARCH ALUMINIM & GLASS CO.,  INC.,** *et al.*
**CASE NO. 09-36232-BKC-JKO**

**William Bonnell Co., Inc.**
Cs Drawer 198638
Atlanta, GA 30384

**Zeledyne, LLC**
PO Box 841426
Dallas, TX 75284

**Solutia, Inc.**
PO Box 75098
Charlotte, NC 28275

**Hydro Aluminum North America MP**
PO Box 2599
Carol Stream, IL 60132

**Rockford Trading Co.**
124 N Walter Street
Rockford, IL 61107

**AGC Industries**
PO Box 533108
Charlotte, NC 28290

**C.R. Laurence**
PO Box 58923
Los Angeles, CA 90058

**Allmetal**
97412 Eagle Way
Chicago, IL 60678

**Spraylat Corp.**
24268 Network Place
Chicago, IL 60673

**Penske**
PO Box 827380
Philadelphia, PA 19182

**Walker Glass Co. Ltd.**
9551 Ray Lawson Blvd.
Montreal, Quebec H1J 1L5 Canada

**Ryder Truck Rental**
c/o Kevin P. Sauntry
6000 Windward Parkway
Alpharetta, GA 30005

**Fenzi USA, Inc.**
PO Box 2508
Buffalo, NY 14240

**Ir Security & Safety**
75 Remittance Dr
Chicago, IL 60675

**Global Door Control, Inc.**
PO Box 601296
Charlotte, NC 28260

**Lockton Companies, LLC**
PO Box 671291
Dallas, TX 75267

**Industrial Control Development**
13911 NW Third Court
Vancouver, WA 98685

**TOP 20 UNSECURED CREDITORS –
AWP, LLC**

**Benada Aluminum of Florida, Inc.**
PO Box 126100
Hialeah, FL 33012

**Vetro USA**
8050 NW 74th Ave
Medley, FL 33166-7542

**Yale Ogron Mfgr. Inc.**
15201 NW 34th Ave
Opalocka, FL 33054

**Ryder Transportation Services**
PO Box 96723
Chicago, IL 96723

**MASTER SERVICE LIST**
**ARCH ALUMINIM & GLASS CO., INC.,** *et al.*
**CASE NO. 09-36232-BKC-JKO**

**MC Aluminum and Glass**
227 Landings Blvd.
Weston, FL 33327-1106

**Amesbury Group**
Box 65637
Charlotte, NC 28265

**Sullivan & Associates**
3360 SW 13th Ave
Ft. Lauderdale, FL 33315

**Sunlite Sales**
545 Burlington Street
Opalocka, FL 33054

**Fenestration Testing Laboratory, Inc.**
8148 NW 74th Ave
Medley, FL 33166

**The Southern Die Casting Corp.**
3500 NW 59th St
Miami, FL 33142-2022

**Timbar Packaging & Display**
148 North Penn Street
Hanover, PA 17331

**Bellsouth Security Systems**
7255 Corporate Center Drive, Building 2,
Bay F
Miami, FL 33126

**Saint-Gobain Technical Fabrics**
1795 Baseline Road
Grand Island, NY 14072

**Guardian Industries Corp.**
24396 Network Place
Chicago, IL 60673

**Nudo Products**
1500 Taylor Ave
Springfield, IL 62703

**Jamar Park**
4207 Murray Ave
Pittsburg, PA 15217-2903

**Alro Metal Services Center**
PO Box 860673
Orlando, FL 32886

**Eastern Metal Supply Inc.**
3600 23rd Avenue South
Lake Worth, FL 33461

**Ashley F. Ward, Inc.**
3525 Enterprise Way
Green Cove Springs, FL 32043

**United Die & Mfg. Corp.**
PO Box 38
100 S 17th St.
Sebring, OH 44672-0128

**GOVERNMENTAL ENTITIES**

**U. S. Trustee's Office**
51 S.W. 1st Avenue, Room #1204
Miami, FL 33130

**Internal Revenue Service**
PO Box 21126
Philadelphia, PA 19114

**Internal Revenue Service**
**Special Procedures – Insolvency**
7850 SW 6th Court
Plantation, FL 33324

**Special Asst. U.S. Attorney**
P.O. Box 9, Stop 8000
51 SW 1st Avenue, #1114
Miami, FL 33130

**MASTER SERVICE LIST**
**ARCH ALUMINIM & GLASS CO., INC.,** *et al.*
**CASE NO. 09-36232-BKC-JKO**

**Special Asst. U.S. Attorney**
**IRS District Counsel**
1000 S. Pine Island Rd., Ste 340
Plantation, FL 33324-3906

**The Honorable Eric H. Holden, Jr.**
**Attorney General of the U.S.**
950 Pennsylvania Avenue, NW Room 4400
Washington, DC 20530-0001

**State of Florida**
**Department of Revenue**
c/o Frederick F. Rudzik
PO Box 6668
Tallahassee, FL 32314

**Securities and Exchange Commission**
**Branch of Reorganization**
3475 Lenox Road, N.E., #1000
Atlanta, GA 30326-1232

## PARTIES IN INTEREST

Paul J. Keenan, Esq.
Greenberg Traurig
1221 Brickell Avenue
Miami, FL 33131

Daniel Lampert
Berger Singerman
200 South Biscayne Boulevard
Suite 1000
Miami, FL 33131

Michael R. Dillahunt
Piper Jaffrey & Co.
800 Nicollet Mall
Minneapolis, MN 55402

EXHIBIT 1.01(h)

Form of Arch Assets Bid Procedures Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

ARCH ALUMINUM
& GLASS CO, INC., et al.[1].

Case No. 09-36232-BKC-JKO

Chapter 11
(Jointly Administered)

_____/

**ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF ORDERS PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, AND 6006 (A) APPROVING ASSET PURCHASE AGREEMENT WITH ARCH GLASS ACQUISITION CORPORATION, AN AFFILIATE OF GREY MOUNTAIN PARTNERS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO ASSET PURCHASE AGREEMENT WITH ARCH GLASS ACQUISITION CORPORATION,  (C) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (D) AUTHORIZING THE DEBTORS TO PROVIDE CERTAIN STALKING HORSE BID PROTECTIONS; (E) SCHEDULING A HEARING TO CONSIDER THE APPROVAL OF AND APPROVING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AT THE SALE HEARING, (G) APPROVING THE FORM AND MANNER OF NOTICE IN CONNECTION THEREWITH**

---

[1]       The jointly administered debtors are: Arch Aluminum & Glass Co., Inc; AAG Holdings, Inc.; Arch Aluminum and Glass International, Inc.; Arch Aluminum, L.C.; and AWP, LLC.

## AND (H) GRANTING RELATED RELIEF

THIS MATTER came before the Court upon the motion (the "Motion")[2] (D.E. # __) of Arch Aluminum & Glass Co., Inc. ("Arch Aluminum") and four (4) of its subsidiaries and affiliates, as jointly administered debtors and debtors-in-possession in the above captioned cases (collectively, the "Debtors" or the "Company"), seeking an order pursuant to §§ 105, 363, and 365 of Title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) approving that certain Asset Purchase Agreement, dated December 2, 2009, by and among the Debtors, as sellers, and Arch Glass Acquisition Corporation, as buyer (the "Stalking Horse Bidder"), for the purchase and sale of the Purchased Assets (as defined below) (the "Purchase Agreement"), which Purchase Agreement is attached to the Motion as Exhibit A, (b) authorizing the Debtors to execute and deliver the Purchase Agreement, (c) establishing bidding procedures for the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and interests pursuant to Section 363(f) of the Bankruptcy Code, (d) authorizing the Debtors to provide certain "stalking horse" bid protections to the Stalking Horse Bidder, (e) scheduling a hearing to consider approval of, and approving, the sale of the Purchased Assets pursuant to Sections 363 and 365 of the Bankruptcy Code free and clear of all liens, claims, encumbrances and interests pursuant to the Purchase Agreement to the Stalking Horse Bidder or the highest and best bidder, if applicable, at an Auction, (f) authorizing the Debtors' assumption and assignment of certain executory contracts and unexpired leases in connection therewith, (g) approving the form and manner of notice thereof and (h) granting related relief.

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Motion and all Exhibits thereto.

The Court, having determined at the hearing held on December __, 2009 (the "Hearing") that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties-in-interest;

And upon the record of the Hearing; and the Court having considered all of the evidence presented, testimony adduced, and arguments of counsel made at the Hearing; and after due deliberation thereon, and good cause appearing therefore, it is hereby

FOUND AND DETERMINED THAT:[3]

A.      This Court has jurisdiction over this matter and over the property of the Debtors pursuant to 28 U.S.C. §§ 157(a) and 1334, and venue is proper in this district pursuant to 28 U.S.C. § 1408;

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b);

C.      Good and sufficient notice of the relief sought in the Motion has been given in accordance with Bankruptcy Rules 2002(a)(2), (i) and (k), and no other or further notice is or shall be required.  A reasonable opportunity to object or be heard regarding the relief requested in the Motion (including, without limitation, with respect to the proposed Bidding Procedures, the Break Up Fee, Expense Reimbursement and the other relief sought by the Motion) has been afforded to all parties-in-interest;

D.      The (i) Bidding Procedures, (ii) proposed Sale Notice, and (iii) proposed notice and procedures with respect to the Debtors' assumption and assignment to the Successful Bidder of the Designated Agreements, as described or referred to in the Purchase Agreement, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof;

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, as applicable, in accordance with Bankruptcy Rule 7052.

E.    The Bidding Procedures annexed hereto as <u>Exhibit 1</u> are fair, reasonable, and appropriate and are designed to maximize the recovery on the Debtors' assets;

F.    The Debtors have demonstrated a sound business justification for authorizing the payment of the Break Up Fee and the Expense Reimbursement to the Stalking Horse Bidder under the circumstances, timing, and procedures set forth in the Motion.  The Break Up Fee and the Expense Reimbursement were negotiated by the parties in good faith and at arms' length and payment of the Break Up Fee and the Expense Reimbursement, in accordance with the terms set forth in the Purchase Agreement, is fair and reasonable;

G.    The Debtors' payment of the Break Up Fee and Expense Reimbursement to the Stalking Horse Bidder, in accordance with the terms set forth in the Purchase Agreement, is (i) of substantial benefit to the Debtors' estates, (ii) reasonable and appropriate, including in light of the size and nature of the sale and the efforts that have been and will be expanded by the Stalking Horse Bidder notwithstanding that the proposed sale is subject to higher or better offers, and (iii) necessary to ensure that Stalking Horse Bidder will continue to pursue its proposed acquisition of the Purchased Assets;

H.    The Debtors agreed to pay the Break Up Fee and the Expense Reimbursement, in accordance with the terms and conditions set forth in the Purchase Agreement, in order to induce the Stalking Horse Bidder to hold open its offer to enter into the Purchase Agreement and purchase the Purchased Assets.  The Stalking Horse Bidder is unwilling to hold open its offer to purchase the Purchased Assets in accordance with the Purchase Agreement, unless it is assured payment of the Break Up Fee and Expense Reimbursement in accordance with the conditions set forth in the Purchase Agreement.  Such assurance to the Stalking Horse Bidder has had the effect of promoting and not chilling competitive bidding, including the Stalking Horse Bidder's bid that

otherwise would not have been made, and without which bidding would have been and would continue to be limited.  Further, assuring the Stalking Horse Bidder that it will receive the Break Up Fee and Expense Reimbursement if certain conditions set forth in the Purchase Agreement are met has induced the Stalking Horse Bidder to research the Debtors' businesses and submit a bid which will serve as a minimum floor bid for all of the Purchased Assets on which all other bidders may rely, thus increasing the likelihood of receiving the maximum value of the Purchased Assets;

I.     Absent authorization of the payment of the Break Up Fee and the Expense Reimbursement in accordance with the terms of the Purchase Agreement, the Debtors may be unable to maximize the value of the Purchased Assets.  In light of the benefits to the Debtors' estates realized by having a fully negotiated Purchase Agreement, the expense and risk incurred by the Stalking Horse Bidder in reach such Purchase Agreement, and the size of the Break Up Fee and Expense Reimbursement in relation to the value of the transaction, ample support exists for this Court to authorize the Debtors to pay the Break Up Fee and Expense Reimbursement;

J.     The Debtors' pre-petition marketing efforts and process as described in the Motion was and is fair and reasonable, and fully exposed the Debtors' assets to the market.  As a result, the expedited timeline for the auction and sale process set forth in the Bidding Procedures is reasonable and justified by the circumstances of these chapter 11 cases.

K.     The entry of this Order is in the best interests of the Debtors, each of their respective estates, creditors, and all other parties-in-interest.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

**<u>General Provisions</u>**

1.      The findings and conclusions set forth above constitutes the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

2.      The relief requested in the Motion is granted as set forth herein.

3.      All objections to entry of this Bidding Procedures Order or to the relief provided herein and in the Motion that have not been withdrawn, waived, resolved or settled, and all reservations of rights included therein, are hereby overruled in all respects on the merits.

### Approval of the Purchase Agreement

4.      The Purchase Agreement is hereby approved in its entirety.[4]

5.      The Debtors are hereby authorized to execute and deliver the Purchase Agreement and the Debtors' execution of the Purchase Agreement is hereby ratified.

### Bidding Procedures

6.      The Bidding Procedures annexed hereto as Exhibit 1 and incorporated into this Bidding Procedures Order are hereby approved.  The Debtors are authorized and directed to act in accordance with the Bidding Procedures, which shall be binding upon all parties-in-interest in these cases.

7.      Any Qualified Bidder desiring to submit a Bid for all or substantially all of the Purchased Assets shall submit it in accordance with the Bidding Procedures so that it is received not later than 5:00 p.m., Eastern Time, on January 8, 2010 (the "Bid Deadline").  The Auction, if necessary, shall be held on January 13, 2010, commencing at 10:00 a.m. Eastern Time at the [offices of Genovese Joblove & Battista, P.A. at 100 S.E. 2nd Street, Suite 4400, Miami, Florida 33131][United States Bankruptcy Court, 299 East Broward Blvd., Room 301, Ft. Lauderdale, FL 33301], in accordance with the Bidding Procedures.

---

[4] If there are any inconsistencies between the Purchase Agreement and the Ancillary Agreements (as defined in the Purchase Agreement), then the terms of the Purchase Agreement shall control.

8.    The Debtors shall pay to the Stalking Horse Bidder (i) a fee of 3.0% of the Purchase Price (the "Break Up Fee") plus (b) reimbursement for reasonable fees and expenses, as may be determined by the Court and capped at $1,000,000, incurred by the Stalking Horse Bidder in connection with the Stalking Horse Bidder's due diligence (the "Expense Reimbursement"), which Break Up Fee and Expense Reimbursement shall be payable in accordance with the terms of the Purchase Agreement, including specifically through a "carve out" from the collateral securing the obligations owed to the Senior Lenders under the Prepetition Credit Agreement, as defined in the Purchase Agreement.

## Sale Hearing

9.    The Sale Hearing shall be held before this Court on January [14], 2010 at __:__ _.m (Eastern Time), United States Bankruptcy Court, 299 East Broward Blvd., Room 301, Ft. Lauderdale, FL 33301, or as soon thereafter as counsel and interested parties may be heard.  The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of such adjournment at the Sale Hearing.  The Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale.

## Objections

10.    Objections,  if any, to the Sale, including objections with respect to the Cure Costs, if any, and adequate assurance of future performance of obligations to counterparties to executory contracts and unexpired leases to be assumed and assigned to the Successful Bidder must (a) be in writing; (b) set forth the nature of the objector's claims against or interest in the Debtors' estates, and the basis for the objection and the specific grounds therefore; (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Florida and all Orders of this Court; (d) be filed with the Court and served upon the Debtors, the

Successful Bidder, the Committee and the United States Trustee for the Southern District of Florida, so as to be RECEIVED no later than 12:00 pm (Eastern) one (1) business day prior to the Sale Hearing (the "Objection Deadline").  Only timely filed and served responses, objections, or other pleadings will be considered by this Court at the Sale Hearing.  The failure of any person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Sale or the consummation and performance of the Agreement.

### Notice

11.    The Sale Notice is hereby approved in all respects.

12.    Notice of the Bidding Procedures, the Auction, the Sale Hearing and the remainder of the relief requested in the Motion, as described in the Motion, shall be good and sufficient notice thereof, and any requirements for other or further notice shall be waived and dispensed with pursuant to Bankruptcy Rules 2002, 6004, 6006 and 9007 and pursuant to this Court's powers under section 105 of the Bankruptcy Code.  On or before December 23, the Debtors shall serve the Sale Notice annexed as Exhibit B to the Motion upon (i) the Office of the United States Trustee for the Southern District of Florida; (ii) counsel to the Stalking Horse Bidder; (iii) the holders of the 20 largest unsecured claims against the Debtor Arch Aluminum & Glass Co., Inc. and the holders of the 20 largest unsecured claims against the Debtor AWP, LLC, as identified in the Debtors' Chapter 11 petitions; (iv) counsel to the Senior Lenders; (v) the Notice Parties; (vi) any party that, in the past year, expressed in writing to the Debtors an interest in acquiring the Purchased Assets, directly or through a merger or alliance; (vii) all parties who are known to assert Claims upon the Purchased Assets; (viii) the U.S. Treasury; (ix) the Securities and Exchange Commission; (x) the Internal Revenue Service; (xi) all applicable state

attorneys general, local environmental enforcement agencies and local regulatory authorities; (xii) all applicable state and local taxing authorities; (xiii) the Federal Trade Commission; (xiv) United States Attorney General/Antitrust Division of Department of Justice; (xv) the U.S. Environmental Protection Agency; (xvi) United States Attorney's Office; (xvii) the entities set forth in the Master Service List established in these cases; (xviii) all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002; and (xix) any other party identified on the creditor matrices in these cases.

## Assumption and Assignment of Executory Contracts and Unexpired Leases

13.    The procedures set forth in the Motion for the assumption and assignment of the Designated Agreements are hereby approved in all respects.

14.    On or before three (3) business days prior to the Sale Hearing, the Debtors shall file with the Bankruptcy Court and shall serve on each non-debtor counterparty to an executory contract or unexpired lease with any of the Debtors (each a "Non-Debtor Counterparty") that the Debtors may assume and assign to the Stalking Horse Bidder or another Successful Bidder (each such agreement, a "Designated Agreement"), by overnight delivery service, a notice of assumption and assignment of executory contracts and unexpired leases (the "Assignment Notice"). The Debtors shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to each Designated Agreement and the cure costs, if any, that would be due pursuant to section 365(b)(1) of the Bankruptcy Code ("Cure Costs") to each Non-Debtor Counterparty, provided that such Assignment Notice shall in no way limit such Non-Debtor Counterparty's entitlement to Cure Costs by filing an objection to such Cure Costs prior to the Sale Hearing.

15.    The Assignment Notice shall also provide notice to each Non-Debtor Counterparty of the date and time of the Sale Hearing and indicate that, upon written request to the Debtors' counsel by a Non- Debtor Counterparty to a Designated Agreement, the Debtors will provide to such party any Adequate Assurance Package provided by the Stalking Horse Bidder or Successful Bidder, as applicable.

16.    Objections, if any to the proposed assumption and assignment of the Designated Agreements, including the Cure Costs, the provision of adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of Section 365(c)(1) of the Bankruptcy Code, shall be in writing and filed with this Court and served on the Notice Parties so as to be received no later than 12:00 pm Eastern one (1) business day prior to the Sale Hearing.  Where a Non-Debtor Counterparty to an Designated Agreement files an objection to the assumption by the Debtors and assignment to the Successful Bidder of such Designated Agreement (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtors, the Successful Bidder and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.

17.    If any of the Debtors, the Non-Debtor Counterparty or the Successful Bidder determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under Section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Bankruptcy Court at the Sale Hearing.

18.     Any Non-Debtor Counterparty to a Designated Agreement who fails to file a timely objection to the proposed Cure Costs or the proposed assumption and assignment of an Designated Agreement is deemed to have consented to such Cure Costs and the assumption and assignment of such Designated Agreement, and such party shall be forever barred from objecting to the Cure Costs or such assumption and assignment and from asserting any additional cure or other amounts against the Debtors, their estates or the Stalking Horse Bidder.

19.     If the Non-Debtor Counterparty to a Designated Agreement fails to timely assert an objection as described above, or upon the resolution of any timely objection by agreement of the parties or order of this Court approving an assumption and assignment, such Designated Agreement shall be deemed to be assumed by the Debtors and assigned to the Stalking Horse Bidder or other Successful Bidder and the proposed Cure Cost related to such Designated Agreement shall be established and approved in all respects, subject to the conditions set forth below.

20.     Subject to the satisfaction of conditions to address any cure or assignment disputes, the Debtors shall be deemed to have assumed and assigned to the Successful Bidder each of the Designated Agreements as of the date of and effective only upon the Closing Date, and absent such closing, each of the Designated Agreements shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code. Assumption and assignment of the Designated Agreements also is subject to the Successful Bidder's rights set forth above. The Successful Bidder shall have no rights in and to a particular Designated Agreement until such time as the particular Designated Agreement has been assumed and assigned in accordance with the procedures set forth herein.

## **Miscellaneous**

21.    The Debtors are hereby authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary to implement and effect the terms and requirements established by this Bidding Procedures Order.

22.    This Bidding Procedures Order shall be binding upon, and inure to the benefit of the Debtors, the Stalking Horse Bidder, any Successful Bidder other than the Stalking Horse Bidder, and their respective successors and assigns, including any chapter 7 or 11 trustee or other fiduciary appointed for any of the Debtors' estates whether in the above-captioned cases, subsequent bankruptcy cases or upon dismissal of any of the Debtors' bankruptcy cases.

23.    Notwithstanding Bankruptcy Rules 6004 and 6006, this Bidding Procedures Order shall be effective and enforceable immediately upon its entry.

24.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25.    To the extent this Order is inconsistent with the Motion, or with any prior order or pleading with respect to the Motion in these cases, the terms of this order shall govern.

26.    This Court shall retain jurisdiction over any matters relating to or arising from the implementation of this Bidding Procedures Order, including, but not limited to the right to amend this Bidding Procedures Order.

###

Submitted by:

Paul J. Battista, Esq.
Genovese Joblove & Battista, P.A.
Counsel to Debtors-in-Possession
100 Southeast Second Street, Suite 4400
Miami, FL 33131
Telephone:  (305) 349-2300

Facsimile:    (305) 349-2310
pbattista@gjb-law.com


Copy to: Paul J. Battista, Esq.
(Attorney Battista is directed to serve a conformed copy of this Order on all parties in interest)

<u>**EXHIBIT 1**</u>

**PROPOSED BIDDING PROCEDURES**

- **<u>Purchased Assets</u>**. The "Purchased Assets" shall include those assets set forth in Section 2.01(a) of the Purchase Agreement. The Purchased Assets shall not include the Excluded Assets set forth in Section 2.01(b) of the Purchase Agreement.

- **<u>Qualification</u>**. The Debtors shall: (a) coordinate the efforts of Potential Bidders (as defined below) in conducting their respective due diligence investigations regarding the Purchased Assets; (b) determine whether any person or entity is a Qualified Bidder (as defined below); (c) receive and evaluate bids from Qualified Bidders; and (d) administer the Auction (as defined below). Any person or entity who wishes to participate in the bidding process and the Auction must meet the participation requirements for Potential Bidders below and must thereafter submit a Qualified Bid to become a Qualified Bidder. Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any person or entity who does not comply with the participation requirements below.

- **<u>Participation Requirements</u>**. To participate in the bidding process and the Auction, each interested person or entity (a "Potential Bidder") must deliver the following documents (the "Participation Materials") on or before five (5) business days prior to the Bid Deadline to (i) Genovese Joblove & Battista, P.A., counsel to the Debtors, 100 S.E. Second Street, 44th Floor, Miami, FL 33131, Attn: Paul J. Battista, Esq., pbattista@gjb-law.com, (ii) Piper Jaffray & Co., 800 Nicollet Mall, Minneapolis, MN 55402, Attn: Michael R. Dillahunt, michael.r.dillahunt@pjc.com, (iii) Moore & Van Allen, counsel to the Senior Lenders, 100 North Tryon Street, Suite 4700, Charlotte, NC 28292, Attn: James R. Langdon, Esq., jimlangdon@mvalaw.com, and (iv) Berger Singerman, counsel to Leon Silverstein, 200 South Biscayne Boulevard, Suite 1000, Miami, FL 33131 Attn: Daniel Lampert, Esq., DLampert@bergersingerman.com (the "Notice Parties"):

    i. an executed confidentiality agreement in form and substance satisfactory to the Debtors;

    ii. a statement demonstrating, to the Debtors' satisfaction, the Potential Bidder's bona fide interest in purchasing substantially all of the Purchased Assets from the Debtors;

    iii. written evidence acceptable to the Debtors that the Potential Bidder has received debt and/or equity funding commitments or has on deposit in its bank account(s) sufficient unrestricted cash to consummate the purchase contemplated hereby, provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the

cash portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such Bid;

iv. A letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder, and full disclosure of all parties participating with the Potential Bidder, as well as full disclosure of any prepetition and post-petition affiliation that the Potential Bidder may have with (i) the Debtors, (ii) the Debtors' affiliates, (iii) major creditors of the Debtors, (iv) equity security holders of the Debtors, and/or (v) any of the Debtors' former officers or directors or other insiders; and

v. An executed letter acknowledging receipt of a copy of the Bidding Procedures and agreeing to accept and be bound by the provisions contained therein.

vi. If, based on such Participation Materials, the Debtors determine that a Potential Bidder has a bona fide interest in purchasing the Purchased Assets, then no later than three (3) business days after the Debtors make that determination and have received from the Potential Bidder all of the Participation Materials required above, the Debtors will deliver to the Potential Bidder: (a) an electronic copy of the Purchase Agreement; and (b) access information for confidential data concerning the Purchased Assets, which shall include any and all documents furnished by the Debtors to the Stalking Horse Bidder in connection with its due diligence related to the Purchase Agreement (the "Data Room").

- **Due Diligence Period**. Until the Bid Deadline (as defined below), the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their judgment, determine to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to the Debtors. The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders. If the Debtors determine that due diligence material requested by a Potential Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Potential Bidder, the Debtors shall post such materials in the Data Room and provide email notice of such posting to all Potential Bidders, as well as to the Notice Parties, and shall provide such materials to the Stalking Horse Bidder.  Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease on the Bid Deadline. Except as provided above with respect to the copy of the Purchase Agreement provided by the Debtors to the Potential Bidders, and information in the Data Room, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any party.

- **Bid Deadline**. A Potential Bidder that desires to make a bid on all or substantially all of the Purchased Assets (a "Bid") shall deliver written and electronic copies of its Bid and the Bid Requirements set forth below to (i) the Notice Parties, and (ii) counsel to the Official Committee of Unsecured Creditors (the "Committee") so that it is received not later than 5:00 p.m., Eastern Time, on January 8, 2010 (the "Bid Deadline"), provided however, that the Deposit shall be made to the trust account of Debtors' counsel pursuant to instructions to be provided by Debtors' counsel.

- **Bid Requirements**. To participate in the Auction, if any, a Qualified Bidder must deliver to the Debtors a written offer, which must provide, at a minimum, the items noted below to be deemed a "Qualified Bid":

  i. An executed purchase agreement (a "Marked Agreement") in substantially the same form as the Purchase Agreement, pursuant to which the Potential Bidder offers to purchase substantially all of the Purchased Assets from the Debtors. Such Marked Agreement shall not contain any conditions to closing based upon the ability of the Potential Bidder to obtain financing, the outcome of unperformed due diligence by the Potential Bidder, or any other conditions other than those set forth in the Purchase Agreement. The Potential Bidder shall also provide a marked copy of the Marked Agreement showing any changes to the Purchase Agreement, including changes to reflect the name of the Potential Bidder and the amount of such Potential Bidder's Bid;

  ii. The purchase price in such Bid is a higher or better offer for the Purchased Assets as compared to the offer of the Stalking Horse Bidder. An offer shall not be considered a higher or better offer unless such Bid provides for the assumption of the same amount of liabilities that the Stalking Horse Bidder is assuming under the Purchase Agreement and provides for net consideration (on a risk-adjusted basis) to the Debtors' estates of at least $250,000.00 more than the sum of (i) the cash portion of the purchase price provided by the Stalking Horse Bidder in the Purchase Agreement, plus (ii) the amount of the Break Up Fee, plus (iii) plus the amount of the Expense Reimbursement (such amount, the "Minimum Overbid Amount").

  iii. A deposit of cash or cash equivalents in the amount equal to at least five (5%) percent of the Minimum Overbid Amount (the "Deposit"). The Deposit shall be tendered by cashier's check and/or wire transfer into a segregated bank account established by Debtors' counsel. A Potential Bidder shall forfeit its Deposit if it is the Successful Bidder or Back-Up Bidder (as defined below) and (i) modifies or withdraws its Bid without the Debtors' consent before the consummation of the sale with such Potential Bidder or (ii) breaches the terms of the agreement pursuant to which the Bidder has agreed to purchase the Purchased Assets or a portion thereof. A Potential Bidder's Deposit shall be returned (i) if such Potential Bidder is determined by the Debtors not to be a Qualified Bidder, promptly upon the making of such determination, (ii) if such Potential

Bidder is not the Successful Bidder or the Back-Up Bidder, promptly after the conclusion of the Auction, or (iii) if such Potential Bidder is the Back-Up Bidder and the sale transaction is consummated with the Successful Bidder, promptly upon the consummation of the sale with the Successful Bidder;

iv.  The Bid is received by the Debtors by the Bid Deadline, together with the Potential Bidder's Deposit;

v.  The Bid does not entitle the Potential Bidder to any break-up fee, termination fee or similar type of payment or reimbursement;

vi.  A statement that the Bid is irrevocable and binding until the closing of the sale of the Purchased Assets if the applicable bidder is the Successful Bidder or the Back-Up Bidder;

vii.  Evidence satisfactory to the Debtors of the Potential Bidder's (i) financial ability to close the sale described in its Marked Agreement, which may include the most recent audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring some or all of the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidder, and such other financial disclosure acceptable to, and requested by, the Debtors, and (ii) ability to consummate such sale on or prior to the date contemplated by and on the date and on terms and conditions no less favorable to the Debtors those set forth in the Purchase Agreement; and

viii.  The Bid is accompanied by a list of any executory contracts and unexpired leases that are to be assumed and/or assigned under such Bid and a demonstration of the Potential Bidder's commitment to pay all Cure Costs in accordance with the Marked Agreement and provide adequate assurance of future performance under any such executory contracts or unexpired leases to be assumed and/or assigned pursuant to such Bid.

ix.  A Potential Bidder shall accompany its Bid with: (a) written evidence acceptable to the Debtors that the Potential Bidder has received debt and/or equity funding commitments or has on deposit in its bank account(s) sufficient unrestricted cash to consummate the purchase contemplated hereby, provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such Bid; (b) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable Bid on the terms proposed; and (c) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws or other aspects of the Bid.

- A Bid received from a Potential Bidder will be considered a "Qualified Bid" only if it meets the above requirements. Each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." For purposes hereof and notwithstanding anything to the contrary provided herein, the Stalking Horse Bidder is a "Qualified Bidder" and the Purchase Agreement executed by the Stalking Horse Bidder and the Bid contained therein is a Qualified Bid.

- A Qualified Bid will be valued based upon the following factors: (a) the purported amount of the Qualified Bid, including any benefit to the Debtors' bankruptcy estates from any assumption of liabilities of the Debtors; (b) the ability to close the proposed sale transaction without delay and within the time frames contemplated by the Purchase Agreement; (c) the ability and delay associated with obtaining all necessary antitrust or other regulatory approvals, including under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, for the proposed transaction; and (d) any other factors the Debtors may deem relevant.

- As soon as reasonably practicable following the Bid Deadline but it no event later than noon Eastern Time on Monday, January 11, 2010, the Debtors shall distribute a copy of each Bid received by the Bidding Deadline, together with notice of which Bids the Debtors have determined are Qualified Bids, to the Notice Parties, to counsel for the Stalking Horse Bidder and to counsel to the Committee.  Any disputes as to whether a Potential Bidder is a Qualified Bidder shall be resolved by the Bankruptcy Court prior to the Auction. The Debtors reserve the right to reject any Bid if such Bid: (i) is on terms that are materially more burdensome or conditional than the terms of the Purchase Agreement; (ii) requires any indemnification of the Potential Bidder on terms that are materially more burdensome than the terms of the Purchase Agreement; or (iii) includes a noncash instrument or similar consideration that is not freely marketable. Any Bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid.

- **Auction.** In the event that the Debtors receive one or more Qualified Bids (other than the Bid of the Stalking Horse Bidder), then the Debtors will hold an auction (the "Auction") on January 13, 2010, commencing at 10:00 a.m. Eastern Time at the [offices of Genovese Joblove & Battista, P.A. at 100 S.E. 2nd Street, Suite 4400, Miami, Florida 33131][ United States Bankruptcy Court, 299 East Broward Blvd., Room 301, Ft. Lauderdale, FL 33301], for consideration of the Qualified Bids, each as may be increased at such Auction.  Bidding will start at the highest Qualified Bid and will continue with minimum Bid increments of $250,000. The Auction may be adjourned as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given to all entities that submitted a Qualified Bid. The Auction shall be conducted in accordance with the following procedures:

    i. Only the Debtors, representatives of the Senior Lenders and their counsel, members of the Committee and its counsel, the Stalking Horse Bidder and any other Qualified Bidder, in each case, along with their representatives, shall attend the Auction in person, and only the Stalking Horse Bidder and

such other Qualified Bidders will be entitled to make any Bids at the Auction.

ii. Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale by the Debtors of the Purchased Assets;

iii. By 12:00 p.m. Eastern Time on January 12, 2010, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that, in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.

iv. By 5:00 p.m. Eastern Time on January 12, 2010, the Debtors will notify the Stalking Horse Bidder and all Qualified Bidders that have informed the Debtors of their intent to participate in the Auction of which Qualified Bid(s) the Debtors believes, in their reasonable judgment, is the highest or best offer (the "Starting Bid").

v. Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

vi. At the Auction, the Debtors may employ and announce additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

vii. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent Bid or combination of Bids is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (such bid or combination of Bids, a "Subsequent Bid") and (ii) the Debtors determine that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental Bid or combination of Bids at the Auction shall provide net value to the Debtors' estates of at least U.S. $250,000 over the Starting Bid or the Leading Bid, as the case may be.

After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid or combination of Bids that they believe to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Promptly at the conclusion of the Auction, the Debtors shall (a) determine, consistent with the Bidding Procedures, which Bid constitutes the highest or best Bid (such Bid, the "Successful Bid") and (b) communicate to the Stalking Horse Bidder, the Notice Parties, and the other Qualified Bidders the identity of the Successful Bidder(s) and the details of the Successful Bid(s). If no Qualified Bids are received other than the Purchase Agreement, the Purchase Agreement shall be designated as the Successful Bid, and there shall be no Auction. The Bidder making the Successful Bid is referred to as the "Successful Bidder." The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final subject to approval by the Bankruptcy Court.

- **The Back-Up Bid**. After determining which Qualified Bid is the Successful Bid, the Debtors shall (a) determine which of the Qualified Bid constitutes the next highest or best Qualified Bid(s) for the Purchased Assets and (b) communicate to the Stalking Horse Bidder, the other Qualified Bidders, and the other Notice Parties the identity of such Qualified Bidder(s) (a "Potential Back-Up Bidder(s)") and the details of such Qualified Bid(s) (a "Potential Back-Up Bid(s)"). In the event that the Potential Back-Up Bidder(s) agrees that (a) its/their Back-Up Bid(s) will remain irrevocable and (b) the Debtors may retain its/their Deposit, until the closing and effectiveness of the sale transactions, then such Potential Back-Up Bidder(s) shall be considered the "Back-Up Bidder(s)" and its/their Potential Back-Up Bid(s) shall be considered the "Back-Up Bid(s)". In the event of the failure by the Successful Bidder(s) to timely consummate the sale transaction, the Back-up Bidder(s) shall be deemed the Successful Bidder(s) without further order of the Court, and shall proceed to close the transactions contemplated by its/their Bid(s) no later than three (3) business days following the Debtors' tender of a notice to the Back-up Bidder(s), unless otherwise ordered by the Bankruptcy Court. The Debtors shall be entitled to the Deposit of any Successful Bidder in circumstances described above, and in such circumstances, such Deposit shall be deemed forfeited by such defaulting Successful Bidder, and shall not be credited against the purchase price for the benefit of any Back-up Bidder. Similarly, in the event that any Back-up Bidder fails to consummate the sale transaction, then the Debtors shall be entitled to the Deposit of said party, and such Deposit shall be deemed forfeited. The Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder and/or Back-up Bidder as the case may be, provided however, that any recourse against the Stalking Horse Bidder shall be strictly governed by the terms of the Purchase Agreement. If the Qualified Bidder(s) initially identified as the Potential Back-Up Bidder(s) do/es not agree to become the Back-Up Bidder(s), then such Potential Back-Up Bidder(s) shall be entitled to its/their Deposit(s) and the Debtors (and the

Bankruptcy Court, to the extent there is a dispute), may identify the next highest or otherwise best Bid(s) as the Potential Back-Up Bid(s), and may continue to do so until Potential Back-Up Bidder(s) agree to become the Back-Up Bidder(s).

- **The Successful Bid**. At the Auction, the Debtors shall have the right to select the highest and best Bid from the Auction, which will be determined by considering, among other things: (A) the number, type and nature of any changes to the Purchase Agreement requested by each Qualifying Bidder; (B) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and the cost to the Debtors of such modifications or delay; (C) the total consideration to be received by the Debtors; (D) the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof; and (E) the net benefit to the estate, taking into account the Stalking Horse Bidder's rights to the Breakup Fee and Expense Reimbursement (for avoidance of doubt, the Debtors hereby agree that the value attributed by the Debtors to any Bid made by the Stalking Horse Bidder at the Auction shall include the requirement to pay the Break Up Fee and the Expense Reimbursement).

- **The Sale Hearing**. The Successful Bid will be presented to the Bankruptcy Court for approval at the Sale Hearing. If no other Qualified Bid is received by the Debtors, and the Stalking Horse Bid is the Successful Bid, then the Debtors will seek entry of an order at the Sale Hearing authorizing and approving the sale transaction, including the sale of the Purchased Assets to the Stalking Horse Bidder, pursuant to the terms and conditions set forth in the Purchase Agreement. If a different Qualified Bid is the Successful Bid, then the Debtors anticipate that they will seek the entry of an order, modified as necessary to reflect the terms of the Successful Bid, authorizing and approving the sale of the applicable Purchased Assets to the Successful Bidder. The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of such adjournment at the Sale Hearing. Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale, and parties shall be prepared to present their evidence in support of or in opposition to the proposed sale at the Sale Hearing.

- **"As Is, Where Is"**. The sale transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates, except to the extent expressly set forth in the Purchase Agreement or the Marked Agreement corresponding to the Successful Bid, as the case may be. Except as otherwise provided in the Successful Bid, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), encumbrances, rights, remedies, restrictions, interests, liabilities, leasehold interests and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Purchased Assets to the Successful Bidder, and the proposed order approving the sale transaction (as so

defined therein, "Claims") as set forth in the Purchase Agreement and the Sale Order, with such Claims to attach to the net proceeds of the sale with the same validity and priority as such Claims applied against the Purchased Assets.

- **Bankruptcy Court Jurisdiction**. Any and all disputes related or pertaining to or resulting or arising from the Bid Procedures, the Auction, the sale transaction and/or the conduct of the Debtors shall be adjudicated solely by the Bankruptcy Court. The submission of a Bid shall constitute an express consent by the Bidder to the exclusive jurisdiction of the Bankruptcy Court for all such matters.

- **Break Up Fee**. In consideration of the Stalking Horse Bidder's undertaking of the substantial legal, accounting and other expenses attendant to the Purchase Agreement, proceeding toward the consummation of the sale transaction, and acting as the Stalking Horse Bidder, the Debtors have agreed to pay the Stalking Horse Bidder (i) a fee of 3.0% of the Purchase Price (the "Break Up Fee") plus (b) reimbursement of up to $1.0 million in reasonable expenses incurred by Stalking Horse Bidder and determined by the Bankruptcy Court in connection with the Stalking Horse Bidder's due diligence (the "Expense Reimbursement"), which Break Up Fee and Expense Reimbursement shall be payable in accordance with the terms of the Purchase Agreement, including specifically through a "carve out" from the collateral securing the obligations owed to the Senior Lenders under the Prepetition Credit Agreement, as defined in the Purchase Agreement.

<u>EXHIBIT 1.01(i)</u>

Arch Canada Working Capital Analysis

## Arch Aluminum & Glass
## Canada Working Capital Analysis

| Working Capital analysis (using $COM October FX rate) | GL Acct # | Actual Jan-09 | Actual Feb-09 | Actual Mar-09 | Actual Apr-09 | Actual May-09 | Actual Jun-09 | Actual Jul-09 | Actual Aug-09 | Actual Sep-09 | Actual Oct-09 | Forecast Nov-09 | Forecast Dec-09 | Forecast Jan-10 | Forecast Feb-10 | Forecast Mar-10 | Forecast Apr-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Currency Exchange Rate | | $ 0.8125 | $ 0.7936 | $ 0.7913 | $ 0.8261 | $ 0.8676 | $ 0.8894 | $ 0.8863 | $ 0.9210 | $ 0.9298 | $ 0.9325 | $ 0.9325 | $ 0.9325 | $ 0.9325 | $ 0.9325 | $ 0.9325 | $ 0.9325 |
| **Receivables** | | | | | | | | | | | | | | | | | |
| Total - Receivables | | 4,562,744 | 3,852,170 | 4,619,735 | 5,103,111 | 5,597,768 | 5,014,483 | 4,801,111 | 4,284,097 | 3,758,230 | 3,986,992 | 3,981,693 | 3,640,955 | 3,808,445 | 3,818,260 | 4,259,234 | 4,485,720 |
| **Total - Receivables** | | 4,562,744 | 3,852,170 | 4,619,735 | 5,103,111 | 5,597,768 | 5,014,483 | 4,801,111 | 4,284,097 | 3,758,230 | 3,986,992 | 3,981,693 | 3,640,955 | 3,808,445 | 3,818,260 | 4,259,234 | 4,485,720 |
| **Inventory** | | | | | | | | | | | | | | | | | |
| Total - Inventory | | 2,184,017 | 2,112,821 | 2,146,050 | 1,972,669 | 2,166,394 | 1,860,932 | 2,100,439 | 2,143,148 | 2,096,853 | 1,920,488 | 2,002,378 | 2,061,272 | 1,953,300 | 2,041,640 | 2,080,903 | 1,972,931 |
| **Total - Inventory** | | 2,184,017 | 2,112,821 | 2,146,050 | 1,972,669 | 2,166,394 | 1,860,932 | 2,100,439 | 2,143,148 | 2,096,853 | 1,920,488 | 2,002,378 | 2,061,272 | 1,953,300 | 2,041,640 | 2,080,903 | 1,972,931 |
| **Total - Working Capital Assets** | | 6,686,761 | 5,974,992 | 6,765,785 | 7,075,780 | 7,764,162 | 6,875,335 | 6,901,550 | 6,427,246 | 5,855,084 | 5,907,480 | 5,984,071 | 6,002,227 | 5,761,745 | 6,380,126 | 6,458,651 | 6,458,651 |
| **Accruals/Payables** | | | | | | | | | | | | | | | | | |
| Total - Accruals/Payables | | 3,104,181 | 2,456,150 | 2,623,809 | 2,755,609 | 2,721,142 | 2,558,759 | 2,088,857 | 2,603,670 | 2,588,062 | 2,532,169 | 2,329,728 | 2,245,804 | 1,995,016 | 2,037,233 | 2,380,071 | 2,468,312 |
| **Total - Accruals/Payables** | | 3,104,181 | 2,456,150 | 2,623,809 | 2,755,609 | 2,721,142 | 2,558,759 | 2,088,857 | 2,603,670 | 2,588,062 | 2,532,169 | 2,329,728 | 2,245,804 | 1,995,016 | 2,037,233 | 2,380,071 | 2,468,312 |
| **Total - Net Working Capital** | | 3,582,580 | 3,519,842 | 4,135,976 | 4,321,171 | 5,043,020 | 4,316,577 | 3,912,592 | 3,823,576 | 3,267,021 | 3,375,311 | 3,574,343 | 3,756,422 | 3,766,728 | 3,822,677 | 4,042,055 | 4,080,339 |
| Monthly WC Change | | | (62,738) | 616,134 | 186,195 | 728,849 | (726,443) | (403,584) | (89,416) | (556,555) | 108,290 | 199,032 | 182,079 | 10,306 | 55,949 | 239,378 | (41,716) |
| Cumulative Monthly WC Change | | | (62,738) | 553,397 | 739,592 | 1,468,440 | 733,997 | 330,413 | 240,997 | (315,558) | (207,268) | (8,236) | 173,843 | 184,149 | 240,098 | 459,476 | 417,760 |

**Areti Aluminum & Glass**
**Canada Working Capital Analysis**

| | GL Acct # | Actual Jun-09 | Actual Feb-09 | Actual Mar-09 | Actual Apr-09 | Actual May-09 | Actual Jun-09 | Actual Jul-09 | Actual Aug-09 | Actual Sep-09 | Actual Oct-09 | Forecast Nov-09 | Forecast Dec-09 | Forecast Jan-10 | Forecast Feb-10 | Forecast Mar-10 | Forecast Apr-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Working Capital analysis (using IXOX October FX rate)** | | | | | | | | | | | | | | | | | |
| Currency: Exchange Rate | | 0.8125 | 0.7936 | 0.7913 | 0.8261 | 0.8670 | 0.8884 | 0.8863 | 0.8218 | 0.8208 | 0.9325 | 0.9325 | 0.9325 | 0.9325 | 0.9325 | 0.9325 | 0.9325 |
| **Receivables** | | | | | | | | | | | | | | | | | |
| Accounts Receivable - Trade | 131000 | 4,655,972 | 4,009,515 | 4,786,242 | 5,287,068 | 5,810,790 | 5,294,933 | 5,108,767 | 4,608,238 | 4,190,841 | 4,380,246 | 4,220,699 | 4,147,082 | 4,171,031 | 4,662,400 | 4,858,712 | 2,012,194 |
| Accounts Receivable - Misc | 131100 | 25,602 | 24,070 | 23,286 | 26,234 | 28,937 | (34,417) | (97,385) | (82,705) | (87,623) | (75,956) | (73,617) | (73,617) | (78,525) | (78,525) | (78,525) | 58,807 |
| Allowance for Doubtful Accounts - Trade | 132000 | (178,836) | (182,314) | (191,794) | (210,191) | (241,960) | (245,913) | (280,071) | (251,436) | (294,997) | (318,198) | (245,389) | (255,205) | (205,021) | (274,450) | (286,653) | (294,467) |
| Allowance for Doubtful Accounts - Notes | 132100 | | | | | | | | | | | | | | | | |
| Allowance for Prior Pd Sales DM | 132500 | | | | | | | | | | | | | | | | |
| Notes Receivable | 133000 | | | | | | | | | | | | | | | | |
| **Total - Receivables** | | 4,502,744 | 3,852,170 | 4,619,735 | 5,103,111 | 5,597,768 | 5,014,603 | 4,801,111 | 4,284,097 | 3,788,220 | 3,986,992 | 3,901,693 | 3,840,955 | 3,888,445 | 4,299,224 | 4,488,720 |  |
| **Inventory** | | | | | | | | | | | | | | | | | |
| Raw Materials - Glass | 144001 | 2,196,167 | 2,146,321 | 2,178,050 | 2,014,169 | 1,221,234 | 1,921,482 | 2,174,071 | 2,223,561 | 2,188,955 | 2,023,063 | 2,110,349 | 2,061,272 | 1,963,116 | 2,061,272 | 2,110,349 | 2,012,194 |
| Inventory Reserve | 149500 | (12,150) | (23,700) | (32,000) | (41,500) | (24,570) | (60,550) | (73,632) | (82,413) | (92,080) | (102,575) | (107,971) | | (9,810) | (19,631) | (39,262) | |
| **Total - Inventory** | | 2,184,017 | 2,122,621 | 2,146,050 | 1,972,669 | 2,166,294 | 1,860,932 | 2,100,439 | 2,141,148 | 2,096,853 | 1,920,488 | 2,002,378 | 2,061,272 | 1,953,306 | 2,041,640 | 2,080,943 | 1,972,931 |
| **Total - Working Capital Assets** | | 6,686,761 | 5,974,992 | 6,765,785 | 7,075,780 | 7,764,162 | 6,875,535 | 6,901,550 | 6,427,246 | 5,885,084 | 5,907,480 | 5,904,071 | 6,002,227 | 5,841,745 | 6,359,901 | 6,390,126 | 6,458,651 |
| **Accruals/Payables** | | | | | | | | | | | | | | | | | |
| Accounts Payable - Trade | 200000 | 2,140,222 | 2,004,240 | 1,906,202 | 1,958,471 | 2,109,706 | 2,106,386 | 2,556,714 | 2,176,399 | 2,177,978 | 2,081,076 | 1,914,638 | 1,815,882 | 1,570,429 | 1,610,571 | 1,914,638 | 2,012,194 |
| Sales/Use Tax Payable | 251500 | 37,376 | 47,595 | 73,699 | 53,113 | 63,423 | 55,468 | 65,857 | 63,531 | 64,608 | 61,138 | 55,786 | 44,170 | 44,170 | 49,078 | 55,986 | 58,807 |
| Corp Federal Income Tax Payable | 212500 | | | | | | | | | | | | | | | | |
| Deferred Tax Liability - Foreign | 211700 | 279,831 | 272,942 | 276,796 | 286,761 | 316,301 | 298,834 | 317,994 | 316,570 | 318,172 | 322,175 | 314,099 | 314,099 | 314,099 | 314,099 | 314,099 | 314,099 |
| Accrued Accounts Payable | 271000 | (35,564) | (47,825) | (9,127) | 24,293 | 12,937 | (970) | (27,078) | (65,357) | (82,311) | (47,744) | (58,895) | | (14,725) | (29,447) | (44,170) | (19,631) |
| Accrued Rebates - Purchases | 271010 | | | | | | | | | | | | | | | | |
| Accrued Rebates - Sales | 271020 | 20,023 | 19,150 | 19,009 | 20,876 | 19,310 | 20,106 | 19,565 | 19,232 | 19,030 | 18,159 | 17,668 | 17,177 | 15,705 | 15,705 | 14,233 | 12,760 |
| Accrued Liability - Deferred Rent | 270105 | | | 15,386 | 13,786 | 12,788 | 15,377 | 14,449 | 13,518 | 11,688 | 11,251 | 11,251 | 13,351 | 7,833 | 7,833 | 7,833 | |
| Accrued Liability - Health Insurance | 270500 | 15,507 | 11,968 | 24,966 | 16,094 | 14,331 | 14,255 | 14,710 | 14,380 | 18,355 | 14,721 | 14,721 | 14,721 | 14,721 | 17,668 | 17,668 | 14,723 |
| Accrued Liability - RESP Deductions Payable | 270507 | 1,659 | 1,314 | 1,405 | 1,311 | 1,565 | 2,052 | 1,138 | 1,949 | 1,472 | 1,472 | 1,472 | 1,472 | 1,472 | 1,472 | 1,472 | 1,472 |
| Accrued Liability - Union Dues-Trade | 270510 | 535,338 | 149,761 | 271,649 | 393,541 | 68,879 | 57,438 | 61,138 | 60,826 | 61,165 | 61,942 | 58,893 | 24,539 | 34,355 | 44,170 | 58,893 | 63,801 |
| Accrued Liability - Other | 270512 / 270599 | | | | | | | | | | | | | | | | |
| **Total - Accruals/Payables** | | 3,104,181 | 2,455,439 | 2,629,889 | 2,763,009 | 2,711,143 | 2,588,759 | 2,098,857 | 2,604,079 | 2,588,062 | 2,532,650 | 2,329,728 | 2,245,864 | 1,995,016 | 2,057,223 | 2,388,071 | 2,468,312 |
| **Total - Net Working Capital** | | 3,582,580 | 3,519,842 | 4,135,976 | 4,321,171 | 5,043,020 | 4,316,577 | 3,912,992 | 3,823,576 | 3,267,021 | 3,373,511 | 3,574,343 | 3,756,422 | 3,766,728 | 3,522,677 | 4,042,055 | 4,080,339 |
| Months WC Change | | | (62,738) | 616,134 | 186,195 | 720,849 | (726,443) | (403,584) | (89,416) | (556,555) | 108,290 | 199,832 | 182,079 | 10,306 | (243,551) | 519,378 | (41,716) |
| Cumulative Monthly WC Change | | | (62,738) | 553,397 | 739,592 | 1,460,440 | 733,997 | 330,413 | 240,997 | (315,558) | (207,269) | (9,236) | 173,843 | 184,149 | 240,098 | 459,476 | 417,760 |

EXHIBIT 2.01(xvii)(1)

List of Customers

Masco Contracting Services
Lowes
Home Depot
Eastern Metals

EXHIBIT 2.01(xvii)(2)

List of Suppliers

Pilkington North America, Inc.
Guardian Industries
PPG Industries, Inc.
Zeledyne LLC
Solutia, Inc.
William Bonnell Co., Inc.
Allmetal
Spraylat Corporation
Walker Glass Co. Ltd.
Global Door Control, Inc.

EXHIBIT 2.04

Form of Deposit Escrow Agreement

## DEPOSIT ESCROW AGREEMENT

THIS DEPOSIT ESCROW AGREEMENT (this "Deposit Escrow Agreement") dated as of December __, 2009 by and among AAG HOLDINGS, INC., a Florida corporation ("AAG"), ARCH ALUMINUM & GLASS CO., INC., a Florida corporation ("Arch"), ARCH ALUMINUM L.C., a Florida limited liability company ("Arch LC"), AWP, LLC, a Florida limited liability company ("AWP"), and ARCH ALUMINUM AND GLASS INTERNATIONAL, INC., a Florida corporation ("Arch International", and collectively with AAG, Arch, Arch LC and AWP, the "Sellers"), ARCH GLASS ACQUISITION CORPORATION, a Delaware corporation (the "Purchaser") and JP Morgan Chase Bank, N.A., as escrow agent (the "Escrow Agent"). Capitalized terms used but not otherwise defined in this Deposit Escrow Agreement shall have the meanings ascribed to such terms in the Asset Purchase Agreement (as defined below).

## RECITALS

WHEREAS, this Deposit Escrow Agreement is being entered into pursuant to that certain Asset Purchase Agreement (the "Asset Purchase Agreement"), dated as of December ___, 2009, by and among the Sellers and the Purchaser;

WHEREAS, in accordance with the Asset Purchase Agreement, the parties desire to establish an escrow to secure the payment of the Purchaser's Deposit pursuant to Section 2.04(a) and Section 2.06 of the Asset Purchase Agreement;

WHEREAS, the Escrow Agent is willing to act as the escrow agent under this Deposit Escrow Agreement to hold certain funds designated herein as the "Escrow Fund" in an escrow account (the "Escrow Account"); and

WHEREAS, pursuant to the terms of the Asset Purchase Agreement, the parties have agreed to enter into this Deposit Escrow Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and agreements set forth in this Deposit Escrow Agreement the parties hereto agree as follows:

## ARTICLE I

## ESCROW PROVISIONS

1.1    Appointment and Agreement of Escrow Agent.  The Sellers and the Purchaser hereby appoint the Escrow Agent to serve as, and the Escrow Agent hereby agrees to act as, escrow agent upon the terms and conditions of this Deposit Escrow Agreement.

1.2    Establishment of the Escrow Fund.

(a)    Simultaneously with the execution of this Deposit Escrow Agreement, the Purchaser has delivered the amount of $2,600,000 (the "Purchaser's Deposit") to the Escrow Agent to be held in the Escrow Account (together with all interest, accretion in principal or other income or gain realized upon the amounts, the "Escrow Fund"). The Escrow Fund shall not be subject to a lien or attachment by any creditor of any party hereto and shall not be available to, and shall not be used by, the Escrow Agent to set off any obligations of any party hereto owing to the Escrow Agent in any capacity.

(b)    The Sellers and the Purchaser hereby agree that the Escrow Fund shall be initially invested in a JPMorgan Chase Bank, N.A. money market deposit account ("MMDA") or a successor or similar investment offered by the Escrow Agent, unless otherwise instructed in writing by the Sellers and the Purchaser and as shall be acceptable to the Escrow Agent. The rate of return on an MMDA varies from time to time based upon market conditions. Written investment instructions, if any, shall specify the type and identity of the investments to be purchased and/or sold. The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Sellers and the Purchaser recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Fund or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Escrow Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Parties to give the Escrow Agent instructions to invest or reinvest the Escrow Fund. The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Escrow Agreement.

(c)    During the term of this Deposit Escrow Agreement, the Escrow Agent shall invest and reinvest the Escrow Fund in any of the following investments, in each case at the written direction of an Authorized Person (as hereinafter defined) of both the Sellers and the Purchaser:

(i)    money market or mutual funds registered under the Investment Act of 1940;

(ii)    commercial paper (having original maturities of not more than 270 days) of any corporation, which on the date of acquisition has been rated by any nationally recognized statistical rating organization in its highest short-term unsecured debt rating category available;

(iii)    direct obligations of, or obligations fully guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States; or

(iv)    time deposits with any commercial bank that is a member of the Federal Reserve System.

(d)    The Escrow Agent shall have no obligation to invest or reinvest the Escrow Fund if deposited with the Escrow Agent after 11:00 a.m. (E.S.T.) of such day of deposit.  Instructions received after 11:00 a.m. (E.S.T.) will be treated as if received on the following Business Day.  The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the Escrow Fund.  Any interest or other income received on such investment and reinvestment of the Escrow Fund shall become part of the Escrow Fund and any losses incurred on such investment and reinvestment of the Escrow Fund shall be debited against the Escrow Fund.  If a selection is not made and a written direction not given to the Escrow Agent, the Escrow Fund shall be invested in JPMorgan Chase Bank, N.A. money market deposit account.  Notwithstanding the foregoing, the Escrow Agent shall have the power to sell or liquidate the foregoing investments whenever the Escrow Agent shall be required to release the Escrow Fund pursuant to Section 1.5 hereof.  In no event shall the Escrow Agent be deemed an investment manager or adviser in respect of any selection of investments hereunder.

1.3    Purpose of the Escrow Fund.  Subject to the terms and conditions of this Deposit Escrow Agreement, the Escrow Agent shall hold the Escrow Fund to secure certain payment obligations pursuant to Section 2.06 of the Asset Purchase Agreement.

1.4    Maintenance of the Escrow.

(a)    The Escrow Agent shall continue to maintain the Escrow Fund, as the case may be, until the earlier of: (i) the time at which there shall be no funds in such Escrow Fund (through any payment made pursuant to Section 1.5 hereof) and (ii) the termination of this Deposit Escrow Agreement.

(b)    Notwithstanding any other provision of this Deposit Escrow Agreement to the contrary, at any time prior to the termination of the Escrow Fund, the Escrow Agent shall, if so instructed by a Joint Notice or Final Order (each as defined below), pay from the Escrow Fund to the Sellers or the Purchaser, as directed in such Joint Notice or Final Order, the amount of cash so instructed.

1.5    Payments from the Escrow Fund.  The Escrow Agent shall hold the Escrow Fund until the Escrow Agent receives (i) joint written notice from both the Purchaser and the Sellers instructing the Escrow Agent with respect to the disbursement of the Escrow Fund in accordance with the Asset Purchase Agreement ("Joint Notice") or (ii) a final written Order of the Bankruptcy Court or other court of competent jurisdiction indicating the manner in which the funds are to be disbursed among the Purchaser and the Sellers (a "Final Order"), in which case the Escrow Agent shall disburse the Escrow Fund in accordance with the Joint Notice or Final Order.

1.6    Term of Deposit Escrow Agreement.  This Deposit Escrow Agreement shall terminate upon the distribution by the Escrow Agent of the Escrow Fund held in the Escrow Account.

1.7    Escrow Agent.

(a)    <u>Duties</u>.  The duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth herein and no duties, responsibilities or obligations shall be inferred or implied against the Escrow Agent.  The Escrow Agent shall not be subject to, nor required to comply with, any other agreement to which any of the Sellers or the Purchaser is a party, even though reference thereto may be made herein, or to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Deposit Escrow Agreement) from the Sellers or the Purchaser.  Except as provided in this Deposit Escrow Agreement and except for the Escrow Agent's willful misconduct or gross negligence, the Escrow Agent shall have no liability or obligation with respect to the Escrow Fund.  The Escrow Agent's sole responsibility shall be for the safekeeping, investment, and disbursement of the Escrow Fund in accordance with the terms of this Deposit Escrow Agreement.  The Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein or in written documentation executed by the Sellers and/or the Purchaser provided to the Escrow Agent.  The Escrow Agent shall not be responsible in any respect for the form, execution, validity, value or genuineness of documents or securities deposited hereunder, or for any description therein, or for the identity, authority or rights of persons executing or delivering or purporting to execute or deliver any such document, security or endorsement.  The Escrow Agent shall not be called upon to advise any party as to the wisdom in selling or retaining or taking or refraining from any action with respect to any securities or other property deposited hereunder.  In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Fund, or to appear in, prosecute or defend any such legal action or proceedings.  The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, and shall incur no liability and shall be fully protected from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel.  The Sellers, on the one hand, and Purchaser, on the other hand, shall each promptly pay, upon demand, 50% of the reasonable fees and expenses of any such counsel.  All instructions to the Escrow Agent shall be in writing.

(b)    <u>Reliance by Escrow Agent</u>.  The Escrow Agent may rely upon any order, judgment, certification, demand, notice or instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Deposit Escrow Agreement.  The Escrow Agent may act in conclusive reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give receipt or advice to make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.  When the Escrow Agent acts on any information, instructions, communications, (including, but not limited to, communications with respect to the delivery of securities or the wire transfer of funds) sent by facsimile, the Escrow Agent shall not be responsible or liable in the event such communication is not an authorized or authentic communication of the Sellers or the Purchaser or is not in the form the Sellers or the Purchaser sent or intended to send (whether due to fraud, distortion or otherwise).

(c)  <u>Indemnification</u>.  From and at all times after the date of this Deposit Escrow Agreement, the Sellers and the Purchaser shall, jointly and severally, indemnify and hold harmless Escrow Agent and its officers, directors, employees, representatives and agents from and against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by or asserted against Escrow Agent from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Deposit Escrow Agreement or any transactions contemplated herein, whether or not the Escrow Agent is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; <u>provided</u>, <u>however</u>, that the Escrow Agent shall not have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of the Escrow Agent.  Notwithstanding the above, the Purchaser and Sellers agree with each other to make payments among themselves so that the Purchaser bears no more than one half of any such indemnity and the Sellers bear no more than one half of any such indemnity.  The obligations under this Section 1.7(c) shall survive any termination of this Deposit Escrow Agreement and the resignation or removal of Escrow Agent.  Nothing contained in this Section 1.7 shall impair, limit, modify or affect the rights of the Sellers and the Purchaser, as between themselves.

(d)  <u>Disputes and Conflicting Claims</u>.  In the event of any dispute between or conflicting claims between the Sellers on the one hand and the Purchaser, on the other, the Escrow Agent shall be entitled, in its sole discretion, to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Fund so long as such dispute or conflict shall continue, and the Escrow Agent shall not be or become liable in any way to the Sellers or the Purchaser for failure or refusal to comply with such conflicting claims, demands or instructions.  The Escrow Agent shall be entitled to refuse to act until such conflicting or adverse claims or demands shall have been determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or settled by agreement between the conflicting parties.

(e)  <u>Provision of Statements</u>.  The Escrow Agent shall provide to the Sellers and the Purchaser monthly statements identifying transactions, transfers or holdings of the Escrow Fund and each such statement shall be deemed to be correct and final upon receipt thereof by the Sellers and the Purchaser unless the Escrow Agent is notified in writing by the Sellers or the Purchaser to the contrary within thirty (30) Business Days of the date of such statement.

(f)  <u>Resignation of Escrow Agent</u>.  The Escrow Agent may resign from the performance of its duties hereunder at any time by giving twenty (20) Business Days' prior written notice to the Sellers and the Purchaser or may be removed, with or without cause, by the Sellers and the Purchaser, acting jointly, at any time by the giving of seven (7) Business Days'

prior written notice to the Escrow Agent. Such resignation or removal shall take effect upon the appointment of a successor Escrow Agent as provided herein. Upon any such notice of resignation or removal, the Sellers and the Purchaser mutually shall agree upon and appoint a successor Escrow Agent hereunder, which shall be a commercial bank, trust company or other financial institution with a combined capital and surplus in excess of $1,000,000,000, unless waived by the Sellers and the Purchaser, which shall agree in writing to be bound by the terms of this Deposit Escrow Agreement. Upon the acceptance in writing of any appointment as the Escrow Agent hereunder by a successor Escrow Agent, such successor Escrow Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Escrow Agent, and the retiring Escrow Agent shall be discharged from its duties and obligations under this Deposit Escrow Agreement, but shall not be discharged from any liability for actions taken as the Escrow Agent hereunder prior to such succession. After any retiring Escrow Agent's resignation or removal, the provisions of this Deposit Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Escrow Agent under this Deposit Escrow Agreement. If the Sellers and the Purchaser are unable to agree upon a successor escrow agent, the Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief.

(g)     Fees of Escrow Agent. All fees and costs of the Escrow Agent, including the normal and usual costs of administering the Escrow Account shall be paid 50% by the Sellers and 50% by the Purchaser in accordance with Exhibit A, attached hereto. In the event that the conditions of this Deposit Escrow Agreement are not promptly fulfilled or that the Escrow Agent renders any service hereunder not provided for herein or that there is any assignment of any interest in the subject matter of the Escrow Fund or modification hereof, the Escrow Agent shall be reasonably compensated for such extraordinary services by the party that is responsible for or requests such services. The obligations under this Section 1.8(g) shall survive any termination of this Deposit Escrow Agreement and the resignation or removal of the Escrow Agent.

## ARTICLE II

## GENERAL PROVISIONS

2.1     Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 2.1):

If to the Sellers:

Arch Aluminum & Glass Co., Inc.
10200 N.W. 67th Street
Tamarac, Florida 33321  USA
Attention: Leon J. Silverstein, President
Tel.: (954) 724-1775
Fax: (954) 724-2083

with a copy to:

Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103  USA
Attention: Joseph J. Devine, Esq.
Tel: (215) 751-2415
Fax: (215) 751-2205

with a copy to:

Genovese Joblove & Battista P.A.
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida  33131
Attention: Paul J. Battista, Esq.
Tel.: (305) 349-2300
Fax: (305) 349-2310

if to the Purchaser:

Arch Glass Acquisition Corporation
1426 Pearl Street, Suite 400
Boulder, CO
Attention: Wm. Robert Wright
Tel.:  (303) 449-5544
Fax:  (303) 449-3194

with a copy to:

GreenbergTraurig
1221 Brickell Avenue
Miami, FL  33131
Attention:  Paul J. Keenan, Jr., Esq.
Tel.:  (305) 579-0500
Fax:  (305) 579-0717

If to Escrow Agent:

> JP Morgan Chase Bank N.A.
> Escrow Services
> 4 New York Plaza, 21st Floor
> New York, NY 10004
> Attention: Ilona Kandarova/Audrey Mohan
> Tel.: (212) 623-0046
> Fax: (212) 623-6168

2.2    <u>Parties Bound by Agreement</u>.    The terms, conditions and obligations of this Deposit Escrow Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns.    Except as hereinafter provided, without the prior written consent of the other parties, no party may assign such party's rights, duties or obligations hereunder or any part thereof to any other person or entity.

2.3    <u>Number; Gender</u>.    Whenever the context so requires, the singular number shall include the plural and the plural shall include the singular, and the gender of any pronoun shall include the other genders.

2.4    <u>Headings</u>.    The headings of the Articles and Sections of this Deposit Escrow Agreement are inserted for convenience only and shall not be deemed to constitute part of this Deposit Escrow Agreement or to affect the construction hereof.

2.5    <u>Amendment</u>.    This Deposit Escrow Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Sellers, the Purchaser and the Escrow Agent or (b) by a waiver in accordance with Section 2.6.

2.6    <u>Waiver</u>.    Any party to this Deposit Escrow Agreement may (with respect to itself): (a) extend the time for the performance of any of the obligations or other acts of the other parties; (b) waive any inaccuracies in the representations and warranties of the other parties contained herein or in any document delivered by the other parties pursuant hereto; or (c) waive compliance with any of the agreements of the other parties or conditions to such other parties' obligations contained herein.    Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be hound thereby.    Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Deposit Escrow Agreement.    The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

2.7    <u>Governing Law</u>.    This Deposit Escrow Agreement shall be governed by, and construed in accordance with, the Laws of the State of Florida and, to the extent applicable, the Bankruptcy Code.    The parties hereto agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Deposit Escrow Agreement and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Deposit Escrow Agreement, then each party: (a) agrees that all such

actions or proceedings shall be heard and determined in a Florida federal court sitting in The City of Miami in the County of Broward; (b) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 2.1 hereof (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Florida Law).

2.8    Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS DEPOSIT ESCROW AGREEMENT.  EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS DEPOSIT ESCROW AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2.8.

2.9    No Limitation.  The parties agree that the rights and remedies of any party under this Deposit Escrow Agreement shall not operate to limit any other rights and remedies otherwise available to any party under the Asset Purchase Agreement or otherwise.

2.10    Severability.  If any term or other provision of this Deposit Escrow Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Deposit Escrow Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Deposit Escrow Agreement is not affected in any manner materially adverse to either party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Deposit Escrow Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Deposit Escrow Agreement are consummated as originally contemplated to the greatest extent possible.

2.11    Exclusions.  The Escrow Agent is not a party to, nor is it bound by, nor need it give consideration to the terms or provisions off, any agreement or undertaking among the undersigned or any of them, or between the undersigned or any of them and other persons, including, but not limited to, the Asset Purchase Agreement or any agreement or undertaking which may be evidenced by or disclosed by the Escrow Fund, it being the intention of the parties that the Escrow Agent assent to and be obligated to give consideration only to the terms and provisions thereof.

2.12    <u>Absent, of Third Parts, Beneficiary Rights</u>.  This Deposit Escrow Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Deposit Escrow Agreement.

2.13    <u>Tax Matters</u>.

(a)    Each of Arch Aluminum & Glass Co. and the Purchaser shall provide the Escrow Agent with its taxpayer identification number documented by an appropriate IRS Form W-8 or W-9 upon execution of this Deposit Escrow Agreement.  Any payments of income pursuant to this Deposit Escrow Agreement shall be subject to all applicable withholding and information reporting requirements.

(b)    To the extent that any portion of the principal amount of the Escrow Fund represents part or all of the purchase price under the Asset Purchase Agreement, the Purchaser and the Sellers shall provide all information required for the Escrow Agent to perform tax reporting on IRS Form 1099-B on or prior to each distribution.  Unless otherwise directed in a joint written instruction executed by the Purchaser and the Sellers, the Escrow Agent shall report to the IRS, and as appropriate withhold and remit taxes to the IRS or to any other taxing authority as required by law, based upon the information or documentation so provided and, when schedule and documentation is not properly and timely provided prior to payment of principal, to the Sellers and the Purchaser.

(c)    In addition, all interest or other income disbursed under the Escrow Agreement shall be allocated to the either the Purchaser or the Sellers, as case may be, and reported, as and to the extent required by law, by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income disbursed from the Escrow Fund.  Any other tax returns required to be filed will be prepared and filed by the Seller and/or the Purchaser with the IRS and any other taxing authority as required by law, including but not limited to any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("<u>FIRPTA</u>").  The Sellers and the Purchaser acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Fund or any income earned by the Escrow Fund.  The Sellers and the Purchaser further acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Escrow Fund shall be paid by the Purchaser and the Sellers.  In the absence of written direction from the Sellers and the Purchaser, all proceeds of the Escrow Fund shall be retained in the Escrow Fund and reinvested from time to time by the Escrow Agent as provided in this Escrow Agreement.  The Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities

2.14    <u>Counterparts</u>.  This Deposit Escrow Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties

hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

2.15   USA Patriot Act.   Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm the Parties identity including without limitation name, address and organizational documents ("identifying information"). The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

2.16   Authorized Persons.   In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on schedule 1 hereto ("Schedule 1"), and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.   Each funds transfer instruction shall be executed by an authorized signatory, a list of such authorized signatories is set forth on Schedule 1.   The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow Agent. If the Escrow Agent is unable to contact any of the authorized representatives identified in Schedule 1, the Escrow Agent is hereby authorized to seek confirmation of such instructions by telephone call-back to any one or more of Purchaser or Seller's executive officers, ("President, CEO"), as the case may be, which shall include the titles of President and Chief Financial Officer of the Sellers and President and Vice-President of the Purchaser, as the Escrow Agent may select. Such "Executive Officer" shall deliver to the Escrow Agent a fully executed incumbency certificate, and the Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by the Purchaser or the Sellers to identify (a) the beneficiary, (b) the beneficiary's bank, or (c) an intermediary bank.   The Escrow Agent may apply any of the escrowed funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. The Parties acknowledge that these security procedures are commercially reasonable.

2.17   Compliance with Court Orders.   In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Escrow Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or

to any other person, entity, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

    2.18   Force Majeure. No party to this Escrow Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Deposit Escrow Agreement to be executed as of the date first above written,

**SELLERS:**

AAG HOLDINGS, INC.

By: _____
      Name:
      Title:

ARCH ALUMINUM & GLASS CO., INC.

By: _____
      Name:
      Title:

ARCH ALUMINUM L.C.

By: _____
      Name:
      Title:

AWP, LLC

By: _____
      Name:
      Title:

ARCH ALUMINUM & GLASS
INTERNATIONAL, INC.

By: _____
      Name:
      Title:

**PURCHASER:**

ARCH GLASS ACQUISITION CORPORATION

By: _____
    Name: Wm. Robert Wright
    Title:   President

**ESCROW AGENT:**

JP MORGAN CHASE BANK, N.A.


By:     _____
        Name:
        Title:

## **Schedule I**

Telephone Number(s) and authorized signature(s) for
**Person(s) Designated to give Funds Transfer Instructions**

If to Purchaser:

|     | <u>Name</u> | <u>Telephone Number</u> | <u>Signature</u> |
|-----|-------------|-------------------------|------------------|
| 1.  | Wm. Robert Wright | (303) 449-5544 | |
| 2.  | Jeffrey M. Vincent | (303) 449-0451 | |
| 3.  | | | |

If to Seller:

|     | <u>Name</u> | <u>Telephone Number</u> | <u>Signature</u> |
|-----|-------------|-------------------------|------------------|
| 1.  | Leon Silverstein | (800) 432- 8132 | |
| 2.  | Thomas Watson | (800) 432- 8132 | |
| 3.  | | | |

Telephone Number(s) for Call-Backs and
**Person(s) Designated to Confirm Funds Transfer Instructions**

If to Purchaser:

|     | <u>Name</u> | <u>Telephone Number</u> |
|-----|-------------|-------------------------|
| 1.  | Wm. Robert Wright | (303) 449-5544 |
| 2.  | Jeffrey M. Vincent | (303) 449-0451 |
| 3.  | | |

If to Seller:

|     | <u>Name</u> | <u>Telephone Number</u> |
|-----|-------------|-------------------------|
| 1.  | Leon Silverstein | (800) 432- 8132 |
| 2.  | Thomas Watson | (800) 432- 8132 |
| 3.  | | |

Telephone call backs shall be made to both Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer.

*Error! Unknown document property name.*

**Exhibit A**

# J.P.Morgan

███████████████████████████████████████████

Based upon our current understanding of your proposed transaction, our fee proposal is as follows:

**Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .            **Waived**
Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation.  Payable upon closing.

**Annual Administration Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .            **$**
The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction.

**Extraordinary Services and Out-of Pocket Expenses**
Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Bank's then standard rate.  Disbursements, receipts, investments or tax reporting exceeding 25 items per year may be treated as extraordinary services thereby incurring additional charges.

**Disclosure & Assumptions**
- Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review.  JPMorgan reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or conditions or other factors change from those used to set our fees.

- The escrow deposit shall be continuously invested in a JPMorgan Chase Bank money market deposit account ("MMDA") or a JPMorgan Chase Bank Cash Compensation account. MMDA and Cash Compensation Accounts have rates of compensation that may vary from time to time based upon market conditions.

- The Parties acknowledge and agree that they are permitted by U.S. law to make up to six (6) pre-authorized withdrawals or telephonic transfers from an MMDA per calendar month or statement cycle or similar period.  If the MMDA can be accessed by checks, drafts, bills of exchange, notes and other financial instruments ("Items"), then no more than three (3) of these six (6) transfers may be made by an Item.  The Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days
notice prior to a withdrawal from a money market deposit account.

- Payment of the invoice is due upon receipt.

**Compliance**
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account.  We may ask for information that will enable us to meet the requirements of the Act.

## EXHIBIT 2.04(h)

Tax Withholding Escrow Agreement

## SECTION 116 ESCROW AGREEMENT

**THIS AGREEMENT** is made as of the ● day of ●, 2009.

**AMONG:**

●

(the **"Purchaser"**)

- and -

**ARCH ALUMINUM AND GLASS INTERNATIONAL, INC.**

(the **"Seller"**)s

- and -

**HEENAN BLAIKIE LLP,** a limited liability partnership having an office in Toronto, Ontario

(the **"Escrow Agent"**)

**RECITALS:**

A.          AAG Holdings, Inc., Arch Aluminum & Glass Co., Inc., Arch Aluminum L.C., AWP, LLC and Arch Aluminum and Glass International, Inc. entered into an asset purchase agreement with Arch Glass Acquisition Corporation dated December ●, 2009 (the **"APA"**);

B.          Pursuant to the APA, the Purchaser will acquire on the Closing Date (as defined in the APA), inter alia, all of the shares of Arch Canada, ULC (the **"Arch Canada Stock"**) from the Seller in consideration for the sum of $● (the "Arch Canada Stock **Purchase Price"**);

C.          The Seller is a non-resident person within the meaning of section 116 of the *Income Tax Act* (Canada) (**"ITA"**) and, accordingly, the Purchaser is required to comply with the requirements of section 116 of the ITA;

D.          Pursuant to subsection 116(5) of the ITA, the Purchaser is required to remit an amount equal to 25% of the Arch Canada Stock Purchase Price to the Canada Revenue Agency (**"CRA"**) if a certificate as described in Subsection 116(4) of the ITA (a **"Section 116 Certificate"**) is not received from the CRA by the date that is 30 days after the end of the month in which the Purchaser acquired the Arch Canada Stock ;

E.          The Seller has or will apply for the Section 116 Certificate but was not able to provide a Section 116 Certificate on the Closing Date;

F.          The Seller and the Purchaser wish to provide a mechanism to allow the Seller to attempt to obtain a Section 116 Certificate prior to the Remittance Date (as defined herein) and therefore have agreed to enter into this agreement with the Escrow Agent whereby the Purchaser will withhold from the Arch Canada Stock Purchase Price an amount equal to the 25% of the Arch Canada Stock Purchase Price (the **"Escrowed Amount"**) and will deposit the Escrowed Amount into escrow with the Escrow Agent in accordance with the terms and conditions of this agreement (the "Agreement");

G.          The Escrow Agent is willing to hold the Escrowed Amount in escrow on behalf of the Seller and the Purchaser subject to the terms and conditions of this Agreement.

NOW THEREFORE THIS AGREEMENT WITNESSES that in consideration of the premises and the mutual covenants hereinafter set forth, the Parties hereto agree as follows:

## ARTICLE 1
## APPOINTMENT OF ESCROW AGENT

1.1    Seller and the Purchaser hereby appoint the Escrow Agent to act as escrow agent on the terms and conditions set forth herein and the Escrow Agent hereby accepts such appointment on such terms and conditions.

## ARTICLE 2
## ESCROW PROPERTY

2.1    On the Closing Date, the Purchaser shall deliver to the Escrow Agent the Escrowed Amount which shall be held in escrow by the Escrow Agent in accordance with the terms of this Agreement.

2.2    The Escrowed Amount shall be held by the Escrow Agent in an interest-bearing trust account or in Government of Canada treasury bills.

2.3    In this Agreement, the "Remittance Date" means the first business day following the 25th day of the month following the month in which the Closing Date occurred or such other date as may be mutually agreed to by the parties hereto, provided that if CRA gives reasonable written assurances prior to the Remittance Date (before any applicable extension) that the application for a Section 116 Certificate is being reviewed and that no payment is required to then be made to CRA until demanded by CRA, the Remittance Date shall be extended to the extent permitted by CRA.

2.4    Unless section 2.5, 2.6 or 2.7 hereof applies, the Escrow Agent shall, on the Remittance Date, remit the Escrowed Amount to the CRA pursuant to Section 116 of the ITA.

2.5    If a Section 116 Certificate in respect of the sale of the Arch Canada Stock is delivered to the Escrow Agent before 12:00 p.m. EST on the Remittance Date and the certificate limit of such Section 116 Certificate is not less than the Arch Canada Stock Purchase Price, then the Escrowed Amount shall be released to the Seller, or as it directs in writing, within two (2) Business Days following delivery of the Section 116 Certificate.

2.6    If a Section 116 Certificate in respect of the sale of the Arch Canada Stock is delivered to the Escrow Agent before 12:00 p.m. EST on the Remittance Date and the certificate limit of such Section 116 Certificate is less than the Arch Canada Stock Purchase Price, then the Escrow Agent shall:

(a)    remit to the CRA from the Escrowed Amount held in escrow by it pursuant hereto, 25% of the amount by which the Arch Canada Stock Purchase Price exceeds the certificate limit of such Section 116 Certificate; and

(b)    release the balance of the Escrowed Amount, if any, to the Seller, or as it directs in writing, within two (2) Business Days following delivery of the Section 116 Certificate.

2.7    If the CRA provides reasonable written assurance that payment of an amount (the "**Tax Amount**") which is not more than the Escrowed Amount would allow the CRA to issue a Section 116 Certificate with a certificate limit at least equal to the Arch Canada Stock Purchase Price, the Escrow Agent shall pay the Tax Amount to the CRA from the Escrowed Amount held in escrow by it pursuant hereto and, within two (2) Business Days following the delivery of the relevant Section 116 Certificate to the Escrow Agent, the balance of the Escrowed Amount shall be released to the Seller or as it directs in writing;

2.8    Any interest or other income earned on the Escrowed Amount shall be paid, net of all applicable withholdings, to the Seller upon release of the balance of the Escrowed Amount in accordance with the terms hereof. The Escrow Agent makes no representation as to the yield available upon the Escrowed Amount and shall bear no liability for any failure to achieve the maximum possible yield from the Escrowed Amount.

**ARTICLE 3**
**ESCROW AGENT**

3.1    Neither the Escrow Agent nor its partners, employees, agents or associates shall be liable for any claim, proceeding, loss, damage, liability or expense of any kind or nature caused directly or indirectly by any action taken or omitted by any of them under or in connection with this Agreement or as a result of relying on any communication or document believed by any of them to be genuine and correct and to have been communicated or signed by the person by whom it purports to be communicated or signed, unless caused by gross negligence or wilful misconduct.

3.2    Seller hereby indemnifies the Escrow Agent, its partners, employees, agents and associates from and against all claims, proceedings, losses, damages, liabilities and expenses of every description which may be incurred by the Escrow Agent, its employees, agents and associates and which are in any way related to or arise out of this Agreement, except only any thereof resulting from gross negligence or wilful misconduct of the Escrow Agent, its partners, employees, agents and associates and fees, costs and expenses payable to the Escrow Agent for acting as such which are the sole responsibility of Seller. This indemnity shall survive the termination of the escrow arrangements provided for in this Agreement.

3.3    The Seller acknowledges that it has had access to and advice from its own legal counsel with respect to the APA and this Agreement.  The Seller and the Purchaser acknowledge that:

(a)    the Escrow Agent or its partners, employees, agents or associates have provided counsel to the Purchaser in connection with the transactions contemplated by the APA and in connection with this Agreement;

(b)    the duties of the Escrow Agent hereunder are purely mechanical;

(c)    the Escrow Agent is acting hereunder for the convenience of the Seller and the Purchaser and shall not be impeachable or accountable because of any conflicting or potentially conflicting duty to the Purchaser or any advice provided to it;

(d)    the Escrow Agent shall continue to be at liberty to act as counsel for the Purchaser and related entities on this or any other matter notwithstanding the Escrow Agent's role as escrow agent hereunder; and

(e)    the Escrow Agent has no duties or obligations other than those specifically set forth herein.

3.4     Subject to what is hereafter provided, all fees, costs and expenses incurred by the Escrow Agent in performing its duties hereunder shall be paid by the Seller.  If the Escrow Agent believes it to be reasonably necessary to consult with counsel concerning any of its duties hereunder, or if the Escrow Agent becomes involved in litigation relating to this Agreement, the Purchaser and Seller shall be equally responsible for the cost, expense and legal fees incurred by the Escrow Agent.

3.5     The Escrow Agent shall be entitled, upon three days' written notice to the Seller and the Purchaser, to assign its rights and obligations under this Agreement to a member of the Law Society of Upper Canada residing in and practising law in the City of Toronto, in the Province of Ontario, or to a trust company registered to carry on business as such in the Province of Ontario, in either case acceptable to the Purchaser and Seller, acting reasonably, provided that such assignment shall not be effective unless and until such assignee has agreed in writing to assume such obligations.

3.6     If the Escrow Agent assigns its rights and obligations as aforesaid, a replacement escrow agent will be appointed by the other parties hereto jointly, and failing such appointment within the time period set out in section 3.5, the Escrow Agent may apply to a court of competent jurisdiction in the City of Toronto in the Province of Ontario, on such notice as such Court may direct for the appointment of a new escrow agent.  Either Seller or the Purchaser may at any time appoint a replacement escrow agent with the consent of the other, which consent shall not be unreasonably withheld.

3.7     If any dispute arises out of this Agreement or any process is commenced against the subject matter of this Agreement, including court orders, garnishees or any other processes, the Escrow Agent is hereby empowered and entitled to comply with any orders, writs, judgments or decrees or, if it sees fit, to deliver the subject matter of the escrow to a court of competent jurisdiction in the City of Toronto in the Province of Ontario.

3.8     Should the Seller and the Purchaser fail to appoint a replacement escrow agent as outlined herein, then the Escrow Agent shall cease its function at the expiration of the period of notice and may retain the Escrowed Amount on a merely safekeeping basis at such reasonable fee as may be determined solely by the Escrow Agent, or may pay into or otherwise deposit with a court of competent jurisdiction in the City of Toronto in the Province of Ontario, the Escrowed Amount, pending the appointment of such replacement escrow agent.

3.9     The Escrow Agent shall not be obligated to take any legal action hereunder which might, in the Escrow Agent's judgment, involve any expense or liability unless the Escrow Agent shall have been furnished with reasonable retainer or indemnity.

3.10    The Escrow Agent shall not be bound in any way by any other contract or agreement between the parties hereto whether or not the Escrow Agent has knowledge thereof or of its terms and conditions and the Escrow Agent's only duty, liability and responsibility shall be to hold and deal with the Escrowed Amount as herein directed.

3.11    The Escrow Agent shall be entitled to assume that any notice and evidence received by the Escrow Agent pursuant to these instruments from the Seller and the Purchaser has been duly executed by the party by whom it purports to have been signed and the Escrow Agent shall not be obligated to enquire into the sufficiency or authority of any signatures appearing on such notice or evidence.

3.12    In the event of any disagreement between any of the parties to these instructions or between them or any of them and any other person, resulting in adverse claims or demands being made in

connection with the Escrowed Amount, or in the event that the Escrow Agent, in good faith, is in doubt as to what action the Escrow Agent should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on the Escrow Agent or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any person for the Escrow Agent's failure or refusal to act, and the Escrow Agent shall be entitled to continue so to refrain from acting until (i) the rights of all parties shall have been finally adjudicated by a court of competent jurisdiction or (ii) all differences shall have been adjusted and all doubt resolved by agreement among all of the interested parties, and the Escrow Agent shall have been notified thereof in writing signed by all such parties. The Escrow Agent's rights under this section 3.12 are cumulative of all other rights which the Escrow Agent may have pursuant to this Agreement, by law or otherwise.

3.13    The terms of these instructions are irrevocable by the Seller and the Purchaser unless revocation is consented to in writing by all of the parties hereto.

3.14    The terms herein shall be binding upon the Escrow Agent and the Escrow Agent's successors in the practice of law and upon the Seller and the Purchaser and the respective successors and assigns thereof.

3.15    This Agreement shall terminate upon the Escrow Agent disposing of the balance of the Escrowed Amount and interest or other income thereon, if any, in accordance with the provisions of this Agreement. Upon termination of this Agreement, the Escrow Agent shall be relieved and discharged from all claims and liabilities relating to the Escrowed Amount and interest or other income thereon, if any, and any other obligation of the Escrow Agent hereunder and the Escrow Agent shall not be subject to any claims made by or on behalf of any party hereto.

### ARTICLE 4
### MISCELLANEOUS

4.1    Except as otherwise provided herein, any instruction to the Escrow Agent under this Agreement shall be in writing and shall be delivered to the Escrow Agent as set forth below.

4.2    This Agreement shall, in all respects, be subject to, interpreted, construed and enforced in accordance with and under the laws of the Province of Ontario and the federal laws of Canada applicable therein and shall, in all respects, be treated as a contract made in the Province of Ontario. The parties hereto irrevocably attorn and submit to the jurisdiction of the court of the Province of Ontario and the courts of appeal therefrom in respect to all matters arising, out of or in connection with this Agreement.

4.3    The addresses for service and the fax numbers of the parties shall be as follows:

the Purchaser:            ●

With a copy to:           Heenan Blaikie LLP
                          333 Bay Street, Suite 2900
                          Toronto, Ontario  M5H 2T4

                          Attention:    Ilia Danef
                          Fax:          1-866-778-5024

the Seller:               Arch Aluminum and Glass International, Inc.

10200 N.W. 67th Street
Tamarac, Florida 33321

Attention:     Leon J. Silverstein, President
Fax:           (954) 724-2083

With a copy to:     Schnader Harrison Segal & Lewis LLP
                    1600 Market Street, Suite 3600
                    Philadelphia, Pennsylvania 19103

                    Attention:     Joseph J. Devine, Esq.
                    Fax:           (215) 751-2205

and to:             Cassels Brock & Blackwell LLP
                    2100 Scotia Plaza
                    40 King Street West
                    Toronto, Ontario  M5H 3C2

                    Attention:     Maxwell Gotlieb
                    Fax:           416-350-6945

the Escrow Agent:   Heenan Blaikie LLP
                    333 Bay Street, Suite 2900
                    Toronto, Ontario  M5H 2T4

                    Attention:     Ilia Danef
                    Fax:           1-866-778-5024

All notices, communications and statements required, permitted or contemplated hereunder shall be in writing, and shall be delivered as follows:

(a)     by personal service on a party at the address of such party set out above,

(b)     in which case the item so served shall be deemed to have been received by that party when personally served; or

(c)     by facsimile transmission to a party to the fax number of such party set out above, in which case the item so transmitted shall be deemed to have been received by that party when transmitted with written confirmation of receipt from the sending machine.

A party may from time to time change its address for service or its fax number or both by giving written notice of such change to the other parties.

4.4     Time shall be of the essence of this Agreement.

4.5     The parties hereto shall do all such further acts and things as may be required from time to time in order to fully carry out the terms and intent of this Agreement.

4.6    This Agreement may be executed by facsimile and in counterpart and each such counterpart shall be considered to be an original and all such counterparts together shall be deemed to constitute one instrument.

**IN WITNESS WHEREOF** the parties hereto have executed and delivered this Agreement as of the day and year first written above.

●                                           **ARCH ALUMINUM AND GLASS INTERNATIONAL, INC.**

Per: _____

Name:                                           Per: _____

Title:                                            Name:

Title:

**HEENAN BLAIKIE LLP**

Per: _____

Name:

Title:

<u>EXHIBIT 2.07(b)</u>

Form of Price Adjustment Escrow Agreement

## PRICE ADJUSTMENT ESCROW AGREEMENT

THIS PRICE ADJUSTMENT ESCROW AGREEMENT (this "Price Adjustment Escrow Agreement") dated as of [*], 20[*] by and among AAG HOLDINGS, INC., a Florida corporation ("AAG"), ARCH ALUMINUM & GLASS CO., INC., a Florida corporation ("Arch"), ARCH ALUMINUM L.C., a Florida limited liability company ("Arch LC"), AWP, LLC, a Florida limited liability company ("AWP"), and ARCH ALUMINUM AND GLASS INTERNATIONAL, INC., a Florida corporation ("Arch International", and collectively with AAG, Arch, Arch LC and AWP, the "Sellers"), ARCH GLASS ACQUISITION CORPORATION, a Delaware corporation (the "Purchaser") and JP Morgan Chase Bank, N.A., as escrow agent (the "Escrow Agent").  Capitalized terms used but not otherwise defined in this Price Adjustment Escrow Agreement shall have the meanings ascribed to such terms in the Asset Purchase Agreement (as defined below).

### RECITALS

WHEREAS, this Price Adjustment Escrow Agreement is being entered into pursuant to that certain Asset Purchase Agreement (the "Asset Purchase Agreement"), dated as of December [*], 2009, by and among the Sellers and the Purchaser;

WHEREAS, in accordance with the Asset Purchase Agreement, the parties desire to establish an escrow to secure the payment of the Purchaser's Deposit pursuant to Section 2.04(b), Section 2.07 and Section 2.08 of the Asset Purchase Agreement;

WHEREAS, the Escrow Agent is willing to act as the escrow agent under this Price Adjustment Escrow Agreement to hold certain funds designated herein as the "Escrow Fund" in an escrow account (the "Escrow Account"); and

WHEREAS, pursuant to the terms of the Asset Purchase Agreement, the parties have agreed to enter into this Price Adjustment Escrow Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and agreements set forth in this Price Adjustment Escrow Agreement the parties hereto agree as follows:

### ARTICLE I

### ESCROW PROVISIONS

1.1     Appointment and Agreement of Escrow Agent.  The Sellers and the Purchaser hereby appoint the Escrow Agent to serve as, and the Escrow Agent hereby agrees to act as, escrow agent upon the terms and conditions of this Price Adjustment Escrow Agreement.

1.2     Establishment of the Escrow Fund.

(a)    Simultaneously with the execution of this Price Adjustment Escrow Agreement, the Purchaser has delivered the amount of $[*] (the "Purchaser's Deposit") to the Escrow Agent to be held in the Escrow Account (together with all interest, accretion in principal or other income or gain realized upon the amounts, the "Escrow Fund"). The Escrow Fund shall not be subject to a lien or attachment by any creditor of any party hereto and shall not be available to, and shall not be used by, the Escrow Agent to set off any obligations of any party hereto owing to the Escrow Agent in any capacity.

(b)    The Sellers and the Purchaser hereby agree that the Escrow Fund shall be initially invested in a JPMorgan Chase Bank, N.A. money market deposit account ("MMDA") or a successor or similar investment offered by the Escrow Agent, unless otherwise instructed in writing by the Sellers and the Purchaser and as shall be acceptable to the Escrow Agent. The rate of return on an MMDA varies from time to time based upon market conditions. Written investment instructions, if any, shall specify the type and identity of the investments to be purchased and/or sold. The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Sellers and the Purchaser recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Fund or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Escrow Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Parties to give the Escrow Agent instructions to invest or reinvest the Escrow Fund. The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Escrow Agreement.

(c)    During the term of this Price Adjustment Escrow Agreement, the Escrow Agent shall invest and reinvest the Escrow Fund in any of the following investments, in each case at the written direction of an Authorized Person (as hereinafter defined) of both the Sellers and the Purchaser:

(i)    money market or mutual funds registered under the Investment Act of 1940;

(ii)    commercial paper (having original maturities of not more than 270 days) of any corporation, which on the date of acquisition has been rated by any nationally recognized statistical rating organization in its highest short-term unsecured debt rating category available;

(iii)    direct obligations of, or obligations fully guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States; or

(iv)    time deposits with any commercial bank that is a member of the Federal Reserve System.

(d)    The Escrow Agent shall have no obligation to invest or reinvest the Escrow Fund if deposited with the Escrow Agent after 11:00 a.m. (E.S.T.) of such day of deposit.  Instructions received after 11:00 a.m. (E.S.T.) will be treated as if received on the following Business Day.  The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the Escrow Fund.  Any interest or other income received on such investment and reinvestment of the Escrow Fund shall become part of the Escrow Fund and any losses incurred on such investment and reinvestment of the Escrow Fund shall be debited against the Escrow Fund.  If a selection is not made and a written direction not given to the Escrow Agent, the Escrow Fund shall be invested in JPMorgan Chase Bank, N.A. money market deposit account.  Notwithstanding the foregoing, the Escrow Agent shall have the power to sell or liquidate the foregoing investments whenever the Escrow Agent shall be required to release the Escrow Fund pursuant to Section 1.5 hereof.  In no event shall the Escrow Agent be deemed an investment manager or adviser in respect of any selection of investments hereunder.

1.3    <u>Purpose of the Escrow Fund</u>.  Subject to the terms and conditions of this Price Adjustment Escrow Agreement, the Escrow Agent shall hold the Escrow Fund to secure certain payment obligations pursuant to Section 2.07 and Section 2.08 of the Asset Purchase Agreement.

1.4    <u>Maintenance of the Escrow</u>.

(a)    The Escrow Agent shall continue to maintain the Escrow Fund, as the case may be, until the earlier of: (i) the time at which there shall be no funds in such Escrow Fund (through any payment made pursuant to Section 1.5 hereof) and (ii) the termination of this Price Adjustment Escrow Agreement.

(b)    Notwithstanding any other provision of this Price Adjustment Escrow Agreement to the contrary, at any time prior to the termination of the Escrow Fund, the Escrow Agent shall, if so instructed by a Joint Notice or Final Order (each as defined below), pay from the Escrow Fund to the Sellers or the Purchaser, as directed in such Joint Notice or Final Order, the amount of cash so instructed.

1.5    <u>Payments from the Escrow Fund</u>.  The Escrow Agent shall hold the Escrow Fund until the Escrow Agent receives (i) joint written notice from both the Purchaser and the Sellers instructing the Escrow Agent with respect to the disbursement of the Escrow Fund in accordance with the Asset Purchase Agreement ("<u>Joint Notice</u>") or (ii) a final written Order of the Bankruptcy Court or other court of competent jurisdiction indicating the manner in which the funds are to be disbursed among the Purchaser and the Sellers (a "<u>Final Order</u>"), in which case the Escrow Agent shall disburse the Escrow Fund in accordance with the Joint Notice or Final Order.

1.6    <u>Term of Price Adjustment Escrow Agreement</u>.  This Price Adjustment Escrow Agreement shall terminate upon the distribution by the Escrow Agent of the Escrow Fund held in the Escrow Account.

1.7    <u>Escrow Agent</u>.

(a)    Duties.  The duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth herein and no duties, responsibilities or obligations shall be inferred or implied against the Escrow Agent.  The Escrow Agent shall not be subject to, nor required to comply with, any other agreement to which any of the Sellers or the Purchaser is a party, even though reference thereto may be made herein, or to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Price Adjustment Escrow Agreement) from the Sellers or the Purchaser.  Except as provided in this Price Adjustment Escrow Agreement and except for the Escrow Agent's willful misconduct or gross negligence, the Escrow Agent shall have no liability or obligation with respect to the Escrow Fund.  The Escrow Agent's sole responsibility shall be for the safekeeping, investment, and disbursement of the Escrow Fund in accordance with the terms of this Price Adjustment Escrow Agreement.  The Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein or in written documentation executed by the Sellers and/or the Purchaser provided to the Escrow Agent.  The Escrow Agent shall not be responsible in any respect for the form, execution, validity, value or genuineness of documents or securities deposited hereunder, or for any description therein, or for the identity, authority or rights of persons executing or delivering or purporting to execute or deliver any such document, security or endorsement.  The Escrow Agent shall not be called upon to advise any party as to the wisdom in selling or retaining or taking or refraining from any action with respect to any securities or other property deposited hereunder.  In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Fund, or to appear in, prosecute or defend any such legal action or proceedings.  The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, and shall incur no liability and shall be fully protected from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel.  The Sellers, on the one hand, and Purchaser, on the other hand, shall each promptly pay, upon demand, 50% of the reasonable fees and expenses of any such counsel.  All instructions to the Escrow Agent shall be in writing.

(b)    Reliance by Escrow Agent.  The Escrow Agent may rely upon any order, judgment, certification, demand, notice or instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Price Adjustment Escrow Agreement.  The Escrow Agent may act in conclusive reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give receipt or advice to make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.  When the Escrow Agent acts on any information, instructions, communications, (including, but not limited to, communications with respect to the delivery of securities or the wire transfer of funds) sent by facsimile, the Escrow Agent shall not be responsible or liable in the event such communication is not an authorized or authentic communication of the Sellers or the Purchaser or is not in the form

the Sellers or the Purchaser sent or intended to send (whether due to fraud, distortion or otherwise).

(c)    Indemnification.  From and at all times after the date of this Price Adjustment Escrow Agreement, the Sellers and the Purchaser shall, jointly and severally, indemnify and hold harmless Escrow Agent and its officers, directors, employees, representatives and agents from and against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by or asserted against Escrow Agent from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Price Adjustment Escrow Agreement or any transactions contemplated herein, whether or not the Escrow Agent is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; provided, however, that the Escrow Agent shall not have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of the Escrow Agent.  Notwithstanding the above, the Purchaser and Sellers agree with each other to make payments among themselves so that the Purchaser bears no more than one half of any such indemnity and the Sellers bear no more than one half of any such indemnity.  The obligations under this Section 1.7(c) shall survive any termination of this Price Adjustment Escrow Agreement and the resignation or removal of Escrow Agent.  Nothing contained in this Section 1.7 shall impair, limit, modify or affect the rights of the Sellers and the Purchaser, as between themselves.

(d)    Disputes and Conflicting Claims.  In the event of any dispute between or conflicting claims between the Sellers on the one hand and the Purchaser, on the other, the Escrow Agent shall be entitled, in its sole discretion, to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Fund so long as such dispute or conflict shall continue, and the Escrow Agent shall not be or become liable in any way to the Sellers or the Purchaser for failure or refusal to comply with such conflicting claims, demands or instructions. The Escrow Agent shall be entitled to refuse to act until such conflicting or adverse claims or demands shall have been determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or settled by agreement between the conflicting parties.

(e)    Provision of Statements.  The Escrow Agent shall provide to the Sellers and the Purchaser monthly statements identifying transactions, transfers or holdings of the Escrow Fund and each such statement shall be deemed to be correct and final upon receipt thereof by the Sellers and the Purchaser unless the Escrow Agent is notified in writing by the Sellers or the Purchaser to the contrary within thirty (30) Business Days of the date of such statement.

(f)    <u>Resignation of Escrow Agent</u>.  The Escrow Agent may resign from the performance of its duties hereunder at any time by giving twenty (20) Business Days' prior written notice to the Sellers and the Purchaser or may be removed, with or without cause, by the Sellers and the Purchaser, acting jointly, at any time by the giving of seven (7) Business Days' prior written notice to the Escrow Agent.  Such resignation or removal shall take effect upon the appointment of a successor Escrow Agent as provided herein.  Upon any such notice of resignation or removal, the Sellers and the Purchaser mutually shall agree upon and appoint a successor Escrow Agent hereunder, which shall be a commercial bank, trust company or other financial institution with a combined capital and surplus in excess of $1,000,000,000, unless waived by the Sellers and the Purchaser, which shall agree in writing to be bound by the terms of this Price Adjustment Escrow Agreement.  Upon the acceptance in writing of any appointment as the Escrow Agent hereunder by a successor Escrow Agent, such successor Escrow Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Escrow Agent, and the retiring Escrow Agent shall be discharged from its duties and obligations under this Price Adjustment Escrow Agreement, but shall not be discharged from any liability for actions taken as the Escrow Agent hereunder prior to such succession.  After any retiring Escrow Agent's resignation or removal, the provisions of this Price Adjustment Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Escrow Agent under this Price Adjustment Escrow Agreement.  If the Sellers and the Purchaser are unable to agree upon a successor escrow agent, the Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief.

(g)    <u>Fees of Escrow Agent</u>.  All fees and costs of the Escrow Agent, including the normal and usual costs of administering the Escrow Account shall be paid 50% by the Sellers and 50% by the Purchaser in accordance with <u>Exhibit A</u>, attached hereto.  In the event that the conditions of this Price Adjustment Escrow Agreement are not promptly fulfilled or that the Escrow Agent renders any service hereunder not provided for herein or that there is any assignment of any interest in the subject matter of the Escrow Fund or modification hereof, the Escrow Agent shall be reasonably compensated for such extraordinary services by the party that is responsible for or requests such services.  The obligations under this Section 1.8(g) shall survive any termination of this Price Adjustment Escrow Agreement and the resignation or removal of the Escrow Agent.

**ARTICLE II**

**GENERAL PROVISIONS**

2.1    <u>Notices</u>.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 2.1):

If to the Sellers:

    Arch Aluminum & Glass Co., Inc.
    10200 N.W. 67th Street
    Tamarac, Florida 33321  USA
    Attention: Leon J. Silverstein, President
    Tel.:  (954) 724-1775
    Fax:  (954) 724-2083

    with a copy to:

    Schnader Harrison Segal & Lewis LLP
    1600 Market Street, Suite 3600
    Philadelphia, Pennsylvania 19103  USA
    Attention: Joseph J. Devine, Esq.
    Tel: (215) 751-2415
    Fax: (215) 751-2205

    with a copy to:

    Genovese Joblove & Battista P.A.
    Bank of America Tower
    100 Southeast 2nd Street, 44th Floor
    Miami, Florida  33131
    Attention: Paul J. Battista, Esq.
    Tel.: (305) 349-2300
    Fax: (305) 349-2310

if to the Purchaser:

    Arch Glass Acquisition Corporation
    1426 Pearl Street, Suite 400
    Boulder, CO
    Attention: Wm. Robert Wright
    Tel.:  (303) 449-5544
    Fax:  (303) 449-3194

    with a copy to:

    GreenbergTraurig
    1221 Brickell Avenue
    Miami, FL  33131
    Attention:  Paul J. Keenan, Jr., Esq.
    Tel.:  (305) 579-0500
    Fax:  (305) 579-0717

If to Escrow Agent:

> JP Morgan Chase Bank N.A.
> Escrow Services
> 4 New York Plaza, 21st Floor
> New York, NY  10004
> Attention: Ilona Kandarova/Audrey Mohan
> Tel.: (212) 623-0046
> Fax: (212) 623-6168

2.2    <u>Parties Bound by Agreement</u>.  The terms, conditions and obligations of this Price Adjustment Escrow Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns.  Except as hereinafter provided, without the prior written consent of the other parties, no party may assign such party's rights, duties or obligations hereunder or any part thereof to any other person or entity.

2.3    <u>Number; Gender</u>.  Whenever the context so requires, the singular number shall include the plural and the plural shall include the singular, and the gender of any pronoun shall include the other genders.

2.4    <u>Headings</u>.  The headings of the Articles and Sections of this Price Adjustment Escrow Agreement are inserted for convenience only and shall not be deemed to constitute part of this Price Adjustment Escrow Agreement or to affect the construction hereof.

2.5    <u>Amendment</u>.  This Price Adjustment Escrow Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Sellers, the Purchaser and the Escrow Agent or (b) by a waiver in accordance with Section 2.6.

2.6    <u>Waiver</u>.  Any party to this Price Adjustment Escrow Agreement may (with respect to itself): (a) extend the time for the performance of any of the obligations or other acts of the other parties; (b) waive any inaccuracies in the representations and warranties of the other parties contained herein or in any document delivered by the other parties pursuant hereto; or (c) waive compliance with any of the agreements of the other parties or conditions to such other parties' obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be hound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Price Adjustment Escrow Agreement.  The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

2.7    <u>Governing Law</u>.  This Price Adjustment Escrow Agreement shall be governed by, and construed in accordance with, the Laws of the State of Florida and, to the extent applicable, the Bankruptcy Code.  The parties hereto agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Price Adjustment Escrow Agreement and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Price Adjustment Escrow Agreement, then each party: (a) agrees

that all such actions or proceedings shall be heard and determined in a Florida federal court sitting in The City of Miami in the County of Broward; (b) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 2.1 hereof (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Florida Law).

    2.8   <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS PRICE ADJUSTMENT ESCROW AGREEMENT. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS PRICE ADJUSTMENT ESCROW AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2.8.

    2.9   <u>No Limitation</u>. The parties agree that the rights and remedies of any party under this Price Adjustment Escrow Agreement shall not operate to limit any other rights and remedies otherwise available to any party under the Asset Purchase Agreement or otherwise.

    2.10   <u>Severability</u>. If any term or other provision of this Price Adjustment Escrow Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Price Adjustment Escrow Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Price Adjustment Escrow Agreement is not affected in any manner materially adverse to either party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Price Adjustment Escrow Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Price Adjustment Escrow Agreement are consummated as originally contemplated to the greatest extent possible.

    2.11   <u>Exclusions</u>. The Escrow Agent is not a party to, nor is it bound by, nor need it give consideration to the terms or provisions off, any agreement or undertaking among the undersigned or any of them, or between the undersigned or any of them and other persons, including, but not limited to, the Asset Purchase Agreement or any agreement or undertaking which may be evidenced by or disclosed by the Escrow Fund, it being the intention of the parties that the Escrow Agent assent to and be obligated to give consideration only to the terms and provisions thereof.

2.12    <u>Absent, of Third Parts, Beneficiary Rights</u>.    This Price Adjustment Escrow Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Price Adjustment Escrow Agreement.

2.13    <u>Tax Matters</u>.

(a)    Each of Arch Aluminum & Glass Co. and the Purchaser shall provide the Escrow Agent with its taxpayer identification number documented by an appropriate IRS Form W-8 or W-9 upon execution of this Price Adjustment Escrow Agreement.  Any payments of income pursuant to this Price Adjustment Escrow Agreement shall be subject to all applicable withholding and information reporting requirements.

(b)    To the extent that any portion of the principal amount of the Escrow Fund represents part or all of the purchase price under the Asset Purchase Agreement, the Purchaser and the Sellers shall provide all information required for the Escrow Agent to perform tax reporting on IRS Form 1099-B on or prior to each distribution.  Unless otherwise directed in a joint written instruction executed by the Purchaser and the Sellers, the Escrow Agent shall report to the IRS, and as appropriate withhold and remit taxes to the IRS or to any other taxing authority as required by law, based upon the information or documentation so provided and, when schedule and documentation is not properly and timely provided prior to payment of principal, to the Sellers and the Purchaser.

(c)    In addition, all interest or other income disbursed under the Escrow Agreement shall be allocated to the either the Purchaser or the Sellers, as case may be, and reported, as and to the extent required by law, by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income disbursed from the Escrow Fund.  Any other tax returns required to be filed will be prepared and filed by the Seller and/or the Purchaser with the IRS and any other taxing authority as required by law, including but not limited to any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("<u>FIRPTA</u>").  The Sellers and the Purchaser acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Fund or any income earned by the Escrow Fund.  The Sellers and the Purchaser further acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Escrow Fund shall be paid by the Purchaser and the Sellers.  In the absence of written direction from the Sellers and the Purchaser, all proceeds of the Escrow Fund shall be retained in the Escrow Fund and reinvested from time to time by the Escrow Agent as provided in this Escrow Agreement.  The Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities

2.14    <u>Counterparts</u>.  This Price Adjustment Escrow Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different

parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

2.15    USA Patriot Act.    Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.   Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm the Parties identity including without limitation name, address and organizational documents ("identifying information"). The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

2.16    Authorized Persons.    In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on schedule 1 hereto ("Schedule 1"), and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.   Each funds transfer instruction shall be executed by an authorized signatory, a list of such authorized signatories is set forth on Schedule 1.   The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow Agent. If the Escrow Agent is unable to contact any of the authorized representatives identified in Schedule 1, the Escrow Agent is hereby authorized to seek confirmation of such instructions by telephone call-back to any one or more of Purchaser or Seller's executive officers, ("President, CEO"), as the case may be, which shall include the titles of President and Chief Financial Officer of the Sellers and President and Vice-President of the Purchaser, as the Escrow Agent may select. Such "Executive Officer" shall deliver to the Escrow Agent a fully executed incumbency certificate, and the Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by the Purchaser or the Sellers to identify (a) the beneficiary, (b) the beneficiary's bank, or (c) an intermediary bank.   The Escrow Agent may apply any of the escrowed funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. The Parties acknowledge that these security procedures are commercially reasonable.

2.17    Compliance with Court Orders.    In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Escrow Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or

to any other person, entity, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

2.18    Force Majeure.  No party to this Escrow Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Price Adjustment Escrow Agreement to be executed as of the date first above written,

**SELLERS:**

AAG HOLDINGS, INC.


By: _____
        Name:
        Title:

ARCH ALUMINUM & GLASS CO., INC.


By: _____
        Name:
        Title:

ARCH ALUMINUM L.C.


By: _____
        Name:
        Title:

AWP, LLC


By: _____
        Name:
        Title:

ARCH ALUMINUM & GLASS
INTERNATIONAL, INC.


By: _____
        Name:
        Title:

**PURCHASER:**

ARCH GLASS ACQUISITION CORPORATION

By: _____
      Name: Wm. Robert Wright
      Title:  President

**ESCROW AGENT:**

JP MORGAN CHASE BANK, N.A.


By:    _____
       Name:
       Title:

## <u>Schedule I</u>

Telephone Number(s) and authorized signature(s) for
<u>Person(s) Designated to give Funds Transfer Instructions</u>

If to Purchaser:

|   | <u>Name</u> | <u>Telephone Number</u> | <u>Signature</u> |
|---|---|---|---|
| 1. | Wm. Robert Wright | (303) 449-5544 | |
| 2. | Jeffrey M. Vincent | (303) 449-0451 | |
| 3. | | | |

If to Seller:

|   | <u>Name</u> | <u>Telephone Number</u> | <u>Signature</u> |
|---|---|---|---|
| 1. | Leon Silverstein | (800) 432- 8132 | |
| 2. | Thomas Watson | (800) 432- 8132 | |
| 3. | | | |

Telephone Number(s) for Call-Backs and
<u>Person(s) Designated to Confirm Funds Transfer Instructions</u>

If to Purchaser:

|   | <u>Name</u> | <u>Telephone Number</u> |
|---|---|---|
| 1. | Wm. Robert Wright | (303) 449-5544 |
| 2. | Jeffrey M. Vincent | (303) 449-0451 |
| 3. | | |

If to Seller:

|   | <u>Name</u> | <u>Telephone Number</u> |
|---|---|---|
| 1. | Leon Silverstein | (800) 432- 8132 |
| 2. | Thomas Watson | (800) 432- 8132 |
| 3. | | |

Telephone call backs shall be made to both Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer.

**Exhibit A**

# J.P.Morgan

Based upon our current understanding of your proposed transaction, our fee proposal is as follows:

**Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Waived**
Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation.  Payable upon closing.

**Annual Administration Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$**
The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction.

**Extraordinary Services and Out-of Pocket Expenses**
Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Bank's then standard rate.   Disbursements, receipts, investments or tax reporting exceeding 25 items per year may be treated as extraordinary services thereby incurring additional charges.

**Disclosure & Assumptions**
- Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review. JPMorgan reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or conditions or other factors change from those used to set our fees.

- The escrow deposit shall be continuously invested in a JPMorgan Chase Bank money market deposit account ("MMDA") or a JPMorgan Chase Bank Cash Compensation account. MMDA and Cash Compensation Accounts have rates of compensation that may vary from time to time based upon market conditions.

- The Parties acknowledge and agree that they are permitted by U.S. law to make up to six (6) pre-authorized withdrawals or telephonic transfers from an MMDA per calendar month or statement cycle or similar period.  If the MMDA can be accessed by checks, drafts, bills of exchange, notes and other financial instruments ("Items"), then no more than three (3) of these six (6) transfers may be made by an Item.  The Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days notice prior to a withdrawal from a money market deposit account.

- Payment of the invoice is due upon receipt.

**Compliance**
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account.  We may ask for information that will enable us to meet the requirements of the Act.

EXHIBIT 2.08

Form of Independent Accounting Firm Escrow Agreement

## INDEPENDENT ACCOUNTING FIRM ESCROW AGREEMENT

THIS INDEPENDENT ACCOUNTING FIRM ESCROW AGREEMENT (this "Independent Accounting Firm Escrow Agreement") dated as of [*], 20[*] by and among AAG HOLDINGS, INC., a Florida corporation ("AAG"), ARCH ALUMINUM & GLASS CO., INC., a Florida corporation ("Arch"), ARCH ALUMINUM L.C., a Florida limited liability company ("Arch LC"), AWP, LLC, a Florida limited liability company ("AWP"), and ARCH ALUMINUM AND GLASS INTERNATIONAL, INC., a Florida corporation ("Arch International", and collectively with AAG, Arch, Arch LC and AWP, the "Sellers"), ARCH GLASS ACQUISITION CORPORATION, a Delaware corporation (the "Purchaser") and JP Morgan Chase Bank, N.A., as escrow agent (the "Escrow Agent"). Capitalized terms used but not otherwise defined in this Independent Accounting Firm Escrow Agreement shall have the meanings ascribed to such terms in the Asset Purchase Agreement (as defined below).

### RECITALS

WHEREAS, this Independent Accounting Firm Escrow Agreement is being entered into pursuant to that certain Asset Purchase Agreement (the "Asset Purchase Agreement"), dated as of December [*], 2009, by and among the Sellers and the Purchaser;

WHEREAS, in accordance with the Asset Purchase Agreement, the parties desire to establish an escrow to secure the payment of the Purchaser's Deposit pursuant to Section 2.04(c) and Section 2.08 of the Asset Purchase Agreement;

WHEREAS, the Escrow Agent is willing to act as the escrow agent under this Independent Accounting Firm Escrow Agreement to hold certain funds designated herein as the "Escrow Fund" in an escrow account (the "Escrow Account"); and

WHEREAS, pursuant to the terms of the Asset Purchase Agreement, the parties have agreed to enter into this Independent Accounting Firm Escrow Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and agreements set forth in this Independent Accounting Firm Escrow Agreement the parties hereto agree as follows:

### ARTICLE I

### ESCROW PROVISIONS

1.1    Appointment and Agreement of Escrow Agent.  The Sellers and the Purchaser hereby appoint the Escrow Agent to serve as, and the Escrow Agent hereby agrees to act as, escrow agent upon the terms and conditions of this Independent Accounting Firm Escrow Agreement.

1.2    Establishment of the Escrow Fund.

(a)    Simultaneously with the execution of this Independent Accounting Firm Escrow Agreement, the Purchaser has delivered the amount of $[*] (the "Purchaser's Deposit") to the Escrow Agent to be held in the Escrow Account (together with all interest, accretion in principal or other income or gain realized upon the amounts, the "Escrow Fund"). The Escrow Fund shall not be subject to a lien or attachment by any creditor of any party hereto and shall not be available to, and shall not be used by, the Escrow Agent to set off any obligations of any party hereto owing to the Escrow Agent in any capacity.

(b)    The Sellers and the Purchaser hereby agree that the Escrow Fund shall be initially invested in a JPMorgan Chase Bank, N.A. money market deposit account ("MMDA") or a successor or similar investment offered by the Escrow Agent, unless otherwise instructed in writing by the Sellers and the Purchaser and as shall be acceptable to the Escrow Agent. The rate of return on an MMDA varies from time to time based upon market conditions. Written investment instructions, if any, shall specify the type and identity of the investments to be purchased and/or sold. The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Sellers and the Purchaser recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Fund or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Escrow Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Parties to give the Escrow Agent instructions to invest or reinvest the Escrow Fund. The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Escrow Agreement.

(c)    During the term of this Independent Accounting Firm Escrow Agreement, the Escrow Agent shall invest and reinvest the Escrow Fund in any of the following investments, in each case at the written direction of an Authorized Person (as hereinafter defined) of both the Sellers and the Purchaser:

(i)    money market or mutual funds registered under the Investment Act of 1940;

(ii)    commercial paper (having original maturities of not more than 270 days) of any corporation, which on the date of acquisition has been rated by any nationally recognized statistical rating organization in its highest short-term unsecured debt rating category available;

(iii)    direct obligations of, or obligations fully guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States; or

(iv)    time deposits with any commercial bank that is a member of the Federal Reserve System.

(d)    The Escrow Agent shall have no obligation to invest or reinvest the Escrow Fund if deposited with the Escrow Agent after 11:00 a.m. (E.S.T.) of such day of deposit.  Instructions received after 11:00 a.m. (E.S.T.) will be treated as if received on the following Business Day.  The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the Escrow Fund.  Any interest or other income received on such investment and reinvestment of the Escrow Fund shall become part of the Escrow Fund and any losses incurred on such investment and reinvestment of the Escrow Fund shall be debited against the Escrow Fund.  If a selection is not made and a written direction not given to the Escrow Agent, the Escrow Fund shall be invested in JPMorgan Chase Bank, N.A. money market deposit account.  Notwithstanding the foregoing, the Escrow Agent shall have the power to sell or liquidate the foregoing investments whenever the Escrow Agent shall be required to release the Escrow Fund pursuant to Section 1.5 hereof.  In no event shall the Escrow Agent be deemed an investment manager or adviser in respect of any selection of investments hereunder.

1.3    Purpose of the Escrow Fund.    Subject to the terms and conditions of this Independent Accounting Firm Escrow Agreement, the Escrow Agent shall hold the Escrow Fund to secure certain payment obligations pursuant to Section 2.08 of the Asset Purchase Agreement.

1.4    Maintenance of the Escrow.

(a)    The Escrow Agent shall continue to maintain the Escrow Fund, as the case may be, until the earlier of: (i) the time at which there shall be no funds in such Escrow Fund (through any payment made pursuant to Section 1.5 hereof) and (ii) the termination of this Independent Accounting Firm Escrow Agreement.

(b)    Notwithstanding any other provision of this Independent Accounting Firm Escrow Agreement to the contrary, at any time prior to the termination of the Escrow Fund, the Escrow Agent shall, if so instructed by a Joint Notice or Final Order (each as defined below), pay from the Escrow Fund to the Sellers or the Purchaser, as directed in such Joint Notice or Final Order, the amount of cash so instructed.

1.5    Payments from the Escrow Fund.    The Escrow Agent shall hold the Escrow Fund until the Escrow Agent receives (i) joint written notice from both the Purchaser and the Sellers instructing the Escrow Agent with respect to the disbursement of the Escrow Fund in accordance with the Asset Purchase Agreement ("Joint Notice") or (ii) a final written Order of the Bankruptcy Court or other court of competent jurisdiction indicating the manner in which the funds are to be disbursed among the Purchaser and the Sellers (a "Final Order"), in which case the Escrow Agent shall disburse the Escrow Fund in accordance with the Joint Notice or Final Order.

1.6    Term of Independent Accounting Firm Escrow Agreement.    This Independent Accounting Firm Escrow Agreement shall terminate upon the distribution by the Escrow Agent of the Escrow Fund held in the Escrow Account.

1.7    Escrow Agent.

(a)    Duties. The duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth herein and no duties, responsibilities or obligations shall be inferred or implied against the Escrow Agent. The Escrow Agent shall not be subject to, nor required to comply with, any other agreement to which any of the Sellers or the Purchaser is a party, even though reference thereto may be made herein, or to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Independent Accounting Firm Escrow Agreement) from the Sellers or the Purchaser. Except as provided in this Independent Accounting Firm Escrow Agreement and except for the Escrow Agent's willful misconduct or gross negligence, the Escrow Agent shall have no liability or obligation with respect to the Escrow Fund. The Escrow Agent's sole responsibility shall be for the safekeeping, investment, and disbursement of the Escrow Fund in accordance with the terms of this Independent Accounting Firm Escrow Agreement. The Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein or in written documentation executed by the Sellers and/or the Purchaser provided to the Escrow Agent. The Escrow Agent shall not be responsible in any respect for the form, execution, validity, value or genuineness of documents or securities deposited hereunder, or for any description therein, or for the identity, authority or rights of persons executing or delivering or purporting to execute or deliver any such document, security or endorsement. The Escrow Agent shall not be called upon to advise any party as to the wisdom in selling or retaining or taking or refraining from any action with respect to any securities or other property deposited hereunder. In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Fund, or to appear in, prosecute or defend any such legal action or proceedings. The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, and shall incur no liability and shall be fully protected from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel. The Sellers, on the one hand, and Purchaser, on the other hand, shall each promptly pay, upon demand, 50% of the reasonable fees and expenses of any such counsel. All instructions to the Escrow Agent shall be in writing.

(b)    Reliance by Escrow Agent. The Escrow Agent may rely upon any order, judgment, certification, demand, notice or instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Independent Accounting Firm Escrow Agreement. The Escrow Agent may act in conclusive reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give receipt or advice to make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so. When the Escrow Agent acts on any information, instructions, communications, (including, but not limited to, communications with respect to the delivery of securities or the wire transfer of funds) sent by facsimile, the Escrow Agent shall not be responsible or liable in the event such communication is not an authorized or authentic communication of the Sellers or the Purchaser

or is not in the form the Sellers or the Purchaser sent or intended to send (whether due to fraud, distortion or otherwise).

(c)    Indemnification. From and at all times after the date of this Independent Accounting Firm Escrow Agreement, the Sellers and the Purchaser shall, jointly and severally, indemnify and hold harmless Escrow Agent and its officers, directors, employees, representatives and agents from and against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by or asserted against Escrow Agent from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Independent Accounting Firm Escrow Agreement or any transactions contemplated herein, whether or not the Escrow Agent is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; provided, however, that the Escrow Agent shall not have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of the Escrow Agent. Notwithstanding the above, the Purchaser and Sellers agree with each other to make payments among themselves so that the Purchaser bears no more than one half of any such indemnity and the Sellers bear no more than one half of any such indemnity. The obligations under this Section 1.7(c) shall survive any termination of this Independent Accounting Firm Escrow Agreement and the resignation or removal of Escrow Agent. Nothing contained in this Section 1.7 shall impair, limit, modify or affect the rights of the Sellers and the Purchaser, as between themselves.

(d)    Disputes and Conflicting Claims. In the event of any dispute between or conflicting claims between the Sellers on the one hand and the Purchaser, on the other, the Escrow Agent shall be entitled, in its sole discretion, to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Fund so long as such dispute or conflict shall continue, and the Escrow Agent shall not be or become liable in any way to the Sellers or the Purchaser for failure or refusal to comply with such conflicting claims, demands or instructions. The Escrow Agent shall be entitled to refuse to act until such conflicting or adverse claims or demands shall have been determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or settled by agreement between the conflicting parties.

(e)    Provision of Statements. The Escrow Agent shall provide to the Sellers and the Purchaser monthly statements identifying transactions, transfers or holdings of the Escrow Fund and each such statement shall be deemed to be correct and final upon receipt thereof by the Sellers and the Purchaser unless the Escrow Agent is notified in writing by the Sellers or the Purchaser to the contrary within thirty (30) Business Days of the date of such statement.

(f)    Resignation of Escrow Agent.  The Escrow Agent may resign from the performance of its duties hereunder at any time by giving twenty (20) Business Days' prior written notice to the Sellers and the Purchaser or may be removed, with or without cause, by the Sellers and the Purchaser, acting jointly, at any time by the giving of seven (7) Business Days' prior written notice to the Escrow Agent.  Such resignation or removal shall take effect upon the appointment of a successor Escrow Agent as provided herein.  Upon any such notice of resignation or removal, the Sellers and the Purchaser mutually shall agree upon and appoint a successor Escrow Agent hereunder, which shall be a commercial bank, trust company or other financial institution with a combined capital and surplus in excess of $1,000,000,000, unless waived by the Sellers and the Purchaser, which shall agree in writing to be bound by the terms of this Independent Accounting Firm Escrow Agreement.  Upon the acceptance in writing of any appointment as the Escrow Agent hereunder by a successor Escrow Agent, such successor Escrow Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Escrow Agent, and the retiring Escrow Agent shall be discharged from its duties and obligations under this Independent Accounting Firm Escrow Agreement, but shall not be discharged from any liability for actions taken as the Escrow Agent hereunder prior to such succession.  After any retiring Escrow Agent's resignation or removal, the provisions of this Independent Accounting Firm Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Escrow Agent under this Independent Accounting Firm Escrow Agreement.  If the Sellers and the Purchaser are unable to agree upon a successor escrow agent, the Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief.

(g)    Fees of Escrow Agent.  All fees and costs of the Escrow Agent, including the normal and usual costs of administering the Escrow Account shall be paid 50% by the Sellers and 50% by the Purchaser in accordance with Exhibit A, attached hereto.  In the event that the conditions of this Independent Accounting Firm Escrow Agreement are not promptly fulfilled or that the Escrow Agent renders any service hereunder not provided for herein or that there is any assignment of any interest in the subject matter of the Escrow Fund or modification hereof, the Escrow Agent shall be reasonably compensated for such extraordinary services by the party that is responsible for or requests such services.  The obligations under this Section 1.8(g) shall survive any termination of this Independent Accounting Firm Escrow Agreement and the resignation or removal of the Escrow Agent.

## ARTICLE II

## GENERAL PROVISIONS

2.1    Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 2.1):

If to the Sellers:

    Arch Aluminum & Glass Co., Inc.
    10200 N.W. 67th Street
    Tamarac, Florida 33321  USA
    Attention: Leon J. Silverstein, President
    Tel.:  (954) 724-1775
    Fax:  (954) 724-2083

    with a copy to:

    Schnader Harrison Segal & Lewis LLP
    1600 Market Street, Suite 3600
    Philadelphia, Pennsylvania 19103  USA
    Attention: Joseph J. Devine, Esq.
    Tel: (215) 751-2415
    Fax: (215) 751-2205

    with a copy to:

    Genovese Joblove & Battista P.A.
    Bank of America Tower
    100 Southeast 2nd Street, 44th Floor
    Miami, Florida  33131
    Attention: Paul J. Battista, Esq.
    Tel.: (305) 349-2300
    Fax: (305) 349-2310

if to the Purchaser:

    Arch Glass Acquisition Corporation
    1426 Pearl Street, Suite 400
    Boulder, CO
    Attention: Wm. Robert Wright
    Tel.:  (303) 449-5544
    Fax:  (303) 449-3194

    with a copy to:

    GreenbergTraurig
    1221 Brickell Avenue
    Miami, FL  33131
    Attention:  Paul J. Keenan, Jr., Esq.
    Tel.: (305) 579-0500
    Fax: (305) 579-0717

If to Escrow Agent:

> JP Morgan Chase Bank N.A.
> Escrow Services
> 4 New York Plaza, 21st Floor
> New York, NY 10004
> Attention: Ilona Kandarova/Audrey Mohan
> Tel.: (212) 623-0046
> Fax: (212) 623-6168

2.2    Parties Bound by Agreement.    The terms, conditions and obligations of this Independent Accounting Firm Escrow Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns.  Except as hereinafter provided, without the prior written consent of the other parties, no party may assign such party's rights, duties or obligations hereunder or any part thereof to any other person or entity.

2.3    Number; Gender.    Whenever the context so requires, the singular number shall include the plural and the plural shall include the singular, and the gender of any pronoun shall include the other genders.

2.4    Headings.    The headings of the Articles and Sections of this Independent Accounting Firm Escrow Agreement are inserted for convenience only and shall not be deemed to constitute part of this Independent Accounting Firm Escrow Agreement or to affect the construction hereof.

2.5    Amendment.    This Independent Accounting Firm Escrow Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Sellers, the Purchaser and the Escrow Agent or (b) by a waiver in accordance with Section 2.6.

2.6    Waiver.  Any party to this Independent Accounting Firm Escrow Agreement may (with respect to itself): (a) extend the time for the performance of any of the obligations or other acts of the other parties; (b) waive any inaccuracies in the representations and warranties of the other parties contained herein or in any document delivered by the other parties pursuant hereto; or (c) waive compliance with any of the agreements of the other parties or conditions to such other parties' obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be hound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Independent Accounting Firm Escrow Agreement.  The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

2.7    Governing Law.  This Independent Accounting Firm Escrow Agreement shall be governed by, and construed in accordance with, the Laws of the State of Florida and, to the extent applicable, the Bankruptcy Code.  The parties hereto agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Independent Accounting Firm Escrow Agreement and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have subject matter jurisdiction

over any action or proceeding arising out of or relating to this Independent Accounting Firm Escrow Agreement, then each party: (a) agrees that all such actions or proceedings shall be heard and determined in a Florida federal court sitting in The City of Miami in the County of Broward; (b) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 2.1 hereof (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Florida Law).

2.8    Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS INDEPENDENT ACCOUNTING FIRM ESCROW AGREEMENT. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS INDEPENDENT ACCOUNTING FIRM ESCROW AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2.8.

2.9    No Limitation. The parties agree that the rights and remedies of any party under this Independent Accounting Firm Escrow Agreement shall not operate to limit any other rights and remedies otherwise available to any party under the Asset Purchase Agreement or otherwise.

2.10    Severability. If any term or other provision of this Independent Accounting Firm Escrow Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Independent Accounting Firm Escrow Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Independent Accounting Firm Escrow Agreement is not affected in any manner materially adverse to either party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Independent Accounting Firm Escrow Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Independent Accounting Firm Escrow Agreement are consummated as originally contemplated to the greatest extent possible.

2.11    Exclusions. The Escrow Agent is not a party to, nor is it bound by, nor need it give consideration to the terms or provisions off, any agreement or undertaking among the undersigned or any of them, or between the undersigned or any of them and other persons, including, but not limited to, the Asset Purchase Agreement or any agreement or undertaking which may be evidenced by or disclosed by the Escrow Fund, it being the intention of the parties

that the Escrow Agent assent to and be obligated to give consideration only to the terms and provisions thereof.

2.12    Absent, of Third Parts, Beneficiary Rights.   This Independent Accounting Firm Escrow Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Independent Accounting Firm Escrow Agreement.

2.13    Tax Matters.

(a)    Each of Arch Aluminum & Glass Co. and the Purchaser shall provide the Escrow Agent with its taxpayer identification number documented by an appropriate IRS Form W-8 or W-9 upon execution of this Independent Accounting Firm Escrow Agreement.  Any payments of income pursuant to this Independent Accounting Firm Escrow Agreement shall be subject to all applicable withholding and information reporting requirements.

(b)    To the extent that any portion of the principal amount of the Escrow Fund represents part or all of the purchase price under the Asset Purchase Agreement, the Purchaser and the Sellers shall provide all information required for the Escrow Agent to perform tax reporting on IRS Form 1099-B on or prior to each distribution. Unless otherwise directed in a joint written instruction executed by the Purchaser and the Sellers, the Escrow Agent shall report to the IRS, and as appropriate withhold and remit taxes to the IRS or to any other taxing authority as required by law, based upon the information or documentation so provided and, when schedule and documentation is not properly and timely provided prior to payment of principal, to the Sellers and the Purchaser.

(c)    In addition, all interest or other income disbursed under the Escrow Agreement shall be allocated to the either the Purchaser or the Sellers, as case may be, and reported, as and to the extent required by law, by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income disbursed from the Escrow Fund.  Any other tax returns required to be filed will be prepared and filed by the Seller and/or the Purchaser with the IRS and any other taxing authority as required by law, including but not limited to any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("FIRPTA").  The Sellers and the Purchaser acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Fund or any income earned by the Escrow Fund.  The Sellers and the Purchaser further acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Escrow Fund shall be paid by the Purchaser and the Sellers.  In the absence of written direction from the Sellers and the Purchaser, all proceeds of the Escrow Fund shall be retained in the Escrow Fund and reinvested from time to time by the Escrow Agent as provided in this Escrow Agreement.  The Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities

2.14    Counterparts.  This Independent Accounting Firm Escrow Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

2.15    USA Patriot Act.  Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm the Parties identity including without limitation name, address and organizational documents ("identifying information"). The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

2.16    Authorized Persons.  In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on schedule 1 hereto ("Schedule 1"), and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  Each funds transfer instruction shall be executed by an authorized signatory, a list of such authorized signatories is set forth on Schedule 1.  The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow Agent. If the Escrow Agent is unable to contact any of the authorized representatives identified in Schedule 1, the Escrow Agent is hereby authorized to seek confirmation of such instructions by telephone call-back to any one or more of Purchaser or Seller's executive officers, ("President, CEO"), as the case may be, which shall include the titles of President and Chief Financial Officer of the Sellers and President and Vice-President of the Purchaser, as the Escrow Agent may select. Such "Executive Officer" shall deliver to the Escrow Agent a fully executed incumbency certificate, and the Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by the Purchaser or the Sellers to identify (a) the beneficiary, (b) the beneficiary's bank, or (c) an intermediary bank.  The Escrow Agent may apply any of the escrowed funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. The Parties acknowledge that these security procedures are commercially reasonable.

2.17    Compliance with Court Orders.  In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Escrow Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding

upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, entity, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

2.18   <u>Force Majeure</u>.  No party to this Escrow Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Independent Accounting Firm Escrow Agreement to be executed as of the date first above written,

**SELLERS:**

AAG HOLDINGS, INC.


By: _____
     Name:
     Title:

ARCH ALUMINUM & GLASS CO., INC.


By: _____
     Name:
     Title:

ARCH ALUMINUM L.C.


By: _____
     Name:
     Title:

AWP, LLC


By: _____
     Name:
     Title:

ARCH ALUMINUM & GLASS
INTERNATIONAL, INC.


By: _____
     Name:
     Title:

**PURCHASER:**

ARCH GLASS ACQUISITION CORPORATION

By: _____
       Name: Wm. Robert Wright
       Title:   President

**ESCROW AGENT:**

JP MORGAN CHASE BANK, N.A.

By: _____
      Name:
      Title:

## **Schedule I**

Telephone Number(s) and authorized signature(s) for
<u>Person(s) Designated to give Funds Transfer Instructions</u>

If to Purchaser:

|  | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Wm. Robert Wright | (303) 449-5544 | |
| 2. | Jeffrey M. Vincent | (303) 449-0451 | |
| 3. | | | |

If to Seller:

|  | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Leon Silverstein | (800) 432- 8132 | |
| 2. | Thomas Watson | (800) 432- 8132 | |
| 3. | | | |

Telephone Number(s) for Call-Backs and
<u>Person(s) Designated to Confirm Funds Transfer Instructions</u>

If to Purchaser:

|  | Name | Telephone Number |
|---|---|---|
| 1. | Wm. Robert Wright | (303) 449-5544 |
| 2. | Jeffrey M. Vincent | (303) 449-0451 |
| 3. | | |

If to Seller:

|  | Name | Telephone Number |
|---|---|---|
| 1. | Leon Silverstein | (800) 432- 8132 |
| 2. | Thomas Watson | (800) 432- 8132 |
| 3. | | |

Telephone call backs shall be made to both Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer.

**Exhibit A**

# J.P.Morgan



Based upon our current understanding of your proposed transaction, our fee proposal is as follows:

**Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **Waived**
Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation. Payable upon closing.

**Annual Administration Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **$**
The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction.

**Extraordinary Services and Out-of Pocket Expenses**
Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Bank's then standard rate. Disbursements, receipts, investments or tax reporting exceeding 25 items per year may be treated as extraordinary services thereby incurring additional charges.

**Disclosure & Assumptions**
• Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review. JPMorgan reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or conditions or other factors change from those used to set our fees.

• The escrow deposit shall be continuously invested in a JPMorgan Chase Bank money market deposit account ("MMDA") or a JPMorgan Chase Bank Cash Compensation account. MMDA and Cash Compensation Accounts have rates of compensation that may vary from time to time based upon market conditions.

• The Parties acknowledge and agree that they are permitted by U.S. law to make up to six (6) pre-authorized withdrawals or telephonic transfers from an MMDA per calendar month or statement cycle or similar period. If the MMDA can be accessed by checks, drafts, bills of exchange, notes and other financial instruments ("Items"), then no more than three (3) of these six (6) transfers may be made by an Item. The Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days
notice prior to a withdrawal from a money market deposit account.

• Payment of the invoice is due upon receipt.

**Compliance**
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account. We may ask for information that will enable us to meet the requirements of the Act.

<u>EXHIBIT 2.09(a)</u>

Form of Asserted Cure Costs Escrow Agreement

## ASSERTED CURE COSTS ESCROW AGREEMENT

THIS ASSERTED CURE COSTS ESCROW AGREEMENT (this "Asserted Cure Costs Escrow Agreement") dated as of [*], 20[*] by and among AAG HOLDINGS, INC., a Florida corporation ("AAG"), ARCH ALUMINUM & GLASS CO., INC., a Florida corporation ("Arch"), ARCH ALUMINUM L.C., a Florida limited liability company ("Arch LC"), AWP, LLC, a Florida limited liability company ("AWP"), and ARCH ALUMINUM AND GLASS INTERNATIONAL, INC., a Florida corporation ("Arch International", and collectively with AAG, Arch, Arch LC and AWP, the "Sellers"), ARCH GLASS ACQUISITION CORPORATION, a Delaware corporation (the "Purchaser") and JP Morgan Chase Bank, N.A., as escrow agent (the "Escrow Agent").  Capitalized terms used but not otherwise defined in this Asserted Cure Costs Escrow Agreement shall have the meanings ascribed to such terms in the Asset Purchase Agreement (as defined below).

### RECITALS

WHEREAS, this Asserted Cure Costs Escrow Agreement is being entered into pursuant to that certain Asset Purchase Agreement (the "Asset Purchase Agreement"), dated as of December [*], 2009, by and among the Sellers and the Purchaser;

WHEREAS, in accordance with the Asset Purchase Agreement, the parties desire to establish an escrow to secure the payment of the Purchaser's Deposit pursuant to Section 2.04(d) and Section 2.09 of the Asset Purchase Agreement;

WHEREAS, the Escrow Agent is willing to act as the escrow agent under this Asserted Cure Costs Escrow Agreement to hold certain funds designated herein as the "Escrow Fund" in an escrow account (the "Escrow Account"); and

WHEREAS, pursuant to the terms of the Asset Purchase Agreement, the parties have agreed to enter into this Asserted Cure Costs Escrow Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and agreements set forth in this Asserted Cure Costs Escrow Agreement the parties hereto agree as follows:

### ARTICLE I

### ESCROW PROVISIONS

1.1    Appointment and Agreement of Escrow Agent.  The Sellers and the Purchaser hereby appoint the Escrow Agent to serve as, and the Escrow Agent hereby agrees to act as, escrow agent upon the terms and conditions of this Asserted Cure Costs Escrow Agreement.

1.2    Establishment of the Escrow Fund.

(a)    Simultaneously with the execution of this Asserted Cure Costs Escrow Agreement, the Purchaser has delivered the amount of $[*] (the "Purchaser's Deposit") to the Escrow Agent to be held in the Escrow Account (together with all interest, accretion in principal or other income or gain realized upon the amounts, the "Escrow Fund"). The Escrow Fund shall not be subject to a lien or attachment by any creditor of any party hereto and shall not be available to, and shall not be used by, the Escrow Agent to set off any obligations of any party hereto owing to the Escrow Agent in any capacity.

(b)    The Sellers and the Purchaser hereby agree that the Escrow Fund shall be initially invested in a JPMorgan Chase Bank, N.A. money market deposit account ("MMDA") or a successor or similar investment offered by the Escrow Agent, unless otherwise instructed in writing by the Sellers and the Purchaser and as shall be acceptable to the Escrow Agent. The rate of return on an MMDA varies from time to time based upon market conditions. Written investment instructions, if any, shall specify the type and identity of the investments to be purchased and/or sold. The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Sellers and the Purchaser recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Fund or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Escrow Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Parties to give the Escrow Agent instructions to invest or reinvest the Escrow Fund. The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Escrow Agreement.

(c)    During the term of this Asserted Cure Costs Escrow Agreement, the Escrow Agent shall invest and reinvest the Escrow Fund in any of the following investments, in each case at the written direction of an Authorized Person (as hereinafter defined) of both the Sellers and the Purchaser:

(i)    money market or mutual funds registered under the Investment Act of 1940;

(ii)    commercial paper (having original maturities of not more than 270 days) of any corporation, which on the date of acquisition has been rated by any nationally recognized statistical rating organization in its highest short-term unsecured debt rating category available;

(iii)    direct obligations of, or obligations fully guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States; or

(iv)    time deposits with any commercial bank that is a member of the Federal Reserve System.

(d)    The Escrow Agent shall have no obligation to invest or reinvest the Escrow Fund if deposited with the Escrow Agent after 11:00 a.m. (E.S.T.) of such day of deposit. Instructions received after 11:00 a.m. (E.S.T.) will be treated as if received on the following Business Day. The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the Escrow Fund. Any interest or other income received on such investment and reinvestment of the Escrow Fund shall become part of the Escrow Fund and any losses incurred on such investment and reinvestment of the Escrow Fund shall be debited against the Escrow Fund. If a selection is not made and a written direction not given to the Escrow Agent, the Escrow Fund shall be invested in JPMorgan Chase Bank, N.A. money market deposit account. Notwithstanding the foregoing, the Escrow Agent shall have the power to sell or liquidate the foregoing investments whenever the Escrow Agent shall be required to release the Escrow Fund pursuant to Section 1.5 hereof. In no event shall the Escrow Agent be deemed an investment manager or adviser in respect of any selection of investments hereunder.

1.3    <u>Purpose of the Escrow Fund</u>. Subject to the terms and conditions of this Asserted Cure Costs Escrow Agreement, the Escrow Agent shall hold the Escrow Fund to secure certain payment obligations pursuant to Section 2.09 of the Asset Purchase Agreement.

1.4    <u>Maintenance of the Escrow</u>.

(a)    The Escrow Agent shall continue to maintain the Escrow Fund, as the case may be, until the earlier of: (i) the time at which there shall be no funds in such Escrow Fund (through any payment made pursuant to Section 1.5 hereof) and (ii) the termination of this Asserted Cure Costs Escrow Agreement.

(b)    Notwithstanding any other provision of this Asserted Cure Costs Escrow Agreement to the contrary, at any time prior to the termination of the Escrow Fund, the Escrow Agent shall, if so instructed by a Joint Notice or Final Order (each as defined below), pay from the Escrow Fund to the Sellers or the Purchaser, as directed in such Joint Notice or Final Order, the amount of cash so instructed.

1.5    <u>Payments from the Escrow Fund</u>. The Escrow Agent shall hold the Escrow Fund until the Escrow Agent receives (i) joint written notice from both the Purchaser and the Sellers instructing the Escrow Agent with respect to the disbursement of the Escrow Fund in accordance with the Asset Purchase Agreement ("<u>Joint Notice</u>") or (ii) a final written Order of the Bankruptcy Court or other court of competent jurisdiction indicating the manner in which the funds are to be disbursed among the Purchaser and the Sellers (a "<u>Final Order</u>"), in which case the Escrow Agent shall disburse the Escrow Fund in accordance with the Joint Notice or Final Order.

1.6    <u>Term of Asserted Cure Costs Escrow Agreement</u>. This Asserted Cure Costs Escrow Agreement shall terminate upon the distribution by the Escrow Agent of the Escrow Fund held in the Escrow Account.

1.7    <u>Escrow Agent</u>.

(a)    Duties.  The duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth herein and no duties, responsibilities or obligations shall be inferred or implied against the Escrow Agent.  The Escrow Agent shall not be subject to, nor required to comply with, any other agreement to which any of the Sellers or the Purchaser is a party, even though reference thereto may be made herein, or to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Asserted Cure Costs Escrow Agreement) from the Sellers or the Purchaser.  Except as provided in this Asserted Cure Costs Escrow Agreement and except for the Escrow Agent's willful misconduct or gross negligence, the Escrow Agent shall have no liability or obligation with respect to the Escrow Fund.  The Escrow Agent's sole responsibility shall be for the safekeeping, investment, and disbursement of the Escrow Fund in accordance with the terms of this Asserted Cure Costs Escrow Agreement.  The Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein or in written documentation executed by the Sellers and/or the Purchaser provided to the Escrow Agent.  The Escrow Agent shall not be responsible in any respect for the form, execution, validity, value or genuineness of documents or securities deposited hereunder, or for any description therein, or for the identity, authority or rights of persons executing or delivering or purporting to execute or deliver any such document, security or endorsement.  The Escrow Agent shall not be called upon to advise any party as to the wisdom in selling or retaining or taking or refraining from any action with respect to any securities or other property deposited hereunder.  In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Fund, or to appear in, prosecute or defend any such legal action or proceedings.  The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, and shall incur no liability and shall be fully protected from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel.  The Sellers, on the one hand, and Purchaser, on the other hand, shall each promptly pay, upon demand, 50% of the reasonable fees and expenses of any such counsel.  All instructions to the Escrow Agent shall be in writing.

(b)    Reliance by Escrow Agent.  The Escrow Agent may rely upon any order, judgment, certification, demand, notice or instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Asserted Cure Costs Escrow Agreement.  The Escrow Agent may act in conclusive reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give receipt or advice to make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.  When the Escrow Agent acts on any information, instructions, communications, (including, but not limited to, communications with respect to the delivery of securities or the wire transfer of funds) sent by facsimile, the Escrow Agent shall not be responsible or liable in the event such communication is not an authorized or authentic communication of the Sellers or the Purchaser or is not in the form

the Sellers or the Purchaser sent or intended to send (whether due to fraud, distortion or otherwise).

(c)    Indemnification.  From and at all times after the date of this Asserted Cure Costs Escrow Agreement, the Sellers and the Purchaser shall, jointly and severally, indemnify and hold harmless Escrow Agent and its officers, directors, employees, representatives and agents from and against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by or asserted against Escrow Agent from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Asserted Cure Costs Escrow Agreement or any transactions contemplated herein, whether or not the Escrow Agent is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; provided, however, that the Escrow Agent shall not have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of the Escrow Agent.  Notwithstanding the above, the Purchaser and Sellers agree with each other to make payments among themselves so that the Purchaser bears no more than one half of any such indemnity and the Sellers bear no more than one half of any such indemnity.  The obligations under this Section 1.7(c) shall survive any termination of this Asserted Cure Costs Escrow Agreement and the resignation or removal of Escrow Agent.  Nothing contained in this Section 1.7 shall impair, limit, modify or affect the rights of the Sellers and the Purchaser, as between themselves.

(d)    Disputes and Conflicting Claims.  In the event of any dispute between or conflicting claims between the Sellers on the one hand and the Purchaser, on the other, the Escrow Agent shall be entitled, in its sole discretion, to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Fund so long as such dispute or conflict shall continue, and the Escrow Agent shall not be or become liable in any way to the Sellers or the Purchaser for failure or refusal to comply with such conflicting claims, demands or instructions. The Escrow Agent shall be entitled to refuse to act until such conflicting or adverse claims or demands shall have been determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or settled by agreement between the conflicting parties.

(e)    Provision of Statements.  The Escrow Agent shall provide to the Sellers and the Purchaser monthly statements identifying transactions, transfers or holdings of the Escrow Fund and each such statement shall be deemed to be correct and final upon receipt thereof by the Sellers and the Purchaser unless the Escrow Agent is notified in writing by the Sellers or the Purchaser to the contrary within thirty (30) Business Days of the date of such statement.

(f)    <u>Resignation of Escrow Agent</u>.  The Escrow Agent may resign from the performance of its duties hereunder at any time by giving twenty (20) Business Days' prior written notice to the Sellers and the Purchaser or may be removed, with or without cause, by the Sellers and the Purchaser, acting jointly, at any time by the giving of seven (7) Business Days' prior written notice to the Escrow Agent.  Such resignation or removal shall take effect upon the appointment of a successor Escrow Agent as provided herein.   Upon any such notice of resignation or removal, the Sellers and the Purchaser mutually shall agree upon and appoint a successor Escrow Agent hereunder, which shall be a commercial bank, trust company or other financial institution with a combined capital and surplus in excess of $1,000,000,000, unless waived by the Sellers and the Purchaser, which shall agree in writing to be bound by the terms of this Asserted Cure Costs Escrow Agreement.   Upon the acceptance in writing of any appointment as the Escrow Agent hereunder by a successor Escrow Agent, such successor Escrow Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Escrow Agent, and the retiring Escrow Agent shall be discharged from its duties and obligations under this Asserted Cure Costs Escrow Agreement, but shall not be discharged from any liability for actions taken as the Escrow Agent hereunder prior to such succession.   After any retiring Escrow Agent's resignation or removal, the provisions of this Asserted Cure Costs Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Escrow Agent under this Asserted Cure Costs Escrow Agreement.  If the Sellers and the Purchaser are unable to agree upon a successor escrow agent, the Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief.

(g)    <u>Fees of Escrow Agent</u>.  All fees and costs of the Escrow Agent, including the normal and usual costs of administering the Escrow Account shall be paid 50% by the Sellers and 50% by the Purchaser in accordance with <u>Exhibit A</u>, attached hereto.  In the event that the conditions of this Asserted Cure Costs Escrow Agreement are not promptly fulfilled or that the Escrow Agent renders any service hereunder not provided for herein or that there is any assignment of any interest in the subject matter of the Escrow Fund or modification hereof, the Escrow Agent shall be reasonably compensated for such extraordinary services by the party that is responsible for or requests such services.  The obligations under this Section 1.8(g) shall survive any termination of this Asserted Cure Costs Escrow Agreement and the resignation or removal of the Escrow Agent.

## ARTICLE II

## GENERAL PROVISIONS

2.1    <u>Notices</u>.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 2.1):

If to the Sellers:

    Arch Aluminum & Glass Co., Inc.
    10200 N.W. 67th Street
    Tamarac, Florida 33321  USA
    Attention: Leon J. Silverstein, President
    Tel.:  (954) 724-1775
    Fax:  (954) 724-2083

    with a copy to:

    Schnader Harrison Segal & Lewis LLP
    1600 Market Street, Suite 3600
    Philadelphia, Pennsylvania 19103  USA
    Attention: Joseph J. Devine, Esq.
    Tel: (215) 751-2415
    Fax: (215) 751-2205

    with a copy to:

    Genovese Joblove & Battista P.A.
    Bank of America Tower
    100 Southeast 2nd Street, 44th Floor
    Miami, Florida  33131
    Attention: Paul J. Battista, Esq.
    Tel.: (305) 349-2300
    Fax: (305) 349-2310

if to the Purchaser:

    Arch Glass Acquisition Corporation
    1426 Pearl Street, Suite 400
    Boulder, CO
    Attention: Wm. Robert Wright
    Tel.:  (303) 449-5544
    Fax:  (303) 449-3194

    with a copy to:

    GreenbergTraurig
    1221 Brickell Avenue
    Miami, FL  33131
    Attention:  Paul J. Keenan, Jr., Esq.
    Tel.:  (305) 579-0500
    Fax:  (305) 579-0717

If to Escrow Agent:

    JP Morgan Chase Bank N.A.
    Escrow Services
    4 New York Plaza, 21st Floor
    New York, NY  10004
    Attention: Ilona Kandarova/Audrey Mohan
    Tel.: (212) 623-0046
    Fax: (212) 623-6168

    2.2   <u>Parties Bound by Agreement</u>.  The terms, conditions and obligations of this Asserted Cure Costs Escrow Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns.  Except as hereinafter provided, without the prior written consent of the other parties, no party may assign such party's rights, duties or obligations hereunder or any part thereof to any other person or entity.

    2.3   <u>Number; Gender</u>.  Whenever the context so requires, the singular number shall include the plural and the plural shall include the singular, and the gender of any pronoun shall include the other genders.

    2.4   <u>Headings</u>.  The headings of the Articles and Sections of this Asserted Cure Costs Escrow Agreement are inserted for convenience only and shall not be deemed to constitute part of this Asserted Cure Costs Escrow Agreement or to affect the construction hereof.

    2.5   <u>Amendment</u>.  This Asserted Cure Costs Escrow Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Sellers, the Purchaser and the Escrow Agent or (b) by a waiver in accordance with Section 2.6.

    2.6   <u>Waiver</u>.  Any party to this Asserted Cure Costs Escrow Agreement may (with respect to itself): (a) extend the time for the performance of any of the obligations or other acts of the other parties; (b) waive any inaccuracies in the representations and warranties of the other parties contained herein or in any document delivered by the other parties pursuant hereto; or (c) waive compliance with any of the agreements of the other parties or conditions to such other parties' obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be hound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Asserted Cure Costs Escrow Agreement.  The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

    2.7   <u>Governing Law</u>.  This Asserted Cure Costs Escrow Agreement shall be governed by, and construed in accordance with, the Laws of the State of Florida and, to the extent applicable, the Bankruptcy Code.  The parties hereto agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Asserted Cure Costs Escrow Agreement and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Asserted Cure Costs Escrow Agreement, then each

party: (a) agrees that all such actions or proceedings shall be heard and determined in a Florida federal court sitting in The City of Miami in the County of Broward; (b) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 2.1 hereof (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Florida Law).

2.8    <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS ASSERTED CURE COSTS ESCROW AGREEMENT. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS ASSERTED CURE COSTS ESCROW AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2.8.

2.9    <u>No Limitation</u>. The parties agree that the rights and remedies of any party under this Asserted Cure Costs Escrow Agreement shall not operate to limit any other rights and remedies otherwise available to any party under the Asset Purchase Agreement or otherwise.

2.10    <u>Severability</u>. If any term or other provision of this Asserted Cure Costs Escrow Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Asserted Cure Costs Escrow Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Asserted Cure Costs Escrow Agreement is not affected in any manner materially adverse to either party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Asserted Cure Costs Escrow Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Asserted Cure Costs Escrow Agreement are consummated as originally contemplated to the greatest extent possible.

2.11    <u>Exclusions</u>. The Escrow Agent is not a party to, nor is it bound by, nor need it give consideration to the terms or provisions off, any agreement or undertaking among the undersigned or any of them, or between the undersigned or any of them and other persons, including, but not limited to, the Asset Purchase Agreement or any agreement or undertaking which may be evidenced by or disclosed by the Escrow Fund, it being the intention of the parties that the Escrow Agent assent to and be obligated to give consideration only to the terms and provisions thereof.

2.12    Absent, of Third Parts, Beneficiary Rights.  This Asserted Cure Costs Escrow Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Asserted Cure Costs Escrow Agreement.

2.13    Tax Matters.

(a)    Each of Arch Aluminum & Glass Co. and the Purchaser shall provide the Escrow Agent with its taxpayer identification number documented by an appropriate IRS Form W-8 or W-9 upon execution of this Asserted Cure Costs Escrow Agreement.  Any payments of income pursuant to this Asserted Cure Costs Escrow Agreement shall be subject to all applicable withholding and information reporting requirements.

(b)    To the extent that any portion of the principal amount of the Escrow Fund represents part or all of the purchase price under the Asset Purchase Agreement, the Purchaser and the Sellers shall provide all information required for the Escrow Agent to perform tax reporting on IRS Form 1099-B on or prior to each distribution.  Unless otherwise directed in a joint written instruction executed by the Purchaser and the Sellers, the Escrow Agent shall report to the IRS, and as appropriate withhold and remit taxes to the IRS or to any other taxing authority as required by law, based upon the information or documentation so provided and, when schedule and documentation is not properly and timely provided prior to payment of principal, to the Sellers and the Purchaser.

(c)    In addition, all interest or other income disbursed under the Escrow Agreement shall be allocated to the either the Purchaser or the Sellers, as case may be, and reported, as and to the extent required by law, by the Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income disbursed from the Escrow Fund.  Any other tax returns required to be filed will be prepared and filed by the Seller and/or the Purchaser with the IRS and any other taxing authority as required by law, including but not limited to any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("FIRPTA").  The Sellers and the Purchaser acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Fund or any income earned by the Escrow Fund.   The Sellers and the Purchaser further acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Escrow Fund shall be paid by the Purchaser and the Sellers.  In the absence of written direction from the Sellers and the Purchaser, all proceeds of the Escrow Fund shall be retained in the Escrow Fund and reinvested from time to time by the Escrow Agent as provided in this Escrow Agreement.  The Escrow Agent shall withhold any taxes it deems appropriate, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities

2.14    Counterparts. This Asserted Cure Costs Escrow Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different

parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

2.15    <u>USA Patriot Act</u>.  Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("<u>USA PATRIOT Act</u>") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm the Parties identity including without limitation name, address and organizational documents ("<u>identifying information</u>"). The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

2.16    <u>Authorized Persons</u>.  In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on schedule 1 hereto ("<u>Schedule 1</u>"), and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  Each funds transfer instruction shall be executed by an authorized signatory, a list of such authorized signatories is set forth on Schedule 1.  The persons and telephone numbers for call-backs may be changed only in a writing actually received and acknowledged by the Escrow Agent. If the Escrow Agent is unable to contact any of the authorized representatives identified in Schedule 1, the Escrow Agent is hereby authorized to seek confirmation of such instructions by telephone call-back to any one or more of Purchaser or Seller's executive officers, ("<u>President, CEO</u>"), as the case may be, which shall include the titles of President and Chief Financial Officer of the Sellers and President and Vice-President of the Purchaser, as the Escrow Agent may select. Such "Executive Officer" shall deliver to the Escrow Agent a fully executed incumbency certificate, and the Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by the Purchaser or the Sellers to identify (a) the beneficiary, (b) the beneficiary's bank, or (c) an intermediary bank.  The Escrow Agent may apply any of the escrowed funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. The Parties acknowledge that these security procedures are commercially reasonable.

2.17    <u>Compliance with Court Orders</u>.  In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Escrow Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or

to any other person, entity, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

2.18    <u>Force Majeure</u>.  No party to this Escrow Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Asserted Cure Costs Escrow Agreement to be executed as of the date first above written,

**SELLERS:**

AAG HOLDINGS, INC.


By: _____
     Name:
     Title:

ARCH ALUMINUM & GLASS CO., INC.


By: _____
     Name:
     Title:

ARCH ALUMINUM L.C.


By: _____
     Name:
     Title:

AWP, LLC


By: _____
     Name:
     Title:

ARCH ALUMINUM & GLASS INTERNATIONAL, INC.


By: _____
     Name:
     Title:

*[Signature Page to Asserted Cure Costs Escrow Agreement]*

**PURCHASER:**

ARCH GLASS ACQUISITION CORPORATION

By: _____

       Name: Wm. Robert Wright
       Title:   President

**ESCROW AGENT:**

JP MORGAN CHASE BANK, N.A.

By: _____

      Name:
      Title:

## **Schedule I**

Telephone Number(s) and authorized signature(s) for
Person(s) Designated to give Funds Transfer Instructions

If to Purchaser:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Wm. Robert Wright | (303) 449-5544 | |
| 2. | Jeffrey M. Vincent | (303) 449-0451 | |
| 3. | | | |

If to Seller:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Leon Silverstein | (800) 432- 8132 | |
| 2. | Thomas Watson | (800) 432- 8132 | |
| 3. | | | |

Telephone Number(s) for Call-Backs and
Person(s) Designated to Confirm Funds Transfer Instructions

If to Purchaser:

| | Name | Telephone Number |
|---|---|---|
| 1. | Wm. Robert Wright | (303) 449-5544 |
| 2. | Jeffrey M. Vincent | (303) 449-0451 |
| 3. | | |

If to Seller:

| | Name | Telephone Number |
|---|---|---|
| 1. | Leon Silverstein | (800) 432- 8132 |
| 2. | Thomas Watson | (800) 432- 8132 |
| 3. | | |

Telephone call backs shall be made to both Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer.

<u>**Exhibit A**</u>

# J.P.Morgan

███████████████████████████████████████████

Based upon our current understanding of your proposed transaction, our fee proposal is as follows:

**Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     **Waived**
Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation.  Payable upon closing.

**Annual Administration Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . .     **$**
The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction.

**Extraordinary Services and Out-of Pocket Expenses**
Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Bank's then standard rate.  Disbursements, receipts, investments or tax reporting exceeding 25 items per year may be treated as extraordinary services thereby incurring additional charges.

**Disclosure & Assumptions**
- Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review. JPMorgan reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or conditions or other factors change from those used to set our fees.

- The escrow deposit shall be continuously invested in a JPMorgan Chase Bank money market deposit account ("MMDA") or a JPMorgan Chase Bank Cash Compensation account. MMDA and Cash Compensation Accounts have rates of compensation that may vary from time to time based upon market conditions.

- The Parties acknowledge and agree that they are permitted by U.S. law to make up to six (6) pre-authorized withdrawals or telephonic transfers from an MMDA per calendar month or statement cycle or similar period.  If the MMDA can be accessed by checks, drafts, bills of exchange, notes and other financial instruments ("Items"), then no more than three (3) of these six (6) transfers may be made by an Item.  The Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days notice prior to a withdrawal from a money market deposit account.

- Payment of the invoice is due upon receipt.

**Compliance**
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account.  We may ask for information that will enable us to meet the requirements of the Act.

2

EXHIBIT 7.02(m)

General Release of Claims Agreement

GENERAL RELEASE OF CLAIMS AGREEMENT

This **GENERAL RELEASE OF CLAIMS AGREEMENT** (the "Release") is executed as of the [*] day of [*], 2010, by AAG HOLDINGS, INC., a Florida corporation ("AAG"), ARCH ALUMINUM & GLASS CO., INC., a Florida corporation, ARCH ALUMINUM L.C., a Florida limited liability company ("Arch LC"), AWP, LLC, a Florida limited liability company, and ARCH ALUMINUM AND GLASS INTERNATIONAL, INC., a Florida corporation (each a "Seller" and collectively, the "Sellers"), in favor of Arch Glass Acquisition Corporation, a Delaware corporation (the "Purchaser") and Arch Canada, ULC, an Alberta unlimited liability corporation ("Arch Canada").

W I T N E S S E T H

**WHEREAS**, the Sellers and the Purchaser have entered into that certain Asset Purchase Agreement dated as of December ___, 2009 (the "Asset Purchase Agreement");

**WHEREAS**, pursuant to Section 7.02[(n)] of the Asset Purchase Agreement, the execution and delivery by each of the Sellers of this Release is a condition precedent to the consummation of the transactions contemplated by the Asset Purchase Agreement;

**WHEREAS**, each of the Sellers has made an independent and informed decision that the transactions contemplated by this Release are in its best interests; and

**WHEREAS**, capitalized terms used herein and not defined have the meanings given them in the Asset Purchase Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants between the parties, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned agrees as follows:

1. **Release**.  In order to induce the Purchaser to enter into the Asset Purchase Agreement and to consummate the transactions contemplated thereby, effective as of the Closing Date, each of the undersigned Sellers hereby remises, releases and forever discharges, and by these presents do for their respective subsidiaries (direct or indirect), and for themselves and their predecessors, successors, affiliates and assigns (each, a "Releasor"), remise, release and forever discharge, the Purchaser, Arch Canada, and each of their respective predecessors, Affiliates, subsidiaries (direct or indirect), successors, assigns, participants, officers, directors, shareholders, partners, employees or agents (each, a "Released Party"), of and from all manner of claims or actions at law or equity, all causes of action for damages, costs, debts, sums of money, accounts, bills, rights of indemnity, breach of contract, provision of labor or materials, loss of use, loss of services, expenses, compensation, consequential or punitive damages, equitable subordination, avoidance of preferential or fraudulent transfers, or any other liability or thing whatever, whether or not now known, claimed or suspected, which any Releasor ever had or now has against any of the Released Parties and which may have arisen prior to the Closing Date or by virtue of actions taken, actions omitted to be taken or the occurrence of any other event prior to the Closing Date; provided however, that nothing herein shall be construed or deemed to release the Purchaser from any covenants, obligations or agreements contained

in the Asset Purchase Agreement, in any Ancillary Agreement, or in the Transaction Approval Order, so long as this Agreement, the Ancillary Agreements and the Transaction Approval Order shall remain in full force and effect (collectively, "Causes of Action").

2. **No Assignment of Claims**. The Releasor hereby represents to the Released Parties that such Releasor (a) has not assigned any Causes of Action or possible Causes of Action against any Released Party, (b) fully intends to release all Causes of Action against the Released Parties including, without limitation, unknown and contingent Causes of Action, and (c) has consulted with counsel with respect to the execution and delivery of this Release and has been fully apprised of the consequences hereof.

3. **Covenant Not to Sue.** The Releasor covenants and agrees not to institute any litigation, lawsuit, claim or action against any of the Released Parties with respect to the released Causes of Action.

4. **Adequacy of Information.** The Releasor hereby represents and warrants that he has access to adequate information regarding the terms of the Asset Purchase Agreement and each other document and agreement to which the Releasor is a party in connection with the transactions contemplated by the Asset Purchase Agreement, the scope and effect of the general release set forth herein, and all other matters encompassed by this Release, to make an informed and knowledgeable decision with regard to entering into this Release.

5. **Sufficiency of Consideration.** The Releasor acknowledges and agrees that the obligations of the Released Parties pursuant to the Asset Purchase Agreement and the covenants contained therein provide good and sufficient consideration for every promise, duty, release, obligation, agreement and right contained in this Release.

6. **Law Governing; Dispute Resolution.** This Release, and all claims and disputes arising in connection with this Release, or the negotiation, breach, termination, performance or validity hereof or the transactions contemplated hereby, shall be governed by and construed in accordance with the laws of the State of Florida, without giving effect to the conflicts of laws principles thereof. Any claim or dispute arising out of or relating to this Release, or the negotiation, breach, termination, performance or validity hereof or the transactions contemplated hereby, shall be resolved solely and exclusively in accordance with the terms of the Asset Purchase Agreement.

7. **Interpretation.** Each party has been represented by counsel in connection with this Release and each provision of this Release shall be interpreted and construed as if it were equally and jointly drafted by the parties hereto.

8. **Entire Agreement.** This Release and the Asset Purchase Agreement contains the entire understanding and agreement between and among the parties with respect to the subject matter hereof. No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party with respect to the subject matter of this Release. All prior or contemporaneous conversations, negotiations, proposed agreements and agreements, or representations, covenants and warranties with respect to

PHDATA 3251561_3

the subject matter hereof are merged herein, waived, superseded and replaced in total by this Release.

3

**IN WITNESS WHEREOF**, each of the undersigned have caused this Release to be duly executed as of the date first written above.

**SELLERS/RELEASORS:**

**AAG HOLDINGS, INC.**

By: _____
    Name:
    Title:

**ARCH ALUMINUM & GLASS CO., INC.**

By: _____
    Name:
    Title:

**ARCH ALUMINUM L.C**

By: _____
    Name:
    Title:

**AWP, LLC**

By: _____
    Name:
    Title:

**ARCH ALUMINUM & GLASS INTERNATIONAL, INC.**

By: _____
    Name:
    Title: