

**ORDERED in the Southern District of Florida on December 22, 2009.**

**John K. Olson, Judge**
**United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

ARCH ALUMINUM
& GLASS CO, INC., et al.[1].

_____/

Case No. 09-36232-BKC-JKO

Chapter 11
(Jointly Administered)

**ORDER GRANTING CERTAIN RELIEF REQUESTED IN DEBTORS' MOTION FOR ENTRY OF ORDERS PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, AND 6006 (A) APPROVING ASSET PURCHASE AGREEMENT WITH ARCH GLASS ACQUISITION CORPORATION, AN AFFILIATE OF GREY MOUNTAIN PARTNERS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO ASSET PURCHASE AGREEMENT WITH ARCH GLASS ACQUISITION CORPORATION,  (C) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (D) AUTHORIZING THE DEBTORS TO PROVIDE CERTAIN STALKING HORSE BID PROTECTIONS; (E) SCHEDULING A HEARING TO CONSIDER THE APPROVAL OF AND APPROVING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AT THE SALE HEARING, (G) APPROVING THE FORM AND MANNER OF**

---

[1]      The jointly administered debtors are: Arch Aluminum & Glass Co., Inc; AAG Holdings, Inc.; Arch Aluminum and Glass International, Inc.; Arch Aluminum, L.C.; and AWP, LLC.

**NOTICE IN CONNECTION THEREWITH
AND (H) GRANTING RELATED RELIEF**

THIS MATTER came before the Court on December 17, 2009 at 9:30 a.m. upon the motion (the "Motion")[2] [D.E. #29] of Arch Aluminum & Glass Co., Inc. ("Arch Aluminum") and four (4) of its subsidiaries and affiliates, as jointly administered debtors and debtors-in-possession in the above captioned cases (collectively, the "Debtors" or the "Company"), seeking an order pursuant to §§ 105, 363, and 365 of Title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) approving that certain Asset Purchase Agreement, dated December 2, 2009, by and among the Debtors, as sellers, and Arch Glass Acquisition Corporation, as buyer (the "Stalking Horse Bidder"), for the purchase and sale of the Purchased Assets (as defined below) (the "Purchase Agreement"), which Purchase Agreement is attached to the Motion as Exhibit A, (b) authorizing the Debtors to execute and deliver the Purchase Agreement, (c) establishing bidding procedures for the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and interests pursuant to Section 363(f) of the Bankruptcy Code, (d) authorizing the Debtors to provide certain "stalking horse" bid protections to the Stalking Horse Bidder, (e) scheduling a hearing to consider approval of, and approving, the sale of the Purchased Assets pursuant to Sections 363 and 365 of the Bankruptcy Code free and clear of all liens, claims, encumbrances and interests pursuant to the Purchase Agreement to the Stalking Horse Bidder or the highest and best bidder, if applicable, at an Auction, (f) authorizing the Debtors' assumption and assignment of certain executory contracts and unexpired leases in

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Motion and all Exhibits thereto.

connection therewith, (g) approving the form and manner of notice thereof and (h) granting related relief.

The Court, having determined at the hearing held on December 17, 2009 (the "Hearing") that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties-in-interest;

And upon the record of the Hearing; and the Court having considered all of the evidence presented, testimony proffered, and arguments of counsel made at the Hearing, including in respect of the resolution of any objections to the relief requested in the Motion and modifications to the Break Up Fee and Expense Reimbursement provisions; and after due deliberation thereon, and good cause appearing therefore, it is hereby

FOUND AND DETERMINED THAT:[3]

A.      This Court has jurisdiction over this matter and over the property of the Debtors pursuant to 28 U.S.C. §§ 157(a) and 1334, and venue is proper in this district pursuant to 28 U.S.C. § 1408;

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b);

C.      Good and sufficient notice of the relief sought in the Motion has been given in accordance with Bankruptcy Rule 2002, and no other or further notice is or shall be required.  At the hearing, the Committee appeared through prospective counsel who was heard by the Court. A reasonable opportunity to object or be heard regarding the relief requested in the Motion (including, without limitation, with respect to the proposed Bidding Procedures, the Break Up Fee, the Expense Reimbursement and the other relief sought by the Motion) has been afforded to all parties-in-interest;

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, as applicable, in accordance with Bankruptcy Rule 7052.

D.      The (i) Bidding Procedures, (ii) proposed Sale Notice, and (iii) proposed notice and procedures with respect to the Debtors' assumption and assignment to the Successful Bidder of the Designated Agreements, as described or referred to in the Purchase Agreement, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof;

E.      The Bidding Procedures annexed hereto as <u>Exhibit 1</u> are fair, reasonable, and appropriate and are designed to maximize the recovery on the Debtors' assets;

F.      The Debtors have demonstrated a sound business justification for authorizing the payment of the Break Up Fee and the Expense Reimbursement (each as modified herein) to the Stalking Horse Bidder under the circumstances, timing, and procedures set forth in the Motion. The Break Up Fee and the Expense Reimbursement, as well as the modification thereto set forth herein, were negotiated by the parties in good faith and at arms' length and payment of the Break Up Fee and the Expense Reimbursement, in accordance with the terms set forth in the Purchase Agreement, as modified herein, is fair and reasonable;

G.      The Debtors' payment of the Break Up Fee and Expense Reimbursement, as modified, to the Stalking Horse Bidder, in accordance with the terms set forth in the Purchase Agreement, as modified herein, is (i) of substantial benefit to the Debtors' estates, (ii) reasonable and appropriate, including in light of the size and nature of the sale and the efforts that have been and will be expanded by the Stalking Horse Bidder notwithstanding that the proposed sale is subject to higher or better offers, and (iii) necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed acquisition of the Purchased Assets;

H.      The Debtors agreed to pay the Break Up Fee and the Expense Reimbursement, in accordance with the terms and conditions set forth in the Purchase Agreement, as modified

herein, in order to induce the Stalking Horse Bidder to hold open its offer to enter into the Purchase Agreement and purchase the Purchased Assets.  The Stalking Horse Bidder is unwilling to hold open its offer to purchase the Purchased Assets in accordance with the Purchase Agreement, unless it is assured payment of the Break Up Fee and Expense Reimbursement in accordance with the conditions set forth in the Purchase Agreement, as modified herein.  Such assurance to the Stalking Horse Bidder has had the effect of promoting and not chilling competitive bidding, including the Stalking Horse Bidder's bid that otherwise would not have been made, and without which bidding would have been and would continue to be limited.  Further, assuring the Stalking Horse Bidder that it will receive the Break Up Fee and Expense Reimbursement, as modified herein, if certain conditions set forth in the Purchase Agreement are met has induced the Stalking Horse Bidder to research the Debtors' businesses and submit a bid which will serve as a minimum floor bid for all of the Purchased Assets on which all other bidders may rely, thus increasing the likelihood of receiving the maximum value of the Purchased Assets;

I.      Absent authorization of the payment of the Break Up Fee and the Expense Reimbursement in accordance with the terms of the Purchase Agreement, as modified herein, the Debtors may be unable to maximize the value of the Purchased Assets.  In light of the benefits to the Debtors' estates realized by having a fully negotiated Purchase Agreement, the expense and risk incurred by the Stalking Horse Bidder in reaching such Purchase Agreement, and the size of the Break Up Fee and Expense Reimbursement, as modified herein, in relation to the value of the transaction, ample support exists for this Court to authorize the Debtors to pay the Break Up Fee and Expense Reimbursement, as modified herein;

J.      The Debtors' believe the pre-petition marketing efforts and process as described in the Motion and at the Hearing was and is fair and reasonable, and fully exposed the Debtors' assets to the market.  The Committee has yet to review the thoroughness and completeness of the Debtors' marketing efforts in connection with the sale process and therefore reserves any and all rights it has to either support or object to the sale.  Notwithstanding the Committee's reservation of rights, the expedited timeline for the auction and sale process set forth in the Bidding Procedures appears to be reasonable and justified by the circumstances of these chapter 11 cases.

K.      The entry of this Order is in the best interests of the Debtors, each of their respective estates, creditors, and all other parties-in-interest.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

## General Provisions

1.      The findings and conclusions set forth above constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

2.      The relief requested in the Motion is granted as modified herein.

3.      The Objection to the Motion filed by the Office of the United States Trustee [D.E. #106] is resolved as set forth herein.  All other objections to entry of this Bidding Procedures Order or to the relief provided herein and in the Motion that have not been withdrawn, waived, resolved or settled, and all reservations of rights included therein, are hereby overruled in all respects on the merits.

## Approval of the Purchase Agreement

4.     The Purchase Agreement, as modified on the record at the Hearing and in this Order, is hereby approved in its entirety.[4]

5.     The Debtors are hereby authorized to execute and deliver the Purchase Agreement, as modified, and the Debtors' execution of the Purchase Agreement is hereby ratified.

## Bidding Procedures

6.     The Bidding Procedures annexed hereto as <u>Exhibit 1</u> and incorporated into this Bidding Procedures Order are hereby approved.  The Debtors are authorized and directed to act in accordance with the Bidding Procedures, which shall be binding upon all parties-in-interest in these cases.

7.     Any Qualified Bidder desiring to submit a Bid for all or substantially all of the Purchased Assets shall submit it in accordance with the Bidding Procedures so that it is received not later than **5:00 p.m., Eastern Time, on January 8, 2010** (the "<u>Bid Deadline</u>").

8.     The Auction, if necessary, shall be held on **January 13, 2010, commencing at 10:00 a.m. Eastern Time** at the offices of Genovese Joblove & Battista, P.A. at 100 S.E. 2nd Street, Suite 4400, Miami, Florida 33131, in accordance with the Bidding Procedures.

9.     In the event the Stalking Horse Bidder is not the Successful Bidder, the Debtors shall be authorized to pay to the Stalking Horse Bidder in accordance with the terms and conditions set forth in the Purchase Agreement as modified below, (i) a fee of 1.5% of the cash portion of the Purchase Price (the "<u>Break Up Fee</u>") plus (b) reimbursement for reasonable fees and expenses up to $800,000, incurred by the Stalking Horse Bidder (the amount of such reasonable fees and expenses, if requested by the Debtors, the Committee or the Senior Lenders,

---

[4] If there are any inconsistencies between the Purchase Agreement and the Ancillary Agreements (as defined in the Purchase Agreement), then the terms of the Purchase Agreement shall control.

shall be determined by the Bankruptcy Court upon motion and a hearing in advance of the Auction) (the "Expense Reimbursement")[5].  Notwithstanding anything herein or in the Purchase Agreement to the contrary, the payment of the modified Break Up Fee and Expense Reimbursement through a "carve out" from the collateral securing the obligations owed to the Senior Lenders under the Prepetition Credit Agreement, as defined in the Purchase Agreement, shall be subject to and conditioned upon the approval of the Senior Lenders.  Notwithstanding Section 5.02 of the Purchase Agreement, the Stalking Horse Bidder's right to terminate the Purchase Agreement for the failure of the Senior Lenders to approve payment of the Break Up Fee and Expense Reimbursement as a carve-out from the collateral securing the obligations owed to the Senior Lenders shall be extended to 5:00 p.m. on December 30, 2009.

10.    In addition, for avoidance of doubt, consummation of a sale to any holder of a secured claim against any of the Purchased Assets pursuant to a credit bid under 11 U.S.C. § 363(k) shall be included in the definition of Alternate Transaction for purposes of establishing the payment of the Break Up Fee and Expense Reimbursement, as modified herein, pursuant to a carve-out to be (but not yet) obtained from the collateral securing the obligations owed to the Secured Lenders.

### Sale Hearing

11.    The Sale Hearing shall be held before this Court on January 14, 2010 at 9:30 a.m. (Eastern Time), United States Bankruptcy Court, 299 East Broward Blvd., Room 301, Ft. Lauderdale, FL 33301.  The Sale Hearing may be adjourned or rescheduled without notice other

---

5  The modified Break Up Fee and Expense Reimbursement amounts set forth herein as well as the Overbid protections were reduced from those amounts originally sought in the Motion.  In addition, any amounts payable for the Break Up Fee and Expense Reimbursement are to be carve outs from the Senior Lenders' collateral and are not payable from the Debtors' estates.

than by an announcement of such adjournment at the Sale Hearing. The Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale.

## Objections

12.     Objections, if any, to the Sale, including objections with respect to the Cure Costs, if any, and adequate assurance of future performance of obligations to counterparties to executory contracts and unexpired leases to be assumed and assigned to the Successful Bidder must (a) be in writing; (b) set forth the nature of the objector's claims against or interest in the Debtors' estates, and the basis for the objection and the specific grounds therefore; (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Florida and all Orders of this Court; (d) be filed with the Court and served upon the Debtors, the Successful Bidder, the Committee, the United States Trustee for the Southern District of Florida and counsel to the Agent, so as to be RECEIVED no later than 12:00 pm (Eastern) one (1) business day prior to the Sale Hearing (the "Objection Deadline"). Only timely filed and served responses, objections, or other pleadings will be considered by this Court at the Sale Hearing. The failure of any person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Sale or the consummation and performance of the Agreement.

## Notice

13.     The Sale Notice is hereby approved in all respects.

14.     Notice of the Bidding Procedures, the Auction, the Sale Hearing and the remainder of the relief requested in the Motion, as described in the Motion, shall be good and sufficient notice thereof, and any requirements for other or further notice shall be waived and dispensed with pursuant to Bankruptcy Rules 2002, 6004, 6006 and 9007 and pursuant to this

Court's powers under section 105 of the Bankruptcy Code.  On or before December 23, 2009, the Debtors shall serve the Sale Notice annexed as Exhibit B to the Motion upon (i) the Office of the United States Trustee for the Southern District of Florida; (ii) counsel to the Stalking Horse Bidder; (iii) the holders of the 20 largest unsecured claims against the Debtor Arch Aluminum & Glass Co., Inc. and the holders of the 20 largest unsecured claims against the Debtor AWP, LLC, as identified in the Debtors' Chapter 11 petitions; (iv) counsel to the Committee; (v) counsel to the Agent; (vi) the Notice Parties; (vii) any party that, in the past year, expressed in writing to the Debtors an interest in acquiring the Purchased Assets, directly or through a merger or alliance; (viii) all parties who are known to assert Claims upon the Purchased Assets; (ix) the U.S. Treasury; (x) the Securities and Exchange Commission; (xi) the Internal Revenue Service; (xii) all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities; (xiii) all applicable state and local taxing authorities; (xiv) the Federal Trade Commission; (xv) United States Attorney General/Antitrust Division of Department of Justice; (xvi) the U.S. Environmental Protection Agency; (xvii) United States Attorney's Office; (xviii) the entities set forth in the Master Service List established in these cases; (xix) all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002; and (xx) any other party identified on the creditor matrices in these cases.

## Assumption and Assignment of Executory Contracts and Unexpired Leases

15.    The procedures set forth in the Motion for the assumption and assignment of the Designated Agreements are hereby approved in all respects.

16.    On or before January 11, 2010 at 5:00 p.m. (Eastern), the Debtors shall file with the Bankruptcy Court and shall serve notice on each non-debtor counterparty to an executory contract or unexpired lease with any of the Debtors (each a "Non-Debtor Counterparty") that the

Debtors may assume and assign to the Stalking Horse Bidder or another Successful Bidder (each such agreement, a "Designated Agreement"), by overnight delivery service, a notice of assumption and assignment of executory contracts and unexpired leases (the "Assignment Notice"). The Debtors shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to each Designated Agreement and the cure costs, if any, that would be due pursuant to section 365(b)(1) of the Bankruptcy Code ("Cure Costs") to each Non-Debtor Counterparty, provided that such Assignment Notice shall in no way limit such Non-Debtor Counterparty's entitlement to Cure Costs by filing an objection to such Cure Costs prior to the Sale Hearing.

17.    The Assignment Notice shall also provide notice to each Non-Debtor Counterparty of the date and time of the Sale Hearing and indicate that, upon written request to the Debtors' counsel by a Non-Debtor Counterparty to a Designated Agreement, the Debtors will provide to such party any Adequate Assurance Package provided by the Stalking Horse Bidder or Successful Bidder, as applicable.

18.    Objections, if any to the proposed assumption and assignment of the Designated Agreements, including the Cure Costs, the provision of adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of Section 365(c)(1) of the Bankruptcy Code, shall be in writing and filed with this Court and served on the Notice Parties so as to be received no later than 12:00 pm Eastern one (1) business day prior to the Sale Hearing.  Where a Non-Debtor Counterparty to a Designated Agreement files an objection to the assumption by the Debtors and assignment to the Successful Bidder of such Designated Agreement (the "Disputed Designation") and/or asserts a

cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtors, the Successful Bidder and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.

19.      If any of the Debtors, the Non-Debtor Counterparty or the Successful Bidder determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under Section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Bankruptcy Court at the Sale Hearing.

20.      Any Non-Debtor Counterparty to a Designated Agreement who fails to file a timely objection to the proposed Cure Costs or the proposed assumption and assignment of a Designated Agreement is deemed to have consented to such Cure Costs and the assumption and assignment of such Designated Agreement, and such party shall be forever barred from objecting to the Cure Costs or such assumption and assignment and from asserting any additional cure or other amounts against the Debtors, their estates or the Stalking Horse Bidder.

21.      If the Non-Debtor Counterparty to a Designated Agreement fails to timely assert an objection as described above, or upon the resolution of any timely objection by agreement of the parties or order of this Court approving an assumption and assignment, such Designated Agreement shall be deemed to be assumed by the Debtors and assigned to the Stalking Horse Bidder or other Successful Bidder and the proposed Cure Cost related to such Designated Agreement shall be established and approved in all respects, subject to the conditions set forth below.

22.      Subject to the satisfaction of conditions to address any cure or assignment disputes, the Debtors shall be deemed to have assumed and assigned to the Successful Bidder

each of the Designated Agreements as of the date of and effective only upon the Closing Date, and absent such closing, each of the Designated Agreements shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code. Assumption and assignment of the Designated Agreements also is subject to the Successful Bidder's rights set forth above and in the Purchase Agreement. The Successful Bidder shall have no rights in and to a particular Designated Agreement until such time as the particular Designated Agreement has been assumed and assigned in accordance with the procedures set forth herein.

## **Miscellaneous**

23.     The Debtors are hereby authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary to implement and effect the terms and requirements established by this Bidding Procedures Order.

24.     This Bidding Procedures Order shall be binding upon, and inure to the benefit of the Debtors, the Stalking Horse Bidder, any Successful Bidder other than the Stalking Horse Bidder, and their respective successors and assigns, including any chapter 7 or 11 trustee or other fiduciary appointed for any of the Debtors' estates whether in the above-captioned cases, subsequent bankruptcy cases or upon dismissal of any of the Debtors' bankruptcy cases.

25.     Notwithstanding Bankruptcy Rules 6004 and 6006, this Bidding Procedures Order shall be effective and enforceable immediately upon its entry.

26.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

27.     To the extent this Order is inconsistent with the Motion, or with any prior order or pleading with respect to the Motion in these cases, the terms of this order shall govern.

28.     Except as set forth herein, the Senior Lenders and the Committee each reserve any and all rights to object to the sale of the Purchase Assets at the Sale Hearing.  The Debtors also reserve any and all rights in respect of the sale of the Purchase Assets, including, without limitation, the right to proceed with such sale over the objection of the Senior Lenders and/or the Committee.

29.     This Court shall retain jurisdiction over any matters relating to or arising from the implementation of this Bidding Procedures Order, including, but not limited to the right to amend this Bidding Procedures Order.

###

Submitted by:

Paul J. Battista, Esq.
Genovese Joblove & Battista, P.A.
Counsel to Debtors-in-Possession
100 Southeast Second Street, Suite 4400
Miami, FL 33131
Telephone:  (305) 349-2300
Facsimile:   (305) 349-2310
pbattista@gjb-law.com


Copy to: Paul J. Battista, Esq.
(Attorney Battista is directed to serve a conformed copy of this Order on all parties in interest)

## EXHIBIT 1

### PROPOSED BIDDING PROCEDURES

- **Purchased Assets**. The "Purchased Assets" shall include those assets set forth in Section 2.01(a) of the Purchase Agreement. The Purchased Assets shall not include the Excluded Assets set forth in Section 2.01(b) of the Purchase Agreement.

- **Qualification**. The Debtors shall: (a) coordinate the efforts of Potential Bidders (as defined below) in conducting their respective due diligence investigations regarding the Purchased Assets; (b) upon consultation with the Senior Lenders and the Committee, determine whether any person or entity is a Qualified Bidder (as defined below); (c) receive and evaluate bids from Qualified Bidders; and (d) administer the Auction (as defined below). Any person or entity who wishes to participate in the bidding process and the Auction must meet the participation requirements for Potential Bidders below and must thereafter submit a Qualified Bid to become a Qualified Bidder. Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any person or entity who does not comply with the participation requirements below.

- **Participation Requirements**. To participate in the bidding process and the Auction, each interested person or entity (a "Potential Bidder") must deliver the following documents (the "Participation Materials") on or before **January 4, 2010 at 5:00 p.m. (Eastern)** to (i) Genovese Joblove & Battista, P.A., counsel to the Debtors, 100 S.E. Second Street, 44th Floor, Miami, FL 33131, Attn: Paul J. Battista, Esq., pbattista@gjb-law.com, (ii) Piper Jaffray & Co., 800 Nicollet Mall, Minneapolis, MN 55402, Attn: Michael R. Dillahunt, michael.r.dillahunt@pjc.com, (iii) Moore & Van Allen, counsel to the Senior Lenders, 100 North Tryon Street, Suite 4700, Charlotte, NC 28292, Attn: James R. Langdon, Esq., jimlangdon@mvalaw.com, (iv) Berger Singerman, counsel to Leon Silverstein, 200 South Biscayne Boulevard, Suite 1000, Miami, FL 33131 Attn: Daniel Lampert, Esq., DLampert@bergersingerman.com, and (v) Hunton & Williams LLP, counsel to the Joint Committee of Creditors Holding Unsecured Claims, 1111 Brickell Avenue, Suite 2500, Miami, Florida 33131 Attn: Craig V. Rasile, Esq., crasile@hunton.com (the "Notice Parties"):

    i. an executed confidentiality agreement in form and substance satisfactory to the Debtors;

    ii. a statement demonstrating, to the Debtors' satisfaction, the Potential Bidder's bona fide interest in purchasing substantially all of the Purchased Assets from the Debtors;

    iii. written evidence acceptable to the Debtors that the Potential Bidder has received debt and/or equity funding commitments or has on deposit in its bank account(s) sufficient unrestricted cash to consummate the purchase contemplated hereby, provided that if the Potential Bidder proposes to

finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such Bid;

iv. A letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder, and full disclosure of all parties participating with the Potential Bidder, as well as full disclosure of any prepetition and post-petition affiliation that the Potential Bidder may have with (i) the Debtors, (ii) the Debtors' affiliates, (iii) major creditors of the Debtors, (iv) equity security holders of the Debtors, and/or (v) any of the Debtors' former officers or directors or other insiders; and

v. An executed letter acknowledging receipt of a copy of the Bidding Procedures and agreeing to accept and be bound by the provisions contained therein.

vi. If, based on such Participation Materials, the Debtors determine that a Potential Bidder has a bona fide interest in purchasing the Purchased Assets, then no later than one (1) business day after the Debtors make that determination and have received from the Potential Bidder all of the Participation Materials required above, the Debtors will deliver to the Potential Bidder: (a) an electronic copy of the Purchase Agreement; and (b) access information for confidential data concerning the Purchased Assets, which shall include any and all documents furnished by the Debtors to the Stalking Horse Bidder in connection with its due diligence related to the Purchase Agreement (the "Data Room"). The Debtors will consult with the Committee and the Senior Lenders before electing to exclude a Potential Bidder from conducting due diligence despite the fact that they have submitted Participation Materials.

- **Due Diligence Period**. Until the Bid Deadline (as defined below), the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their judgment, determine to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to the Debtors. The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders. If the Debtors determine that due diligence material requested by a Potential Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Potential Bidder, the Debtors shall post such materials in the Data Room and provide email notice of such posting to all Potential Bidders, as well as to the Notice Parties, and shall provide such materials to the Stalking Horse Bidder. Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease on the Bid Deadline. Except as provided above with respect to the copy of the Purchase Agreement provided by the Debtors to the Potential Bidders, and

information in the Data Room, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any party.

- **Bid Deadline**. A Potential Bidder that desires to make a bid on all or substantially all of the Purchased Assets (a "Bid") shall deliver written and electronic copies of its Bid and the Bid Requirements set forth below to (i) the Notice Parties, and (ii) counsel to the Official Committee of Unsecured Creditors (the "Committee") so that it is received not later than **5:00 p.m., Eastern Time, on January 8, 2010** (the "Bid Deadline"), provided however, that the Deposit shall be made to the trust account of Debtors' counsel pursuant to instructions to be provided by Debtors' counsel.

- **Bid Requirements**. To participate in the Auction, if any, a Qualified Bidder must deliver to the Debtors a written offer, which must provide, at a minimum, the items noted below to be deemed a "Qualified Bid":

    i.  An executed purchase agreement (a "Marked Agreement") in substantially the same form as the Purchase Agreement, pursuant to which the Potential Bidder offers to purchase substantially all of the Purchased Assets from the Debtors. Such Marked Agreement shall not contain any conditions to closing based upon the ability of the Potential Bidder to obtain financing, the outcome of unperformed due diligence by the Potential Bidder, or any other conditions other than those set forth in the Purchase Agreement. The Potential Bidder shall also provide a marked copy of the Marked Agreement showing any changes to the Purchase Agreement, including changes to reflect the name of the Potential Bidder and the amount of such Potential Bidder's Bid;

    ii. The purchase price in such Bid is a higher or better offer for the Purchased Assets as compared to the offer of the Stalking Horse Bidder. An offer shall not be considered a higher or better offer unless such Bid provides for the assumption of the same amount of liabilities that the Stalking Horse Bidder is assuming under the Purchase Agreement and provides for net consideration (on a risk-adjusted basis) to the Debtors' estates of at least $100,000.00 more than the sum of (i) the cash portion of the purchase price provided by the Stalking Horse Bidder in the Purchase Agreement, plus (ii) the amount of the Break Up Fee, as modified herein, plus (iii) the amount of the Expense Reimbursement, as modified herein (such amount, the "Minimum Overbid Amount");

    iii. A deposit of cash or cash equivalents in the amount equal to at least five (5%) percent of the Minimum Overbid Amount (the "Deposit"). The Deposit shall be tendered by cashier's check and/or wire transfer into a segregated bank account established by Debtors' counsel. A Potential Bidder shall forfeit its Deposit if it is the Successful Bidder or Back-Up Bidder (as defined below) and (i) modifies or withdraws its Bid without the Debtors' consent before the consummation of the sale with such Potential Bidder or (ii) breaches the terms of the agreement pursuant to

which the Bidder has agreed to purchase the Purchased Assets or a portion thereof. A Potential Bidder's Deposit shall be returned (i) if such Potential Bidder is determined by the Debtors not to be a Qualified Bidder, promptly upon the making of such determination, (ii) if such Potential Bidder is not the Successful Bidder or the Back-Up Bidder, promptly after the conclusion of the Auction, or (iii) if such Potential Bidder is the Back-Up Bidder and the sale transaction is consummated with the Successful Bidder, promptly upon the consummation of the sale with the Successful Bidder;

iv. The Bid must be received by the Debtors by the Bid Deadline, together with the Potential Bidder's Deposit;

v. The Bid does not entitle the Potential Bidder to any break-up fee, termination fee or similar type of payment or reimbursement;

vi. A statement that the Bid is irrevocable and binding until the closing of the sale of the Purchased Assets if the applicable bidder is the Successful Bidder or the Back-Up Bidder;

vii. Evidence satisfactory to the Debtors, in consultation with the Committee, of the Potential Bidder's (i) financial ability to close the sale described in its Marked Agreement, which may include the most recent audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring some or all of the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidder, and such other financial disclosure acceptable to, and requested by, the Debtors, in consultation with the Committee, and (ii) ability to consummate such sale on or prior to the date contemplated by and on the date and on terms and conditions no less favorable to the Debtors those set forth in the Purchase Agreement; and

viii. The Bid is accompanied by a list of any executory contracts and unexpired leases that are to be assumed and/or assigned under such Bid and a demonstration of the Potential Bidder's commitment to pay all Cure Costs in accordance with the Marked Agreement and provide adequate assurance of future performance under any such executory contracts or unexpired leases to be assumed and/or assigned pursuant to such Bid.

ix. A Potential Bidder shall accompany its Bid with: (a) written evidence acceptable to the Debtors, in consultation with the Committee, that the Potential Bidder has received debt and/or equity funding commitments or has on deposit in its bank account(s) sufficient unrestricted cash to consummate the purchase contemplated hereby, provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such Bid; (b) a copy of a board resolution or similar

document demonstrating the authority of the Potential Bidder to make a binding and irrevocable Bid on the terms proposed; and (c) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws or other aspects of the Bid.

    x. The Debtors will consult with the Committee and the Senior Lenders before determining that a Bid by a Potential Bidder is not a Qualified Bid or rejecting any Bid.

- A Bid received from a Potential Bidder will be considered a "Qualified Bid" only if it meets the above requirements. Each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." For purposes hereof and notwithstanding anything to the contrary provided herein, the Stalking Horse Bidder is a "Qualified Bidder" and the Purchase Agreement executed by the Stalking Horse Bidder and the Bid contained therein is a Qualified Bid.

- A Qualified Bid will be valued based upon the following factors: (a) the purported amount of the Qualified Bid, including any benefit to the Debtors' bankruptcy estates from any assumption of liabilities of the Debtors; (b) the ability to close the proposed sale transaction without delay and within the time frames contemplated by the Purchase Agreement; (c) the ability and delay associated with obtaining all necessary antitrust or other regulatory approvals, including under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, for the proposed transaction; and (d) any other factors the Debtors may deem relevant.

- As soon as reasonably practicable following the Bid Deadline but in no event later than **noon Eastern Time on Monday, January 11, 2010**, the Debtors shall distribute a copy of each Bid received by the Bidding Deadline, together with notice of which Bids the Debtors have determined are Qualified Bids, to the Notice Parties, to counsel for the Stalking Horse Bidder and to counsel to the Committee. Any disputes as to whether a Potential Bidder is a Qualified Bidder shall be resolved by the Bankruptcy Court prior to the Auction. The Debtors reserve the right to reject any Bid if such Bid: (i) is on terms that are materially more burdensome or conditional than the terms of the Purchase Agreement; (ii) requires any indemnification of the Potential Bidder on terms that are materially more burdensome than the terms of the Purchase Agreement; or (iii) includes a noncash instrument or similar consideration that is not freely marketable. Any Bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid.

- **Auction.** In the event that the Debtors receive one or more Qualified Bids (other than the Bid of the Stalking Horse Bidder), then the Debtors will hold an auction (the "Auction") on **January 13, 2010, commencing at 10:00 a.m. Eastern Time** at the offices of Genovese Joblove & Battista, P.A. at 100 S.E. 2nd Street, Suite 4400, Miami, Florida 33131, for consideration of the Qualified Bids, each as may be increased at such Auction. Bidding will start at the highest Qualified Bid and will continue with minimum Bid increments of $100,000. The Auction may be adjourned as the Debtors deem appropriate, after consultation with the Committee

and the Senior Lenders. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given to the Notice Parties and all entities that submitted a Qualified Bid. The Auction shall be conducted in accordance with the following procedures:

 i. Only the Debtors, representatives of the Senior Lenders and their counsel, members of the Committee and its counsel, the Stalking Horse Bidder and any other Qualified Bidder, in each case, along with their representatives, shall attend the Auction in person, and only the Stalking Horse Bidder and such other Qualified Bidders will be entitled to make any Bids at the Auction.

 ii. Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale by the Debtors of the Purchased Assets;

 iii. By **12:00 p.m. Eastern Time on January 12, 2010**, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that, in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.

 iv. By **5:00 p.m. Eastern Time on January 12, 2010**, the Debtors will notify the Stalking Horse Bidder and all Qualified Bidders that have informed the Debtors of their intent to participate in the Auction of which Qualified Bid(s) the Debtors believes, in their reasonable judgment, is the highest or best offer (the "Starting Bid").

 v. Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

 vi. At the Auction, the Debtors may employ and announce additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

 vii. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one

subsequent Bid or combination of Bids is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (such bid or combination of Bids, a "Subsequent Bid") and (ii) the Debtors determine that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental Bid or combination of Bids at the Auction shall provide net value to the Debtors' estates of at least U.S. $100,000 over the Starting Bid or the Leading Bid, as the case may be. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid or combination of Bids that they believe to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.  Promptly at the conclusion of the Auction, the Debtors, after consultation with the Senior Lenders and the Committee, shall (a) determine, consistent with the Bidding Procedures, which Bid constitutes the highest or best Bid (such Bid, the "Successful Bid") and (b) communicate to the Stalking Horse Bidder, the Notice Parties, and the other Qualified Bidders the identity of the Successful Bidder(s) and the details of the Successful Bid(s). If no Qualified Bids are received other than the Purchase Agreement, the Purchase Agreement shall be designated as the Successful Bid, and there shall be no Auction. The Bidder making the Successful Bid is referred to as the "Successful Bidder." The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final subject to approval by the Bankruptcy Court.

- **The Back-Up Bid**. After determining which Qualified Bid is the Successful Bid, the Debtors shall (a) determine which of the Qualified Bid constitutes the next highest or best Qualified Bid(s) for the Purchased Assets and (b) communicate to the Stalking Horse Bidder, the other Qualified Bidders, and the other Notice Parties the identity of such Qualified Bidder(s) (a "Potential Back-Up Bidder(s)") and the details of such Qualified Bid(s) (a "Potential Back-Up Bid(s)"). In the event that the Potential Back-Up Bidder(s) agrees that (a) its/their Back-Up Bid(s) will remain irrevocable and (b) the Debtors may retain its/their Deposit, until the closing and effectiveness of the sale transactions, then such Potential Back-Up Bidder(s) shall be considered the "Back-Up Bidder(s)" and its/their Potential Back-Up Bid(s) shall be considered the "Back-Up Bid(s)". In the event of the failure by the Successful Bidder(s) to timely consummate the sale transaction, the Back-up Bidder(s) shall be deemed the Successful Bidder(s) without further order of the Court, and shall proceed to close the transactions contemplated by its/their Bid(s) no later than three (3) business days following the Debtors' tender of a notice to the Back-up Bidder(s), unless otherwise ordered by the Bankruptcy Court.  The Debtors shall be entitled to the Deposit of any Successful Bidder under the circumstances described above, and in such circumstances, such Deposit shall be deemed forfeited by such defaulting Successful Bidder, and shall

not be credited against the purchase price for the benefit of any Back-up Bidder. Similarly, in the event that any Back-up Bidder fails to consummate the sale transaction, then the Debtors shall be entitled to the Deposit of said party, and such Deposit shall be deemed forfeited. The Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder and/or Back-up Bidder as the case may be, provided however, that any recourse against the Stalking Horse Bidder shall be strictly governed by the terms of the Purchase Agreement.  If the Qualified Bidder(s) initially identified as the Potential Back-Up Bidder(s) do/es not agree to become the Back-Up Bidder(s), then such Potential Back-Up Bidder(s) shall be entitled to its/their Deposit(s) and the Debtors (and the Bankruptcy Court, to the extent there is a dispute), may identify the next highest or otherwise best Bid(s) as the Potential Back-Up Bid(s), and may continue to do so until Potential Back-Up Bidder(s) agree to become the Back-Up Bidder(s).

- **The Successful Bid**.  At the Auction, and upon consultation with the Senior Lenders and the Committee, the Debtors shall have the right to select the highest and best Bid from the Auction, which will be determined by considering, among other things:  (A) the number, type and nature of any changes to the Purchase Agreement requested by each Qualifying Bidder; (B) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and the cost to the Debtors of such modifications or delay; (C) the total consideration to be received by the Debtors; (D) the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof; and (E) the net benefit to the estate, taking into account the Stalking Horse Bidder's rights to the Breakup Fee and Expense Reimbursement, as modified herein (for avoidance of doubt, the Debtors hereby agree that the value attributed by the Debtors to any Bid made by the Stalking Horse Bidder at the Auction shall include the requirement to pay the Break Up Fee and the Expense Reimbursement, as modified herein).

- **The Sale Hearing**. The Successful Bid will be presented to the Bankruptcy Court for approval at the Sale Hearing. If no other Qualified Bid is received by the Debtors, and the Stalking Horse Bid is the Successful Bid, then the Debtors will seek entry of an order at the Sale Hearing authorizing and approving the sale transaction, including the sale of the Purchased Assets to the Stalking Horse Bidder, pursuant to the terms and conditions set forth in the Purchase Agreement. If a different Qualified Bid is the Successful Bid, then the Debtors anticipate that they will seek the entry of an order, modified as necessary to reflect the terms of the Successful Bid, authorizing and approving the sale of the applicable Purchased Assets to the Successful Bidder. The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of such adjournment at the Sale Hearing. Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale, and parties shall be prepared to present their evidence in support of or in opposition to the proposed sale at the Sale Hearing.

- **"As Is, Where Is"**. The sale transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the

Debtors, their agents or their estates, except to the extent expressly set forth in the Purchase Agreement or the Marked Agreement corresponding to the Successful Bid, as the case may be. Except as otherwise provided in the Successful Bid, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), encumbrances, rights, remedies, restrictions, interests, liabilities, leasehold interests and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Purchased Assets to the Successful Bidder, and the proposed order approving the sale transaction (as so defined therein, "Claims") as set forth in the Purchase Agreement and the Sale Order, with such Claims to attach to the net proceeds of the sale with the same validity and priority as such Claims applied against the Purchased Assets.

- **Bankruptcy Court Jurisdiction**. Any and all disputes related or pertaining to or resulting or arising from the Bid Procedures, the Auction, the sale transaction and/or the conduct of the Debtors shall be adjudicated solely by the Bankruptcy Court. The submission of a Bid shall constitute an express consent by the Bidder to the exclusive jurisdiction of the Bankruptcy Court for all such matters.

- **Break Up Fee**. In consideration of the Stalking Horse Bidder's undertaking of the substantial legal, accounting and other expenses attendant to the Purchase Agreement, proceeding toward the consummation of the sale transaction, and acting as the Stalking Horse Bidder, the Debtors have agreed to pay the Stalking Horse Bidder (i) a fee of 1.5% of the Purchase Price (the "Break Up Fee") plus (b) reimbursement of up to $800,000 in reasonable fees and expenses incurred by the Stalking Horse Bidder (the amount of such reasonable fees and expenses, if requested by the Debtors, the Committee or the Senior Lenders, shall be determined by the Bankruptcy Court upon motion and a hearing in advance of the Auction)(the "Expense Reimbursement").