**ASSET PURCHASE AGREEMENT**

**among**

**AAG HOLDINGS, INC.,**

**ARCH ALUMINUM & GLASS CO., INC.,**

**ARCH ALUMINUM L.C.,**

**AWP, LLC**

**and**

**ARCH ALUMINUM AND GLASS INTERNATIONAL, INC.**

**AS "SELLERS"**

**AND**

**ARCH ALUMINUM & GLASS ENTERPRISES, INC.**

**AS "PURCHASER"**

**Dated as of January 14, 2010**

PHDATA 3256011_3

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................1

SECTION 1.01.    Definitions. ................................................................. 1
SECTION 1.02.    Interpretation and Rules of Construction ....................... 20

ARTICLE II PURCHASE AND SALE ........................................................................20

SECTION 2.01.    Purchase and Sale of Assets ........................................ 20
SECTION 2.02.    Assumption and Exclusion of Liabilities ......................... 24
SECTION 2.03.    Purchase Price ........................................................... 26
SECTION 2.04.    Payment of the Purchase Price ..................................... 26
SECTION 2.05.    Allocation of the Purchase Price ................................... 27
SECTION 2.06.    Purchaser's Deposit. ................................................... 27
SECTION 2.07.    Interim Price Adjustment. ............................................ 28
SECTION 2.08.    Actual Price Adjustment. ............................................ 28
SECTION 2.09.    Cure Costs. ............................................................... 30
SECTION 2.10.    Closing ..................................................................... 31
SECTION 2.11.    Closing Deliveries by the Sellers .................................. 31
SECTION 2.12.    Closing Deliveries by the Purchaser .............................. 32
SECTION 2.13.    Registration of Transfers of Real Property ..................... 33

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS....................33

SECTION 3.01.    Organization, Authority and Qualification of the Sellers ................ 33
SECTION 3.02.    No Conflict. ............................................................... 34
SECTION 3.03.    Governmental Consents and Approvals........................... 34
SECTION 3.04.    Financial Statements; Undisclosed Liabilities. ................. 35
SECTION 3.05.    Litigation .................................................................. 35
SECTION 3.06.    Compliance with Laws................................................. 35
SECTION 3.07.    Environmental Matters................................................ 36
SECTION 3.08.    Intellectual Property ................................................... 36
SECTION 3.09.    Real Property. ........................................................... 37
SECTION 3.10.    Employee Matters. ..................................................... 37
SECTION 3.11.    Taxes ....................................................................... 39
SECTION 3.12.    Material Contracts. ..................................................... 40
SECTION 3.13.    Brokers ..................................................................... 41
SECTION 3.14.    Title to Purchased Assets; Good Condition. .................... 41
SECTION 3.15.    Sufficiency of Assets................................................... 41
SECTION 3.16.    Insurance .................................................................. 42
SECTION 3.17.    Suppliers and Customers ............................................. 42
SECTION 3.18.    Permits. .................................................................... 42
SECTION 3.19.    Absence of Certain Changes ........................................ 43
SECTION 3.20.    Labor Matters. ........................................................... 43
SECTION 3.21.    Inventory .................................................................. 44
SECTION 3.22.    Receivables................................................................ 44

i

SECTION 3.23.  Arch Canada ................................................................... 45
SECTION 3.24.  Customer Warranties ........................................................ 55
SECTION 3.25.  Relationships with Related Persons ................................. 56
SECTION 3.26.  Disclaimer of the Sellers ................................................ 56
SECTION 3.27.  Service of Process ........................................................... 57

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............. 57

SECTION 4.01.  Organization and Authority of the Purchaser.................... 57
SECTION 4.02.  No Conflict ...................................................................... 57
SECTION 4.03.  Governmental Consents and Approvals ........................... 58
SECTION 4.04.  Financing ......................................................................... 58
SECTION 4.05.  Litigation ......................................................................... 58
SECTION 4.06.  Brokers ............................................................................ 58
SECTION 4.07.  Independent Investigation; Sellers' Representations ........ 58
SECTION 4.08.  Investment Canada .......................................................... 59

ARTICLE V ADDITIONAL AGREEMENTS ............................................................. 59

SECTION 5.01.  Bankruptcy Court Approvals ........................................... 59
SECTION 5.02.  [Intentionally Omitted].................................................... 59
SECTION 5.03.  Assumption of Assigned Contracts. ................................. 59
SECTION 5.04.  Conduct of Business Prior to the Closing ........................ 61
SECTION 5.05.  Access to Information ....................................................... 64
SECTION 5.06.  Damage or Destruction .................................................... 65
SECTION 5.07.  Confidentiality.................................................................. 65
SECTION 5.08.  Regulatory and Other Authorizations; Notices and Consents........... 66
SECTION 5.09.  Permits and Licenses........................................................ 68
SECTION 5.10.  Transferred Names and Marks. ........................................ 68
SECTION 5.11.  Bulk Transfer Laws .......................................................... 68
SECTION 5.12.  Transition Services ........................................................... 69
SECTION 5.13.  Further Action .................................................................. 69
SECTION 5.14.  Tax Cooperation and Exchange of Information ................ 69
SECTION 5.15.  Conveyance Taxes ........................................................... 70
SECTION 5.16.  Proration of Taxes and Certain Charges. ......................... 70
SECTION 5.17.  Personal Information ........................................................ 71
SECTION 5.18.  Vehicle Registration ........................................................ 71
SECTION 5.19.  Post-Closing ICA Filing................................................... 71
SECTION 5.20.  ISRA ............................................................................... 71
SECTION 5.21.  Arch Canada .................................................................... 72
SECTION 5.22.  Tax Refund ...................................................................... 72
SECTION 5.23.  [Intentionally Omitted].................................................... 72
SECTION 5.24.  Other Reports .................................................................. 72
SECTION 5.25.  Jim Pattison Consents...................................................... 72

ARTICLE VI EMPLOYEE MATTERS ....................................................................... 73

SECTION 6.01.  Employees. ...................................................................... 73
SECTION 6.02.  Co-operation .................................................................... 74
SECTION 6.03.  Employee Plans ............................................................... 74

SECTION 6.04.    Intentionally Omitted ....................................................................... 74
SECTION 6.05.    COBRA Obligations ........................................................................ 74
SECTION 6.06.    Payment and Expenses at Closing.................................................... 74

ARTICLE VII CONDITIONS TO CLOSING ...................................................................75

SECTION 7.01.    Conditions to Obligations of the Sellers ......................................... 75
SECTION 7.02.    Conditions to Obligations of the Purchaser..................................... 76

ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER .........................................78

SECTION 8.01.    Termination ..................................................................................... 78
SECTION 8.02.    Effect of Termination ...................................................................... 80
SECTION 8.03.    Specific Performance ...................................................................... 80

ARTICLE IX NON-SURVIVAL OF REPRESENTATIONS AND WARRANTIES ................80

SECTION 9.01.    Non-Survival of Representations and Warranties............................. 80

ARTICLE X GENERAL PROVISIONS..........................................................................80

SECTION 10.01.    Expenses ....................................................................................... 80
SECTION 10.02.    Notices.......................................................................................... 81
SECTION 10.03.    Public Announcements.................................................................. 82
SECTION 10.04.    Severability................................................................................... 82
SECTION 10.05.    Entire Agreement; Exclusivity ...................................................... 82
SECTION 10.06.    Successors and Assigns.................................................................. 82
SECTION 10.07.    Amendment ................................................................................... 83
SECTION 10.08.    Waiver .......................................................................................... 83
SECTION 10.09.    No Third Party Beneficiaries......................................................... 83
SECTION 10.10.    Currency ....................................................................................... 83
SECTION 10.11.    Governing Law.............................................................................. 83
SECTION 10.12.    Waiver of Jury Trial ...................................................................... 84
SECTION 10.13.    Counterparts.................................................................................. 84
SECTION 10.14.    Time is of the Essence................................................................... 84

## EXHIBITS

| | | |
|---|---|---|
| Exhibit 1.01(a) | - | Form of Omnibus Assignment of Lease |
| Exhibit 1.01(b) | - | Form of Assignment of Transferred Intellectual Property |
| Exhibit 1.01(c) | - | Form of Bill of Sale and Instrument of Assignment of Assets and Assumption of Liabilities |
| Exhibit 1.01(d) | - | Sellers' Knowledge |
| Exhibit 1.01(e) | - | Principles and Procedures for Inventory |
| Exhibit 1.01(f) | - | Receivables Valuation Methodology |
| Exhibit 1.01(g) | - | Form of Arch Assets Bid Procedures Motion |
| Exhibit 1.01(h) | - | Form of Arch Assets Bid Procedures Order |
| Exhibit 1.01(i) | - | Arch Canada Working Capital Calculation Methodology |
| Exhibit 2.01(xvii)(1) | - | List of Customers |
| Exhibit 2.01(xvii)(2) | - | List of Suppliers |
| Exhibit 2.04 | - | Form of Deposit Escrow Agreement |
| Exhibit 2.04(h) | | Form of Section 116 Escrow Agreement |
| Exhibit 2.07(b) | - | Form of Price Adjustment Escrow Agreement |
| Exhibit 2.08 | - | Form of Independent Accounting Firm Escrow Agreement |
| Exhibit 2.08(d) | - | Example Purchase Price and Adjustment Calculations |
| Exhibit 2.09(a) | - | Form of Asserted Cure Costs Escrow Agreement |
| Exhibit 5.03(e) | - | Designated Remaining Contracts |
| Exhibit 7.02(m) | - | General Release |

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of this 14th day of January, 2010 (the "Execution Date"), by and among AAG HOLDINGS, INC., a Florida corporation ("AAG"), ARCH ALUMINUM & GLASS CO., INC., a Florida corporation ("Arch"), ARCH ALUMINUM L.C., a Florida limited liability company ("Arch LC"), AWP, LLC, a Florida limited liability company ("AWP"), and ARCH ALUMINUM AND GLASS INTERNATIONAL, INC., a Florida corporation ("Arch International", and together with AAG, Arch, Arch LC, AWP collectively, the "Sellers" and each individually, a "Seller"), and ARCH ALUMINUM & GLASS ENTERPRISES, INC., a Delaware corporation (the "Purchaser").

## RECITALS

**WHEREAS**, Sellers are fabricators and distributors of architectural glass and aluminum products and other related products serving the North American architectural glass industries, including customers in the commercial and residential construction markets (together with all other profit seeking activities undertaken by Sellers and its subsidiaries (including Arch Canada and any subsidiary of Arch Canada), the "Business");

**WHEREAS**, the Sellers have commenced voluntary cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "Bankruptcy Court") pursuant to chapter 11 of title 11, United States Code (the "Bankruptcy Code"); and

**WHEREAS**, the Sellers wish to sell, assign and transfer to the Purchaser, and the Purchaser wishes to purchase and acquire from the Sellers, the Purchased Assets (as defined below) free and clear of all Liens other than Permitted Encumbrances (other than Mechanics Liens) pursuant to Sections 363 (b), (m), and (f) and Section 365 of the Bankruptcy Code, and, in connection therewith, the Purchaser is willing to assume all of the Assumed Liabilities (as defined below) all upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the Sellers and the Purchaser hereby agree as follows:

ARTICLE I
DEFINITIONS

SECTION 1.01.          Definitions. For purposes of this Agreement:

"2009 Tax Refund" means any and all amounts received by the Sellers as a refund of Taxes for any pre-Closing periods.

"AAG" has the meaning given to it in the Preamble.

"Action" means any claim, as defined in the Bankruptcy Code, action, complaint, suit, litigation, arbitration, appeal, petition, demand, inquiry, hearing, proceeding, investigation or other dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority or any third person.

1

"Active Employees" has the meaning given to it in Section 6.0l(a).

"Actual Price Adjustment" means an amount equal to:

(i)        in the event that the Combined Inventory and Receivables Amount at Closing is less than the Target Inventory and Receivables Floor or greater than the Target Inventory and Receivables Collar, the difference (which may be positive or negative) between (a) the Combined Inventory and Receivables as of the Effective Time and (b) the Target Inventory and Receivables Amount; plus

(ii)        cash deposits paid by the Sellers that are outstanding as of the Effective Time and transferred to the Purchaser at Closing (A) on all Assigned Contracts for which all necessary consents and Bankruptcy Court  approvals to transfer have been obtained; or (B) that relate to any of the Purchased Assets except, in the case of both (A) and (B), (1) to the extent such cash deposits are to be applied against Excluded Liabilities; and (2) the deposit being held in connection with the Arch Aluminum & Glass Co., Inc. Self-Insured Medical Plan; plus

(iii)        the net amount of any pro-rations pursuant to Section 5.16 (if such net amount is owed by Seller to Purchaser, the amount in this clause (iii) shall be negative); plus

(iv)        in the event that the Arch Canada Working Capital at the Closing is less than the Arch Canada Working Capital Floor or Arch Canada Working Capital is greater than the Arch Canada Working Capital Collar, the difference (which may be positive or negative) between (a) the Arch Canada Working Capital as of the Effective Time less (b) the Target Arch Canada Working Capital; minus

(v)        the amount of any Arch Canada Indebtedness (should the Purchaser determine to waive the condition in Section 7.02(o)).

"Affected Assets" has the meaning given to it in Section 5.06.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Agreement" has the meaning given to it in the Preamble.

"Allocation" has the meaning given to it in Section 2.05.

"Ancillary Agreements" means the Bill of Sale, the Deeds, the Omnibus Assignment of Lease, the Assignment of Transferred Intellectual Property, the Transition Services Agreement, the Deposit Escrow Agreement, the Price Adjustment Escrow Agreement, the Asserted Cure Costs Escrow Agreement, the Independent Accounting Firm Escrow Agreement, and any other instrument or agreement contemplated by this Agreement or the foregoing.

"Arch" has the meaning given to it in the Preamble.

2

"<u>Arch Assets Bid Procedures Motion</u>" means a motion reasonably acceptable to the Purchaser in substantially the form and substance attached hereto as <u>Exhibit 1.01(g)</u> that seeks entry of the Arch Assets Bid Procedures Order.

"<u>Arch Assets Bid Procedures Order</u>" means the Order of the Bankruptcy Court attached hereto as <u>Exhibit 1.01(h)</u> that, among other things, authorizes and approves the Bid Procedures.

"<u>Arch Canada</u>" means Arch Canada, ULC, an Alberta unlimited liability corporation.

"<u>Arch Canada Accounts Receivable</u>" has the meaning given to it in <u>Section 3.23(x)</u>.

"<u>Arch Canada Assets</u>" means the assets owned, leased or used by Arch Canada in connection with the Arch Canada Business.

"<u>Arch Canada Business</u>" means the business of fabrication and distribution of glass and window products for the commercial and residential glazing industry operated in Canada.

"<u>Arch Canada Employees</u>" has the meaning given to it in <u>Section 3.23(l)</u>.

"<u>Arch Canada Financial Statements</u>" has the meaning given to it in <u>Section 3.23(f)</u>.

"<u>Arch Canada General Security Agreement</u>" means the General Security Agreement dated as of April 2, 2007 pursuant to which Arch Canada granted a security interest in favor of PNC (in its capacity as agent for and on behalf of and for the benefit of Arch International) in all of its property and assets to secure the obligations of Arch Canada to Arch International, including under the Arch Canada Intercompany Notes and related Personal Property Security Act registration filed in Canada in favor of PNC in connection therewith.

"<u>Arch Canada Indebtedness</u>" means without duplication (a) all indebtedness (including the principal amount thereof or, if applicable, the accreted amount thereof and the amount of accrued and unpaid interest thereon) of Arch Canada or any subsidiary of Arch Canada, whether or not represented by bonds, debentures, notes or other securities, for the repayment of money borrowed, whether owing to banks, financial institutions, on equipment leases or otherwise, (b) all deferred indebtedness of Arch Canada or any subsidiary of Arch Canada for the payment of the purchase price of property or assets purchased, (c) all obligations of Arch Canada or any subsidiary of Arch Canada to pay rent or other payment amounts under a lease of real or personal property which is required to be classified as a capital lease or a liability on the face of a balance sheet prepared in accordance with Canadian GAAP, (d) all outstanding reimbursement obligations of Arch Canada or any subsidiary of Arch Canada with respect to letters of credit, bankers' acceptances or similar facilities issued for the account of Arch Canada or any subsidiary of Arch Canada, (e) all payment obligations of Arch Canada or any subsidiary of Arch Canada under any interest rate swap agreement, forward rate agreement, interest rate cap or collar agreement or other financial agreement or arrangement entered into for the purpose of

3

limiting or managing interest rate risks, (f) all indebtedness for borrowed money secured by any Lien existing on property owned by Arch Canada or any subsidiary of Arch Canada, whether or not indebtedness secured thereby will have been assumed, (g) all guaranties, endorsements, assumptions and other contingent obligations of Arch Canada or any subsidiary of Arch Canada in respect of, or to purchase or to otherwise acquire, indebtedness for borrowed money of others, (h) all premiums, penalties and change of control payments required to be paid or offered in respect of any of the foregoing as a result of the consummation of the transactions contemplated by this Agreement regardless if any of such are actually paid, and (i) all obligations of Arch Canada or any subsidiary of Arch Canada, whether interest bearing or otherwise, owed to their existing stockholders and/or their Affiliates; provided, that the Arch Canada Indebtedness will not include the Arch Canada Intercompany Notes or Arch Canada's accounts payable, deferred Taxes or accrued expenses.  For the avoidance of doubt, the calculation of Arch Canada Indebtedness for purposes of the Interim Price Adjustment and the Actual Price Adjustment shall be in U.S. Dollars utilizing the exchange rate in effect as of the date of the applicable calculation.

"Arch Canada Insurance Policies" has the meaning given to it in Section 3.23(r).

"Arch Canada Intellectual Property" means the Intellectual Property listed in Section 3.23(j) of the Disclosure Schedule.

"Arch Canada Intercompany Notes" means the Secured Term Promissory Note dated as of April 2, 2007 in the original principal amount of 10,000,000 Canadian Dollars and the Secured Term Promissory Note dated as of May 7, 2007 in the original principal amount of 666,666 Canadian Dollars both issued by Arch Canada in favor of Arch International.

"Arch Canada Inventory" has the meaning given to it in Section 3.23(y).

" Arch Canada Leased Real Property" means the real property listed on Section 3.23(k)(ii) of the Disclosure Schedule.

"Arch Canada Material Contracts" has the meaning given to it in Section 3.23(o)(i).

"Arch Canada Pension Plans" has the meaning given to it in Section 3.23(n)(ii).

"Arch Canada Permit" has the meaning given to it in Section 3.23(t).

"Arch Canada Plans" has the meaning given to it in Section 3.23(n)(i).

"Arch Canada Quarterly Statements" has the meaning given to it in Section 3.23(f).

"Arch Canada Security Documents" means Arch Canada General Security Agreement, Collateral Assignment of Security Documents (Intercompany Loan), Collateral Assignment of Intercompany Note and Security Documents and the Arch Canada Trademark Liens.

"Arch Canada Stock" means the 100 shares of common stock of Arch Canada owned by Arch International.

"Arch Canada Trademark Liens" means the Notice of Security Interest in Trade-Marks made as of April 2, 2007 by Arch Canada and submitted to the Canadian Registrar of Trade-Marks as notice of the granting of a security interest by Arch Canada in certain Arch Canada Intellectual Property to PNC in connection with the Arch Canada General Security Agreement.

"Arch Canada Working Capital" shall mean the difference between (i) Arch Canada's accounts receivable and inventory, and (ii) Arch Canada's accounts payable, deferred Taxes and accrued expenses, but excluding Arch Canada Indebtedness and the Arch Canada Intercompany Notes, in each case calculated in accordance with Canadian GAAP, calculated in accordance with the methodology set forth in Exhibit 1.01(i).  For purposes of clarity, the calculation of Arch Canada Working Capital shall be in U.S. Dollars utilizing the exchange rate in effect as of the Closing Date.

"Arch Canada Year-End Financial Statements" has the meaning given to it in Section 3.23(f).

"Arch LC" has the meaning given to it in the Preamble.

"Arch International" has the meaning given to it in the Preamble.

"Asserted Cure Costs" means, in the aggregate, all Cure Costs asserted by any counterparty to an Assigned Contract or a Designated Remaining Contract that, as of the Closing Date, are not Determined Cure Costs.

"Asserted Cure Costs Deposit" has the meaning given to it in Section 2.09(a).

"Asserted Cure Costs Escrow Agreement" has the meaning given to it in Section 2.09(a).

"Assigned Contract" means any Contract set forth on the Disclosure Schedules that relates primarily to the Business, including any Material Contract, that is not an Excluded Asset or a Designated Remaining Contract.

"Assignment of Transferred Intellectual Property" means the Assignment of Transferred Intellectual Property to be executed by the Sellers at the Closing, substantially in the form of Exhibit 1.01(b).

"Assumed Liabilities" has the meaning given to it in Section 2.02(a).

"AWP" has the meaning given to it in the Preamble.

"Bankruptcy Code" has the meaning given to it in the Recitals.

"Bankruptcy Court" has the meaning given to it in the Recitals.

5

"Bill of Sale" means the Bill of Sale and Instrument of Assignment of Assets and Assumption of Liabilities to be executed by the Sellers at the Closing, substantially in the form of Exhibit 1.01(c).

"Burdensome Term or Condition" has the meaning given to it in Section 5.08(b).

"Business" has the meaning given to it in the Recitals.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of Miami, Florida.

"Business Employees" means all current and former employees, officers and directors of Sellers who perform as of the date hereof (or have in the past performed) services primarily related to the Business.

"Canada Leased Real Property Leases" has the meaning given to it in Section 3.23(k)(ii).

"Canadian GAAP" means the generally accepted accounting principles as set forth in the Handbook of the Canadian Institute of Chartered Accountants or a successor entity, as amended from time to time consistently applied.

"Canadian Industry Benefit Plan" means the welfare or benefit plan contributed to by Arch Canada for the benefit of the union employees of Arch Canada in Canada pursuant to the Collective Agreements.

"Canadian Purchase Price Escrow Amount" means twenty-five percent (25%) of the portion of the Purchase Price allocated to the purchase and sale of the Arch Canada Stock exclusive of any amount allocated to the Arch Canada Intercompany Notes.

"Chapter 11 Cases" has the meaning given to it in the Recitals.

"Closing" has the meaning given to it in Section 2.10.

"Closing Date" has the meaning given to it in Section 2.10.

"COBRA Obligations" has the meaning given to it in Section 6.05.

"Collateral Assignment of Intercompany Note and Security Documents" means that Collateral Assignment of Intercompany Note and Security Documents (Arch Aluminum and Glass International, Inc.) dated as of April 2, 2009 between Arch International and PNC.

"Collateral Assignment of Security Documents (Intercompany Loan)" means that Collateral Assignment of Security Documents (Intercompany Loan Collateral Agreement) dated as of April 2, 2007 between Arch International and PNC.

"Collective Agreements" has the meaning given to it in Section 3.23(l)(ii).

6

"Combined Inventory and Receivables Amount" means the aggregate value of the Inventory and Receivables.

"Competition Act" means the Competition Act (Canada).

"Competition Act Compliance" means:

(i)     the issuance of an advance ruling certificate by the Commissioner of Competition pursuant to section 102 of the Competition Act with respect to the Transactions;

(ii)     the Purchaser and the Sellers have given the notice required under section 114 of the Competition Act with respect to the Transactions and the applicable waiting period under section 123 of the Competition Act has expired or been waived in accordance with the Competition Act and the Commissioner has not obtained an injunction which adversely effects the Purchaser's ability to close this Transaction; or

(iii)     the obligation to give the requisite notice has been waived pursuant to subsection 113(c) of the Competition Act;

and, in the case of (ii) or (iii), the Purchaser has been advised in writing by the Commissioner of Competition appointed under the Competition Act (or a person authorized by the Commissioner of Competition) that such person is of the view, at that time, that, in effect, grounds do not exist to initiate proceedings before the Competition Tribunal under the merger provisions of the Competition Act with respect to the Transactions, and the form of and any terms and conditions attached to any such advice are acceptable to the Purchaser, and such advice has not been rescinded or amended.  The capitalized terms used in this definition shall have the meanings ascribed thereto in the Competition Act.

"Confidentiality Agreement" has the meaning given to it in Section 5.07(a).

"Contracts" means any contract, arrangement, note, bond, commitment, purchase order, sales order, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith.

"Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs, policies or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by Contract, credit arrangement or otherwise.

"Conveyance Taxes" means all sales, use, value added, transfer, stamp, stock transfer, real property transfer and similar Taxes.

"Corporate Name" has the meaning given to it in Section 5.10(a).

7

"Cure Costs" has the meaning given to it in Section 5.03(c).

"Deed" means, with respect to each parcel of Owned Real Property, the instrument of conveyance customary to the applicable jurisdiction in registrable or recordable form where applicable, to be executed by the applicable Seller at the Closing in order to convey to the applicable Purchaser such Seller's interest, if any, in such parcel of Owned Real Property, free and clear of all Liens, other than Permitted Encumbrances.

"Deposit Escrow Agreement" means the Deposit Escrow Agreement to be entered into among the Sellers, Purchaser and Escrow Agent, attached hereto as Exhibit 2.04.

"Determined Cure Costs" means, in the aggregate, all Cure Costs that have been determined pursuant to a Final Order or pursuant to an agreement between one or more of the Sellers and the counterparty to the applicable Assigned Contract or Designated Remaining Contract.

"Designated Remaining Contract" means each Contract designated on Exhibit 5.03(e) or which is not set forth on the Disclosure Schedules, it being agreed and understood for avoidance of doubt that the Purchaser may update Exhibit 5.03(e) at any time prior to one (1) day prior to the Closing to add or remove any Contract to or from Exhibit 5.03(e); provided, however, Purchaser may not add any previously Excluded Contract to Exhibit 5.03(e).

"Determined Remaining Liabilities" has the meaning given to it in Section 5.22(b).

"DIP Credit Agreement" has the meaning given to it in Section 2.02(b)(vii).

"Disclosure Schedule" means the Disclosure Schedule attached hereto, dated as of the date hereof, delivered by the Sellers to the Purchaser in connection with this Agreement. Notwithstanding anything to the contrary contained in the Disclosure Schedule or in this Agreement, the information and disclosures contained in any Section of the Disclosure Schedule shall be deemed to be disclosed and incorporated by reference in any other Section of the Disclosure Schedule as though fully set forth in such other Section for which the relevance and significance of such information and disclosure to such other Section is reasonably apparent on the face of such information or disclosure.

"Effective Time" means 12:01 am EST on the Closing Date.

"Employee Liabilities" has the meaning given to it in Section 2.02(a)(v).

"Employee Plans" has the meaning given to it in Section 3.10(a).

"Environmental Law" means all applicable federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule; code, order, injunction, license, rule of common law, consent decree or judgment, or legally binding judicial or administrative interpretations thereof, any of which govern or relate to pollution, protection of the environment, air emissions, water discharges, waste disposal, hazardous or toxic substances, solid or hazardous waste,

petroleum or petroleum products as any of these terms are defined in such statutes, laws, rules, regulations, codes, orders, ordinances, injunctions, decrees, rulings, or legally binding judicial or legally binding administrative interpretations thereof.

"Environmental Liability" means any claim, demand, order, suit, obligation, Liability, cost (including the cost of any investigation, testing, compliance or remedial action), consequential damages, loss or expense (including reasonable and incurred attorney's and consultant's fees and expenses) arising out of, relating to or resulting from any Environmental Law or environmental, health or safety matter or condition, including natural resources, and related in any way to the Sellers, the Business, the Purchased Assets or to this Agreement or its subject matter, in each case arising or incurred before, or related to operations, activities or events occurring before the Closing Date.

"Environmental Permits" means any permit, registration, certificate, qualification, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law or otherwise required by any applicable Governmental Authority.

"ERISA" has the meaning given to it in Section 3.10(a).

"ERISA Affiliate" means a person required at any particular time to be aggregated with any of the Sellers under Sections 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Escrow Agent" has the meaning given to it in the Deposit Escrow Agreement, the Price Adjustment Escrow Agreement, the Asserted Cure Costs Escrow Agreement, and the Independent Accounting Firm Escrow Agreement.

"Excluded Assets" has the meaning given to it in Section 2.01(b).

"Excluded Contract" has the meaning given to it in Section 5.03(a).

"Excluded Liabilities" has the meaning given to it in Section 2.02(b).

"Excluded Taxes" means all Taxes relating to the Purchased Assets or the Business for any Pre-Closing Period and any income Taxes imposed on the Sellers. For purposes of this Agreement, in the case of any Straddle Period, (a) Property Taxes relating to the Purchased Assets allocable to the Pre-Closing Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that fall within the portion of the Straddle Period ending on (and including) the day before the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (b) Taxes (other than Property Taxes) relating to the Purchased Assets for the Pre-Closing Period shall be computed as if such taxable period ended as of 12:01 a.m. eastern time on the Closing Date.

"Execution Date" shall have the meaning given to it in the Preamble.

"Final Order" means an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and: (i) as to which the time to appeal or seek reconsideration or rehearing thereof has expired; (ii) in the event of a motion for reconsideration or rehearing is filed, such motion shall have been denied by an order or judgment of the Bankruptcy Court; or (iii) in the event an appeal is filed and pending, a stay pending appeal has not been entered; provided, however that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order, and provided further with respect to an Order or judgment of the Bankruptcy Court determining a Cure Cost, such Order or judgment shall have become final and non-appealable.

"Financial Statements" has the meaning given to it in Section 3.04.

"Finished Goods Inventory" means all finished goods relating to the Business and maintained, held or stored by or for any of the Sellers in connection with the Business, as of the Closing Date, and any prepaid deposits for any of the same.

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Governmental Authority" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court (including the Bankruptcy Court), tribunal, or judicial or arbitral body.

"Hazardous Material" means (a) any petroleum, petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials or polychlorinated biphenyls, (b) any chemical, material or substance defined or regulated as toxic or hazardous or as a pollutant, contaminant or waste under any Environmental Law and (c) any other chemical, material, substance, mixture or by product, the presence of or exposure to which is prohibited, limited or regulated by any Governmental Authority.

"HHH" has the meaning given to it in Section 2.02(b)(xi).

"HHH Liability" has the meaning given to it in Section 5.22(c)

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"ICA" means the Investment Canada Act (Canada).

"Inactive Employees" means Business Employees who are, at the Closing, on an authorized leave of absence or temporary leave of absence, including absence for workers' compensation leave, short term or long term disability, military leave, and parental or maternity leave.

"Independent Accounting Firm" means a qualified independent public accounting firm, which such accounting firm shall not be one of the ten largest accounting firms in the United States, having no material relationship to either Purchaser or Sellers as may be jointly selected by the Sellers and the Purchaser acting reasonably, or, if they are unable to so jointly select such a firm, as may be appointed by the Bankruptcy Court.

"Independent Accounting Firm Report" has the meaning given to it in Section 2.08(a).

"Independent Accounting Firm Cost Deposit" means a deposit in the amount of $25,000.00 for the estimated fees and disbursements of the Independent Accounting Firm for the services contemplated in Section 2.08.

"Independent Accounting Firm Escrow Agreement" means the Independent Accounting Firm Escrow Agreement in the form attached hereto as Exhibit 2.08 to be entered into among the Sellers, the Purchaser, the Independent Accounting Firm and the Escrow Agent.

"Insurance Policies" has the meaning given to it in Section 3.16.

"Intellectual Property" means (a) patents, including reissued and reexamined patents and extensions corresponding thereto, and patent applications, including continuation, continuation in part and divisional applications and patents issuing therefrom and inventions and discoveries that may be patentable, (b) registered and unregistered trademarks, service marks, trade names, trade dress and Internet domain names, together with the goodwill associated therewith, and registrations and applications for registration thereof, (c) the Sellers' corporate names including "Arch Aluminum & Glass Co., Inc." and all similar names and all derivations thereof, (d) copyrights including copyrights in computer software and registrations and applications for registration thereof; (e) trade secrets and confidential and proprietary information, know-how, customer lists, software, technical information, data, processes and plans and (f) other related proprietary rights.

"Intercompany Loans" means, with respect to each Seller, any intercompany indebtedness related to the Business between any such Seller and another Seller, whether or not evidenced by promissory notes and/or recorded in the books and records of such Sellers.

"Interim Price Adjustment" means the amount of the Actual Price Adjustment, determined as provided in Section 2.08, as if the Closing occurred at the first instance in time (Eastern time) on the most recent practical date preceding the Closing as reasonably determined by the parties. For purposes of Section 2.04(a)(ii), if the calculation of the Interim Price Adjustment results in a positive amount, such amount shall be an "excess" and if the calculation of the Interim Price Adjustment results in a negative amount, such amount shall be a "deficiency." For the avoidance of doubt, the Interim Price Adjustment shall include calculations of the Target Arch Canada Working Capital and the Target Inventory and Receivables Amount.

"Inventory" means all inventory, merchandise, work in progress, residual by-products, samples, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to the Business (other than the Arch Canada Business) and

maintained, held or stored by or for any of the Sellers in connection with the Business (other than the Arch Canada Business), as of the Closing Date, and any prepaid deposits for any of the same, all as calculated in accordance with Exhibit 1.01(e). For the avoidance of doubt, Inventory relating to the Arch Canada Business shall not be included in the definition of "Inventory."

"Investment Banker" means Piper Jaffray & Co.

"IRS" means the Internal Revenue Service of the United States.

"Law" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, by-law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, order, ruling, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued or entered by any Governmental Authority.

"Leased Real Property" means the real property listed on Section 2.01(a)(i)(B) of the Disclosure Schedule, together with (a) any prepaid rent, cash security deposits and options to renew or purchase relating to the foregoing and (b) all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems and items of personal property of such Seller used in the Business attached or appurtenant thereto and all easements, rights of way, options, renewal rights, licenses, rights and appurtenances relating to the foregoing.

"Lenders" means those parties defined as "Lenders" under any DIP Credit Agreement.

"Liabilities" means any and all debts, liabilities, obligations to perform services and other obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, known or unknown or determined or determinable, including those arising under any Law, Action or Order and those arising under any Contract.

"Liens" means any mortgage, deed of trust, pledge, assignment, security interest, encumbrance, lien, charge, hypothecation, deemed trust, Action, easement, charge, option, warrant, lease, sublease, right of possession, restrictive covenant, claim as defined in Section 101(5) of the Bankruptcy Code or otherwise, or claim of any kind or nature whatsoever in respect of any property including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code, any Personal Property Security Act or any comparable Law in any other jurisdiction.

"Loss" has the meaning given to it in Section 5.06.

"Material Adverse Effect" means any event, circumstance, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes or effects (a) has had or could reasonably be expected to have or result in a material adverse effect in the operations, results of operations, properties, assets, liabilities,

prospects, or condition (financial or otherwise) of the Business, the Purchased Assets, or the Assumed Liabilities or (b) has or could reasonably be expected to prevent, materially delay or materially impair the ability of the Sellers to consummate the Transactions, except, in each case, for any such effects resulting from or attributable to (i) events, circumstances, changes or effects that generally, or in the regions in which the Business operates, affect the industries in which the Business operates (including legal and regulatory changes); (ii) general economic or political conditions or events, circumstances, changes or effects affecting the financial or securities markets generally; (iii) events, circumstances, changes or effects relating to foreign currency exchange rate fluctuations; (iv) any circumstance, change, effect that results from any action taken at the written request of Purchaser; (v) any event, circumstance, change or effect arising solely by reason of the mere filing of the Chapter 11 Cases; (vi) changes caused by acts of war, armed hostilities or terrorism or any escalation or worsening of current conditions caused by such acts of war, armed hostilities or terrorism (whether or not declared) occurring after the date hereof and (vii) changes arising from the consummation of the Transactions, or the announcement of the execution of this Agreement, including any actions of competitors; provided, however, that the foregoing clauses (other than clauses (iv) or (v)) shall not include, and thus the determination of "Material Adverse Effect" shall not exclude, any event, circumstance, development, change or effect that has a disproportionately negative effect on the Business, the Purchased Assets, the Assumed Liabilities or the Sellers as compared to the effect on other companies in the industries and markets in which the Business is conducted.

"Material Canadian Adverse Effect" means any event, circumstance, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes or effects (a) has had or could reasonably be expected to have or result in a material adverse effect in the operations, results of operations, properties, assets, liabilities or condition (financial or otherwise) of the Arch Canada Business or the Arch Canada Assets or (b) has or could reasonably be expected to prevent, materially delay or materially impair the ability of the Sellers to consummate the Transactions with respect to the transfer of the Arch Canada Stock, except, in each case, for any such effects resulting from or attributable to (i) events, circumstances, changes or effects that generally, or in the regions in which the Arch Canada Business operates, affect the industries in which the Arch Canada Business operates (including legal and regulatory changes); (ii) general economic or political conditions or events, circumstances, changes or effects affecting the financial or securities markets generally; (iii) events, circumstances, changes or effects relating to foreign currency exchange rate fluctuations; (iv) any circumstance, change, effect that results from any action taken at the written request of Purchaser; (v) any event, circumstance, change or effect arising solely by reason of the mere filing of the Chapter 11 Cases; (vi) changes caused by acts of war, armed hostilities or terrorism or any escalation or worsening of current conditions caused by such acts of war, armed hostilities or terrorism (whether or not declared) occurring after the date hereof and (vii) changes arising from the consummation of the Transactions, or the announcement of the execution of, this Agreement, including any actions of competitors; provided, however, that the foregoing clauses (other than clauses (iv) or (v)) shall not include, and thus the determination of "Material Canadian Adverse Effect" shall not exclude, any event, circumstance, development, change or effect that has a disproportionately negative effect on the Arch Canada Business, the Arch Canada Assets, or Arch Canada as compared to the effect on other companies in the industries and markets in which the Arch Canada Business is conducted.

13

"Material Contracts" has the meaning given to it in Section 3.12(a).

"Mechanics Liens" means mechanics', carriers', workers', repairers' and other similar Liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the obligated party, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation) and there is no dispute with respect thereto.

"Memorandum" has the meaning given to it in Section 3.26.

"Non-Compliance" has the meaning given to it in Section 7.02(a)(i).

"Non-Compliance Payments" has the meaning given to it in Section 7.02(a)(i).

"Omnibus Assignment of Lease" means the Omnibus Assignment of Lease to be executed by the Sellers at the Closing with respect to all parcels of Leased Real Property, substantially in the form of Exhibit 1.01(a).

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final, including, without limitation, any order entered by the Bankruptcy Court in the Chapter 11 Cases (including, without limitation the Transaction Approval Order).

"Owned Real Property" means the real property and interests in real property listed on Section 2.01(a)(i)(A) of the Disclosure Schedule and all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, and items of personal property attached or appurtenant thereto and all interests, easements, rights of way, licenses, rights, privileges, covenants, restrictive covenants, possibilities of reverter, options to purchase, hereditaments and other appurtenances relating to the foregoing.

"Paid Employee Liabilities" has the meaning given to it in Section 5.22(b).

"Permit" has the meaning given to it in Section 3.18.

"Permits and Licenses" has the meaning given to it in Section 2.01(a)(ix).

"Permitted Encumbrances" means (a) statutory Liens for current Property Taxes not yet due and payable and that are subject to pro-ration pursuant to Section 5.16; (b) Mechanics Liens with respect to the Arch Canada Leased Real Property and any interest therein; (c) zoning, landmarking, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the occupancy or current use of any of the Purchased Assets; (d) all covenants, conditions, restrictions, easements, rights of way, licenses and other similar interests in land (excluding, for greater certainty, as of the Closing, any mortgages, assignments of rents or any other financial charges except those in the preceding clause (a)) that do not materially interfere with the occupancy, value or current use of any such real property or any interests therein; (e) in the case

14

of real property located in the United States, standard printed general title exceptions customarily contained in title policies issued in the state where the property is located which do not materially impair the occupancy, value or current use of the real property which they encumber, excluding those with respect to exceptions for parties in possession, it being understood that exclusive possession is being delivered at Closing; and (f) matters which would be disclosed by an accurate survey of the real property which do not materially impair the occupancy, value or current use of such real property which they encumber.

"Permitting Process" has the meaning given to it in Section 5.09(a).

"Person" means any individual, partnership, firm, corporation, limited liability company, association, joint venture, trust, Governmental Authority, first nation, aboriginal or native group or band, unincorporated organization or other entity.

"Personal Information" means any information about an identifiable individual subject to Privacy Laws.

"Personal Property Security Act" means the Personal Property Security Act as in effect in the applicable Canadian province.

"Petition Date" means the date on which the Sellers file the Chapter 11 Cases with the Bankruptcy Court.

"PNC" means PNC Bank, National Association.

"PNC Credit Facility" means the PNC Loan Agreement and the Other Documents as defined in the PNC Loan Agreement.

"PNC Lenders" means the "Lenders" as defined in the PNC Loan Agreement.

"PNC Loan Agreement" means the Loan and Security Agreement dated as of April 2, 2007 among the Sellers, PNC and the additional lenders signatory thereto (the "Other Lenders"), as amended.

"Pre-Closing Period" means any taxable period (or portion thereof ending on or prior to the Closing Date.

"Prepetition Credit Agreement" has the meaning given to it in Section 2.02(b)(vii).

"Price Adjustment Deposit" has the meaning given to it in Section 2.04(b).

"Price Adjustment Difference" has the meaning given to it in Section 2.08(b)(i).

"Price Adjustment Escrow Agreement" has the meaning given to it in Section 2.07(b).

"Privacy Laws" means all applicable Laws governing the collection, use, disclosure, processing, and/or protection of personal information.

"Product Liabilities" means, with respect to any products designed, manufactured, tested, marketed, distributed or sold by the Sellers to the extent relating to the Business, all Liabilities resulting from actual harm, injury, damage or death to persons, property or business.

"Property Taxes" means real and personal ad valorem property Taxes and any other Taxes imposed on a periodic basis and measured by the value of any item of property.

"Purchase Price" has the meaning given to it in Section 2.03.

"Purchase Price Bank Account" means a bank account in the United States to be designated by Arch in a written notice to the Purchaser at least five (5) Business Days before the Closing.

"Purchased Assets" has the meaning given to it in Section 2.01(a).

"Purchaser" has the meaning given to it in the Preamble.

"Purchaser's Deposit" has the meaning given to it in Section 2.06(a).

"Purchaser's Counsel" means Kirkland & Ellis, LLP.

"Quarterly Statements" has the meaning given to it in Section 3.04.

"Receivables" means any and all accounts receivable, notes and other amounts receivable from third parties, including customers, arising from the conduct of the Business (other than the Arch Canada Business) before the Closing, whether or not in the ordinary course, together with any unpaid financing costs accrued thereon, all as calculated in accordance with Exhibit 1.01(f). For the avoidance of doubt, Receivables relating to the Arch Canada Business shall not be included in the definition of "Receivables."

"Registered" means, solely with respect to Intellectual Property, issued by, registered or filed with, renewed by or the subject of a pending application or registration before any Governmental Authority or Internet domain name registrar.

"Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"Related Person" means, (a) with respect to a particular individual, (i) each other member of such individual's Family; (ii) any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family; (iii) any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest; and (iv) any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee; and (b) with respect to a specified Person other than an individual, (i) any Person that directly or

indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person; (ii) any Person that holds a Material Interest in such specified Person; (iii) each Person that serves as a director, officer, partner, executor, or trustee of such specified Person; (iv) any Person in which such specified Person holds a Material Interest; (v) any Person with respect to which such specified Person serves as a general partner or a trustee; and (vi) any Related Person of any individual described in clause (ii) or (iii).  For purposes of this definition, (x) the "<u>Family</u>" of an individual includes (i) the individual, (ii) the individual's spouse and children who reside with such individual, and (y) "<u>Material Interest</u>" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least 25% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 25% of the outstanding equity securities or equity interests in a Person.

"<u>Release</u>" means any release, spill, emission, migration, leaking, pumping, injection, deposit, disposal or discharge of any Hazardous Materials into the environment, to the extent giving rise to liability under applicable Environmental Laws.

"<u>Representatives</u>" means, with respect to a particular Person, any director or officer or other designated representative of such Person, including such Person's attorneys and financial advisors.

"<u>Section 116 Escrow Agreement</u>" means the Section 116 Escrow Agreement in the form attached hereto as <u>Exhibit 2.04(h)</u> to be entered into among Arch International, the Purchaser (or its assignee) and Heenan Blaikie LLP.

"<u>Sellers</u>" has the meaning given to it in the Preamble.

"<u>Sellers' Knowledge</u>", "<u>Knowledge of the Sellers</u>" or similar terms used in this Agreement mean the knowledge (actual or the knowledge that a prudent individual could be expected to become aware of) of the Persons listed in <u>Exhibit 1.01(d)</u> after reasonable inquiry and investigation.

"<u>Shared Contract</u>" has the meaning given to it in <u>Section 5.03(e)</u>.

"<u>Straddle Period</u>" means any taxable period beginning on or prior to and ending after the Closing Date.

"<u>Target Arch Canada Working Capital</u>" shall be determined in connection with the calculation of the Interim Price Adjustment and the Actual Price Adjustment and will be based on Arch Canada Working Capital at Closing within a range of Three Million Six Hundred Thousand Dollars ($3,600,000.00) (the "<u>Arch Canada Working Capital Floor</u>") and Four Million Dollars ($4,000,000.00) (the "<u>Arch Canada Working Capital Collar</u>").  Accordingly, if Arch Canada Working Capital at Closing is greater than the Arch Canada Working Capital Collar then the Target Arch Canada Working Capital shall mean the Arch Canada Working Capital Collar and if the Arch Canada Working Capital at Closing is the less than the Arch Canada Working Capital Floor, then the Target Arch Canada Working Capital shall mean the Arch Canada Working Capital Floor.

"Target Inventory and Receivables Amount" shall be determined in connection with the calculation of the Interim Price Adjustment and the Actual Price Adjustment and will be based on the aggregate book value of the Combined Inventory and Receivables Amount at Closing within a range of Fifty Five Million Dollars ($55,000,000.00) (the "Target Inventory and Receivables Floor") and Sixty One Million Dollars ($61,000,000.00) (the "Target Inventory and Receivables Collar"). Accordingly, if the Target Inventory and Receivables Amount at Closing is greater than the Target Inventory and Receivables Collar then the Target Inventory and Receivables Amount shall mean the Target Inventory and Receivables Collar and if the Target Inventory and Receivables Amount at Closing is the less than the Target Inventory and Receivables Floor, then the Target Inventory and Receivables Amount shall mean the Target Inventory and Receivables Floor.

"Tax" or "Taxes" means any and all taxes, assessments, charges, duties, fees, levies or other governmental charges, including, without limitation, all federal, state, provincial, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, employment insurance, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

"Tax Act" means the Income Tax Act (Canada), as amended through the date hereof.

"Tax Code" means the U.S. Internal Revenue Code of 1986, as amended through the date hereof.

"Tax Documents" has the meaning given to it in Section 5.14.

"Tax Escrow Account" has the meaning given to it in Section 5.22(a).

"Tax Escrow Agreement" has the meaning given to it in Section 5.22(a).

"Tax Returns" means any and all returns, reports, documents, declarations, claims for refund, actual refunds or other information or filings required to be supplied to any Governmental Authority or jurisdiction (foreign or domestic) with respect to Taxes together with all schedules or attachments thereto, including, without limitation, information returns where required, any documents with respect to or accompanying payments of estimated Taxes, or any documents with respect to or accompanying requests for the extension of time in which to file any such report, return, document, declaration or other information, and including any amendments of any of the foregoing.

"Title Company" has the means given to it in Section 2.13.

"Transaction Approval Order" means an Order of the Bankruptcy Court, in a form reasonably acceptable to the Purchaser, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing the Sellers to consummate the Transactions contemplated hereby, including the transfers of the Purchased Assets to Purchaser.  The Transaction Approval Order shall find and provide, inter alia, that (i) the transfers of the Purchased Assets by the Sellers to the Purchaser pursuant to this Agreement (A) will be legal, valid and effective transfers of the Purchased Assets, (B) will vest the Purchaser with all right, title and interest of the Sellers in and to the Purchased Assets, free and clear of any Liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code (including, without limitation, any right of setoff, recoupment, netting or deduction); and (C) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and under applicable state law; (ii) the Transactions contemplated by this Agreement are undertaken by the Purchaser and the Sellers at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code; (iii) the Purchaser has a full general release with respect to all claims and defenses that the Sellers or any party claiming through the Sellers may have against the Purchaser  (other than claims against the Purchaser arising under this Agreement); (iv) the Sellers have complied with the notice requirements of Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure and any applicable rules of the Bankruptcy Court with respect to the Transactions contemplated by this Agreement and by all other agreements, documents and instruments contemplated in connection with this Agreement; (v) the Sellers have satisfied all of the requirements of, and are authorized pursuant to, Sections 105, 363(b) and 365 of the Bankruptcy Code to enter into this Agreement and to consummate the Transactions contemplated hereby and (vi) the Transaction Approval Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rule 6004(h) and 6006(d).

"Transactions" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"Transferred Employees" means the Business Employees who accept an offer of employment by the Purchaser made pursuant to Section 6.01(a) or Section 6.01(b).

"Transferred Intellectual Property" means all Intellectual Property owned by any Seller that is used primarily in connection with the Business, including any right, title and interest of the Sellers in and to the Transferred Names and Marks, but excluding the Intellectual Property that is listed or described in Section 2.01(b)(v) of the Disclosure Schedule.

"Transferred Names and Marks" means the names and trademarks listed on Section 3.08 to the Disclosure Schedule, together with any and all goodwill associated exclusively therewith.

"Transition Services Agreement" has the meaning given to it in Section 5.12.

"Uniform Commercial Code" means Uniform Commercial Code as in effect in the applicable state.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988.

19

"Welfare Benefits" has the meaning given to it in Section 6.04.

"Year-End Financial Statements" has the meaning given to it in Section 3.04.

SECTION 1.02.    Interpretation and Rules of Construction.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)    references to a Person are also to the Person's heirs, executors, administrators, personal representatives, successors and permitted assigns, as applicable;

(h)    references to the Sellers are also to each Seller individually; and

(i)    the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

ARTICLE II
PURCHASE AND SALE

SECTION 2.01.    Purchase and Sale of Assets.

(a)    Upon the terms and subject to the conditions of this Agreement, at the Closing, each Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to the Purchaser, and the Purchaser shall purchase from such Seller, (x) the Arch Canada Stock and (y) any and all assets and rights of the Sellers which are used in or held for use in the Business, other than the Excluded Assets, including but not limited to the following assets (the "Purchased Assets"), in each case, free and clear of all Liens (except, in relation to any Purchased Assets (other than any Arch Canada Stock) any Permitted

20

Encumbrances other than Mechanics Liens) pursuant to Sections 363(b), (m) and (f) and Section 365 of the Bankruptcy Code:

(i)    the Owned Real Property and the Leased Real Property save and except any Leased Real Property that is leased under a lease that is an Excluded Contract;

(ii)    all tangible personal property used primarily in the conduct of the Business, including equipment, machinery, spare parts, trucks, cars, other vehicles and rolling stock, furniture, fixtures, trade fixtures, leasehold improvements, office materials and supplies, and other tangible personal property located on, or off, the premises of the Owned Real Property and Leased Real Property;

(iii)    Receivables, including the outstanding receivable evidenced by the Arch Canada Intercompany Notes (as of the date hereof, the outstanding receivable evidenced by the Arch Canada Intercompany Notes is 5,206,076 Canadian Dollars).

(iv)    the Inventory;

(v)    all files, books of account, general, financial and Tax (other than income tax) records, personnel records of the Transferred Employees, invoices, shipping records, supplier lists, correspondence, memoranda, plats, architectural plans, surveys, title insurance policies, drawings, plans and specifications, environmental reports, maintenance or service records, soil tests, engineering reports, expired purchase orders, operating records, operating safety manuals, and other printed, written or electronic material and documents, records and files and any rights thereto owned, primarily associated with or primarily employed by the Sellers in the conduct of the Business;

(vi)    all goodwill associated with the Business or the Purchased Assets, including rights under any confidentiality agreements executed by any third party for the benefit of any of the Sellers to the extent relating to the Business;

(vii)    the Transferred Intellectual Property other than Transferred Intellectual Property that may not be transferable as expressly identified in Section 2.01(b)(v) of the Disclosure Schedule;

(viii)    all Assigned Contracts, including any outstanding cash deposits thereunder (provided that Purchaser shall be required to replace any non-cash security in connection with any Assigned Contract);

(ix)    all of Sellers' assignable interest in all municipal, state, provincial, federal and foreign franchises, permits, licenses, agreements, waivers and authorizations, including Environmental Permits, held or used by the Sellers primarily in connection with the Business (collectively, the "Permits and Licenses") and all cash deposits and prepaid expenses held by third parties and/or governmental agencies, save and except any that is an Excluded Contract;

(x)    all causes of action (whether or not asserted as of the Closing Date) relating to the Purchased Assets or the Business (including, without limitation, of vendors,

suppliers and customers thereof) or Sellers' operations relating to the Business or any of the foregoing, other than the causes of action described in Section 2.01(b)(ix);

(xi)    the sales and promotional literature, customer lists and other sales-related materials related to the Business;

(xii)    the amount of, and all rights to any, insurance proceeds received by the Sellers after the date hereof in respect of the Loss, destruction or condemnation of any Purchased Assets occurring prior to or after the Closing or relating to any Assumed Liabilities;

(xiii)    all unexpired, transferable warranties, indemnities, or guaranties from any third party with respect to any Purchased Asset, including any item of real property, personal property or equipment;

(xiv)    subject to the provisions of Section 2.01(b), (A) to the extent related to the Purchased Assets, the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and all security therefor received by the Sellers on the purchase or other acquisition of the Purchased Assets, and (B) any rights, demands, claims, credits, allowances, rebates, or rights of setoff, other than against Sellers or any of their Affiliates arising out of or relating to any of the Purchased Assets;

(xv)    the Arch Canada Stock;

(xvi)    all current and prior insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(xvii)    all avoidance Actions against (1) customers of the Sellers listed on Exhibit 2.01(xvii)(1) and (2) suppliers or vendors to the Sellers listed on Exhibit 2.01(xvii)(2);

(xviii)    any Employee Plans and any assets relating thereto, including the cash deposit associated with the Assumed Benefit Plans; and

(xix)    the interest of Sellers in all other property and rights of every kind or nature used by the Sellers or useful in the operation of the Business other than the Excluded Assets.

Notwithstanding anything in this Agreement to the contrary (including for avoidance of doubt the provisions governing Designated Remaining Contracts), the Purchaser may, at any time on or before one (1) day prior to the Closing, exclude from the definition of Purchased Assets and include in the definition of the Excluded Assets any asset, Contract or property, or any portion, part or parcel of any such asset or property not otherwise included therein. Purchaser's determination to exclude any asset or property from the definition of Purchased Assets shall not in any manner reduce the Purchase Price.

(b)    Notwithstanding anything in Section 2.01(a) to the contrary, the Sellers shall not sell, convey, assign, transfer or deliver, nor cause to be sold, conveyed, assigned, transferred or delivered, to the Purchaser, and the Purchaser shall not purchase, and the

Purchased Assets shall not include, the Sellers' right, title and interest in and to the following assets of the Sellers (the "<u>Excluded Assets</u>"):

(i)     the Purchase Price Bank Account;

(ii)     all cash and cash equivalents, securities and negotiable instruments of the Sellers other than Arch Canada on hand, in lock boxes, in financial institutions or elsewhere, including all cash residing in any collateral cash account securing any obligation or contingent obligation of the Sellers or any of their United States Affiliates unless such cash is a specific Purchased Asset or unless such cash relates to an Assumed Liability, in which case such cash will be deemed a Purchased Asset and will be set forth in a schedule to be provided by the Sellers to the Purchaser one (1) Business Day prior to the date of the Auction (as defined in the Arch Assets Bid Procedures Order) or unless such cash is property of Arch Canada;

(iii)     all Tax refunds, rights to Tax refunds and all Tax attributes, including net operating losses, related to any period prior to the Closing, including to carryback net operating losses to obtain refunds of Taxes paid in years prior to the Closing, in each case, except as such Tax refunds and attributes relate to Arch Canada;

(iv)     the company seal, minute books, charter documents, stock or equity record books and such other books and records pertaining to the organization, existence or capitalization of the Sellers, as well as any other records or materials relating to the Sellers generally, and not involving or directly related to the Purchased Assets or the operations of the Business, in each case, except as it relates to Arch Canada;

(v)     any right, property or asset that is listed or described in <u>Section 2.01(b)(v)</u> of the Disclosure Schedule;

(vi)     all rights of the Sellers under this Agreement and the Ancillary Agreements;

(vii)     Tax Returns of the Sellers, other than those relating solely to the Purchased Assets or the Business, except that income tax returns and documents and records related to such income tax returns (whether or not relating solely to the Purchased Assets or the Business) shall be Excluded Assets, with the exception of income tax returns and documents and records related to such income tax returns relating to Arch Canada;

(viii)     Intercompany Loans and all promissory notes evidencing the same, except for the Arch Canada Intercompany Notes;

(ix)     any rights, demands, claims, actions, including causes of action constituting avoidance actions or other claims of Sellers' estates under chapter 5 of the Bankruptcy Code other than those set for in <u>Section 2.01(a)(xvii)</u>; and

(x)     any Excluded Contract and rights thereunder.

SECTION 2.02.        Assumption and Exclusion of Liabilities.

(a)        The Purchaser shall assume no Liability of the Sellers whatsoever except the Liabilities expressly set forth in this Section 2.02 (the "Assumed Liabilities"), which the Purchaser shall assume and pay, perform and discharge in accordance with their respective terms, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such Liabilities are owed:

(i)        all liabilities of the Sellers under the Assigned Contracts for the lease of Real Property (other than any that is an Excluded Contract) and the other Assigned Contracts, in each case, arising and relating to the period from and after the Closing Date;

(ii)        in respect of each Assigned Contract for which all necessary consents and Bankruptcy Court approvals to transfer have been obtained, all Determined Cure Costs determined on or before the date that is two (2) Business Days prior to Closing and all other Determined Cure Costs determined thereafter in respect of such Assigned Contract, it being understood and agreed that all Determined Cure Costs shall be paid from the Purchase Price in accordance with Section 2.04;

(iii)        all Liabilities in respect of Permits and Licenses (other than any that is an Excluded Contract) arising and relating to the period from and after the Closing Date, including filing and other fees related thereto;

(iv)        all Liabilities to Transferred Employees with respect to accrued vacation (the "Employee Accrued Vacation");

(v)        all Liabilities of the Sellers under or with respect to the Employee Plans that are specifically set forth in Section 2.02(a)(v) of the Disclosure Schedule, except as provided in Section 2.02(b)(xi) (the "Assumed Benefit Plans") and all Liabilities of Sellers under or with respect to the workers' compensation insurance covering Business Employees specifically set forth in Section 2.02(a)(v) of the Disclosure Schedule (the "Assumed Workers' Compensation Insurance") (collectively, the Liabilities set forth in Section 2.02(a)(iv) with respect to Employee Accrued Vacation, the Liabilities set forth in this Section 2.02(a)(v) with respect to the Assumed Benefit Plans and the Assumed Workers' Compensation Insurance and the Liabilities with respect to COBRA Obligations, the "Employee Liabilities").

(vi)        all Liabilities of the Sellers under the Permitted Encumbrances, other than Mechanics Liens, relating to the Business and the Purchased Assets arising and relating to the period from and after the Closing Date;

(vii)        all real and personal property Taxes and assessments on the Purchased Assets that relate to the period from and after the Closing Date;

(viii)        all Liabilities arising as a result of the ownership, operation and use of the Purchased Assets by the Purchaser from and after the Closing Date; and

(ix)        all Liabilities set forth in Section 2.02(a)(ix) of the Disclosure Schedule.

(b)     Notwithstanding anything to the contrary in this Agreement, the parties expressly acknowledge and agree that the Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of the Sellers, or of any predecessor or Affiliate of the Sellers, or relating to any of the Purchased Assets other than the Assumed Liabilities.  Without limiting the foregoing, the Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims all of the following Liabilities of the Sellers, or of any predecessor or Affiliate of the Sellers (the "Excluded Liabilities"):

(i)     all Excluded Taxes;

(ii)    all Liabilities relating to or arising out of the Excluded Assets;

(iii)   all accounts payable;

(iv)    all  Environmental Liabilities in respect of the Owned Real Property, the Leased Real Property and any area used pursuant to the Permits and Licenses or relating to the Business, or Hazardous Material or environmental conditions that exist on or prior to the Closing Date;

(v)     all  Sellers' obligations under this Agreement and the Ancillary Agreements and any expenses incurred by the Sellers in connection with the execution of this Agreement and the Ancillary Agreements;

(vi)    all Liabilities arising as a result of any Action initiated at any time, to the extent related to the Business on or prior to the Closing Date, except to the extent that any such Liability is an Assumed Liability;

(vii)   all  Liabilities arising under any loan, account payable or other indebtedness of the Sellers, including any such Liabilities owed to the Affiliates of the Sellers and any such Liabilities arising under the PNC Credit Facility (as amended to date, the "Pre-petition Credit Agreement") and, if applicable, any Debtor-In-Possession Credit and Security Agreement entered into by the Sellers with the approval of the Bankruptcy Court after the Petition Date (the "DIP Credit Agreement");

(viii)  all  Liabilities to Transferred Employees arising under the severance agreements, including but not limited to those disclosed in Sections 3.10 and 3.10(f) of the Disclosure Schedules, or for the payment of a "parachute payment" (as such term is defined in Section 280G of the Tax Code);

(ix)    all Liens except Permitted Encumbrances (excluding Mechanics Liens);

(x)     all Product Liabilities, successor liabilities and the like other than those warranty claims and rebate obligations set forth in Section 2.02(a)(ix) of the Disclosure Schedule. Provided, however, the Sellers covenant and agree to make all payments of rebate obligations in the ordinary course of the Business through Closing;

(xi)    all Liabilities under or with respect to the Employee Plans as they relate to or were incurred by any employees of HHH Architectural Tempering Systems, Inc. ("HHH"), including any Liabilities for penalties, fines or other amounts for any non-compliance or violations by the Sellers or the Employee Plans relating to HHH's participation in the Employee Plans; and

(xii)    all claims and causes of action of Sellers against the PNC Lenders and the lenders party to the DIP Credit Agreement.

SECTION 2.03.    Purchase Price.  The purchase price (the "Purchase Price") payable by the Purchaser to the Sellers for the sale, transfer, assignment, conveyance and delivery to the Purchaser of the Purchased Assets shall be Fifty Three Million Eight Hundred Twenty Thousand  Five Hundred Eighty Two Dollars and Twenty Three Cents ($53,820,582.23), subject to the adjustments set forth in Section 2.04.

SECTION 2.04.    Payment of the Purchase Price.  The Purchaser shall pay the Purchase Price as follows:

(a)    the sum of: (i) the Purchase Price (as adjusted pursuant to Section 2.04(i)); (ii) plus an amount equal to fifty percent (50%) of an Interim Price Adjustment excess or minus an amount equal to fifty percent (50%) of an Interim Price Adjustment deficiency; minus (iii) the amount of the Purchaser's Deposit plus all accrued interest thereon; minus (iv) the amount of the Determined Cure Costs as of two (2) Business Days prior to the Closing Date; minus (v) the amount of the Asserted Cure Costs; minus (vi) the Canadian Purchase Price Escrow Amount; minus (vii) the Independent Accounting Firm Cost Deposit minus (viii) the difference (if and only if positive) between  the Price Adjustment Deposit less an amount equal to fifty percent (50%) of an Interim Price Adjustment excess, shall be paid by completed wire transfer to the Purchase Price Bank Account of immediately available, good funds on the Closing Date to the Sellers;

(b)    the greater of (i) Two Million Dollars ($2,000,000) or  (ii) an amount equal to fifty percent (50%) of any Interim Price Adjustment excess (such amount, the "Price Adjustment Deposit") shall be deposited with the Escrow Agent on the Closing Date pursuant to the Price Adjustment Escrow Agreement, in accordance with Section 2.07(b);

(c)    an amount equal to the Independent Accounting Firm Cost Deposit shall be deposited with the Escrow Agent pursuant to the Independent Accounting Firm Escrow Agreement on the Closing Date;

(d)    the amount of the Asserted Cure Costs shall be deposited with the Escrow Agent on the Closing Date pursuant to the Asserted Cure Costs Escrow Agreement, in accordance with Section 2.09(a);

(e)    the amount of the Determined Cure Costs shall be paid to the applicable counterparties of the applicable Assigned Contracts or the Designated Remaining Contracts in accordance with Section 2.09;

(f)    the amount of the Purchaser's Deposit plus all accrued interest thereon shall be deemed to be paid by the Purchaser by the release of such amount on the Closing Date from the account established by Sellers' legal counsel to the account of the Sellers, pursuant to the Deposit Escrow Agreement and in accordance with Section 2.06;

(g)    the Purchase Price shall be (i) reduced at Closing to reflect any reduction that the Purchaser may be entitled to receive under Section 5.06, and (ii) increased by an amount equal to the aggregate amount of the letters of credit set forth in Section 5.03(g) of the Disclosure Schedule that are presented for payment by the beneficiaries thereof prior to the Closing Date and, as a result, are not required to be replaced by Purchaser pursuant to Section 5.03(g) of this Agreement; provided, however, the Purchase Price shall be increased by no more than a total of One Hundred Forty One Thousand Dollars ($141,000) as a result of this clause 2.04(g)(ii);

(h)    the amount equal to the Canadian Purchase Price Escrow Amount shall be deposited on the Closing Date and held pursuant to the provisions of the Section 116 Escrow Agreement; and

(i)    the Purchase Price shall be adjusted after the Closing to reflect any difference between the Interim Price Adjustment and the Actual Price Adjustment, as provided in Section 2.08(b).

SECTION 2.05.    Allocation of the Purchase Price.  The Purchase Price and the Assumed Liabilities (to the extent required by the Tax Code) shall be allocated among the Purchased Assets as of the Closing Date in accordance with the relative fair market value of the Purchased Assets at that time, to the extent relevant, and in a manner consistent with Section 1060 of the Tax Code and the Regulations which allocation will be set out in a schedule to be agreed upon by Sellers and Purchaser prior to the Closing Date (the "Allocation").  If the Sellers and the Purchaser are unable to agree upon the Allocation by the Closing Date, the disputed items shall be resolved by an independent accounting firm selected by the Sellers and the Purchaser.  Any subsequent adjustments to the Purchase Price shall be reflected in the Allocation in a manner consistent with Section 1060 of the Tax Code and the Regulations thereunder. Subject to the foregoing provisions of this Section 2.05, for all Tax purposes, the Purchaser and the Sellers agree that the Transactions shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and that neither of them will take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation, or otherwise. The Sellers and the Purchaser agree to cooperate with each other in preparing IRS Form 8594, and to furnish the other with a copy of such forth prepared in draft form within a reasonable period before its filing due date.  If such allocation is disputed by any taxation or other Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will use their reasonable best efforts to sustain the final allocation.  The parties will share information and cooperate to the extent reasonably necessary to permit the Transactions to be properly, timely and consistently reported.

SECTION 2.06.    Purchaser's Deposit.

(a)    On January 8, 2010, Purchaser deposited an amount equal to Two Million Six Hundred Ninety One Thousand Twenty Nine Dollars and Eleven Cents ($2,691,029.11),

which amount is equal to 5% of the Minimum Overbid Amount as defined in the Arch Assets Bid Procedures Order (the "Purchaser's Deposit") by wire transfer of immediately available good funds to the account established by Sellers' legal counsel to be held pursuant to the terms hereof and the Arch Assets Bid Procedures Order.

(b)    Without limiting the rights of the parties hereunder: (i) if this Agreement is terminated by the Sellers or the Purchaser for any of the reasons set forth in Section 8.01(a), (b), (d) or (e) hereof, then the Purchaser's Deposit, plus any accrued interest thereon, shall be returned to the Purchaser, free and clear of all Liens and without offset within one (1) Business Day of such termination; (ii) if this Agreement is terminated by the Sellers for the reason set forth in Section 8.01(c), then the Sellers shall be entitled to retain the Purchaser's Deposit, plus any accrued interest thereon; and (iii) at the Closing, the Purchaser and Sellers jointly shall cause Genovese Joblove & Battista P.A. to transfer to the Purchase Price Bank Account the Purchaser's Deposit, plus any accrued interest thereon, as a credit against the Purchase Price in all such cases, the Sellers and Purchaser to provide joint written instructions with respect thereto to Genovese Joblove & Battista P.A.  The parties hereby agree that is impossible to determine accurately the amount of damages that the Sellers would suffer if the Transactions were not consummated as a result of a breach of this Agreement by the Purchaser.  As a result, notwithstanding anything in this Agreement (or the Ancillary Agreements) to the contrary, the Sellers hereby agree that, in the event of a failure by the Purchaser to consummate the Transactions and consequent termination of this Agreement by the Sellers in accordance with Section 8.01(c), (i) the Sellers' right to retain the Purchaser's Deposit pursuant to Section 2.06(b)(ii) shall serve as liquidated damages against the Purchaser and (ii) such liquidated damages shall be the sole and exclusive remedy, at law and equity, of the Sellers against the Purchaser for the Purchaser's breach and such termination and Purchaser shall have no further liability to Sellers.

SECTION 2.07.    Interim Price Adjustment.

(a)    Not less than three (3) nor more than five (5) Business Days prior to the Closing Date, the Sellers and Purchaser jointly shall determine a calculation of the Interim Price Adjustment.

(b)    On the Closing Date, the Purchaser shall deliver to and deposit in trust with the Escrow Agent, pursuant to the terms of a Price Adjustment Escrow Agreement entered into among Sellers, the Purchaser, and the Escrow Agent, in substantially the form attached as Exhibit 2.07(b) (the "Price Adjustment Escrow Agreement"), an amount equal to the Price Adjustment Deposit.  Interest earned on the Price Adjustment Deposit shall be deemed a part of the Price Adjustment Deposit for all purposes of this Agreement.  The Price Adjustment Deposit shall be released in accordance with Section 2.08.  The Sellers and the Purchaser shall each pay, and shall each be liable only for, one-half of the Escrow Agent's escrow fees and charges in connection with the Price Adjustment Deposit Escrow Agreement.

SECTION 2.08.    Actual Price Adjustment.

(a)    Within two (2) Business Days following the Closing, (i) Representatives of the Sellers and the Purchaser, and the Independent Accounting Firm shall conduct a physical

count and valuation of the Inventory as of the Effective Time; (ii) the Independent Accounting Firm shall conduct a valuation of the Receivables as of the Effective Time; (iii) the Independent Accounting Firm shall conduct a calculation of the Arch Canada Working Capital as of the Effective Time; and (iv) Representatives of the Sellers shall provide, in consultation with the Purchaser, an accounting of the items set forth in subsections (ii), (iii) and (v) of the definition of "Actual Price Adjustment," and the Independent Accounting Firm shall deliver a report (the "Independent Accounting Firm Report") of the conclusions of that count and valuation within thirty (30) Business Days after the Closing Date, in each case, in accordance with GAAP or Canadian GAAP, as appropriate.

(b)    On the third (3rd) Business Day following the delivery of the Independent Accounting Firm Report pursuant to Section 2.08(a), the appropriate adjusting payment shall be made in accordance with this Section 2.08(b) as follows:

(i)    if the Actual Price Adjustment, as determined in accordance with this Section 2.08 is equal to or greater than the Interim Price Adjustment, then: (A) if an amount equal to the Price Adjustment Difference minus fifty percent (50%) of the absolute value of any Interim Price Adjustment is negative, then the absolute value of such amount shall be paid by Sellers to Purchaser first from release to Purchaser from the Price Adjustment Deposit by the Escrow Agent and second by wire transfer of immediately available , good funds and the remaining Price Adjustment Deposit (if any, which may be the entire Price Adjustment Deposit if such calculation is not negative) shall be released to the Sellers by the Escrow Agent; and (B) the Purchaser shall pay to the Sellers the positive amount, if any, equal to the difference, if any, between the Actual Price Adjustment and Interim Price Adjustment (such difference, the "Price Adjustment Difference") minus fifty percent (50%) of the absolute value of any Interim Price Adjustment deficiency by wire transfer of immediately available, good funds; or

(ii)    if the Actual Price Adjustment, as determined in accordance with this Section 2.08 is less than the Interim Price Adjustment and the absolute value of the Price Adjustment Difference is less than the Price Adjustment Deposit, then: (A) an amount equal to the absolute value of the Price Adjustment Difference shall be released to the Purchaser from the Price Adjustment Deposit by the Escrow Agent; and (B) the balance of the Price Adjustment Deposit shall be released to the Sellers by the Escrow Agent; or

(iii)    if the Actual Price Adjustment, as determined in accordance with this Section 2.08, is less than the Interim Price Adjustment and the absolute value of the Price Adjustment Difference is greater than the Price Adjustment Deposit, then: (A) the Price Adjustment Deposit shall be released to the Purchaser by the Escrow Agent; and (B) the Sellers shall pay to the Purchaser by wire transfer of immediately available, good funds an amount equal to the excess of the absolute value of the Price Adjustment Difference over the Price Adjustment Deposit plus fifty percent (50%) of the absolute value of any Interim Price Adjustment deficiency; and

(c)    an amount equal to the total fees and disbursements of the Independent Accounting Firm shall be released to the Independent Accounting Firm by the Escrow Agent from the Independent Accounting Firm Cost Deposit; provided that, if the total amount of fees and disbursements of the Independent Accounting Firm is greater than the amount of the

Independent Accounting Firm Cost Deposit, the Sellers shall pay the difference to the Independent Accounting Firm and if the total amount of the fees and disbursements of the Independent Accounting Firm is less than the amount of the Independent Accounting Firm Cost Deposit, fifty percent (50%) of the balance of the Independent Accounting Firm Cost Deposit shall be released by the Escrow Agent to each of (A) the Purchaser and (B) the Sellers.

(d)    The parties hereto acknowledge and agree that, for clarity and for avoidance of doubt, Exhibit 2.08(d) attached hereto sets forth mutually agreed upon examples of the interplay between the Purchase Price, Payment of Purchase Price, the Interim Price Adjustment, and the Actual Price Adjustment and such other applicable terms and mechanics set forth in, or otherwise effecting, the provisions and terms of this Article II.  Each party has received an excel version of Exhibit 2.08(d) which includes the formulas used in the calculations.

SECTION 2.09.    Cure Costs.

(a)    As part of the Purchase Price, the Purchaser agrees to satisfy as and when due all Determined Cure Costs in respect of Assigned Contracts for which all necessary consents and Bankruptcy Court approval to transfer have been obtained.  On the Closing Date, the Purchaser shall deliver to and deposit in trust with the Escrow Agent, pursuant to the terms of an Asserted Cure Costs Escrow Agreement to be entered into among the Sellers, the Purchaser and the Escrow Agent, in substantially the form attached as Exhibit 2.09(a) (the "Asserted Cure Costs Escrow Agreement"), an amount equal to the Asserted Cure Costs (the "Asserted Cure Costs Deposit").  Interest on the Asserted Cure Costs Deposit shall be deemed a part of the Asserted Cure Costs Deposit for all purposes of this Agreement.  The Asserted Cure Costs Deposit shall only be released in accordance with Section 2.09(b).  The Sellers and the Purchaser shall each pay, and shall each be liable for, one-half of the Escrow Agent's escrow fees and charges in connection with the Asserted Cure Costs Deposit escrow account.

(b)    The Sellers shall have the responsibility to file and prosecute any pleadings with the Bankruptcy Court to determine the amount of any Asserted Cure Cost.  As and when any Asserted Cure Costs becomes a Determined Cure Cost, (i) the amount of such Determined Cure Costs shall be released from the Asserted Cure Costs Deposit to the counterparty to the applicable Assigned Contract at the direction of the Sellers by the Escrow Agent, provided, however that any Asserted Cure Costs related to the Designated Remaining Contracts shall only be released when and if the Designated Remaining Contract becomes an Assigned Contract, and (ii) if any such Asserted Cure Costs are greater than the corresponding Determined Cure Costs, then the amount equal to the difference between such Asserted Cure Costs and the corresponding Determined Cure Costs shall be released from the Asserted Cure Costs Deposit to the Sellers by the Escrow Agent, in each case in accordance with the terms of the Asserted Cure Costs Escrow Agreement. After all Asserted Cure Costs have become Determined Cure Costs and with respect to any Determined Cure Costs related to the Designated Remaining Contracts at such time as such Designated Remaining Contract becomes an Assigned Contract or an Excluded Contract, the balance of the Asserted Cure Costs Deposit after any payments to counterparties to the applicable Assigned Contract, if any, shall be released to the Sellers in accordance with the terms of the Asserted Cure Costs Escrow Agreement.  At such time as any Designated Remaining Contract becomes an Assigned Contract, the Purchaser shall pay an amount, if any, equal to any cash deposits paid by the Sellers on account of such

30

Designated Remaining Contract which becomes an Assigned Contract and which deposits remain outstanding as of such date and the right to such deposit are transferred to the Purchaser pursuant to the terms hereof.  Such amount shall be paid by wire transfer to Sellers of immediately available, good funds within three (3) Business Days of notice of such amount by the Sellers to the Purchaser.

SECTION 2.10.    Closing.  Subject to the terms and conditions of this Agreement, the sale and purchase of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Genovese Joblove & Battista P.A. located in Miami, Florida on a date designated by the Purchaser within three (3) Business Days following the later of execution and docketing of the Transaction Approval Order and the expiration of the waiting periods set forth in Section 7.02(b) following the satisfaction or waiver of the conditions to the obligations of the parties hereto set forth in Section 7.01 and Section 7.02, or at such other place or at such other time or on such other date as the Sellers and the Purchaser may mutually agree upon in writing (the "Closing Date").

SECTION 2.11.    Closing Deliveries by the Sellers.  At the Closing, the Sellers shall deliver or cause to be delivered to the Purchaser:

(a)    a certified original of the Transaction Approval Order, as entered by the Bankruptcy Court;

(b)    the Bill of Sale, the Deeds, or copies of the Deeds applicable in the relevant jurisdictions for the Owned Real Property (with the Deeds to be recorded with copies of all required Conveyance Tax stamps affixed), the Omnibus Assignment of Lease, a registrable assignment of any registered lease or sublease in respect of the Leased Real Property, the Assignment of Transferred Intellectual Property and such other instruments, in form and substance and in registrable or recordation form where applicable, reasonably satisfactory to the Purchaser, as may be reasonably requested by the Purchaser to effect the transfer of the Purchased Assets to the Purchaser, or to register or record or evidence such transfer on the public records, in each case duly executed by the applicable Seller;

(c)    executed counterparts of the Price Adjustment Escrow Agreement, the Independent Accounting Firm Escrow Agreement and the Asserted Cure Costs Escrow Agreement;

(d)    executed counterparts of each Ancillary Agreement to which any of the Sellers is a party other than the Ancillary Agreements delivered pursuant to Section 2.11(b) and (c);

(e)    a certificate evidencing all of the Arch Canada Stock, duly endorsed in blank for transfer or accompanied by duly executed stock transfer powers satisfactory to Purchaser, free and clear of all Liens;

(f)    a receipt for the amount contemplated by Section 2.04(a) and, if any, Section 2.04(i);

(g)    a certificate of non-foreign status pursuant to section 1.1445-2(b)(2) of the Regulations for each Seller that is not a "foreign person" within the meaning of U.S. Treasury Regulation section 1.1445-2(b)(2)(i) and is selling a United States real property interest within the meaning of section 897(c) of the Tax Code;

(h)    a certificate issued under section 116 of the Tax Act regarding the sale of the Arch Canada Stock by Arch International to the Purchaser, if necessary;

(i)    all the records, including corporate records of Arch Canada;

(j)    a certificate of a duly authorized officer of each of the Sellers certifying as to the matters set forth in Section 7.02(a);

(k)    status statements and consents to the transfer of the Canada Leased Real Property Leases required pursuant to terms of the Canada Leased Real Property Leases from each landlord of Arch Canada Leased Real Property Leases in form and substance reasonably acceptable to the Purchaser; provided, however, the obligation of Sellers with respect to the provision of status statements, and not with respect to the consents, shall be limited to the exertion of reasonable commercial efforts where the lease in question does not obligate the landlord to provide such status statements; and

(l)    with regard to Arch Canada: (1) resolutions of the board of directors of Arch Canada approving the transfer of the Arch Canada Stock; (2) an executed stock power transferring the Arch Canada Stock to the Purchaser; (3) resignations and releases from each director and officer of Arch Canada as well as any necessary terminations of signing authority of any such persons for any Arch Canada bank accounts; and (4) a certificate of status of Arch Canada.

SECTION 2.12.    Closing Deliveries by the Purchaser.  At the Closing, the Purchaser shall deliver, or cause to be delivered

(a)    to the Sellers:

(i)    the amount contemplated by Section 2.04(a), by wire transfer in immediately available funds; and (B) the Purchaser's Deposit, plus any accrued interest thereon, in each case, to the Purchase Price Bank Account;

(ii)    executed counterparts of the Bill of Sale, the Price Adjustment Escrow Agreement, the Independent Accounting Firm Escrow Agreement, the Omnibus Assignment of Lease, the Assignment of Transferred Intellectual Property and such other instruments, in form and substance satisfactory to the Sellers, as may be reasonably requested by the Sellers, to effect the assumption by the Purchaser of the Assumed Liabilities and to evidence such assumption on the public records;

(iii)    executed counterparts of each Ancillary Agreement (other than the Ancillary Agreements delivered pursuant to Section 2.12(a)(ii) to which the Purchaser is a party);

(iv)    a certificate of a duly authorized officer of the Purchaser certifying as to the matters set forth in Section 7.01(a); and

(b)    to the Escrow Agent, the Asserted Cure Costs Deposit in accordance with Section 2.09(a) and the Price Adjustment Deposit in accordance with Section 2.07(b); and

(c)    to the applicable counterparties of the applicable Assigned Contracts, the amount of the Determined Cure Costs in accordance with Section 5.03(c).

SECTION 2.13.    Registration of Transfers of Real Property.  All closing documents shall be executed and placed into escrow at the offices of Genovese Joblove & Battista P.A. located in Miami, Florida on the Business Day before the Closing Date. The Purchaser shall provide the monies referred to in Section 2.04(a), Section 2.04(b), Section 2.04(c), Section 2.04(d) and Section 2.04(e) to the Purchaser's Counsel in trust by the same deadline.  The closing documents and the monies referred to in Section 2.04(a), Section 2.04(b), Section 2.04(c), Section 2.04(d) and Section 2.04(e) shall then be held in escrow until released as provided in this Section 2.13.  Notwithstanding anything in this Section 2.13 to the contrary, all deeds and associated transfer documents (including transfer tax forms) for the Owned Real Property shall be executed and placed into escrow with the title insurance company (the "Title Company") for recordation with the applicable county clerks or county recorder's office, as the case may be in each county where such Owned Real Property will be transferred pursuant to this Agreement.  The Title Company shall hold in escrow all U.S. Owned Real Property Transfer Documents for recordation until instructed to release and record such documents pursuant to written notice from both Sellers' Counsel and Purchaser's Counsel to be provided on the Closing.  Upon such notice, the Title Company shall record all applicable documents and return copies of the recorded documents to Purchaser's Counsel.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers jointly and severally hereby represent and warrant to the Purchaser, as of the date hereof, or if a representation or warranty is made as of a specified date, as of such date, as follows:

SECTION 3.01.    Organization, Authority and Qualification of the Sellers.  Except as a result of the commencement of the Chapter 11 Cases, each of the Sellers is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, formation or organization, and, subject to obtaining the approval of the Bankruptcy Court, has all necessary power and authority to enter into this Agreement and the Ancillary Agreements, to carry out its obligations hereunder and thereunder, and to consummate the Transactions.  Each of the Sellers has all necessary power and authority to own, lease, operate and conduct its respective businesses, properties and assets as now being conducted.  Each of the Sellers is duly licensed or qualified to do business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its respective business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (a) has resulted from the commencement or continuance of the Chapter 11 Cases; or (b) would not

33

adversely affect the ability of such Seller to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions. Subject to obtaining the Transaction Approval Order from the Bankruptcy Court, the execution and delivery of this Agreement and the Ancillary Agreements by each Seller, the performance by each Seller of its obligations hereunder and thereunder, and the consummation by each Seller of the Transactions have been duly authorized by all requisite action on the part of such Seller and its stockholders or members, as the case may be and no other corporate action or proceeding on the part of any of the Sellers is necessary to authorize the execution and delivery of this Agreement and the Ancillary Agreements by each of the Sellers, or the consummation of the Transactions. This Agreement has been, and upon their execution, the Ancillary Agreements shall have been, duly executed and delivered by each Seller, and (assuming due authorization, execution and delivery by the Purchaser), subject to the approval of the Bankruptcy Court, this Agreement constitutes, and, upon their execution, the Ancillary Agreements shall constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

SECTION 3.02.    No Conflict. Subject to the approval of the Bankruptcy Court and except as provided in the Bankruptcy Code, and assuming that all consents, approvals, authorizations and other actions described in Section 3.03 have been obtained, all filings and notifications listed in Section 3.03 of the Disclosure Schedule have been made, and any applicable waiting period has expired or been terminated, and except as may result from any facts or circumstances relating solely to the Purchaser, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Sellers and the consummation of the Transactions thereby do not and will not, except as set forth in Section 3.02 of the Disclosure Schedule: (a) violate, conflict with or result in the breach of the certificate of incorporation, articles or bylaws (or similar formation or organizational documents) of any of the Sellers; (b) conflict with or violate any Law or Order applicable to any of the Sellers or any of the Purchased Assets; (c) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, acceleration or cancellation of, any note, bond, mortgage or indenture, Contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which any of the Sellers is a party, or result in the creation of any Lien on any of the Purchased Assets, except to the extent that any such rights of termination, acceleration or cancellation and such Liens are not enforceable (both before or after completion of the Transactions) due to operation of the Bankruptcy Code, and except, in the case of clauses (b) and (c), for any such conflict, violation, breach or default that would not, individually or in the aggregate, result in a Material Adverse Effect or result in the imposition of any Lien against any assets or properties of Sellers or any subsidiary (other than the super-priority claim of the Purchaser under the Arch Assets Bid Procedures Order).

SECTION 3.03.    Governmental Consents and Approvals. The execution, delivery and performance of this Agreement and each Ancillary Agreement by the Sellers do not or, upon the entry by the Bankruptcy Court of the Transaction Approval Order as required by Section 7.01(d) and Section 7.02(d), will not require any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or other

third party under any of the terms, conditions or provisions of any Law or Order applicable to any Seller or by which any of the Purchased Assets may be bound except to the extent that such requirements are not enforceable due to the operation of the Bankruptcy Code, any Contract to which any Seller is a party or by which any Seller may be bound, except: (a) as described in Section 3.03 of the Disclosure Schedule; (b) any compliance with and filing under the pre-merger notification and waiting period requirements of the HSR Act and the Competition Act, and any compliance with, filings under or approval required under, the antitrust laws of any other relevant jurisdiction; (c) any applicable requirements under the ICA; (d) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification would not, individually or in the aggregate, have a Material Adverse Effect; or (e) as may be necessary as a result of any facts or circumstances relating solely to the Purchaser or any of its Affiliates.

SECTION 3.04.    Financial Statements; Undisclosed Liabilities.

(a)    Section 3.04(a) of the Disclosure Schedule contains (a) a complete and correct copy of the unaudited consolidated and unconsolidated financial statements of each Seller for the years-ended December 31, 2006, 2007 and 2008 ("Year-End Financial Statements"), and (b) a complete and correct copy of the unaudited financial statements of each Seller for its fiscal quarter ended September 30, 2009 ("Quarterly Statements" together with the Year-End Statements, the "Financial Statements").  The Year-End Financial Statements and the Quarterly Statements have been prepared in accordance with GAAP (except for the omission of any accompanying notes required by GAAP), consistently applied and fairly present in all material respects, the financial position, results of operations and cash flows of each of the Sellers at the respective dates thereof and for the respective periods indicated therein (subject in the case of unaudited statements, to normal and recurring year-end adjustments).

(b)    Except as set forth in Section 3.04(b) of the Disclosure Schedule, there are no Liabilities of Sellers which have not been disclosed in the Financial Statements or this Agreement which could affect the Purchased Assets or the Business and which Liabilities would attach to the Purchased Assets or the Business after the transfer to the Purchaser pursuant to the Transaction Approval Order. There is no basis for the assertion against any Seller of any liability of any nature or in any amount which is not fully reflected or reserved against in the Financial Statements.

SECTION 3.05.    Litigation.  Except for (a) the Chapter 11 Cases, and any and all Actions pending in the Bankruptcy Court arising therefrom or related thereto, (b) and as set forth in Section 3.05 of the Disclosure Schedule or (c) to the extent that any such Action constitutes an Excluded Liability, as of the date hereof there is no pending Action by or against any of the Sellers and relating to the Business or any of the Purchased Assets, or, to the Sellers' Knowledge, threatened against or affecting any of the Sellers and relating to the Business or any of the Purchased Assets.  The Sellers do not expect that any of the Actions set forth in Section 3.05 of the Disclosure Schedule would have an adverse effect on the Business or any of the Purchased Assets after taking into account the operation of the Transaction Approval Order.

SECTION 3.06.    Compliance with Laws.  Except as set forth in Section 3.06 of the Disclosure Schedule, the Sellers (a) have conducted and continue to conduct the Business in accordance with all Laws and Orders applicable to the Business, (b) have complied with and

35

continue to comply with all Laws and Orders applicable to the Purchased Assets and the Assumed Liabilities, (c) are not in violation of any such Law or Order, and (d) to the Sellers' Knowledge, have not received any notice that any violation of any such Law or Order is being or may be alleged.

     SECTION 3.07.  <u>Environmental Matters.</u>

     (a)  <u>Section 3.07</u> of the Disclosure Schedule sets forth all environmental site assessment reports and facility compliance audit reports for the past 4 years in the possession or control of the Sellers and that relate to environmental matters concerning a Purchased Asset or the Business.

     (b)  Except as referenced in <u>Section 3.07</u> of the Disclosure Schedule, the Sellers hold all material Environmental Permits required for the ownership and operation of the Purchased Assets and the Business in the manner in which they are currently owned and operated.  All such Permits are in full force and effect and there are no material defaults thereunder except as set forth in <u>Section 3.07</u> of the Disclosure Schedule.

     (c)  Except as set forth in <u>Section 3.07</u> of the Disclosure Schedule, no Seller has been served with notice of any Environmental Liability (including any Order issued under any Environmental Laws) that is currently outstanding against, and, to the Knowledge of the Sellers, no Environmental Liabilities are threatened against, a Seller, or a Purchased Asset, as applicable under any Environmental Laws and, to the Knowledge of the Sellers, there is no basis for any such Environmental Liabilities.

     (d)  Except as set forth in <u>Section 3.07</u> of the Disclosure Schedule, since the initial date on which any Seller or its respective Affiliate took possession of a Purchased Asset, there has been no Release of any Hazardous Material at or from such Purchased Asset, as applicable, that might reasonably be expected to result in an Environmental Liability.

     (e)  Except as set forth in <u>Section 3.07</u> of the Disclosure Schedule, to the Knowledge of the Sellers, there are no material quantities or concentrations of Hazardous Materials in, on or under any of the Purchased Assets, or elsewhere where Hazardous Materials have been Released from the Purchased Assets.

     SECTION 3.08.  <u>Intellectual Property</u>.  Section 3.08 of the Disclosure Schedule sets forth a true and complete list of all Registered Transferred Intellectual Property, and except as set forth therein, each item of such Registered Transferred Intellectual Property currently is in full force and effect with the Governmental Authority or Internet domain name registrar in which it is Registered.  Except as set forth in <u>Section 3.08</u> of the Disclosure Schedule, (a) a Seller is the owner of the entire right, title and interest in and to each item of Registered Transferred Intellectual Property; (b) to the Sellers' Knowledge, (i) no Person is engaging in any activity that infringes, misappropriates or otherwise violates any Registered Transferred Intellectual Property, and (ii) the conduct of the Business by the Sellers does not infringe, misappropriate or otherwise violate, the Intellectual Property rights of any third party; and (c) there is no Action pending or, to the Sellers' Knowledge, threatened, against any Seller (i) alleging that the use of any Transferred Intellectual Property infringes, misappropriates or

otherwise violates, the Intellectual Property rights of any third party, or (ii) challenging any Seller's ownership of any Transferred Intellectual Property.  The Purchaser acknowledges that the representations and warranties contained in (b) and (c) are the only representations and warranties being made in this Agreement with respect to infringement, misappropriation or other violation of Intellectual Property.

SECTION 3.09.    Real Property.

(a)    Section 2.01(a)(i)(A) of the Disclosure Schedule lists the street address, where appropriate and the current owner of each parcel of real property in which any Seller has fee title (or equivalent) interest and which is used in the conduct of the Business other than any real property set forth in Section 2.01(b)(iv) of the Disclosure Schedule.  Except as described in Section 3.09(a) of the Disclosure Schedule: (i) each Seller listed in Section 2.01(a)(i)(A) of the Disclosure Schedule as the owner of a parcel of Owned Real Property has good and marketable title in fee simple to such parcel, subject to Permitted Encumbrances; (ii) to the extent as are in the Sellers' possession, the Sellers have made available to the Purchaser copies of each Deed for each parcel of Owned Real Property; and (iii) all buildings and other improvements situated on the Owned Real Property form a part of the Owned Real Property and are owned by a Seller. The Sellers have not received written notice of any pending condemnation proceeding or any threatened condemnation that would preclude or impair the use of any Owned Real Property or the Leased Real Property by the Business for the purposes for which it is currently used.  The Sellers have not received written notice of the applicable Governmental Authority altering its zoning Laws so as to affect or potentially affect the Owned Real Property or Leased Real Property.

(b)    Section 2.01(a)(i)(B) of the Disclosure Schedule lists the street address where appropriate of each parcel of real property leased or subleased by any Seller as tenant or subtenant, as the ease may be, which is used in the conduct of the Business, and the identity of the lessee of each such parcel of Leased Real Property other than any real property set forth in Section 2.01(b)(iv) of the Disclosure Schedule.  The Sellers have made available to the Purchaser on or before the fourth (4th) Business Day prior to the hearings to approve the Transaction Approval Order, true and complete copies of the leases and subleases in effect at the date hereof (including all amendments thereto and assignments in respect thereof) relating to the Leased Real Property, and except as set forth on Section 2.01(a)(i)(B) of the Disclosure Schedule, there has not been any sublease or assignment entered into by any of the Sellers in respect of the leases and subleases relating to the Leased Real Property.  Assuming good fee simple title vested in the applicable landlords, each lease and sublease in respect of the Leased Real Property is a valid lease or sublease and Sellers have received no written notice of default except as disclosed in Section 2.01(a)(i)(B) of the Disclosure Schedule.

(c)    The Owned Real Property and the Leased Real Property constitute all of the real property used by the Sellers in the conduct of the Business.

SECTION 3.10.    Employee Matters.

(a)    Employee Plans and Material Documents.  Section 3.10 of the Disclosure Schedule lists: (i) all employee benefit plans (as defined in Section 3(3) of the Employee

Retirement Income Security Act of 1974, as amended ("ERISA")) and all bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, active or retiree medical or life insurance, hospital, dental, vision care, drug, sick leave, disability (including short term disability and long term disability), salary continuation, maternity or paternity, legal benefits, unemployment benefits, pension, supplemental retirement, savings, severance, fringe or other benefit plans, programs or arrangements, and all employment, consulting, termination, severance or other contracts or agreements, to which any of the Sellers or ERISA Affiliates is a party, with respect to which any Seller or ERISA Affiliate has any obligation or which are maintained, contributed to or sponsored by a Seller or ERISA Affiliate for the benefit of any Business Employee; (ii) each employee benefit plan related solely to the Business for which any of the Sellers could incur liability under Title IV of ERISA; and (iii) any Material Contracts between any of the Sellers or any of their United States Affiliates, and any Business Employee (collectively, the "Employee Plans").  Each Employee Plan is in writing, and the Sellers have made available to the Purchaser a true and complete copy of each Employee Plan and all amendments made to such plans together with, as applicable, any applicable collective bargaining agreements and ancillary agreements, all current funding agreements, all current summary descriptions, the most recent annual Form 5500 filed on behalf of those Employee Plans (if applicable) and, if applicable, the most recent actuarial report relating to those Employee Plans.  To the Knowledge of Sellers, no facts, conditions or circumstances have occurred between the date of the foregoing documents that were delivered or made available to the Purchaser and the date of this Agreement that would materially affect the information contained in those documents and, in particular, and without limiting the generality of the foregoing, no promises or commitments have been made to amend any Employee Plan or to provide increased benefits under any Employee Plan to any of the Business Employees, except as required by applicable Laws.

       (b)    Compliance.  Except as set forth in Section 3.10(b) of the Disclosure Schedule, each Employee Plan has been operated in all material respects in accordance with its terms and the requirements of all applicable Laws (including, without limitation, the Tax Code, ERISA and all Tax rules with which compliance is required for any intended favorable Tax treatment).  Each of the Sellers has performed all material obligations required to be performed by it in respect of the Business Employees prior to Closing under any Employee Plan, and is not in any material respect in default under or in material violation of, any Employee Plan.  There is no material default or violation of an Employee Plan by any party thereto and no action is pending or, to the Knowledge of the Sellers, threatened with respect to any Employee Plan and, no fact or event exists that could give rise to any such Action.

       (c)    Qualification of Certain Employee Plans.  Each Employee Plan that is intended to be qualified under Section 401(a) of the Tax Code or Section 401(k) of the Tax Code has received a favorable determination letter from the IRS covering all of the provisions applicable to the Employee Plan for which determination letters are currently available, and each trust established in connection with any Employee Plan which is intended to be exempt from federal income taxation under Section 501(a) of the Tax Code has received a determination letter from the IRS that it is so exempt, and, to the Knowledge of the Sellers, except as set forth in Section 3.10(b) of the Disclosure Schedule, no fact or event has occurred since the date of such determination letter or letters from the IRS to adversely affect the qualified status of any such Employee Plan or the exempt status of any such trust.

38

(d)      No Employee Plan, and neither the Sellers nor any ERISA Affiliate has any liability or obligation to contribute to, any "multiemployer plan" (as defined in Section 3(37) of ERISA) or other plan subject to Section 302 or Title IV of ERISA or Section 412 of the Tax Code.

(e)      The Sellers have complied, in all material respects, with the notice and continuation coverage requirements, and all other requirements, of Section 4980B of the Code and Parts 6 and 7 of Title I of ERISA, and the regulations thereunder with respect to each Employee Plan that is an employee welfare benefit plan (as defined in Section 3(1) of ERISA).

(f)      The Sellers are not and will not be obligated to pay separation, severance, termination or similar benefits as a result of the Transactions, nor, except as set forth on Section 3.10(f) of the Disclosure Schedule, will the Transactions accelerate the time of payment or vesting, or increase the amount, of any benefit or other compensation due to any individual.  In addition, the Transactions will not be the direct or indirect cause of any amount paid or payable by the Sellers being classified as an excess parachute payment under Section 280G of the Tax Code.

SECTION 3.11.      Taxes.  Except as set forth in Section 3.11 of the Disclosure Schedule and, in the case of income Taxes, except as would not have a Material Adverse Effect,

(a)      Sellers have timely filed or caused to be timely filed or will timely file or cause to be timely filed with the appropriate taxing authorities (taking into account extensions to file Tax Returns) all Tax Returns that are required to be filed with respect to the income or operations of the Business or the ownership of the Purchased Assets on or prior to the Closing Date;

(b)      Subject to (1) the limitations imposed on the Sellers as a result of the Chapter 11 Cases, if any, and (2) the Purchased Assets being transferred free and clear of such Taxes pursuant to the Transaction Approval Order, all Taxes due and payable by each of the Sellers or with respect to the Business or the Purchased Assets (whether or not shown or required to be shown on any Tax Return) have been paid or will be timely paid and all material Taxes due by or with respect to the income or operations of the Business or the ownership of the Purchased Assets for the Pre-Closing Period have been timely paid or will be timely paid in full on or prior to the Closing Date.  The unpaid Taxes of each Seller (i) did not, as of the most recent fiscal month end, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the their financial statements, including the Latest Balance Sheet (rather than in any notes thereto) and (ii) will not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Sellers;

(c)      (i) None of the Sellers are the subject of an audit or other examination of Taxes by the Tax authorities of any nation, state, province or locality with respect to the income or operations of the Business or the ownership of the Purchased Assets; (ii) to the Knowledge of the Sellers, no such audit is threatened or pending; and (iii) the Sellers have not received any written notices from any Tax authority relating to any issue that could result in any liability for

Taxes with respect to the income or operations of the business or the ownership of the Purchased Assets;

(d)    (i) The Sellers have not entered into an agreement or waiver or have been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of Taxes with respect to the income or operations of the Business or the ownership of the Purchased Assets that has not expired and (ii) the Sellers are not presently contesting the liability for Taxes with respect to the income or operations of the Business or the ownership of the Purchased Assets before any court, tribunal or agency;

(e)    All Taxes that the Sellers are (or were) required by Law to withhold or collect with respect to the income or operations of the Business or the ownership of the Purchased Assets in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid over to the proper authorities to the extent due and payable;

(f)    To the Knowledge of the Sellers, no written claim has ever been made by any taxing authority in a jurisdiction where the Sellers do not file Tax Returns with respect to the income or operations of the Business or the ownership of the Purchased Assets that the Sellers are or may be subject to taxation by that jurisdiction with respect to the income or operations of the Business or the ownership of the Purchased Assets;

(g)    There are no Liens for Taxes or security interests on any of the Purchased Assets arising in connection with any failure (or alleged failure) to pay any Taxes (other than Permitted Encumbrances);

(h)    Sellers are not foreign persons within the meaning of Section 1445 of the Tax Code and the Regulations thereunder;

(i)    None of the Sellers nor Arch Canada is a party to any joint venture, partnership or other arrangement or contract that could be treated as a partnership for federal income Tax purposes;

(j)    No Seller has entered into any sale leaseback or leveraged lease transaction that fails to satisfy the requirements of Revenue Procedure 2001-28 (or similar provisions of foreign law) or any safe harbor lease transaction; and

(k)    No Seller has or had a permanent establishment in any foreign country other than the country in which such entity is organized and does not and has not engaged in a trade or business in any foreign country other than the country in which such entity is organized.

SECTION 3.12.    Material Contracts.

(a)    Section 3.12(a) of the Disclosure Schedule, lists the material Contracts of the Sellers as of the date of this Agreement, but only to the extent such Contracts relate primarily to the Business and are not Excluded Assets (such Contracts, "Material Contracts"). The Sellers have delivered to the Purchaser true and complete copies of the Material Contracts (including all

amendments thereto and assignments thereof) set forth on <u>Section 3.12(a)</u> of the Disclosure Schedule.

(b)     Except as set forth in <u>Section 3.12(b)</u> of the Disclosure Schedule, each Material Contract (i) is valid and binding on the applicable Seller (subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity) and, to the Knowledge of the Sellers, the counterparties thereto, and is in full force and effect; and (ii) upon consummation of the Transactions, except to the extent that any consents set forth in <u>Section 3.03</u> of the Disclosure Schedule, and Bankruptcy Court approval to transfer, are not obtained, shall continue in full force and effect without penalty or other adverse consequence.  Except as disclosed in <u>Section 3.12(b)</u> of the Disclosure Schedule, the applicable Seller and, to the Knowledge of the Sellers, the counterparties thereto, are not in breach of, or default under, any Material Contract to which any of them is a party except for breaches or defaults that, upon entry or issuance of the Transaction Approval Order by the Bankruptcy Court, would not preclude the Sellers from assigning such Material Contract to the Purchaser and that would be cured or rendered unenforceable in accordance with the Transaction Approval Order.

SECTION 3.13.     <u>Brokers</u>.  Except for the Investment Banker, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Seller. The Sellers are solely responsible for the fees and expenses of the Investment Banker.

SECTION 3.14.     <u>Title to Purchased Assets; Good Condition.</u>

(a)     The Sellers have good, valid and marketable title to, or in the ease of leased assets, a valid leasehold interest in all of the Purchased Assets.  Except as set forth in <u>Section 3.14</u> of the Disclosure Schedule, the Purchased Assets are free and clear of all Liens other than Permitted Encumbrances.  Notwithstanding the foregoing, Purchaser acknowledges that Sellers' failure to disclose a Lien shall not give Purchaser a right of termination or claim for breach of representation or warranty so long as the Transaction Approval Order entered by the Bankruptcy Court effects a transfer of title to the Purchased Assets free and clear of all Liens (including any unidentified Liens) other than Permitted Encumbrances.

(b)     All of the tangible personal property used or held for use in connection with the Business is in good operating condition and repair, free of defects and in a state of good maintenance, ordinary wear and tear excepted, and is adequate and suitable for the purposes for which it is presently being used or intended.

SECTION 3.15.     <u>Sufficiency of Assets</u>.  Except as set forth in <u>Section 3.15</u> of the Disclosure Schedule, the Purchased Assets constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used or held for use in the conduct of the Business, or otherwise necessary for the Purchaser to conduct and operate the Business immediately after the Closing in all respects as conducted and operated by the Sellers immediately prior to the Closing.

SECTION 3.16.    Insurance.  Set forth in Section 3.16 of the Disclosure Schedule is an accurate and complete list of each insurance policy and insurance arrangement that covers businesses, properties, assets (including the Purchased Assets), Liabilities (including the Assumed Liabilities) or employees (including self insurance, but excluding insurance policies providing benefits under Employee Plans) of the Business (the "Insurance Policies").  The Insurance Policies are in full force and effect, all premiums thereon have been paid, and the Sellers are otherwise in compliance in all material respects with the terms and provisions of such policies.  No Seller is in default under any of the Insurance Policies (or any policy required to be set forth in Section 3.16 of the Disclosure Schedule) and there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default thereunder.  No Seller has received any notice of cancellation or non-renewal of any such Insurance Policies nor has the termination of any such Insurance Policies been threatened, and there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such Insurance Policies.  Each of the Insurance Policies is of a type and in such amount and covers such risks as are consistent with customary practices and standards of companies engaged in businesses and operations similar to the Business.  Since January 1, 2009, there has not been any material adverse change in any Seller's relationship with its insurers or in the premiums payable pursuant to such Insurance Policies.  Purchaser has been provided an electronic file containing a list of all pending claims and the claims history with respect to the Business during the past five (5) years (including with respect to insurance obtained but not currently maintained).

SECTION 3.17.    Suppliers and Customers.  Section 3.17 of the Disclosure Schedule sets forth (a) each customer accounting for more than two percent (2%) of the sales volume of the Business since January 1, 2007 and (b) each supplier (i) accounting for more than two percent (2%) of the consolidated purchases by the Business during such period.  Except as a result of the commencement of the Chapter 11 Cases, the relationships of the respective Sellers with each such supplier and customer are good commercial working relationships and, except as set forth in Section 3.17 of the Disclosure Schedule, no such supplier or customer has cancelled or otherwise terminated its relationship with any Seller.

SECTION 3.18.    Permits.  The Sellers have obtained or caused to be obtained, all material permits, certificates, licenses, or authorizations of any Governmental Authority (each, a "Permit") and have made all material registrations or filings with or notices to any Governmental Authority necessary for the lawful conduct of the Business as presently conducted and operated, or necessary for the lawful ownership of their properties and assets or the operation of the Business as presently conducted and operated.  Each such Permit is valid and in full force and effect and, to the Sellers' Knowledge, the Sellers are in compliance with all such Permits.  Each such Permit is included in the Purchased Assets to the extent it is assignable.  Any applications for the renewal of any such Permit that are due prior to the Closing Date will be timely made or filed by the applicable Seller prior to the Closing Date.  No proceeding to modify, suspend, revoke, withdraw, terminate or otherwise limit any such Permit is pending or threatened and, to the Sellers' Knowledge, there is no valid basis for any such proceeding, including the Transactions.  No administrative or governmental action or proceeding has been

taken in connection with the expiration, continuance or renewal of any such Permit and, to the Sellers' Knowledge, there is no valid basis for any such proceeding.

SECTION 3.19.    Absence of Certain Changes.  Other than as a result of the commencement of the Chapter 11 Cases, since September 30, 2009, the Business has not experienced any (a) damage, destruction or loss, whether covered by insurance or not, individually having a cost of $100,000 or more; (b) change in accounting methods or principles or any write-down, write up or revaluation of any of the Purchased Assets or Assumed Liabilities, in each case except depreciation accounted for in the ordinary course of business and write-downs of inventory which reflect the lower of cost or market and, in each case, which are in the ordinary course of business and in accordance with GAAP; or (c) sale, assignment, transfer, lease or license (other than a Permitted Encumbrance) of or on any of the Business' tangible assets, except in the ordinary course of business consistent with past practice, or agreement, whether orally or in writing, to do any of the foregoing in this subsection (c).

SECTION 3.20.    Labor Matters.

(a)    Except as set forth in Section 3.20 of the Disclosure Schedule, (i) the Sellers are not party to any collective, collective bargaining, voluntary recognition, union or similar agreement with respect to any of the Business Employees, and to the Sellers' Knowledge, no union represents or claims to represent or is attempting to organize any of the Business Employees and the Sellers are not aware of any existing certification where no Collective Agreement exists, (ii) there is no unfair labor practice charge or complaint against the Sellers in respect of the Business pending or threatened before the National Labor Relations Board, any federal, state or provincial labor relations board or any court or tribunal, (iii) there is no strike, lockout, dispute, request for representation, slowdown or stoppage pending or threatened in respect of the Business and there has been no strike, lockout, dispute, request for representation, slowdown or stoppage within the past three (3) years in respect of the Business, and (iv) the Sellers are not a federal or state contractor or subcontractor.  The Sellers, acting reasonably, do not expect that any of the matters set forth in Section 3.20 of the Disclosure Schedule would have a Material Adverse Effect.

(b)    Except as set forth in Section 3.20 of the Disclosure Schedule, there are no pending, or to the Sellers' Knowledge, threatened actions, grievances, arbitrations, administrative proceedings, charges, complaints or investigations that involve the labor or employment relations of the Business, including but not limited to, issues relating to employment discrimination, wages and hours and occupational health and safety.  There has not been any adverse change in relations with the Business Employees as a result of any announcement of the Transactions.  To Seller's Knowledge, except as disclosed in Section 3.20 of the Disclosure Schedule, since January 1, 2009, no written notice has been received by the Sellers of any complaint filed or threatened by any of the Business Employees claiming that Sellers are in breach of the terms of any contract of employment or that Sellers have violated any applicable Law with respect to employment matters.

(c)    Except as disclosed in Section. 3.20 of the Disclosure Schedule, (i) there are no outstanding Orders against the Sellers under any applicable Laws relating to occupational safety and health, or any other matters relating to employment or employees, in connection with

the Business, (ii) any levies, assessments, and penalties made in connection with the Business against the Sellers pursuant to applicable Laws relating to occupational safety and health, or any other matters relating to employment or employees, have been paid in full, and (iii) the Sellers are not presently in violation of any applicable Law with respect to employment matters in connection with the Business.

(d)    Except as disclosed in Section. 3.20 of the Disclosure Schedule, the Business has not been affected by any transaction and during the last three (3) years and the Sellers have not during the last three (3) years engaged in, or planned or announced for the future, any layoffs, employment terminations or plant or facility closures in connection with the Business sufficient in number to trigger application of the WARN Act or any similar state or local Law (including, but not limited to, any State WARN Acts) to the Business.

SECTION 3.21.    Inventory.  Except as set forth in Section 3.21 of the Disclosure Schedule, all Inventory of the Sellers is of good merchantable quality, reasonably in balance, and readily saleable (in the case of Inventory held for sale) or currently usable (in the case of other Inventory) in the ordinary course of business, subject to the reserve on the most recent balance sheet delivered by Sellers.  The value of obsolete, damaged or excess Inventory and of Inventory below standard quality has been written down on the most recent balance sheet delivered to the Purchaser pursuant to Section 3.04 or, with respect to Inventory purchased since such balance sheet date, on the books and records of the Sellers, to ascertainable market value, or adequate reserves described on such balance sheet have been provided therefor, and the value at which Inventory are carried reflects the customary Inventory valuation policy of the Sellers (which fairly reflects the value of obsolete, spoiled or excess Inventory) for stating Inventory, in accordance with GAAP.  The Sellers have delivered to the Purchaser a true, correct and complete copy of a Inventory report for the week ending immediately prior to the date hereof and shall have delivered on or before the Closing Date to the Purchaser a true, correct and complete copy of a Inventory report for the week ending immediately prior to the Closing Date, together in each case, with a certificate of the chief financial officer of the Sellers certifying the accuracy of such reports to the best of his or her knowledge. Each such Inventory report shall be prepared based upon the books and records of the Sellers (and not physical inventory) and shall set forth an Inventory list of the Sellers and specify the amount, kinds, pricing and location of the Inventory covered thereby.

SECTION 3.22.    Receivables.  Except as set forth in Section 3.22 of the Disclosure Schedule, and except to the extent of a reserve in an amount not in excess of the reserve for doubtful accounts reflected on the Financial Statements: (a) all of the Receivables represent amounts receivable for merchandise actually delivered or services actually provided (or, in the case of non-trade accounts or notes, represent amounts receivable in respect of other bona fide business transactions), have arisen in the ordinary course of the Business consistent with past practices, are not subject to any counterclaims or offsets and have been billed and are generally due within sixty (60) days after such billing, (b) all such Receivables are fully collectable in the normal and ordinary course of Business, and (c) there are no refunds, reimbursements, discounts or other adjustments payable by the Sellers, and there are no deposits held by the Sellers, which may in the future become due to any customer of a Seller and there are no defenses, rights of set-off, assignments, pledges, Liens, claims, equities or conditions enforceable by third parties with respect to the Receivables.

SECTION 3.23.     Arch Canada.

(a)     Organization, Authority and Qualification of Arch Canada.  Arch Canada is a corporation, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation. Arch Canada has all necessary power and authority to own, lease, operate and conduct its businesses, properties and assets as now being conducted.  Arch Canada is duly licensed, registered or qualified to do business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its respective business makes such licensing, registration or qualification necessary.  The province of Ontario is the only jurisdiction in which Arch Canada owns or leases any assets or properties or operates or carries on any business.

(b)     Capitalization; Options; Dividends; Shareholders' Agreement.  The capital stock of Arch Canada consists of 100 issued and outstanding common shares and no more, all of which are issued to Arch International.  The Arch Canada Stock is owned by Arch International as the registered and beneficial owner with good and marketable title, free and clear of all encumbrances except as set forth in Section 3.14 of the Disclosure Schedule.  The Arch Canada Stock is duly authorized, validly issued, fully paid and non-assessable and other than as set forth in Section 3.23(b) of the Disclosure Schedule, without restriction on the right of transfer, save only as to the restrictions on transfer contained in the constating documents or articles of incorporation of Arch Canada. Arch Canada is neither a "reporting issuer" within the meaning of the *Securities Act* (Ontario) and the *Securities Act* (Alberta) as of the date of this Agreement nor an "investment fund" within the meaning of National Instrument 45-106 as of the date of this Agreement.  Except as set forth in Section 3.23(b) of the Disclosure Schedule, there are no outstanding warrants, options, contracts, calls, or other rights of any kind with regard to any authorized and unissued, or issued but not outstanding, shares or other securities of Arch Canada of any kind.  Except for the Purchaser's right in this Agreement, no person has any option, warrant, right, call, commitment, conversion right, right of exchange or other agreement or any right or privilege (whether by law, preemptive or contractual) capable of becoming an option, warrant, right, call, commitment, conversion right, right of exchange or other agreement for (i) the purchase of any of the Arch Canada Stock; (ii) the purchase, subscription, allotment or issuance of any unissued shares or securities of Arch Canada; or (iii) other than in the ordinary course of the Business or the Arch Canada Business, the purchase or other acquisition from Arch Canada of any of its undertaking, property or assets.  Since December 31, 2008, Arch Canada has not, directly or indirectly, declared or paid any dividends or declared or made any other distribution on any of its shares of any class and has not, directly or indirectly, redeemed, purchased or otherwise acquired any of its outstanding shares of any class or agreed to do so. There are no shareholders' agreements, pooling agreements, voting trusts or other similar agreements with respect to the ownership or voting of any of the shares of Arch Canada.

(c)     Subsidiaries.  Arch Canada does not now own, and has not previously owned, of record or beneficially, directly or indirectly, any capital stock or other securities of any other corporation, or any interest in a business, in a business trust, joint stock company or other business organization or association; and is not, and has not previously been, a party to any partnership, joint venture or other business venture.

(d)    No Conflict.  Except as set forth in Section 3.23(d) of the Disclosure Schedule, the sale and transfer from Arch International to the Purchaser of the Arch Canada Stock will not violate, conflict with or result in the breach of Arch Canada's certificate of incorporation, articles or bylaws (or similar formation or organizational documents) or any contract or agreement to which Arch Canada is a party or is otherwise subject to or by which the Arch Canada Assets, the Arch Canada Business or the Arch Canada Stock is bound.

(e)    Governmental Consents and Approvals.  Except for any filing required with respect to the Competition Act and as set forth in Section 3.23(e) of the Disclosure Schedule, the sale and transfer of the Arch Canada Stock from Arch International to the Purchaser, will not require any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or other third party.

(f)    Financial Statements; Undisclosed Liabilities. Section 3.23(f) of the Disclosure Schedule contains (a) a complete and correct copy of the unaudited financial statements of Arch Canada for the year-ended December 31, 2008 ("Arch Canada Year-End Financial Statements"), (b) a complete and correct copy of the unaudited financial statements of Arch Canada for its fiscal quarter ended September 30, 2009 ("Arch Canada Quarterly Statements" and together with the Arch Canada Year-End Statements, the "Arch Canada Financial Statements"). The Arch Canada Year-End Financial Statements and the Arch Canada Quarterly Statements have been prepared in accordance with Canadian GAAP (except for the omission of any accompanying notes required by Canadian GAAP), consistently applied and fairly present in all material respects, the financial position, results of operations and cash flows of Arch Canada at the respective dates thereof and for the respective periods indicated therein (subject in the case of unaudited statements, to normal and recurring year-end adjustments). Except as set forth in Section 3.23(f)(i) of the Disclosure Schedule there are no liabilities of Arch Canada which have not been disclosed in the Financial Statements or this Agreement which could affect the Arch Canada Assets, the Arch Canada Stock or the Arch Canada Business. There is no basis for the assertion against Arch Canada of any liability of any nature or in any amount which is not fully reflected or reserved against in the Financial Statements.

(g)    Litigation.  Except as set forth in Section 3.23(g) of the Disclosure Schedule, as of the date hereof there is no pending Action by or against Arch Canada or relating to the Arch Canada Business, or, to Sellers' Knowledge, threatened against or affecting Arch Canada or relating to the Arch Canada Business.  Sellers, acting reasonably, do not expect that any of the Actions set forth in Section 3.23(g) of the Disclosure Schedule would have a Material Canadian Adverse Effect.

(h)    Compliance with Laws.  Except as set forth in Section 3.23(h) of the Disclosure Schedule and as would not individually or in the aggregate, reasonably be expected to result in a Material Canadian Adverse Effect, Arch Canada (a) has conducted and will continue to conduct the Arch Canada Business in accordance with all Laws and Orders applicable to the Arch Canada Business, (b) is not in violation of any such Law or Order, and (c) to Sellers' Knowledge, has not received any notice that any violation of any such Law or Order is being or may be alleged.

(i)    <u>Environmental Matters</u>.

(i)    <u>Section 3.23(i)</u> of the Disclosure Schedule sets forth all material environmental site assessment reports and facility compliance audit reports for the past 4 years in the possession or control of Arch Canada and that relate to environmental matters concerning the Arch Canada Business or Arch Canada.

(ii)    Except as referenced in <u>Section 3.23(i)</u> of the Disclosure Schedule, Arch Canada holds all Environmental Permits required for the ownership and operation of the Arch Canada Business in the manner in which they are currently owned and operated.  All such Environmental Permits are in full force and effect and there are no defaults thereunder except as set forth in <u>Section 3.23(i)</u> of the Disclosure Schedule.

(iii)    Except as set forth in <u>Section 3.23(i)</u> of the Disclosure Schedule, Arch Canada is in compliance in all respects with all Environmental Laws.

(iv)    Except as set forth in <u>Section 3.23(i)</u> of the Disclosure Schedule, Arch Canada has not been served with notice of any Environmental Liability (including any Order issued under any Environmental Laws) that is currently outstanding against, and, to the Knowledge of Sellers, no Environmental Liabilities are threatened against Arch Canada, as applicable under any Environmental Laws and, to the Knowledge of Sellers, there is no basis for any such Environmental Liabilities.

(v)    Except as set forth in <u>Section 3.23(i)</u> of the Disclosure Schedule, there has been no Release of any Hazardous Material at or from the Arch Canada Leased Real Property, that might reasonably be expected to result in an Environmental Liability.

(vi)    Except as set forth in <u>Section 3.23(i)</u> of the Disclosure Schedule, there are no Hazardous Materials in, on or under any of the Arch Canada Leased Real Property.

(j)    <u>Intellectual Property</u>.  <u>Section 3.23(j)</u> of the Disclosure Schedule sets forth a true and complete list of all Intellectual Property owned or used by Arch Canada (the "<u>Arch Canada Intellectual Property</u>"), and except as set forth therein, each item of such Arch Canada Intellectual Property currently is in full force and effect with the Governmental Authority or Internet domain name registrar in which it is Registered.  Except as set forth in <u>Section 3.23(j)</u> of the Disclosure Schedule or as would not have a Material Canadian Adverse Effect, (a) Arch Canada is the owner of the entire right, title and interest in and to each item of Arch Canada Intellectual Property, free and clear of all Liens; (b) to Sellers' Knowledge, (i) no Person is engaging in any activity that infringes, misappropriates or otherwise violates any Arch Canada Intellectual Property, and (ii) the conduct of the Arch Canada Business by Arch Canada does not infringe, misappropriate or otherwise violate, the Intellectual Property rights of any third party; and (c) there is no Action pending or, to Sellers' Knowledge, threatened, against Arch Canada (i) alleging that the use of any Arch Canada Intellectual Property infringes, misappropriates or otherwise violates, the Intellectual Property rights of any third party, or (ii) challenging Arch Canada's ownership of any Arch Canada Intellectual Property.  The Purchaser acknowledges that the representations and warranties contained in (b) and (c) are the only representations and

warranties being made in this Agreement with respect to infringement, misappropriation or other violation of Intellectual Property with respect to Arch Canada Intellectual Property.

        (k)    <u>Arch Canada Real Property</u>.

        (i)    Arch Canada does not own any real property.

        (ii)    <u>Section 3.23(k)(ii)</u> of the Disclosure Schedule lists the street address and legal description where appropriate of each parcel of real property leased or subleased by Arch Canada as tenant or subtenant, as the case may be, which is used in the conduct of the Arch Canada Business, and the identity of the lessor and lessee of each such parcel of Arch Canada Leased Real Property, along with a list of all applicable agreements relating to the lease of the Arch Canada Leased Real Property (the "<u>Canada Leased Real Property Leases</u>"). Except as set forth on <u>Section 3.23(k)(ii)</u> of the Disclosure Schedule, there has not been any sublease, assignment, license or transfer entered into by Arch Canada in respect of the Arch Canada Leased Real Property Leases and the Canada Leased Real Property Leases constitute all of the agreements pursuant to which Arch Canada has the right to lease or use any real property or any interest in real property, and true, correct and complete copies of each of the Canada Leased Real Property Leases have been made available to the Purchaser. Each Canada Leased Real Property Lease is a valid lease an Arch Canada has received no written notice of default, and no event of default (howsoever described) or event, occurrence, condition or act exists (including the purchase of the Purchased Assets) which, with the giving of notice, the lapse of time or the happening of any other event or condition, could become an event of default (howsoever described) under any of the Canada Leased Real Property Leases, except as disclosed in <u>Section 3.23(k)(ii)</u> of the Disclosure Schedule. Arch Canada has adequate rights of ingress and egress for operation of the Arch Canada Business in the ordinary course of business. Arch Canada has not received written notice of any pending condemnation proceeding or any threatened condemnation that would preclude or impair the use of the Arch Canada Leased Real Property by the Arch Canada Business for the purposes for which it is currently used. Arch Canada has not received written notice of the applicable Governmental Authority altering its zoning Laws so as to affect or potentially affect the Arch Canada Leased Real Property, or the Arch Canada Business.

        (iii)    The Arch Canada Leased Real Property constitutes all of the real property used by Arch Canada in the conduct of the Arch Canada Business.

        (iv)    Arch Canada has complied, in all respects, with all of its obligations under the Canada Leased Real Property Leases.

        (v)    Each of the Canada Leased Real Property Leases creates a valid leasehold interest, in compliance with the provisions of the *Planning Act* (Ontario).

        (vi)    Arch Canada has a good and valid right to use and occupy all the Canada Leased Real Property to the extent required to operate and maintain the Arch Canada Business by way of good, valid and marketable leasehold title and, in each case, Arch Canada's interest therein is free and clear of all encumbrances other than Permitted Encumbrances.

(l)    <u>Arch Canada Employment Matters</u>.

(i)    <u>Section 3.23(l)(i)</u> of the Disclosure Schedule lists all the employees and independent contractors of Arch Canada ("<u>Arch Canada Employees</u>") and the Persons who are receiving remuneration for work or services provided to Arch Canada who are not employees as of the dates listed on such schedule, and the position, status (full or part time/active or inactive), length of service, location of employment and compensation of each Arch Canada Employee and the terms on which each other Person who is providing work or services to Arch Canada is engaged.  Except as set forth in <u>Section 3.23(l)</u> of the Disclosure Schedule, no Arch Canada Employee is on long-term disability leave, extended absence or receiving benefits pursuant to the applicable provincial workers' compensation legislation.  Except as set forth in <u>Section 3.23(l)</u> of the Disclosure Schedule, Arch Canada is not a party to or bound by any contract or requirements of applicable Law in respect of any Arch Canada Employee or former Arch Canada Employee, including any contract for the employment or statutorily required re-employment of any Arch Canada Employee and termination or severance agreements with Arch Canada Employees.

(ii)    Except as set forth in <u>Section 3.23(l)(ii)</u> of the Disclosure Schedule, Arch Canada is not a party to or bound by, either directly or by operation of applicable Law, any collective bargaining agreement or labor contract ("<u>Collective Agreements</u>") and except as set forth in <u>Section 3.23(l)(ii)</u> of the Disclosure Schedule, Arch Canada is not currently engaged in any labor negotiations.

(iii)    Except as set forth in <u>Section 3.23(l)(iii)</u> of the Disclosure Schedule, there is no grievance or arbitration proceeding arising out or under any Collective Agreements which is pending or, to the Knowledge of Sellers, threatened against Arch Canada.

(iv)    Except as set forth on <u>Section 3.23(l)(iv)</u> of the Disclosure Schedule, there are no current, pending or, to the Knowledge of Sellers, threatened strikes, work stoppages, unfair labor practice charges, slowdowns, lockouts, grievances or other labor disputes at any Arch Canada facility, nor have any of the foregoing occurred within the past three (3) years, except minor grievances which have been settled.

(v)    None of the Arch Canada Employees or independent contractors engaged by Arch Canada in the year immediately prior to the date hereof has given notice in writing to Arch Canada that such Arch Canada Employee or independent contractor intends to terminate service or retire.

(vi)    Arch Canada is in compliance in all material respects with all applicable Laws respecting employment, employment practices and standards, terms and conditions of employment, wages and hours, occupational health and safety, human rights, labor relations, pay equity and workers' compensation.  In particular, Arch Canada is in compliance in all material respects with applicable provincial workers' compensation legislation and is not subject to assessments thereunder based upon communications between each of Arch Canada and the applicable provincial workers' compensation board or agency.

(vii)    Except as set forth in Section 3.23(l)(vii) of the disclosure Schedule, no Person (including, but not limited to, Governmental Authority of any kind) has any claim or basis for any action or proceeding against Arch Canada arising out of any statute, ordinance or regulation relating to discrimination in employment or employment practices, occupational safety and health standards, or inflationary wage or price standards which would have a Material Canadian Adverse Effect on Arch Canada.

(viii)    Arch Canada has not violated any other applicable plant closing or mass layoff notification Law.

(ix)    Set forth in Section 3.23(l)(ix) of the Disclosure Schedule is a complete list of:

(A)    all directors of Arch Canada;

(B)    all officers (with office held) of Arch Canada; and

(C)    all consultants, sales representatives and other independent contractors of Arch Canada.

(m)    Arch Canada Taxes.  Except as set forth in Section 3.23(m) of the Disclosure Schedule:

(i)    There are no Lien or any Liens for assessments or governmental charges that have been filed in respect of any the Arch Canada Assets, and, to the Knowledge of Sellers, no basis exists for the imposition of any such Liens.

(ii)    Arch Canada is a registrant for the purposes of the *Excise Tax Act* (Canada) with the registration number as set forth in Section 3.23(m) of the Disclosure Schedule.

(iii)    All Tax Returns required to be filed by or on behalf of Arch Canada on or before the Closing Date have been timely filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax returns are required to be filed (after giving effect to any extensions of time in which to make such filings).  All such Tax Returns were correct and complete in all material respects. All amounts that are shown due from Arch Canada on such Tax Returns with respect to the periods covered thereby have been fully and timely paid. Any other Taxes accruing to the date of the Arch Canada Financial Statements are adequately provided for on the Arch Canada Financial Statements in accordance with Canadian GAAP.  All material Taxes which Arch Canada is required by Law to withhold or collect have been duly withheld or collected and, to the extent required, have been paid over to the proper Governmental Authority or are held in separate bank accounts for such purposes.  There exist no grounds for the assertion or assessment of any additional Taxes against Arch Canada or its assets, which could have a material adverse effect on Arch Canada.

(iv)    Arch Canada has not received any written notice from any Governmental Authority that an assessment or reassessment of Arch Canada is proposed in respect of any Taxes, regardless of its merits.

(v)    Arch Canada has not received any written notice from any Governmental Authority that an assessment or reassessment of Arch Canada is proposed in respect of any Taxes, regardless of its merits and to the Knowledge of the Sellers no audit is pending and no deficiencies have been asserted by any Governmental Authority in connection with any audit or review of any Taxes or Tax Return.

(vi)    Arch Canada has not received a tax ruling and has not entered into any, agreement, waiver or other arrangement with any Governmental Authority respecting Taxes payable by it or Tax Returns required to be filed by or any statute of limitations with respect to Taxes.

(vii)    Arch Canada has not claimed and will not claim in any Tax Return for any taxation year ending before the Closing Date any reserve including, without limitation, any reserve under paragraph 20(1)(n) or subparagraph 40(1)(a)(iii) of the Tax Act or any analogous provision of any comparable Law of any province or territory in Canada.

(viii)    Arch Canada does not have any obligation to file on or before the Closing Date any Tax Return required to be made, prepared or filed, or to pay any Taxes on or before the Closing Date, under the laws of any jurisdiction other than within Canada or will not be obligated to file any such Tax Return or to pay any such Taxes after the Closing Date as a result of Arch Canada Assets owned or activities conducted on or before the Closing Date other than within Canada.

(ix)    To the Knowledge of Sellers, Arch Canada has not participated, directly or through a partnership, in a transaction or series of transactions contemplated in subsection 247(2) of the Tax Act or any comparable Law of any province or territory in Canada.

(x)    To the Knowledge of Sellers, there are no circumstances existing which could result in the application to Arch Canada of sections 78, 80, 80.01, 80.02, 80.03, 80.04 or 160 of the Tax Act or any analogous provision of any comparable Law of any province or territory of Canada.

(xi)    To the Knowledge of Sellers, Arch Canada has not acquired any property from a person with whom it does not deal at arm's length for purposes of the Tax Act for consideration that is greater than the fair market value of such property at the time of acquisition, nor has Arch Canada disposed of any property to a person with whom it does not deal at arm's length for purposes of the Tax Act for consideration that is less than the fair market value of such property at the time of disposition.

(n)    Employee Benefits.

(i)    Section 3.23(n)(i) of the Disclosure Schedule sets forth a complete and correct list of all employee benefit, health, welfare, supplemental unemployment benefit, bonus, pension, profit sharing, deferred compensation, stock option, stock compensation, stock purchase, retirement, hospitalization insurance, medical, dental, prescription drug, legal, vacation, sick leave, personal or other leave, termination, severance, disability, tuition and similar plans or arrangements or practices, whether written or oral, which are directly maintained or sponsored or contributed to by Arch Canada for the benefit of the Arch Canada Employees or

former Arch Canada Employees and their dependants or beneficiaries or as provided by any Collective Agreement to which Arch Canada is a party or by which it is bound or with respect to which Arch Canada participates or has any actual or potential Liability or obligations, other than plans established pursuant to statute (collectively, the "Arch Canada Plans").

(ii)    Section 3.23(n)(ii) of the Disclosure Schedule sets forth each employee benefit plan of Arch Canada that is a "registered pension plan" as that term is defined in subsection 248(1) of the Tax Act (collectively the "Arch Canada Pension Plans").

(iii)    Except as set forth in Section 3.23(n)(iii) of the Disclosure Schedule, none of the Arch Canada Pension Plans is a multi-employer pension plan as defined under the provisions of applicable benefits Laws.

(iv)    No Arch Canada Plan now provides or has at any time provided pension benefits on a defined benefit basis.

(v)    All of the Arch Canada Plans have been established, registered, qualified, funded, invested and administered in all respects in accordance with, and are in good standing under, all applicable benefits Laws.  To the Knowledge of the Sellers, no fact or circumstance exists that could adversely affect the tax-preferred or tax exempt status of any Arch Canada Plan.

(vi)    With respect to the Arch Canada Pension Plans and the Canadian Industry Benefit Plan, all required contributions have been made or properly accrued and along with reporting and audit obligations set out in the Collective Agreements, these constitute the sole obligations of Arch Canada.

(o)    Material Contracts.

(i)    Section 3.23(o) of the Disclosure Schedule lists all the material Contracts of Arch Canada as of the date of this Agreement (such Contracts, "Arch Canada Material Contracts").  Sellers have delivered to the Purchaser true and complete copies of the Arch Canada Material Contracts.

(ii)    Except as set forth in Section 3.23(o) of the Disclosure Schedule, each Arch Canada Material Contract (i) is valid and binding on Arch Canada (subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity) and (ii) is in full force and effect, has not been amended and there exists no default or breach on the part of Sellers nor, to the Knowledge of Sellers, on the part of any counterparty to any Material Contract.

(p)    Title to Arch Canada Assets; Good Condition.

(i)    Arch Canada has good, valid and marketable title to, or in the case of leased assets, a valid leasehold interest in all of the Arch Canada Assets, subject only to Permitted Encumbrances.

(ii)    To Sellers' Knowledge, all of the tangible personal property used or held for use in connection with the Arch Canada Business is in good operating condition and repair, free of defects and in a state of good maintenance, ordinary wear and tear excepted, and is adequate and suitable for the purposes for which it is presently being used or intended.

(q)    Sufficiency of Assets.  Except as set forth in Section 3.23(q) of the Disclosure Schedule, the Arch Canada Assets constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used or held for use in the conduct of the Arch Canada Business, or otherwise necessary for Arch Canada to conduct and operate the Arch Canada Business immediately after the Closing in all material respects as conducted and operated by Arch Canada immediately prior to the Closing.

(r)    Insurance.  Set forth in Section 3.23(r) of the Disclosure Schedule is an accurate and complete list of each insurance policy and insurance arrangement that covers the Arch Canada Assets, Liabilities or employees (including self insurance, but excluding insurance policies providing benefits under welfare plans and directors' and officers' insurance) of the Arch Canada Business (the "Arch Canada Insurance Policies").  The Arch Canada Insurance Policies are in full force and effect, all premiums thereon have been paid, and Arch Canada is otherwise in compliance in all respects with the terms and provisions of such policies.  Arch Canada is not in default under any of the Arch Canada Insurance Policies and there exists no event, occurrence, condition or act that, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default thereunder.  Arch Canada has not received any notice of cancellation or non-renewal of any such Arch Canada Insurance Policies nor has the termination of any such Arch Canada Insurance Policies been threatened, and there exists no event, occurrence, condition or act that, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such Arch Canada Insurance Policies.  Each of the Arch Canada Insurance Policies is of a type and in such amount and covers such risks as are consistent with customary practices and standards of companies engaged in businesses and operations similar to (and in the same geographical area as) the Arch Canada Business.  Purchaser has been provided with an electronic file that sets forth a list of all pending claims and the claims history with respect to the Arch Canada Business during the past three (3) years (including with respect to insurance obtained but not currently maintained).

(s)    Suppliers and Customers.  Section 3.23(s) of the Disclosure Schedule sets forth (a) each customer accounting for more than two percent (2%) of the sales volume of the Arch Canada Business since January 1, 2007 and (b) each supplier (i) accounting for more than two percent (2%) of the purchases by Arch Canada during such period.  The relationships of Arch Canada with each such supplier and customer are good commercial working relationships and, except as set forth in Section 3.23(s) of the Disclosure Schedule, no such supplier or customer has cancelled or otherwise terminated or threatened to cancel or terminate its relationship with Arch Canada.  Except as set forth in Section 3.23(s) of the Disclosures Schedule, Arch Canada has not received any notice that any such supplier or customer has cancelled or terminated its relationship with Arch Canada or the Arch Canada Business.

(t)    Permits.  Except as would not reasonably be expected to have a Material Canadian Adverse Effect, Arch Canada has obtained or caused to be obtained, all permits,

53

certificates, licenses, or authorizations of any Governmental Authority (each, an "Arch Canada Permit") and has made all registrations or filings with or notices to any Governmental Authority necessary for the lawful conduct of the Arch Canada Business as presently conducted and operated, or necessary for the lawful ownership of its  properties and assets or the operation of the Arch Canada Business as presently conducted and operated.  Each such Arch Canada Permit is valid and in full force and effect and, to Sellers' Knowledge, Arch Canada is  in material compliance with all such Arch Canada Permits.  Any applications for the renewal of any such Arch Canada Permit that are due prior to the Closing Date will be timely made or filed by Arch Canada prior to the Closing Date.  No proceeding to modify, suspend, revoke, withdraw, terminate or otherwise limit any such Arch Canada Permit is pending or threatened and, to Sellers' Knowledge, there is no valid basis for any such proceeding.  No administrative or governmental action or proceeding has been taken in connection with the expiration, continuance or renewal of any such Arch Canada Permit and, to Sellers' Knowledge, none are pending or threatened.

(u)    Absence of Certain Changes.  Except as set forth in Section 3.23(u) of the Disclosure Schedule, since September 30, 2009 the Arch Canada Business has not experienced any (a) damage, destruction or loss, whether covered by insurance or not, individually having a cost of $100,000 or more; (b) change in accounting methods or principles or any write-down, write up or revaluation of any of the Arch Canada Assets, in each case except depreciation accounted for in the ordinary course of business, write-downs of inventory which reflect the lower of cost or market, and write-offs of accounts receivable based on consistent practices and, in each case, which are in the ordinary course of business and in accordance with Canadian GAAP; or (c) sale, assignment, transfer, lease or license of or on any of the Arch Canada Business' tangible assets, except in the ordinary course of business consistent with past practice, or agreement, whether orally or in writing, to do any of the foregoing in this subsection (c).

(v)    Bank Accounts and Safe Deposit Boxes.  Set forth in Section 3.23(v) of the Disclosure schedule are (a) the name, branch, account number, and purpose of all bank accounts maintained by Arch Canada together with the names of authorized signatories on each such account, (b) the location of all safe deposit boxes maintained by Arch Canada together with the names of the persons with authorized access thereto, and (d) the name and account number of all securities brokers with which Arch Canada maintains a securities brokerage account and the names of all persons authorized to deal or give instructions therewith.

(w)    Trade Names.  Section 3.23(w) of the Disclosure Schedule sets for the corporate, trade names and other names used currently or at any time during the preceding five (5) years in connection with the Arch Canada Business.

(x)    Arch Canada Accounts Receivable.  Except as set forth in Section 3.23(x) of the Disclosure Schedule, all the accounts and notes receivable of Arch Canada ("Arch Canada Accounts Receivable") represent amounts receivable for merchandise actually delivered or services actually provided (or, in the case of non-trade accounts or notes, represent amounts receivable in respect of other bona fide business transactions), have arisen in the ordinary course of the Arch Canada Business consistent with past practices, are not subject to any counterclaims or offsets and have been billed and are generally due within sixty (60) days after such billing. All such Arch Canada Accounts Receivable are fully collectable in the normal and ordinary

course of Business, except to the extent of a reserve in an amount not in excess of the reserve for doubtful accounts reflected on the Arch Canada Financial Statements and as set forth in Section 3.23(x) of the Disclosure Schedule. Except as set forth in Section 3.23(x) of the Disclosure Schedule, there are no refunds, reimbursements, discounts or other adjustments payable by Arch Canada, and there are no deposits held by Arch Canada, which may in the future become due to Arch Canada's customers and there are no defenses, rights of set-off, assignments, pledges, Liens, claims, equities or conditions enforceable by third parties with respect to Arch Canada Accounts Receivable.

(y)    Arch Canada Inventory. All the inventories of Arch Canada, including those reflected in the Financial Statements (the "Arch Canada Inventory"), are valued at the lower of cost or market, the cost thereof being determined on a first-in, first-out basis, except as disclosed in such Financial Statements or on Section 3.23(y) of the Disclosure Schedule. Except as set forth in Section 3.23(y) of the Disclosure Schedule, all of the Arch Canada Inventory consists of items that are current and of good and merchantable quality and not subject to any write-down or write-off which is not already reflected in the Financial Statements and of a quantity usable and saleable in the ordinary course of Arch Canada's Business consistent with past practices, and all of the raw materials and work-in-process Arch Canada Inventory is of a quality useable in the production of finished products and can reasonably be expected to be consumed in the ordinary course of Arch Canada Business consistent with past practices. Except as set forth in Section 3.23(y) of the Disclosure Schedule, all Arch Canada Inventory is owned by Arch Canada free and clear of any Liens, other than Permitted Encumbrances.

(z)    Debt Instruments. Section 3.23(z) of the Disclosure Schedule sets forth a list of all instruments defining the terms on which Arch Canada has borrowed or is committed to loan money, or has given or committed to give a guarantee of any obligation or any other Person, or any capitalized lease obligation, or under which it has imposed a Lien on any of its assets, tangible or intangible.

(aa)    Privacy Laws. Arch Canada has conducted and is conducting the Arch Canada Business in compliance with all Privacy Laws without limiting the foregoing, Arch Canada has (i) obtained all consents required under applicable Privacy Laws for the collection and use of Personal Information in its custody and (ii) implemented appropriate safeguards to maintain the security and confidentiality of Personal Information.

(bb)    Aggregate Value. Inclusive of the assets owned by Arch Canada, the Purchased Assets do not include assets in Canada, the aggregate value of which exceed CAD $70 million, or gross revenues from sales in or from Canada generated from these assets which exceed CAD $70 million, all as determined in accordance with the Competition Act as amended, and the regulations promulgated thereunder.

SECTION 3.24.    Customer Warranties. There are no pending, nor to the Knowledge of the Sellers, threatened, claims under or pursuant to any warranty, whether expressed or implied, on the products or services sold prior to the Closing Date by the Sellers that are not disclosed or referred to in the Quarterly Statements or included in the books and records of the Sellers and that are not fully reserved against in accordance with GAAP. All of the services rendered by the Sellers (whether directly or indirectly through independent

contractors) have been performed in conformity with all express warranties and, in all material respects, with all applicable contractual commitments, and the Sellers does not have any pending claims for replacement or repair or for other damages relating to or arising from any such services, except for amounts which are immaterial in the aggregate.  No Material Contract with any customer contains any unusual warranty provisions that would impose material liability on the Sellers.  Set forth in Section 3.24 of the Disclosure Schedule are the aggregate amounts of warranty claims incurred by the Sellers during the last three (3) completed fiscal years.  There is no reason to expect an increase in the amount of warranty claims (as a percentage of gross revenues of the Sellers) in the future.

SECTION 3.25.    Relationships with Related Persons.  Except as set forth in Section 3.25 of the Disclosure Schedule, no Seller or any Related Person of any Seller (i) has any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to the Business or the Arch Canada Business, (ii) has had business dealings or a material financial interest in any transaction with the Sellers other than in the ordinary course of business or (iii) is a party to any Material Contract with the Sellers.

SECTION 3.26.    Disclaimer of the Sellers.  (A) THE BUSINESS, INCLUDING THE PURCHASED ASSETS, IS BEING SOLD ON AN "AS IS", "WHERE IS" BASIS AS OF THE CLOSING AND IN ITS CONDITION AS OF THE CLOSING AND, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE IN THIS ARTICLE III AND THE SECTIONS OF THE DISCLOSURE SCHEDULE RELATING THERETO AND EXCEPT FOR ANY WARRANTIES OF TITLE CONTAINED IN ANY DEED TO ANY OWNED REAL PROPERTY DELIVERED AT THE CLOSING, NONE OF THE SELLERS, THEIR AFFILIATES OR, ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE BUSINESS OR ANY OF THE PURCHASED ASSETS, INCLUDING WITH RESPECT TO (I) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, (II) THE OPERATION OF THE BUSINESS BY THE PURCHASER AFTER THE CLOSING IN ANY MANNER OTHER THAN AS USED AND OPERATED BY THE SELLERS OR (III) THE PROBABLE SUCCESS OR PROFITABILITY OF THE BUSINESS AFTER THE CLOSING AND (B) NONE OF THE SELLERS, THEIR AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES WILL HAVE OR BE SUBJECT TO ANY LIABILITY OR INDEMNIFICATION OBLIGATION TO THE PURCHASER OR TO ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO THE PURCHASER, ITS AFFILIATES OR REPRESENTATIVES OF, OR THE PURCHASER'S USE OF, ANY INFORMATION RELATING TO THE BUSINESS, INCLUDING THE MEMORANDUM REGARDING THE SELLERS ISSUED BY THE INVESTMENT BANKER DATED SEPTEMBER 2009 (THE "MEMORANDUM"), AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO THE PURCHASER, WHETHER ORALLY OR IN WRITING, IN CERTAIN "DATA ROOMS," MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF THE PURCHASER OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS. ANY SUCH OTHER REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.

SECTION 3.27.    Service of Process.  The Arch Bid Procedures Motion, the Arch Bid Procedures Order, the Transaction Approval Motion and the Transaction Approval Order shall be properly served on all creditors and parties in interest in accordance with the Federal Rules of Bankruptcy Procedure.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

SECTION 4.01.    Organization and Authority of the Purchaser.  The Purchaser is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation and has all necessary corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the Transactions.  The Purchaser is duly licensed or qualified to do business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not adversely affect the ability of the Purchaser to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions.  The execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the Transactions have been duly authorized by all requisite corporate action on the part of the Purchaser.  This Agreement has been, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall have been, duly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by each of the Sellers) this Agreement constitutes, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

SECTION 4.02.    No Conflict.  Assuming compliance with the pre-merger notification and waiting period requirements of the HSR Act, if applicable, and the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in Section 4.03, the execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements to which the Purchaser is a party do not and will not: (a) violate, conflict with or result in the breach of any provision of the certificate of incorporation, articles or bylaws (or similar organizational documents) of the Purchaser; (b) conflict with or violate any Law or Order applicable to the Purchaser or their respective assets, properties or businesses; or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Purchaser is a party, except, in the can of clauses (b) and (c), as would not materially

57

and adversely affect the ability of the Purchaser to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions.

SECTION 4.03.    Governmental Consents and Approvals.  The execution, delivery and performance by the Purchaser of this Agreement and each Ancillary Agreement to which the Purchaser is a party do not and will not require any consent, approval, authorization or other Order of, action by, filing with, or notification to, any Governmental Authority, except: (a) compliance with and filing under the pre-merger notification and waiting period requirements of the HSR Act, the Competition Act, and any compliance with, filings under or approval required under, the antitrust laws of any other relevant jurisdiction; (b) any applicable requirements under the ICA; or (c) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by the Purchaser of the Transactions.

SECTION 4.04.    Financing.  At the Closing, the Purchaser will have sufficient immediately available funds to pay, in cash, the Purchase Price and all other amounts payable pursuant to this Agreement and the Ancillary Agreements or otherwise necessary to consummate all the Transactions.  Upon the consummation of the Transactions, (a) the Purchaser will not be insolvent, (b) the Purchaser will not be left with unreasonably small capital, and (c) the Purchaser will not have incurred debts beyond its ability to pay such debts as they mature.

SECTION 4.05.    Litigation.  As of the date hereof; no Action by or against the Purchaser is pending or, to the knowledge of the Purchaser, threatened, which could affect the legality, validity or enforceability of this Agreement, any Ancillary Agreement or the consummation of the Transactions.

SECTION 4.06.    Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Purchaser.

SECTION 4.07.    Independent Investigation; Sellers' Representations.  The Purchaser has conducted its own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition, software, technology and prospects of the Business, which investigation, review and analysis was done by the Purchaser and their Affiliates and representatives.  The Purchaser acknowledges that it and its representatives have been provided reasonable access to the personnel, properties, premises and records of the Business for such purpose.  In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of the Sellers or their representatives (except the specific representations and warranties of the Sellers set forth in Article III and the sections of the Disclosure Schedule thereto).  The Purchaser hereby agrees and acknowledges that (a) other than the representations and warranties made in Article III, none of the Sellers, their Affiliates, or any of their respective officers, directors, employees or representatives make or have made any representation or warranty, express or implied, at law or in equity, with respect to the Purchased Assets or the Business including as to: (i) merchantability or fitness for any particular use or purpose; (ii) the operation of the Business by the Purchaser after the Closing in any manner other than as used and operated by the Sellers; or (iii) the probable success or

profitability of the Business after the Closing and (h) none of the Sellers, their Affiliates, or any of their respective officers, directors, employees or representatives will have or be subject to any liability or indemnification obligation to the Purchaser or to any other Person resulting from the distribution to the Purchaser, its Affiliates or representatives of, or the Purchaser's use of, any information relating to the Business, including the Memorandum, and any information, documents or material made available to the Purchaser, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Purchaser or in any other form in expectation of the Transactions.

SECTION 4.08.    Investment Canada.  The Purchaser is a WTO Investor, as that term is defined in Subsection 14.1(6) of the ICA.  If the Purchaser assigns its rights under this Agreement, the assignee or assignees will be either a WTO Investor as that term is defined in Subsection 14.1(6) of the ICA or a Canadian, as that term is defined in the ICA.

ARTICLE V
ADDITIONAL AGREEMENTS

SECTION 5.01.    Bankruptcy Court Approvals.  The Sellers agree to use their best efforts to obtain entry of the Transaction Approval Order.

SECTION 5.02.    [Intentionally Omitted].

SECTION 5.03.    Assumption of Assigned Contracts.

(a)    As of the date hereof, Purchaser has delivered to Sellers a list setting forth Purchaser's designation of Assigned Contracts, Designated Remaining Contracts and Excluded Contracts ("Purchaser's Contract Designations") which list was based upon a list of "material" contracts provided by the Sellers to the Purchaser.  The parties agree and acknowledge that not all of the Sellers' Contracts were included on Purchaser's Contract Designations and that the Purchaser and the Sellers will work together to identify any missing Contracts and to the extent the Purchaser desires that such contracts be Assigned Contracts or Designated Remaining Contracts the Sellers will provide notice to the counterparty to such Contracts as promptly as possible as required by the Bankruptcy Code in order for the Purchaser to assume and assign such Contracts pursuant to the Bankruptcy Code.  At any time and from time to time on or before one (1) Business Day prior to the Closing, the Purchaser may, by written notice to Sellers, amend Purchaser's Contract Designations by (i) electing to exclude any one or more of the Contracts (including any lease pursuant to which the Leased Real Property is leased by a Seller) and Permits and Licenses from the Transactions (i.e., make any Assigned Contract or Designated Remaining Contract an Excluded Contract), (ii) having any Designated Remaining Contract made an Assigned Contract, (iii) designating any Assigned Contract as a Designated Remaining Contract, or (iv) including any Contract that was not on the list of "material" contracts provided by the Sellers as an Assigned Contract or a Designated Remaining Contract; provided, however, solely with respect to clause (iv) of this Section 5.03(a), in the event that (x) the Purchaser determines to include any Contract that was not on the list of "material" contracts provided by the Sellers as an Assigned Contract or a Designated Remaining Contract and (y) such determination results in a net increase in the aggregate Cure Costs after taking into account any

59

reduction in Cure Costs associated with Purchaser's determination after the date hereof to make any previously designated Assigned Contract or Designated Remaining Contract an Excluded Contract, then the Sellers and the Purchaser agree not to proceed to Closing without the prior consent of the PNC Lenders and if the parties and PNC Lenders are unable to agree then the Sellers shall cause the Purchaser's Deposit to be returned to the Purchaser. Any Contract or Permit and License identified in Purchaser's Contract Designations as to be excluded from the Transactions (each, an "Excluded Contract") shall no longer be an Assigned Contract, or a Permit and License to be assigned to the Purchaser hereunder except as provided for in Section 5.03(f) below. There shall be no adjustment to the Purchase Price as a result of the Purchaser's election to exclude or include any one or more of the Contracts or Permits and Licenses from the Transactions pursuant to this Section 5.03(a) except that the Purchaser shall not be required to make any payments for Cure Costs or any other amounts for Excluded Contracts.

(b)     At the time of Closing, the Sellers shall assume (to the extent required) pursuant to Section 365(a) of the Bankruptcy Code and then assign and sell to the Purchaser pursuant to Sections 365(f) and 363(b), (f) and (n) of the Bankruptcy Code, and the Purchaser shall assume and accept from the Sellers, to the extent provided in Section 2.02, all of the Assigned Contracts. The Purchaser shall have the right, in its sole discretion, to direct the Sellers to assume and assign to the Purchaser any one or more schedules, appendices, annexes or other attachments to any Contract as directed by the Purchaser, in its sole discretion, and irrespective of whether such Contract or any other schedules, appendices, annexes or other attachments to such Contract are assumed and assigned to the Purchaser to the extent permitted by applicable Law; for avoidance of doubt, the Sellers obligations under this sentence will be to use reasonable best efforts to cause such schedules, appendices, annexes or other attachments to any Contract desired to be assigned to the Purchaser to be assumed and assigned to the Purchaser pursuant to Sections 365(f) and 363(b), (f) and (n) of the Bankruptcy Code. Any schedules, appendices, annexes or other attachments to any Contract assumed and assigned as set forth in the immediately prior sentence shall be Assigned Contracts.

(c)     The Sellers shall determine the amounts necessary to cure, in accordance with Section 365 of the Bankruptcy Code, any and all defaults existing under and  in respect of the Assigned Contracts or the Designated Remaining Contracts that are required to be paid as of the Closing Date or the date a Designated Remaining Contract becomes an Assumed Contract pursuant to the Transaction Approval Order or such other Order of the Bankruptcy Court (collectively, the "Cure Costs") to the extent they are Determined Cure Costs and assumed pursuant to Section 2.02 or this Section 5.03(c). All such amounts shall be paid in accordance with Section 2.04 and this Section 5.03(c). The Sellers shall be responsible for (i) the verification of all Cure Costs, including all administrative responsibilities associated therewith and (ii) payments of the Cure Costs. The Sellers shall be responsible for and shall use their reasonable best efforts to establish the proper Cure Costs, if any, for each Assigned Contract, including the filing and prosecution of any and all appropriate proceedings in the Bankruptcy Court in connection therewith.

(d)     The Sellers shall have made available to the Purchaser true and complete copies of the Contracts (including all amendments thereto and assignments thereof) on or before the fourth (4th) Business Day prior to the hearings to approve the Transaction Approval Order.

Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through (i) the Closing Date or with respect to any Designated Remaining Contract ninety (90) days after the Closing Date or (ii) earlier termination of this Agreement, the Sellers will not reject, repudiate or disclaim, without prior consent of the Purchaser, any Contract.

(e)     Notwithstanding anything to the contrary in this Agreement, pursuant to written notice of the Purchaser to the Sellers no later than ninety (90) days after the Closing Date, each Designated Remaining Contract shall be assumed by the Sellers and assigned to the Purchaser.  Any Designated Remaining Contract for which Purchaser does not provide notice of its desire to assume, shall be designated an Excluded Contract.  With respect to any Designated Remaining Contract, the Purchaser shall compensate the Sellers for the ordinary costs related thereto first arising after the Closing Date and actually incurred by the Sellers after the Closing in performing the obligations under such Designated Remaining Contracts until the date a final determination is made by the Purchaser with respect to the treatment of such Designated Remaining Contract (in any event, not to exceed 90 days after the Closing).  Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to the Purchaser pursuant to this Section 5.03, such Contract shall be deemed an Assigned Contract for all purposes under this Agreement and, to the extent required herein, any applicable Cure Cost shall be satisfied by the Purchaser.

(f)     With respect to any Excluded Contract which has not been rejected following the Closing upon written notice(s) from the Purchaser, as soon as practicable, the Sellers shall take all actions reasonably necessary to assume and assign to the Purchaser pursuant to Section 365 of the Bankruptcy Code any Contracts set forth in the Purchaser's notice(s); provided that any applicable Cure Cost shall be satisfied by the Purchaser.

(g)     Purchaser shall, on or before Closing, secure replacement letters of credit or cash deposits in lieu thereof, in the amount required to replace the existing letters of credit set forth in Section 5.03(g) of the Disclosure Schedule.  In the event that any letters of credit set forth in Section 5.03(g) of the Disclosure Schedule are presented for payment by the beneficiaries thereof prior to Closing, the Sellers and the Purchaser agree not to proceed to Closing without the prior consent of the PNC Lenders and if the parties and PNC Lenders are unable to agree then the Sellers shall cause the Purchaser's Deposit to be returned to the Purchaser.

SECTION 5.04.     Conduct of Business Prior to the Closing.  The Sellers covenant and agree that, except as described in Section 5.04 of the Disclosure Schedule, between the date hereof and the Closing Date, and except as a result of the Chapter 11 Cases, each Seller, to the extent related solely to the Business and the Arch Canada Business, shall:

(i)     conduct its business in the ordinary course and in compliance with applicable Laws, taking into account past practice, its current and projected financial condition and the condition of the markets in which the Sellers operate the Business or in which Arch Canada operates the Arch Canada Business;

61

(ii)    use its commercially reasonable efforts and take all necessary actions to preserve intact current values, integrity and the business organization of the Business and the Purchased Assets and the Arch Canada Business and the Arch Canada Assets;

(iii)    maintain Inventory and Arch Canada Inventory at the projected volume levels set forth in Section 5.04 of the Disclosures Schedule;

(iv)    use commercially reasonable efforts to maintain the Sellers' current insurance coverage under each insurance policy maintained by the Sellers with respect to the Business and to maintain Arch Canada's current insurance coverage under each insurance policy maintained by Arch Canada with respect to the Arch Canada Business, provided that the Purchaser acknowledges that, after the Closing Date, the Sellers shall have no responsibility for obtaining or maintaining any insurance relating to the Business or the Arch Canada Business, whether relating to or arising out of occurrences prior to, at or subsequent to, the Closing, except to the extent required to enable the Sellers to comply with Section 2.01(a)(xii);

(v)    use commercially reasonable efforts to maintain in full force and effect the Registered Transferred Intellectual Property and the Arch Canada Intellectual Property;

(vi)    use Sellers' respective commercially reasonable efforts to maintain (a) the goodwill and organization of the Business and the Arch Canada Business; (b) Sellers' relationship with the Business Employees, suppliers, customers and others having business dealings with them in connection with the Business; and (c) Arch Canada's relationship with its employees, suppliers, customers, independent contractors and others having business dealing with Arch Canada in connection with the Arch Canada Business;

(vii)    use commercially reasonable efforts to obtain authorization pursuant to the Transaction Approval Order to execute, deliver and/or file Uniform Commercial Code termination statements, lien releases, discharges, financing change; statements and such other documents, notices or instruments as the Purchaser may deem reasonably necessary or desirable to release all Liens, except for Permitted Encumbrances other than Mechanics Liens, against the Purchased Assets;

(viii)    pay and discharge their Liabilities relating to the Business as they come due in the ordinary course except those contested in good faith by the Sellers;

(ix)    make, in the ordinary course, any payments required to be made under the Employee Plans through the Closing Date; and

(x)    use commercially reasonable efforts to consult in good faith on a weekly basis with the representatives of the Purchaser to report material operational developments and the general status of ongoing operations of the Business, including any Material Adverse Effect, and of Arch Canada, including any Material Canadian Adverse Effect.

(b)    The Sellers covenant and agree that, except as described in Section 5.04, of the Disclosure Schedule, between the date hereof and the Closing Date (or earlier termination of this Agreement), and except as required by applicable Law or a result of the Chapter 11 Cases,

each Seller, to the extent related solely to the Business, shall not, without the prior written consent of the Purchaser, and shall cause Arch Canada and each of their Affiliates and the Sellers', Arch Canada's and Affiliates' officers, directors, shareholders, employees, partners, representatives and agents not to:

(i)    sell, lease, dispose or otherwise transfer or distribute any of the Purchased Assets or the Arch Canada Assets, or any interest therein, other than transfers and dispositions, including the sale and purchase of Inventory and Arch Canada Inventory from suppliers, made in the ordinary course of business;

(ii)    grant or announce any increase in the salaries, bonuses, severance or other benefits payable by the Sellers to any of the Business Employees who are to be offered employment by the Purchaser pursuant to Article VI, or the Arch Canada Employees, other than pursuant to any plans, programs or agreements existing on the date hereof and set forth in Section 5.04 of the Disclosure Schedule or in the ordinary course of business and consistent with past business practices, without providing the Purchaser with reasonable notice of the same and a reasonable opportunity to consult with the Sellers;

(iii)    hire any new employees or transfer employees from any other operations of the Sellers or Arch Canada, or enter into any employment Contract or other arrangement with any Arch Canada Employees or any Business Employees, if any such Business Employees are to be offered employment by, or are to become employees of, the Purchaser pursuant to Article VI, except as may be required to replace any Business Employees who terminate voluntarily, without providing the Purchaser with reasonable notice of the same and a reasonable opportunity to consult with the Sellers;

(iv)    effect any involuntary termination of any Arch Canada Employees or any Business Employees who are to be offered employment by, or are to become employees of, the Purchaser pursuant to Article VI, or the Arch Canada Employees, without providing the Purchaser with reasonable notice of the same and a reasonable opportunity to consult with the Sellers prior to doing so;

(v)    adopt any new benefit, retention, severance, or bonus plan for any Business Employees or Arch Canada Employees, or amend or modify any existing Employee Plans or Arch Canada Employee Plans for such employees, without providing the Purchaser with reasonable notice of the same and a reasonable opportunity to consult with the Sellers;

(vi)    change any method of accounting or accounting practice or policy used by the Sellers (as it relates to the Business) or Arch Canada, other than such changes required by GAAP with respect to the Business or required by Canadian GAAP with respect to the Arch Canada Business;

(vii)    fail to exercise any rights of renewal with respect to any Leased Real Property or Arch Canada Leased Real Property that by its terms would otherwise expire, provided however, that any such renewal does not constitute an assumption of the related Contract in accordance with Section 365 of the Bankruptcy Code prior to the consummation of the Transactions;

(viii)   enter or agree to enter into any Material Contract which may be included in the Purchased Assets or any new Arch Canada Material Contract, other than in the ordinary course of business, or make or agree to make any change or modification to any existing Material Contract included in the Purchased Assets or any existing Arch Canada Material Contract, except for agreements relating to sale and purchase of Inventory or Arch Canada Inventory from suppliers in the ordinary course of business without providing the Purchaser with reasonable notice of the same and a reasonable opportunity to consult with the Sellers;

(ix)   take or omit to take any action that would require disclosure under Article III, or that would otherwise result in a breach of any of the representations, warranties or covenants made by the Sellers in this Agreement or in any of the Ancillary Agreements;

(x)   take any action or omit to take any action which act or omission would reasonably be anticipated to have a Material Adverse Effect on the Business or the Purchased Assets or a Material Canadian Adverse Effect on the Arch Canada Business or the Arch Canada Assets; or

(xi)   agree to take any of the actions specified in this Section 5.04, except as contemplated by this Agreement and the Ancillary Agreements.

SECTION 5.05.   Access to Information  From the date hereof until the Closing, upon reasonable notice, the Sellers shall, and shall cause their respective officers, directors, employees, agents, representatives, accountants and counsel to: (a) afford the Purchaser and their authorized representatives reasonable access to the offices, properties and books and records of the Sellers (to the extent relating to the Business) and/or to Arch Canada; and (b) furnish to the officers, employees, and authorized agents and representatives of the Purchaser such additional financial and operating data and other information regarding the Business or the Arch Canada Business (or copies thereof) as the Purchaser may from time to time reasonably request; provided, however, that any such access or furnishing of information shall be conducted at the Purchaser's expense, during normal business hours, under the supervision of the applicable Seller's personnel and in such a manner as not to interfere with the normal operations of the Business or the Arch Canada Business; provided, further, that such review by and any information furnished to the Purchaser shall not affect the representations and warranties made by the Sellers in this Agreement or the remedies of Purchaser for breaches of those representations and warranties.  From time to time prior to the Closing Date, the Sellers shall promptly supplement or amend information previously delivered to the Purchaser with respect to any matter hereafter arising which, if existing or occurring prior to or at the date of this Agreement, would have been required to be set forth or disclosed herein; provided, however, that such supplemental information shall not be deemed to be an amendment to the Disclosure Schedule or the representations and warranties made by the Sellers in this Agreement.  Upon receipt of any such supplemental information, the Purchaser shall have ten (10) Business Days to determine, in the Purchaser's reasonable judgment, whether such supplemental information could reasonably be expected to result in damage to the Purchaser and notify the Sellers whether the Purchaser will terminate this Agreement pursuant to Section 8.01; provided, however, if the Purchaser subsequently discovers that the potential damages that could reasonably be expected to result from such supplemental information are greater than previously determined then (1) in the

event such supplemental information could reasonably be expected to result in damages of at least one million dollars ($1,000,000), the Purchaser shall have the right to terminate this Agreement and (2) in the event such supplemental information could reasonably be expected to result in damages equal to less than one million dollars ($1,000,000), the Purchaser will not have the right to terminate (unless such notice is provided within the ten (10) Business Day period) and the Purchaser will not lose its rights under Section 7.02(a) with respect to aggregating the amount of such potential damages.

SECTION 5.06.        Damage or Destruction.  Until the Closing, the Purchased Assets shall remain at the risk of the Sellers. In the event of any material damage to or destruction of any Purchased Asset (other than normal wear and tear) after the date hereof and prior to the Closing (in any such case, a "Loss"), the Sellers shall give notice thereof to the Purchaser.  If any such Loss is covered by policies of insurance, all right and claim of the Sellers to any proceeds of insurance for such Loss shall be assigned and (if previously received by the Sellers and not used prior to the Closing Date to repair any damage or destruction) paid to the Purchaser at Closing, and the Purchaser shall complete the Transactions as provided in this Agreement without any reduction in the Purchase Price with respect to such Loss, though Purchaser shall receive a credit against the Purchase Price of any uninsured or underinsured amounts and any deductible. If any such Loss is not covered by policies of insurance, the Purchaser shall have the right to reduce the Purchase Price by an amount equal to (i) the estimated cost to repair or restore the Purchased Assets affected by such Loss (the "Affected Assets") to substantially repair or restore their condition immediately prior to the occurrence of such Loss or (ii) if such Affected Assets are destroyed or damaged beyond repair, the replacement cost of the Affected Assets and, in either case the Purchaser shall complete the Transactions as provided in this Agreement and all compensation payable on account of such Loss shall be retained by the Sellers.  If the Purchaser elects to reduce the Purchase Price pursuant to this Section 5.06, the Sellers, the Purchaser shall negotiate in good faith in an effort to agree upon the amount of such reduction.  If the parties are unable to reach agreement within five (5) Business Days after notice of the Loss is given by the Sellers, then the amount of the reduction shall be determined by an independent, qualified insurance adjuster selected by the parties (or, if they are unable to agree on such selection, one appointed by the Bankruptcy Court upon application of either party). Notwithstanding the foregoing, the amount of any Purchase Price reduction pursuant to this Section 5.06 shall be subject to the approval of the PNC Lenders; provided, the Purchaser shall have no obligation to proceed to Closing if the parties and the PNC Lenders are unable to agree on any Purchase Price reduction and the Sellers shall cause the Purchaser's Deposit to be returned to the Purchaser.

SECTION 5.07.        Confidentiality.

(a)        The terms of the confidentiality agreement dated as of October 14, 2009 (as amended from time to time, the "Confidentiality Agreement") between the Investment Banker, as agent for Arch, and Sun Capital Partners Group V, Inc. (on behalf of Purchaser) are hereby incorporated herein by reference, and shall continue in full force and effect in accordance therewith and if the Purchaser is the "Successful Bidder," then at the Closing, the confidentiality and employee non-solicitation obligations of the Purchaser under the Confidentiality Agreement shall terminate; provided, however, that such obligations shall terminate only in respect of that portion of the Evaluation Material (as defined in the Confidentiality Agreement) and those

employees exclusively relating to the Business; provided, further, that notwithstanding anything herein or in the Confidentiality Agreement to the contrary, the Sellers shall not be required to maintain the name of the Purchaser, this Agreement or any Ancillary Agreement as confidential. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement shall nonetheless continue in full force and effect.

(b)     Nothing provided to the Purchaser pursuant to Section 5.05 shall in any way amend or diminish the Purchaser's obligations under the Confidentiality Agreement.  The Purchaser acknowledges and agrees that any Evaluation Material provided to the Purchaser pursuant to Section 5.05 or otherwise by Arch or any Representative (as defined in the Confidentiality Agreement) thereof shall be subject to the terms and conditions of the Confidentiality Agreement.

(c)     Notwithstanding anything herein to the contrary, each party hereto (and its representatives, agents and employees) may consult any tax advisor regarding the tax treatment and tax structure of the Transactions, and may disclose to any person, without limitation of any kind, the tax treatment and tax structure of such transactions and all materials (including opinions and other tax analyses) that are provided relating to such treatment or structure.

SECTION 5.08.     Regulatory and Other Authorizations; Notices and Consents.

(a)     The Purchaser and the Sellers shall each use their commercially reasonable efforts to promptly obtain all waivers, authorizations, notices to proceed, consents, orders and approvals of all Governmental Authorities and officials, make all required filings, applications and petitions with, and give all required notices to, the applicable Governmental Authorities that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement and the Ancillary Agreements and will cooperate fully with the other parties in promptly making and obtaining all such waivers, authorizations, consents, orders, notices to proceed and approvals.  Each party hereto agrees to make promptly its respective filing, if necessary, pursuant to the HSR Act and the Competition Act (the filing fees in regard of which shall be payable by the Purchaser) with respect to the Transactions within ten (10) Business Days of the date hereof, to request expedited treatment of any such filings and to supply as promptly as practicable to the appropriate Governmental Authorities any additional information and documentary material that may be requested pursuant to the HSR Act or the Competition Act, and the Purchaser will promptly make all filings or notifications required under the ICA, if any.  The Purchaser and Sellers each agree that, during the term of this Agreement, it will not withdraw its filing under the HSR Act or any other applicable antitrust, competition or trade regulation law without the written consent of the other party.  The Purchaser and Sellers each agree that it will not enter into any timing agreement with any Governmental Authority without the written consent of the other party.  The Sellers shall not be required to pay any fees, or other payments to any Governmental Authorities in order to obtain any authorization, notice to proceed, consent, order or approval, including any made pursuant to the HSR Act or the Competition Act in connection with the Transactions.

(b)     Without limiting the generality of the undertakings made by the parties hereto pursuant to Section 5.08(a), each party agrees to use its commercially reasonable efforts

and to take any and all steps necessary to avoid or eliminate each and every impediment under any antitrust, competition or trade regulation Law that may be asserted by any United States or non-United States governmental antitrust authority or any other party so as to enable the parties hereto to expeditiously close the Transactions as promptly as practicable. Notwithstanding anything to the contrary in this Agreement, neither the Purchaser nor any of their Affiliates shall be required, in connection with obtaining any action or no action, waiver, authorization, consent, Order or approval of any Governmental Authority or other Person, or otherwise in connection with the consummation or making effective of the Transactions, to (x) sell, divest, hold separate, otherwise dispose of or license or conduct any portion of their respective assets, properties or business or the assets, properties or businesses to be acquired by the Purchaser pursuant hereto in a specified manner, or (y) agree to sell, divest, hold separate, otherwise dispose of or license or conduct any portion of their respective assets, properties or businesses or the assets, properties or businesses to be acquired by the Purchaser pursuant hereto in a specified manner, or (z) take or agree to take any other action or agree to any limitation that, in the ease of clauses (x), (y) or (z), would have a material adverse effect on the Purchaser or their Affiliates or a material adverse effect on the benefits, taken as a whole, reasonably expected to be derived by Purchaser from the Transactions (any such term or condition in clauses (x), (y) or (z) being referred to herein as a "Burdensome Term or Condition"). In addition, each party hereto shall use its commercially reasonable efforts to defend through litigation on the merits any claim asserted in court by any party in order to avoid entry of, or to have vacated or terminated, any decree, order or judgment (whether temporary, preliminary or permanent) that would prevent the Closing.

(c)     Each party to this Agreement shall promptly notify the other parties when any such approval referred to in Section 5.08(a) is obtained, taken, made, given or denied, as applicable, and will notify the other parties of any material communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other party to review in advance any proposed material communication by such party to any Governmental Authority. None of the parties to this Agreement shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other parties in advance and, to the extent permitted by such Governmental Authority, gives the other parties the opportunity to attend and participate at such meeting. Subject to the Confidentiality Agreement, the parties to this Agreement will coordinate and cooperate fully with the other parties in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods including under the HSR Act. Subject to the Confidentiality Agreement, the parties to this Agreement will provide the other parties with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the Transactions.

(d)     The parties to this Agreement shall not, and shall cause their respective Affiliates not to, take any action, or enter into any transaction or any agreement to effect any transaction (including any merger or acquisition but not including transactions or agreements in the ordinary course of business), that would reasonably be expected to make it materially more difficult to: (i) obtain the expiration or termination of the waiting period under the HSR Act applicable to the purchase of the Purchased Assets contemplated by this Agreement, (ii) obtain

the approval under any applicable antitrust, competition or trade regulation law, (iii) avoid the entry of, the commencement of litigation seeking the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order that would prevent the completion of the Transactions, or (iv) obtain all authorizations, consents, orders and approvals of Governmental Authorities necessary for the consummation of the Transactions.

SECTION 5.09.      Permits and Licenses.

(a)      Commencing on the date of this Agreement, the parties, cooperating in good faith, shall use commercially reasonable efforts to take such steps, including the filing of any required applications with Governmental Authorities, as may be necessary (i) to effect the transfer of the Permits and Licenses to the Purchaser on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable Law, and (ii) to enable the Purchaser to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of Facilities from and after the Closing Date (the actions described in the foregoing clauses (i) and (ii) being referred to herein as the "Permitting Process").  Any filing or other fees and other out-of-pocket expenses associated with the Permitting Process shall be paid by the Purchaser.

(b)      Purchaser acknowledges and agrees that the Permitting Process may not be completed prior to the Closing Date and agrees that completion of the Permitting Process shall not be a condition to Closing provided that despite the completion thereof, Purchaser is able to continue to operate the Business without material interruption.

SECTION 5.10.      Transferred Names and Marks.

(a)      Upon the Closing, each Seller shall, and shall cause each of its Affiliates to, file amendments with the appropriate Governmental Authorities changing its corporate name, "doing business as" name, trade name, and any other similar corporate identifier (each, a "Corporate Name") to a Corporate Name that does not contain any of the Transferred Names and Marks.

(b)      Notwithstanding anything in this Agreement to the contrary, and without limiting the rights otherwise granted in this Section 5.10, the Sellers and their Affiliates shall have the right, at all times after the Closing, to (i) keep records and other historical or archival documents containing or referencing the Transferred Names and Marks, (ii) use the Transferred Names and Marks to the extent required by or permitted as a fair use under applicable Law, and (iii) refer to the historical fact that the Sellers and their Affiliates previously conducted their respective businesses under the Transferred Names and Marks.

SECTION 5.11.      Bulk Transfer Laws.  As long as the Transaction Approval Order provides for the transfer of the Purchased Assets free and clear of all pre-petition Taxes, the Purchaser hereby waives compliance by the Sellers with any applicable bulk sale or bulk transfer laws of any jurisdiction in connection with the sale of the Purchased Assets to the Purchaser.

68

SECTION 5.12.    Transition Services.   Following the Closing, the Sellers and the Purchaser shall provide, or cause to be provided, certain services as may be agreed between the Sellers and the Purchaser prior to Closing in a transition services agreement to be entered into by the Sellers and the Purchaser as of the Closing and in form and substance satisfactory to the Purchaser and the Sellers (the "Transition Services Agreement").

SECTION 5.13.    Further Action.   The parties hereto shall use all reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the Transactions, including, but not limited to, causing Arch Canada to take all actions, or refrain from taking such actions, which Arch Canada has covenanted to take (or refrain from taking) in this Agreement.  In addition, prior to Closing, Sellers shall, and shall cause Arch Canada to, undertake any such pre-Closing restructuring requested by Purchaser provided that (i) Purchaser shall pay all costs and expenses associated with such restructuring and (ii) such restructuring is not otherwise disadvantageous to Sellers and Arch Canada as reasonably determined by Sellers.

SECTION 5.14.    Tax Cooperation and Exchange of Information.   The parties hereto will provide the other parties with such cooperation and information as may be reasonably requested in filing any Tax Return, amended Tax Return or claim for refund, determining any liability for Taxes or a right to a refund of Taxes or participating in or conducting any audit or other proceeding in respect of Taxes relating to the Purchased Assets or the Business.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules and related work papers and documents relating to rulings or other determinations by taxing authorities.  Each of the parties will make themselves (and their respective employees) available, on a mutually convenient basis, to provide explanations of any documents or information provided under this Section 5.14.  Each of the parties will retain all Tax Returns, schedules and work papers and all material records or other documents in its possession (or in the possession of its Affiliates) relating to Tax matters relevant to the Purchased Assets or the Business for the taxable period first ending after the Closing and for all prior taxable periods (the "Tax Documents") until the later of (i) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions, or (ii) eight (8) years following the due date (without extension) for such Tax Returns.  After such time, before any of the parties shall dispose of any such documents in its possession (or in the possession of its Affiliates), the other party shall be given the opportunity, after 90 days' prior written notice, to remove and retain all or any part of such documents as such other party may select (at such other party's expense).  In the event that any Seller is liquidated or otherwise ceases to be a going concern prior to the expiration of the period described in the second preceding sentence, such Seller shall offer the Purchaser the opportunity described in the preceding sentence (with 90 days' prior written notice or such shorter period of notice as may be practicable) to remove and retain Tax Documents and such Seller may then dispose of any such documents not removed by Purchaser.  If it is not practical to give the other party the right to retain Tax Documents, the other party may instead be given a reasonable opportunity to make copies, at its own expense of such Tax Documents.  Any information obtained under this Section 5.14 shall be kept confidential, except as may be otherwise of reasonable assistance in connection with the filing of Tax Returns or claims for

refund or in conducting an audit or other proceeding. The Purchaser shall be entitled to make an election under Section 338(g) of the Tax Code with respect to Arch Canada and the Sellers will reasonably cooperate therewith.

SECTION 5.15.     Conveyance Taxes.

(a)     Canadian Conveyance Taxes.  The Sellers and Purchaser shall each pay one-half of any and all Conveyance Taxes incurred in Canada as a result of the Transactions.

(b)     United States Conveyance Taxes.  In the event that any Conveyance Taxes (as may be reduced or eliminated pursuant to Section 1146(a) of the Bankruptcy Code and/or the Transaction Approval Order entered by the Bankruptcy Court) are assessed in the United States on the transfer of the Purchased Assets to the Purchaser, the Sellers and the Purchaser shall each pay one-half of such Conveyance Taxes.  The Sellers shall complete and file all returns associated therewith.

SECTION 5.16.     Proration of Taxes and Certain Charges.

(a)     Except as provided in this Section 5.16, all real property Taxes, personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the day before the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between the Sellers and the Purchaser as of 12:01 a.m. Miami, Florida time on the Closing Date (using the same methodology set forth in the definition of Excluded Taxes).  If any Taxes subject to proration are paid by the Purchaser, on the one hand, or the Sellers, on the other hand, the proportionate amount of such Taxes paid (or in the event a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

(b)     Except as otherwise provided in this Agreement, all installments of special assessments or other charges on or with respect to the Purchased Assets and the Arch Canada Leased Property payable by any of the Sellers or Arch Canada for any period in which the Closing Date shall occur, including base rent, common area maintenance, royalties, all municipal, utility or authority charges for water, sewer, electric or gas charges, garbage or waste removal, cost of fuel, fees and charges under Permits and Licenses and other charges commonly apportioned on the sale of real property and interests therein in the applicable jurisdiction, shall be apportioned as of the Closing, and each party shall pay its proportionate share promptly upon the receipt of any bill, statement or other charge with respect thereto.  If such charges or rates are assessed either based upon time or for a specified period, such charges or rates shall be prorated as of 12:01 a.m. Miami, Florida time on the Closing Date.  If such charges or rates are assessed based upon usage of utility or similar services, such charges shall he prorated based upon meter readings taken on the Closing Date.

(c)     All refunds, reimbursements, installments of base rent, additional rent, license fees or other use related revenue receivable by any party to the extent attributable to the operation of the Business or the Arch Canada Business for any period in which the Closing shall occur shall be prorated so that the Sellers shall be entitled to that portion of any such installment

70

applicable to the period up to but not including the Closing Date and the Purchaser shall be entitled to that portion of any such installment applicable to any period from and after the Closing Date, and if the Purchaser or the Sellers, as the ease may be, shall receive any such payments after the Closing Date, they shall promptly remit to such other parties their share of such payments.

(d)     The pro-rations pursuant to this Section 5.16 may be calculated after the Closing Date, as each item to be prorated (including any such Tax, obligation, assessment, charge, refund, reimbursement, rent installment, fee or revenue) accrues or comes due, provided that, in any event, any such proration shall be calculated not later than 30 days after the party requesting proration of any item obtains the information required to calculate such proration of such item.

(e)     The Sellers shall not take any actions (including, but not limited to, filing any Tax Return or amended Tax Return, responding to any audit or inquiry by a taxing authority, or settling or compromising any controversy with a taxing authority) that could affect the Tax Liability of the Purchaser or any of their Affiliates without the prior written consent of the Purchaser, which consent shall not he unreasonably withheld or delayed provided that this Section 5.16(e) shall not apply to income taxes or Tax Returns in respect thereof, or the ability of the Sellers to seek the maximum Tax refund possible.

SECTION 5.17.     Personal Information.  In respect of any Personal Information contained in the books and records of the Sellers that the Purchaser has had access to or will acquire at Closing, the Purchaser will: (a) before the Closing, use the Personal Information solely for purposes relating to the Transactions and, if the Closing does not occur, return the Personal Information to the Sellers upon written request from the Sellers; and (b) if the Closing does occur, then after the Closing: (i) use and disclose any such Personal Information in compliance with all applicable Laws; and (ii) to the extent expressly required by applicable Laws, notify any Person whose Personal Information has been disclosed to the Purchaser through the books and records that the Transactions have taken place and that the Personal Information was disclosed to the Purchaser as a consequence of such Transactions.

SECTION 5.18.     Vehicle Registration.  Effective upon Closing, the Sellers and Purchaser shall arrange for the transfer of the registration of all registered trucks, cars, other vehicles and rolling stock included in the Purchased Assets into the Purchaser's name.

SECTION 5.19.     Post-Closing ICA Filing. The Purchaser is a "non-Canadian" within the meaning of the ICA and the Purchaser agrees to file the appropriate notice regarding the Transaction with the Investment Review Division of Industry Canada within thirty (30) days of Closing in compliance with the ICA.

SECTION 5.20.     ISRA.  Sellers shall comply with the provisions of the New Jersey Industrial Site Remediation Act with respect to any Leased Real Property located within the State of New Jersey and, to the extent required, Purchaser shall cooperate in connection with Sellers' efforts and shall execute any documents reasonably required thereunder or in connection therewith.

SECTION 5.21.    <u>Arch Canada</u>.  At the request of the Purchaser, Sellers shall cooperate with Purchaser's efforts, including without limitation, executing any documentation reasonably required, to cause Arch Canada to be converted into a corporation organized under Canadian law effective as of Closing.

SECTION 5.22.    <u>Tax Refund</u>.

(a)    Upon receipt of the 2009 Tax Refund, the Sellers shall deposit such 2009 Tax Refund with the Escrow Agent in an escrow account (the "<u>Tax Escrow Account</u>") pursuant to a form of escrow agreement substantially similar to the form of the Deposit Escrow Agreement (the "<u>Tax Escrow Agreement</u>").

(b)    Within thirty (30) days following the Sellers' (or any successor's) receipt of the 2009 Tax Refund, the Sellers and the Purchaser shall engage a mutually agreeable third party independent actuarial firm with significant experience in similar valuations (the fees of which shall be paid out of the 2009 Tax Refund) to evaluate the Employee Liabilities and determine (1) the amount of the remaining Employee Liabilities (the "<u>Determined Remaining Liabilities</u>") and (2) the amounts paid by the Purchaser in respect of the Employee Liabilities (the "<u>Paid Employee Liabilities</u>").  In the event that the amount of the Determined Remaining Liabilities <u>plus</u> the Paid Employee Liabilities exceeds two million eight hundred thousand dollars ($2,800,000), then the Escrow Agent shall release an amount equal to such difference from the Tax Escrow Account to the Purchaser and shall release the remainder of the Tax Escrow Account to the Sellers.  In the event that the amount of the Determined Remaining Liabilities <u>plus</u> the Paid Employee Liabilities is less than or equal to two million eight hundred thousand dollars ($2,800,000), then the Escrow Agent, shall release the funds in the Tax Escrow Account to the Sellers.

SECTION 5.23.    [<u>Intentionally Omitted</u>].

SECTION 5.24.    <u>Other Reports</u>.  The Sellers agree to cause to be delivered to the Purchaser copies of any and all reports that compare the Sellers' actual cash receipts and disbursements to the receipts and disbursements budgeted by the Sellers in connection with their requests to use cash collateral of the PNC Lenders.  In addition, the Sellers shall make their chief restructuring officer available to the Purchaser on reasonable notice for the purposes of providing information to the Purchaser in connection with the accrual of administrative claims, if any, and/or the use of cash collateral.

SECTION 5.25.    <u>Jim Pattison Consents</u>.  The Sellers shall use their commercially reasonable efforts to obtain all consents from Jim Pattison Industries Ltd. under any Contracts between Jim Pattison Industries Ltd. and the Sellers, each in a form and substance reasonably acceptable to the Purchaser.

ARTICLE VI
EMPLOYEE MATTERS

SECTION 6.01.        Employees.

(a)      The Purchaser shall offer employment, conditional upon Closing and effective as of the Closing Date, to each of the Business Employees listed on Section 6.01(a) of the Disclosure Schedule, as may be amended by the Purchaser by notice to the Sellers after the date hereof and prior to Closing, who are, on the Closing Date, not Inactive Employees ("Active Employees").

(b)      The Purchaser shall also offer employment to each of the Business Employees listed on Section 6.0l(a) of the Disclosure Schedule, as may be amended by the Purchaser by notice to the Sellers after the date hereof and prior to Closing, who are, on the Closing Date, Inactive Employees, upon any such Inactive Employee becoming eligible for reinstatement for active employment, or earlier, if required by a contract or by applicable Law or Governmental Authority.

(c)      Each offer contemplated in Section 6.01(a) and Section 6.01(b) above shall provide:

(i)      substantially the same job function and title as such Business Employee was performing or held immediately prior to becoming an employee of the Purchaser without material change or diminution of job responsibility or authority;

(ii)      substantially the same in wages or salary as such Business Employee received at the Effective Time;

(iii)      the same or substantially similar benefits in the aggregate as those provided by the Sellers to the Business Employees at the Effective Time;

(iv)      credit for service with the Sellers and their Affiliates and predecessors under the Purchaser's employee plan for purposes of eligibility, vesting and locking-in but not benefit accrual; provided that in no event shall such credit result in any duplication of benefit or funding; and

(v)      for the recognition of the service of the Business Employees for the purposes of vacation and severance and termination obligations and all other service-based benefits or perquisites as if they had been employed by the Purchaser since their individual dates of hire by a Seller, without preexisting condition exclusions, waiting times to commence coverage, or other lapses in coverage.

(d)      The Sellers will provide notices of termination at Closing to the Business Employees who accept the Purchaser's offer of employment referred to in this Section 6.01, and the Sellers shall obtain the input and approval of the Purchaser regarding the form and content of such notice in advance of issuing it.  In advance of Closing, the Sellers shall not terminate the employment of any Business Employee who accepts the Purchaser's offer of employment referred to in this Section 6.01 without the approval of the Purchaser.

73

(e)      Within ten (10) Business Days after execution by all parties of this Agreement, the Sellers shall deliver or cause to be delivered to the Purchaser a list of Business Employees showing their respective positions and hire dates, which list shall be true and complete in all material respects.

SECTION 6.02.      Co-operation.  The Sellers shall co-operate with the Purchaser (i) in the distribution of the offers of employment to Business Employees made pursuant to this Article VI prior to the Closing and collection of accepted offers, and (ii) in effecting an orderly transfer of the Business Employees who accept employment with the Purchaser.

SECTION 6.03.      Employee Plans.  The Purchaser shall assume and be solely responsible for all obligations to the Business Employees with respect to Employee Liabilities accruing prior to Closing.

SECTION 6.04.      Intentionally Omitted.

SECTION 6.05.      COBRA Obligations.  The Purchaser shall assume all Liabilities with respect to the provision of notices, election periods, and benefits pursuant to Section 4980B of the Tax Code or Part 6 of Subtitle B of Title 1 of ERISA, to any Business Employees or any other former employee of Sellers or other individuals associated with any Business Employees or any other former employees of Sellers with respect to qualifying events occurring on or before the Closing Date or in connection with this transaction (the "COBRA Obligations").

SECTION 6.06.      Payment and Expenses at Closing.

(a)      Except as set forth Sections 2.02(a)(iv) and (v), the Sellers will be responsible for all payments made and all expenses, costs and other Liabilities required to be paid in connection with the termination of employment of those Business Employees who (i) do not accept the Purchaser's offer of employment referred to in Section 6.01 or (ii) are not offered employment by the Purchaser.

(b)      The Sellers acknowledge and agree that they maintain sole responsibility for paying and providing to the Business Employees all wages, salaries tied other incentives relating to the Business Employees' terms and conditions of employment prior to the Closing Date and the Sellers will indemnify and save harmless the Purchaser from and against any and all claims, demands, actions, losses, damages, costs and expenses whatsoever, including legal fees arising in respect of the foregoing.

(c)      The Sellers covenant and agree that in the final paychecks or remittances from the Sellers to the Business Employees, the Sellers will pay to all of the Business Employees all amounts that have accrued for wages, salaries and other incentives attributable for the period up to the Closing Date.

(d)      The Purchaser will be responsible for all payments required by any contract to which Purchaser is a party or required by law to be made and all expenses and costs required to be paid in connection with any Transferred Employee who ceases employment with,

or whose employment is terminated by, the Purchaser following the Closing Date and will indemnify and hold harmless the Seller from and against all claims, demands, actions, losses, damages, costs and expenses whatsoever, including legal fees arising in respect of the foregoing.

ARTICLE VII
CONDITIONS TO CLOSING

SECTION 7.01.    Conditions to Obligations of the Sellers.  The obligations of the Sellers to consummate the Transactions shall be subject to the fulfillment or written waiver by the Sellers, at or prior to the Closing, of each of the following conditions:

(a)    Representations, Warranties and Covenants.  (i) The representations and warranties of the Purchaser contained in this Agreement (A) that are not qualified as to "materiality" shall be true and correct in all material respects on and as of the date hereof and the Closing Date, and (B) that are qualified as to "materiality" shall be true and correct on and as of the date hereof and the Closing Date, except to the extent such representations and warranties are made as of another date, in which case such representations and warranties shall be true and correct in all material respects or true and correct, as the case may be, on and as of such other date; and (ii) the covenants and agreements contained in this Agreement to be complied with by the Purchaser on or before the Closing shall have been complied with in all material respects;

(b)    Governmental Approvals.  (i) Any waiting period (and any extension thereof) under the HSR Act applicable to the purchase of the Purchased Assets contemplated by this Agreement shall have expired or shall have been terminated, or the applicable approval, ruling or the like as is required to comply with the HSR Act has been issued; (ii) Competition Act Compliance applicable to the purchase of the Purchased Assets contemplated by this Agreement shall have been obtained or made; (iii) compliance with the requirements of the New Jersey Industrial Site Remediation Act; and (iv) any approvals, filings, rulings or the like as are required prior to Closing to comply with the antitrust legislation of any relevant jurisdiction (other than under the HSR Act and the Competition Act), the absence of which would reasonably be expected to (A) have a Material Adverse Effect or (B) result in a criminal violation, shall have been obtained or made;

(c)    No Order.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent.) that has the effect of making the Transactions illegal or otherwise restraining or prohibiting the consummation of such Transactions;

(d)    Transaction Approval Order.  The Bankruptcy Court shall have entered the Transaction Approval Order, which is effective and not stayed, and such Transaction Approval Order includes a finding that the sale was conducted in good faith pursuant to Section 363(m) of the Bankruptcy Code; and

(e)    Other Agreements.  The Purchaser shall have duly executed and delivered to Sellers each of the Ancillary Agreements, to which Purchaser is a party and shall have made the other closing deliverables set forth in Section 2.12.

SECTION 7.02.        Conditions to Obligations of the Purchaser.  The obligations of the Purchaser to consummate the Transactions shall be subject to the fulfillment or written waiver by the Purchaser, at or prior to the Closing, of each of the following conditions:

(a)        Representations, Warranties and Covenants.  (i) The representations and warranties of the Sellers contained in this Agreement (A) that are not qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all material respects on and as of the date hereof and the Closing Date and (B) that are qualified as to "materiality" or "Material Adverse Effect" shall be true and correct on and as of the date hereof and the Closing Date, other than such representations and warranties that are made as of another date, in which case such representations and warranties shall be true and correct in all material respects or true and correct, as the case may be, on and as of such other date, and (ii) the covenants and agreements contained in this Agreement to be complied with by the Seller at or before the Closing shall have been complied with in all material respects.  For purposes of this Section 7.02(a), any breach or series of breaches that could reasonably be expected to result in damage to the Purchaser, the Purchased Assets or the Business in excess of One Million Dollars ($1,000,000.00) in the reasonable judgment of Purchaser is deemed material;

(b)        Governmental Approvals. (i) Any waiting period (and any extension thereof) under the HSR Act applicable to the purchase of the Purchased Assets contemplated by this Agreement shall have expired or shall have been terminated, or the applicable approval, ruling or the like as is required to comply with the HSR Act has been issued; (ii) Competition Act Compliance applicable to the purchase of the Purchased Assets contemplated by this Agreement; (iii) compliance with the New Jersey Industrial Site Remediation Act; and (iv) any approvals, filings, rulings or the like as are required prior to Closing to comply with the antitrust legislation of any relevant jurisdiction (other than the HSR Act and the Competition Act), the absence of which would reasonably be expected to (A) have a Material Adverse Effect or (B) result in a criminal violation, shall have been obtained or made; provided that none of the approvals in clauses (i) and (ii) shall include any condition, requirement, restriction or change that, individually or in the aggregate, imposes any Burdensome Term or Condition unless such Burdensome Term or Condition is acceptable to the Purchaser in its reasonable discretion;

(c)        No Order.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that has the effect of making the Transactions illegal or otherwise restraining or prohibiting the consummation of such Transactions;

(d)        Transition Approval Order.  The Bankruptcy Court shall have entered the Transaction Approval Order, which is effective and not stayed and such Transaction Approval Order includes a finding that the sale was conducted in good faith pursuant to Section 363(m) of the Bankruptcy Code;

(e)        No Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred any Material Adverse Effect or Material Canada Adverse Effect;

(f)      Other Agreements.  The Sellers shall have duly executed and delivered to the Purchaser each of the Ancillary Agreements and shall have made the other closing deliverables set forth in Section 2.11;

(g)      Contracts.  The Sellers shall have obtained for the benefit of the Purchaser, to the extent necessary to effect the assignment of the Assigned Contracts, the approval of the Bankruptcy Court pursuant to the Transaction Approval Order and/or the consent to assignment from the applicable counterparties, and the Sellers shall have duly assigned such Assigned Contracts to the Purchaser;  For avoidance of doubt and for purposes of clarifying the "closing condition" set forth in this subsection (g), it is the intent of this subsection (g) that Purchaser shall have a "closing condition" such that following the Closing, (i) Purchaser shall have the full rights and benefits of the Assigned Contracts, (ii) Purchaser shall have no liability for prior breaches of the Assigned Contracts, and (iii) the consummation of the transactions contemplated hereby and the use by Purchaser of the Assigned Contracts following the Closing shall not give the other party thereto any rights against Purchaser solely as a result of the assignment of any Assigned Contract to Purchaser.  Accordingly, for avoidance of doubt, the parties agree that to the extent the Transaction Approval Order cannot transfer to Purchaser any Assigned Contract in a manner that satisfies the intent of this subsection (g), the Sellers will obtain prior to Closing any necessary consent from the counterparties to the Assigned Contracts in order to satisfy the intent of the condition in this subsection (g);

(h)      Facilities Shutdown.  No shutdown of any facility which is a Purchased Asset including any facility with respect to the Arch Canada Business shall have occurred as a result of any labor strike, labor dispute, work stoppage or similar event related to such facility or any supplies of any such facility continued for a period of more than fourteen (14) days and none of the facilities operated by the Sellers shall have been damaged or destroyed, prior to the Closing Date, by fire or other casualty, such that, as of the Closing Date, the Business cannot be operated in the normal course;

(i)      HHH Indemnification Agreement.  The execution and delivery by HHH and Purchaser of a mutually agreeable indemnification agreement that provides that HHH will indemnify, defend and hold Purchaser harmless from and against any claim or liability related to or arising out of any non-compliance with or violation of any Law or other legal requirement, including without limitation those items set forth on Section 3.10(b) of the Disclosure Schedule, with regard to HHH's participation in the Employee Plans (the "Non-Compliance") and to pay any amounts required to any Governmental Authority or other third parties to remedy such Non-Compliance or other violations as a result of any audit or enforcement action instituted by any Governmental Authority or third party (each, a "Non-Compliance Payment"), the terms of which shall specifically survive Closing hereunder.

(j)      Title Policy.  The Purchaser shall have received an original policy or policies of title insurance with respect to the Owned Real Property and Leased Real Property satisfactory to the Purchaser acting reasonably;

(k)      Transferred Employees.  Ninety percent (90%) of the Business Employees at each of the Sellers facilities used in connection with the Business, shall have accepted employment with the Purchaser or an Affiliate of the Purchaser on the terms and conditions

offered by the Purchaser or such Affiliate in accordance with the terms and conditions of this Agreement;

(l)    Release of Liens.  The Purchaser shall have received evidence satisfactory to the Purchaser (which shall include the Transaction Approval Order) that any and all Liens that encumber the Purchased Assets and the Arch Canada Assets (other than the Arch Canada Intercompany Security Documents) will be released at or prior to Closing;

(m)    General Release.  The Sellers shall deliver a general release to the Purchaser as set forth on Exhibit 7.02(m); provided, that such release shall not release the Purchaser of any of its obligations hereunder or under the Ancillary Agreements and the Transaction Approval Order;

(n)    Other Releases.  Each of PNC and Churchill Financial Cayman Ltd., acting for itself and the agent of other lenders, will release its collateral interest in the Arch Canada Intercompany Notes, the related Arch Canada Security Documents and any Liens on the Arch Canada Stock or Arch Canada Assets and Arch International will release its collateral interest in the related Arch Canada Security Documents and any Liens on the Arch Canada Stock or Arch Canada Assets;

(o)    Arch Canada Indebtedness.  There shall be no Arch Canada Indebtedness outstanding as of Closing; and

ARTICLE VIII
TERMINATION, AMENDMENT AND WAIVER

SECTION 8.01.    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by the Purchaser if:

(i)    [Intentionally Omitted];

(ii)    the Purchaser is not selected as "the Successful Bidder" in accordance with the Arch Assets Bid Procedures Order;

(iii)    in the event that the Purchaser is selected as the Successful Bidder in accordance with the Arch Assets Bid Procedures Order, either (A) the Transaction Approval Order has not been approved by the Bankruptcy Court on or prior to January 22, 2010; or (B) the Transaction Approval Order entered by the Bankruptcy Court either (1) does not contain all of the requirements of the "Transaction Approval Order" as defined in Section 1.01; or (2) is not otherwise reasonably acceptable to Purchaser;

(iv)    the Closing shall not have occurred by January 29, 2010;

(v)    the Seller shall cease to operate the Business as a going concern;

(vi)    [Intentionally Omitted];

78

(vii)    after December 18, 2009, the Sellers (i) fail to timely pay a regularly scheduled payroll to their employees, or (ii) fail to procure sufficient goods and services or fulfill customer orders in the ordinary course of business due to lack of liquidity in the reasonable discretion of Purchaser; provided, however, that this right of termination under this Section 8.01(a)(vii) shall not be available in the event (a) the PNC Lenders agree to make a debtor in possession loan in an amount sufficient for the Sellers to achieve its budget (which budget must be reasonably acceptable to the Purchaser) to the Sellers in the Chapter 11 Cases for the period from and after December 18, 2009 (and so long as the lender under any DIP Credit Agreement does not declare Sellers in default or otherwise seek to enforce a default by the Sellers thereunder or Sellers are not otherwise in breach of any Order approving a DIP Credit Agreement), or (b) the PNC Lenders consent to a debtor in possession loan being made to the Sellers in the Chapter 11 Case by the Purchaser or an Affiliate of the Purchaser in an amount sufficient for the Sellers to achieve its budget (which budget must be reasonably acceptable to the Purchaser) under Section 364(d) of the Bankruptcy Code with Liens senior to those Liens of the PNC Lenders on the Purchased Assets (and so long as the lender under any DIP Credit Agreement does not declare Sellers in default or otherwise seek to enforce a default by the Sellers thereunder or Sellers are not otherwise in breach of any Order approving a DIP Credit Agreement); and

(viii)    in the event that the PNC Lenders fail to provide the consent, if any, required pursuant to Sections 5.03(a), 5.03(g) and 5.06 within three (3) business days of receipt of joint written notice from the Sellers and the Purchaser (and, for the avoidance of doubt, the parties agree that upon such termination Sellers shall cause the Purchaser's Deposit to be returned to the Purchaser);

provided, however, that the Purchaser's right to terminate this Agreement under this Section 8.01(a) shall not be available in the event that the Purchaser's failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of any of the foregoing conditions;

(b)    by either the Purchaser or the Sellers in the event that any Order of a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the Transactions shall have become a Final Order;

(c)    by the Sellers (i) if the Purchaser shall have breached any of its representations, warranties, covenants or other agreements contained in this Agreement which would give rise to the failure of a condition set forth in Article VII, which breach cannot be or has not been cured as of the Closing, as the same may be extended by mutual written agreement of the parties, or (ii) if any condition in Article VII has not been satisfied as of the date specified for Closing in Section 2.10;

(d)    by the Purchaser (i) if the Sellers shall have breached any of their representations, warranties, covenants or other agreements contained in this Agreement which would give rise to the failure of a condition set forth in Article VII, which breach cannot be or has not been cured as of the Closing, as the same may be extended by mutual written agreement of the parties, (ii) if the Sellers adjourn or continue the Auction (as defined in the Arch Assets Bid Procedures Order) to a date after January 15, 2010 without the prior written consent of the

Purchaser or if the Sellers determine to pursue one or more transactions other than with a Qualified Bidder as a result of the Auction pursuant to the Arch Assets Bid Procedures Order; (iii) the aggregate amount of the Determined Cure Costs and the Asserted Cure Costs exceeds the cash portion of the Purchase Price; (iv) upon the consummation of any transaction or series of transactions pursuant to which the Sellers and their Affiliates reorganize the Business, or if all or substantially all of the Sellers' assets relating to the Business are sold, disposed of, or otherwise liquidated other than in a sale to Purchaser; (v) if any condition in Article VII has not been satisfied as of the date specified for Closing in Section 2.10; (vi) pursuant to Section 5.05; or (vii) pursuant to Section 5.23; or

(e)     by the written consent of each of the Sellers and the Purchaser.

SECTION 8.02.     Effect of Termination.  In the event of termination of this Agreement as provided in Section 8.01, there shall be no liability on the part of any party hereto except as set forth in Section 2.06(b), Section 5.07, and Article X.

SECTION 8.03.     Specific Performance.  In the event that the Transaction Approval Order is entered by the Bankruptcy Court, the Purchaser shall be entitled to seek specific performance for a breach by the Seller of its obligations hereunder.

ARTICLE IX
NON-SURVIVAL OF REPRESENTATIONS AND WARRANTIES

SECTION 9.01.     Non-Survival of Representations and Warranties.  The representations, warranties and covenants (other than covenants that, by their terms, survive the Closing or termination of this Agreement and any of the Ancillary Agreements) in this Agreement and any of the Ancillary Agreements, all shall terminate at the Closing, or upon termination of this Agreement pursuant to Section 8.01, and, following the Closing or the termination of this Agreement, as the case may be, no party shall make any claim whatsoever against any party or signatory whatsoever to this Agreement or any of the Ancillary Agreements for any inaccuracy or breach of any such representation, warranty, covenant (other than covenants that, by their terms, survive the Closing or termination of this Agreement and any of the Ancillary Agreements), subject to Section 8.02.  This Agreement and all of the Ancillary Agreements to be executed or delivered by the parties shall be executed or delivered by the officers of each respective party solely in their capacity as such, and without any personal liability.  In no event shall the Sellers or the Purchaser be liable for monetary damages (except for a claim to enforce a monetary obligation) as a remedy for the inaccuracy or breach of the representations, warranties, covenants or other provisions of this Agreement, before or after the Closing.

ARTICLE X
GENERAL PROVISIONS

SECTION 10.01.     Expenses.  Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have

occurred.  As between the Purchaser and the Sellers, the Sellers shall bear all of the costs of administration of the Chapter 11 Cases.

SECTION 10.02.    <u>Notices</u>.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 10.02</u>):

(i)    if to the Sellers:

Arch Aluminum & Glass Co., Inc.
10200 N.W. 67th Street
Tamarac, Florida 33321
Attention: Leon J. Silverstein, President
Tel.: (954) 724-1775
Fax: (954) 724-2083

with a copy to:

Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Attention: Joseph J. Devine, Esq.
Tel.: (215) 751-2415
Fax: (215) 751-2205

with a copy to:

Genovese Joblove & Battista P.A.
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida  33131
Attention: Paul J. Battista, Esq.
Tel.: (305) 349-2300
Fax: (305) 349-2310

(ii)    if to the Purchaser:

Arch Aluminum & Glass Enterprises, Inc.
5200 Town Center Circle, Suite 600
Boca Raton, Florida 33486  USA
Attention: C. Deryl Couch, Jason H. Neimark and Aaron P. Wolfe
Tel.: (561) 394-0550
Fax: (561) 394-0540

with a copy to:

Sun Capital Partners Management V, Inc.
5200 Town Center Circle, Suite 600
Boca Raton, Florida 33486  USA
Attention: C. Deryl Couch, Jason H. Neimark and Aaron P. Wolfe
Tel.: (561) 394-0550
Fax: (561) 394-0540

with a copy to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654  USA
Attention: Douglas C. Gessner, P.C., Patrick J. Nash, Jr., and
Jeremy S. Liss
Tel.: (312) 861 2000
Fax: (312) 861 2200

SECTION 10.03.     Public Announcements.  None of the parties to this
Agreement shall make, or cause to be made, any press release or public announcement in respect
of this Agreement or the Transactions, or otherwise communicate with any news media without
the prior written consent of the other parties except as otherwise required by Law or in filings in
the Bankruptcy Court, and the parties to this Agreement shall cooperate as to the timing and
contents of any such press release, public announcement or communication.

SECTION 10.04.     Severability.  If any term or other provision of this
Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all
other terms and provisions of this Agreement shall nevertheless remain in full force and effect
for so long as the economic or legal substance of the Transactions is not affected in any manner
materially adverse to either party hereto.  Upon such determination that any term or other
provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in
good faith to modify this Agreement so as to effect the original intent of the parties as closely as
possible in an acceptable manner in order that the Transactions are consummated as originally
contemplated to the greatest extent possible.

SECTION 10.05.     Entire Agreement; Exclusivity.  This Agreement, the
Ancillary Agreements, the Exclusivity Letter and the Confidentiality Agreement constitute the
entire agreement of the parties hereto with respect to the subject matter hereof and thereof and
supersede all prior agreements and undertakings, both written and oral, among the Sellers and the
Purchaser with respect to the subject matter hereof and thereof.

SECTION 10.06.     Successors and Assigns.  This Agreement shall be binding
upon and inure to the benefit of the parties hereto and their respective successors (including any
trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in
respect of the Sellers in the Chapter 11 Cases) and permitted assigns, but shall not be assignable
or delegable (i) by the Sellers without the prior written consent of the Purchaser and by Orders of

82

the Bankruptcy Court, or (ii) by the Purchaser without the prior written consent of the Sellers or by Orders of the Bankruptcy Court; provided, however, the Purchaser may assign its rights hereunder to one or more of its Affiliates or other parties designated by it, including without limitation the Purchaser assigning its rights to a newly formed entity to acquire the Arch Canada Stock, which assignment shall not relieve the Purchaser of its obligations hereunder.

SECTION 10.07.    Amendment.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Sellers and the Purchaser or (b) by a waiver in accordance with Section 10.08.

SECTION 10.08.    Waiver.  Any party to this Agreement may : (a) extend the time for the performance of any of the obligations or other acts of the other parties; (b) waive any inaccuracies in the representations and warranties of the other parties contained herein or in any document delivered by the other parties pursuant hereto; or (c) waive compliance with any of the agreements of the other parties or conditions to such other parties' obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

SECTION 10.09.    No Third Party Beneficiaries.  This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment, salary, benefits or similar matters for any specified period, under or by reason of this Agreement.

SECTION 10.10.    Currency.  Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

SECTION 10.11.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Florida and, to the extent applicable, the Bankruptcy Code.  The parties hereto agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement or the Transactions and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party:  (a) agrees that all such actions or proceedings shall be heard and determined in a Florida federal court sitting in The City of Miami; (b) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its

address as provided in <u>Section 10.02</u> (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Florida Law).

SECTION 10.12.    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS.  EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.12</u>.

SECTION 10.13.    <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile transmission or other electronic means) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

SECTION 10.14.    <u>Time is of the Essence</u>.  Time is of the essence with respect to the performance of all obligations provided herein and the consummation of all transactions contemplated hereby.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**AAG HOLDINGS, INC.,**
a Florida corporation

By:_____
Name: Leon Silverstein
Title: President/Secretary

**ARCH ALUMINUM & GLASS CO., INC.,**
a Florida corporation

By:_____
Name: Leon Silverstein
Title: President/Secretary

**ARCH ALUMINUM L.C.,**
a Florida limited liability company

By:_____
Name: Leon Silverstein
Title: President

**AWP, LLC,**
a Florida limited liability company

By:_____
Name: Leon Silverstein
Title: President/Manager

**ARCH ALUMINUM AND GLASS INTERNATIONAL, INC.,**
a Florida corporation

By:_____
Name: Leon Silverstein
Title: President

[Signature Page to Purchase Agreement]

**PURCHASER:**

ARCH ALUMINUM & GLASS ENTERPRISES, INC.
a Delaware corporation

By: _____
Name:  Aaron P. Wolfe
Title:   Vice President

**Exhibit 2.08(d)**
**<u>Example Purchase Price and Adjustment Calculations</u>**

See attached.

**Exhibit 5.03(e)**
**Designated Remaining Contracts**

Each of the agreements indentified on the attached Potential Cure Analysis Material Contracts spreadsheet under the column heading "Arch Aluminum & Glass Enterprises, Inc. Contract Treatment" with the letter "D" and, pursuant to the legend, signifying a "Designated Remaining Contract".